Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

'09 CIV 2227

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

Attorneys for Plaintiffs Anderson News, L.L.C.
and Anderson Services, L.L.C.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
ANDERSON NEWS, L.L.C., and                                       :
ANDERSON SERVICES, L.L.C.                                         :
                                                                 :
                        Plaintiffs,                              :      09 CIV. _____ (      )
                                                                 :
                - against -                                      :      JURY TRIAL DEMANDED
                                                                 :
                                                                 :
AMERICAN MEDIA, INC., BAUER PUBLISHING CO., :
LP., CURTIS CIRCULATION COMPANY,                                 :
DISTRIBUTION SERVICES, INC., HACHETTE                            :
FILIPACCHI MEDIA, U.S., HUDSON NEWS                              :
DISTRIBUTORS LLC, KABLE DISTRIBUTION                             :
SERVICES, INC., THE NEWS GROUP, LP, RODALE,                      :
INC., TIME INC. and TIME/WARNER RETAIL SALES                     :
& MARKETING, INC.,                                               :
                                                                 :
                        Defendants.                              :
                                                                 x
------------------------------------------------------------------

## COMPLAINT

Plaintiffs Anderson News, L.L.C. and Anderson Services, L.L.C. (collectively,

"Anderson"), for its complaint against defendants Bauer Publishing Co., L.P. ("Bauer"),

American Media, Inc. ("AMI"), Hachette Filipacchi Media, U.S. ("Hachette"), Rodale, Inc.

("Rodale"), Time Inc. ("Time"), Time/Warner Retail Sales & Marketing Inc. ("TWR"), Curtis

Circulation Company ("Curtis"), Kable Distribution Services, Inc. ("Kable"), Distribution

Services, Inc. ("DSI"), Hudson News Distributors LLC ("Hudson") and The News Group, L.P.

("News Group"), upon knowledge as to Anderson and otherwise upon information and belief,

allege as follows:

## Preliminary Statement

1.     In this action, Anderson, a wholesaler of magazines to leading mass-merchandise

retailers, bookstore chains, grocery stores and other retail outlets, seeks monetary damages  as

a result of defendants collusive anti-competitive scheme -- in clear violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1, and common law -- to attack, disparage and destroy Anderson's

business.

2.     In an attempt to monopolize the United States wholesale magazine distribution

market, defendants -- magazine publishers, their national distributors and two wholesalers --

have conspired to purge, and through coordinated action have purged, Anderson from the

magazine industry and have destroyed Anderson's business

3.     As described below, defendants, in furtherance of their scheme, have, among

other things, cut Anderson off from *People*, *Sports Illustrated*, *Entertainment Weekly*, *Time*

and other major magazines; encouraged Anderson's customers to cease doing business with it

through, among other things, spreading false rumors concerning Anderson and its financial

stability; coerced Anderson into selling its distribution facilities to the defendant wholesalers at fire sale prices; and raided Anderson's employees and sought to steal the intellectual property that those employees used to run its business.

4.      Defendants' indisputable goal throughout the conspiracy was to destroy Anderson's business and that of another wholesaler, non-party Source Interlink Distribution, L.L.C. ("Source"), so that defendants -- through Hudson and News Group, the two remaining wholesalers -- could monopolize the wholesale market and use that monopoly power to shift to retailers and consumers -- and away from publishers -- the entire financial burden resulting from worsening market conditions and publisher-induced inefficiencies in the magazine distribution system.

5.      Through their unlawful coordinated boycott of Anderson, defendants have achieved their anti-competitive goal of eliminating Anderson as a magazine wholesaler.  On February 7, 2009, Anderson announced that it had no recourse but to cease normal business activities effective immediately.  Anderson was forced to shut down its national distribution system, and Anderson's entire business, including its good will, reputation, employee work force and customer base, has been destroyed.

6.      At the same time, defendants have also succeeded in achieving their ultimate and anti-competitive goal of raising the prices paid by magazine retailers, and forcing those retailers to abandon their efforts to introduce efficiencies into the market.  Defendants' illegal efforts also have alleviated any pressure on the publisher and national distributor defendants to bear any of the increased costs of distributing their magazines, and correspondingly have severely injured retailers and consumers.

7.    Anderson therefore seeks compensatory damages in an amount to be determined at trial, as well as treble and punitive damages, arising from the extraordinary harm caused by defendants' collusive, anti-competitive and tortious conduct.

## THE PARTIES

**A.    Publishers**

8.    Defendant AMI, a Delaware corporation with its principal place of business in Boca Raton, Florida, is the fourth largest consumer magazine publisher, and the second largest publisher in retail magazine sales, in the United States.  It publishes 16 titles, including 6 of the top 15 best selling weekly newsstand magazines.  Its publications include *Country Weekly*, *FLEX, GLOBE, Men's Fitness, MUSCLE & FITNESS, National Enquirer, SHAPE,* and *Star.*

9.    Defendant Bauer, a Delaware partnership with its principal place of business in Englewood Cliffs, New Jersey, is the largest publisher of newsstand magazines in the United States.  It publishes magazines such as *In Touch Weekly, Life & Style Weekly, Woman's World, First For Women* and *Soaps In Depth.*

10.    Defendant Hachette, a Delaware corporation with its principal place of business in New York, New York, is the publisher of *Car and Driver, Road & Track, ELLE, ELLEGirl, ELLE Décor, HOME, Metropolitan Home, Woman's Day, American Photo, Boating, Cycle World, Popular Photography* and *Sound & Vision.*

11.    Defendant Rodale, a Pennsylvania corporation with its principal place of business in Emmaus, Pennsylvania, is the publisher of *Men's Health, Prevention, Women's Health, Runner's World, Best Life, Bicycling, Running Times, Organic Gardening,* and *Mountain Bike.*

4

12.   Defendant Time, a Delaware corporation with its principal place of business in New York, New York, the parent corporation of defendant TWR, is the largest magazine publisher. in the United States and publishes more than 120 magazines, including *Time*, *People*, *Entertainment Weekly*, *Sports Illustrated*, *Essence*, *Fortune*, *Gold*, *In Style*, *Money*, *People en Espanol*, *Real Simple*, *Sports Illustrated for Kids*, *This Old House*, *Coastal Living*, *Cooking Light*, *Health*, *Southern Accents*, *Business 2.0*, and *Southern Living*.

**B.**   **National Distributors**

13.   National magazine distributors are retained by magazine publishers to, among other things, broker and manage their relationships with their wholesalers.

14.   Defendant Curtis, a Delaware corporation with its principal place of business in Pennsauken, New Jersey, is the leading distributor of magazines in the United States, distributing hundreds of national titles for at least 400 publishers, including its affiliate, defendant Hachette, as well as defendant publishers Rodale and AMI, and publishers The Economist Group, Forbes, Newsweek, The Atlantic Monthly, Timeout, and US News & World Report, among others.  Publications distributed by Curtis include *Woman's Day*, *Car & Driver*, *Newsweek*, *Men's Health*, *Maxim*, *Elle*, and *The Economist*.

15.   Defendant Kable, a Delaware corporation with its executive offices in New York, New York, is a national magazine distributor that distributes more than 650 magazines, annuals and digests for over 250 different publishers, including defendant publisher Bauer, as well as All American Crafts, Inc., Amos Publications, Archie Comics, Bowtie Incorporated, Niche Media Holdings LLC, and Nielsen Business Media.  Publications distributed by Kable include *In Touch*, *Woman World*, *First for Women*, *Tiger Beat*, and *WWE Magazine*.

16.    Defendant DSI, a Delaware corporation with its principal place of business in Delray Beach, Florida, is a subsidiary of defendant AMI and a provider of marketing services to publishers, including AMI, Bauer, Hachette, and Rodale.

17.    Defendant TWR, a New York corporation with its principal place of business in Parsippany, New Jersey, and an office in New York, New York, is a national magazine distributor, whose publishing clients include its affiliate defendant publisher Time.

### C.    Magazine Wholesalers

18.    Before Anderson was driven out of the business, there were four major wholesalers selling magazines to retail outlets for single-copy sales at such outlets.

19.    Plaintiff Anderson News, L.L.C., is a Delaware corporation with its principal place of business in Knoxville, Tennessee.  Before  February 7, 2009, when it was forced to shut down its operations, Anderson  News, L.L.C., along with its affiliate, plaintiff Anderson Services,  L.L.C., comprised the second largest magazine wholesaler in the United  States, servicing 30,000 retail customers in 37 states.  Anderson News,  L.L.C. was the sales and marketing company  for the combined Anderson  venture.

20.    Plaintiff Anderson Services, L.L.C., is a Delaware limited liability corporation with its principal place of business in Knoxville,  Tennessee.  Before February 7, 2009, when it was forced to shut down its  operations, Anderson Services, L.L.C . provided warehousing, delivery and  merchandising  services for the combined Anderson venture.

21.    Defendant Hudson, a New Jersey limited liability company with its principal place of business in North Bergen, New Jersey, is a major magazine wholesaler.

22.    Defendant News Group, a Delaware limited partnership with its principal place of business in Texas, is a major magazine wholesaler.

23.    Non-party Source, a Delaware corporation with its principal place of business in Bonita Springs, Florida, is a major magazine wholesaler.

## JURISDICTION AND VENUE

24.    This action is brought to recover damages caused by defendants' violation of, among other things, Section 1 of the Sherman Act, 15 U.S.C. § 1.

25.    The Court has subject matter jurisdiction over this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; 28 U.S.C. § 1337, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

26.    Venue is proper in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, inasmuch as defendants transact business and are found within this district, and a substantial part of the events giving rise to plaintiffs' claims occurred within this district.

## BACKGROUND

**A.    Overview:  Single-Copy Magazine Sales**

27.    The major United States magazine publishers, including defendants AMI, Bauer, Hachette, Rodale, and Time, publish the magazines and set their cover prices.  To effectuate single-copy magazine sales (*i.e.*, non-subscription sales), each publisher retains a national distributor, which serves as a broker to manage the publisher's relationship with its

wholesalers, provides marketing and accounting services to the vast majority of publishers and guarantees the wholesaler's payment obligations to the publisher.

28.     The four U.S. national distributors are defendants TWR, Kable and Curtis, as well as non-party Comag Marketing Group LLC ("CMG").  The national distributors are compensated with a percentage, typically two to five percent of the retail sales value of the magazines they handle.  Defendant DSI, a subsidiary of AMI, provides sales and marketing services to publishers.

29.     Pursuant to allotment orders provided by the national distributors (which typically greatly exceed the number ultimately purchased by consumers), the publishers' magazines are shipped to wholesalers, who in turn, ship the magazines to retailers, including traditional mass merchandisers and grocery store chains, such as Wal-Mart and Kroger, as well as newsstands, convenience stores, airport terminals and other retail outlets, and specialty retailers like Barnes & Noble and Borders.

30.     Wholesalers are responsible for picking up, tabulating and destroying copies of magazines that remain unsold.  Wholesalers buy the magazines from the publishers at a price of 50 to 60 percent of the cover price and sell to the retailers at a price of 70 to 80 percent of the cover price.  Before defendants' conspiracy drove Anderson out of business, the market shares of the four wholesalers broke down as follows:  Anderson 27%, Source 31%, Hudson 11% and News Group 21%.

B.     **Inefficiencies in Traditional Distribution System**

31.     The distribution system is plagued by gross publisher-induced inefficiencies that have imposed onerous and unnecessary costs on wholesalers.  For example, publishers and

8

national distributors customarily ship to wholesalers quantities of magazines that far exceed the number of magazines sold by the retailers.  Wholesalers are forced to absorb the full cost of tabulating the unsold copies and transporting them back to their own facilities for disposal or destruction.

32.    In addition to shipping excessive magazine copies, publishers and national distributors ship large numbers of unprofitable magazine titles, forcing the wholesaler to bear unnecessary costs of handling and returns.  Publishers and national distributors have resisted efforts to curtail their ability to ship unprofitable titles.

33.    A different system for distribution has been proposed, under which the retailers automatically would report sales of magazines through electronic checkout scanners and then dispose of unsold copies (known as "scan-based trading," or "SBT").

34.    The publishers, however, adamantly oppose the proposed system, because they supposedly would not be paid for, nor would their circulation numbers reflect, "shrinkage" -- *i.e.*, sales that are not scanned as a result of machine error, estimated to be approximately five percent of all sales.

35.    The defendants' scheme was a reaction to growing requests by retailers, for larger discounts on magazines and the implementation of scan-based trading.  Anderson agreed that scan-based trading was a highly cost-effective and efficient measure for addressing the inefficiencies inherent in the traditional distribution system.  Accordingly, Anderson and Source, supported the retailers' requests.

36.   In response, the defendants conspired, in clear violation of antitrust laws, to eliminate the two wholesalers supporting those efficiency measures and to obtain effective control over the two remaining wholesalers, News Group and Hudson.  By thus gaining control over the distribution system, defendant publishers and national distributors, along with their wholesaler co-conspirators, would be able to exercise their market power to increase the prices charged to retailers and to avoid -- or impose on retailers rather than publishers -- the costs of scan-based trading and other measures to improve efficiencies.

C.   **Anderson and Its Efforts to Remain Competitive**

37.   Until defendants' conspiracy eliminated it from them market, Anderson had been a retailer and wholesaler of periodicals since 1917 and had approximately 6,000 employees. In the traditional single-issue magazine distribution market, Anderson conducted business throughout the United States, with the exception of certain areas in Mid Atlantic, New England, Southern California, Alaska, Michigan, and North Dakota.  Anderson and its predecessors have done business with the defendant national distributors since their formation.

38.   During the past 15 years, Anderson has invested heavily in distribution equipment, wholesaling centers, technology, logistics and software.  The company also has sought to address with publishers and national distributors the unnecessary and burdensome costs caused by excessive supply and unprofitable titles.  Among other things, Anderson has sought to increase the use of scan-based trading among retailers, and has sought the acceptance of the practice by national distributors and publishers.

39.   In early January 2009, Anderson instituted measures to make the magazine distribution system less burdensome and more efficient, goals that had been hampered by the

refusal of the national distributors and publishers to adopt the efficiency-oriented measures that were being requested by Anderson and many of its retailer-customers.  Anderson decided that, as a temporary, stop-gap measure, it would announce an additional $.07 per copy distribution surcharge for all magazine copies it received, and would pass on to the publishers the carrying costs of inventory in retail chains where it had negotiated scan-based trading terms.  The surcharge would be applied to all magazines distributed on or after February 1, 2009.

40.    Anderson's proposed $.07 per copy surcharge was designed to increase the overall efficiency of the magazine distribution industry.  One of the primary aims of the increase was to create an incentive to eliminate the waste and inefficiency caused by the insistence by the publishers and distributors on shipping excessive copies of their magazines to wholesalers, and requiring that the wholesalers physically collect unsold copies.

41.    To this end, on January 12 and 13, 2009, Charles Anderson ("Mr. Anderson"), the CEO of Anderson flew to New York and met with some of Anderson's largest publisher clients, including:  Ann Moore, Chief Executive Officer of Time (Anderson's largest publisher client); Cathie Black, Chief Executive Officer of Hearst Magazines; David Pecker, President of AMI; and Hubert Boehle, President and Chief Executive Officer of Bauer.  At these meetings, Mr. Anderson informed the publishers of Anderson's decision to impose the $.07 per copy surcharge.  These meetings were cordial, and the publishers appeared -- at least on the surface -- to respond amicably.

42.    The next day, January 14, 2009, Mr. Anderson had a call-in interview with the representative of an industry publication, *The New Single Copy*, during which he publicly announced the surcharge and explained the industry constraints compelling that measure.

43.   National distributor CMG did not agree to the proposed surcharge and proposed to Anderson a modified arrangement.  The other national distributors, however, stated that they would not accept the surcharge.

44.   As set forth below, defendants saw Anderson's proposed fee as nothing short of an opportunity to eliminate Anderson as a wholesaler.

**D.   The Conspiracy to Destroy Anderson and Steal Anderson's Business**

45.   In 2008, defendant Curtis, the nation's largest magazine distributor by volume, had attempted unilaterally to cut off Anderson from Curtis's supply of magazines -- which include some of the most popular titles in the industry -- by informing Wal-Mart, one of Anderson's primary retail clients, that Curtis would no longer supply magazines to Anderson. When Wal-Mart supported Anderson by simply accepting the proposed supply stoppage, Curtis immediately reversed course and resumed supply.  Curtis's unilateral decision to cut off Anderson's supply of magazines from Curtis thus was ineffective.  The only way that Curtis successfully, and ultimately profitably, could cut off Anderson's supply -- that is, the only way Curtis would be able to force Wal-Mart and other retailers to abandon their long-term relationships with Anderson -- was through concerted action with Curtis's competitors.

46.   Such concerted action is exactly what happened, as the defendants seized on Anderson's $.07 surcharge -- which was motivated by a desire to introduce necessary efficiencies into the market -- as the pretext for effecting a massive conspiracy to destroy Anderson.

47.    Thus, in late January, national distributor defendants Curtis, Kable, and TWR, and publisher defendants AMI, Bauer, Hachette, Rodale, and Time -- acting in concert -- cut off Anderson from its supply of magazines -- including the most popular titles, like *People* and *Sports Illustrated.*

48.    At the same time, the defendants launched a campaign in which they spread false rumors to Anderson's customers and others that Anderson was in critical financial trouble and had ceased operations or was exiting the magazine wholesale business.  Defendants' goal in that coordinated campaign was to be a self-fulfilled prophecy -- cause Anderson to go out of business.  At the same time that all the defendants had cut Anderson off and defendants were spreading those false rumors, defendants were seeking to acquire Anderson's distribution facilities and defendants were poaching Anderson's employees and the proprietary intellectual property that those employees had used to run Anderson's business.  Simply stated, defendants engaged in a concerted and effective campaign to destroy Anderson.

49.    During and after the week of January 21, 2009 Mr. Anderson met or had phone calls with executives of many of the defendants and he began to hear their common objections to Anderson's surcharge.  On or about January 21, 2009, after talking with representatives of TWR and Kable, Mr. Anderson spoke with Bob Castardi, President and Chief Operating Officer of defendant Curtis.  Castardi, acting on behalf of Curtis as well as all the publishers represented by Curtis -- including publisher defendants AMI, Hachette, and Rodale -- told Mr. Anderson, in words or substance, that "I [Castardi] don't want a problem.  I would like to get this worked out.  But I'm going to have to go with whatever Rich [Jacobsen, CEO of defendant TWR] does."

50.    In at least two instances in late January, after Source had joined Anderson in proposing a $.07 surcharge, defendants indicated that Anderson could profit by joining the conspiracy.  Castardi of Curtis told Mr. Anderson, in words or substance, that "you need to let Source go out first."  In certain areas -- Arizona, for example -- Anderson and Source were the only wholesalers.  Once Source was excluded from the market and its business destroyed, Castardi told Mr. Anderson, in words or substance, that Anderson could use its regional market power to "get all your [Anderson's] profits from the retailers."  And in a phone call with Frank Stockard, President of Anderson, Michael Duloc, President and CEO of Kable, discussed the idea of offering Anderson exclusivity in certain territories in exchange for Anderson dropping the surcharge.  According to Duloc, Anderson could obtain the profits it desired by using its exclusivity arrangement to increase the prices to retailers.  Anderson refused to participate in this blatantly unlawful market allocation, and Kable responded by reaffirming its participation in defendants' boycott of Anderson, thereby refusing to supply Anderson with the magazines it distributes, including those published by defendant Bauer.

51.    During this time, Anderson had received the explicit support of Wal-Mart. Anderson's long-term relationship with Wal-Mart, as alleged above, previously had saved Anderson from Curtis's unilateral attack against the company.  Mr. Anderson hoped that the Wal-Mart support also would save Anderson from the defendants' collusive boycott.  Also during this time, Anderson had commenced to work with CMG toward a mutually-acceptable resolution of the issue concerning the costly publisher-imposed inefficiencies in the distribution system.  Unfortunately, Mr. Anderson underestimated the effectiveness of defendants' unlawful collusive conduct.

14

52.   On Friday, January 30, 2009, Wal-Mart representatives asked Mr. Anderson, to try again to convince Rich Jacobsen of TWR to reach an agreement.  The next day, Mr. Anderson met Jacobsen at his office in New York.  The first thing Jacobsen said, in words or substance, was that he "ha[d] Greg Mays [the CEO of Source] flying in at 1:00 pm to meet with me.  And I'm going to deliver the message that, as long as I'm at TWR or Ann Moore is at Time, we will never, ever do business with Source again."  And when Mr. Anderson told Jacobsen what Castardi had told him -- that "[Castardi's] going whatever way you [Jacobsen] go, and I [Mr. Castardi] have to go with you" -- Jacobsen did not deny it, but indicated that he realized that Anderson knew that there had been collusion.

53.   Nevertheless, by the end of the meeting, Mr. Anderson was led by Jacobsen to believe that TWR and Anderson had an agreement for an increase in the discount to Anderson of the magazines' cover prices of 2.00% for all Time weeklies, or 2.75% for all *People* weeklies, and an agreement that TWR and Anderson would have a call on Monday, February 2, to discuss scan-based trading.  Further, Mr. Anderson agreed to make a $13 million payment to TWR on Monday, February 2, after the call.

54.   On February 2, TWR and Anderson engaged in an apparently cordial call regarding scan-based trading.  Within a few hours, however, TWR revealed its true intentions. Jacobsen informed Anderson in words or substance that TWR and Time executives had decided "to change the channel," that "they were going to have to use two wholesalers," and that "that was the way it was going to be."

55.   TWR never had any intention of honoring its commitment to continue to work with Anderson.  Indeed, throughout the latter part of January and the early days of February,

defendants -- ostensibly each others' competitors -- held numerous meetings during which they discussed dividing the U.S. distribution territory into two regions -- one controlled by Hudson and the other controlled by News Group.  For example, in furtherance of their conspiracy to cut off supply to Anderson and Source, defendants Curtis and Hudson met with their respective competitors, TWR and News Group, in January 2009 at Hudson's offices in North Bergen, New Jersey.

56.    Moreover, Jacobsen made clear in a conversation with Source's CEO, Greg Mays, at a February 2 dinner meeting in New York, why Source and Anderson were being terminated.  When Jacobsen told Mays that TWR would not be supplying any magazines to Source, Mays asserted to Jacobsen that with the distribution system being created by defendants, there would be no scan-based trading, the two remaining wholesalers would force reduced margins down to the retailers rather than to the publishers, and there would be absolute control over the market.  Jacobsen's response, in words or substance, was:  "Exactly -- we now control this space."

57.    At the same time TWR was reneging on its agreement with Anderson, the wholesaler defendants had been poaching Anderson's employees.   For example, Frank Stockard received numerous reports that News Group associates -- or the associates of one or more of its affiliates -- were inducing Anderson associates to leave the employ of Anderson and work for News Group, notwithstanding that News Group knew they had signed covenants not to compete with Anderson.  In at least several of these cases, News Group's solicitations were based on false statements about Anderson's financial situation and future prospects.

58.   The ultimate goal of the conspiracy was to ensure that the publishers and national distributors gained control over the single-copy magazine distribution channel.  To achieve that goal, defendants needed to eliminate Source and Anderson.  To eliminate Anderson, the conspirators cut off the life blood of Anderson's business -- 80% of its magazine supply. Defendants also intended that, as a result of the conspiracy, Anderson would be forced to sell at a "fire sale" its business infrastructure -- including its trucking fleet, distribution equipment and distribution centers -- to its wholesaler competitors, Hudson and News Group.

59.   Defendants' scheme already has succeeded in enabling them to charge retailers higher prices, and at the same time impose their will regarding scan-based trading.  Hudson and News Group, which have begun to serve retailers previously served by Anderson, have demanded and obtained from them reduced discounts for approximately 80% of the new business.  Such increases have ranged as high as 12% or more over the prior rates.

60.   Defendants were acting in concert and not unilaterally.  Indeed, unilateral action would make no economic sense because, unless the other defendants joined in the boycott, the national distributor and publisher defendants' magazines would not be distributed to retailers in the areas where Anderson was the only viable wholesaler.  As Curtis learned in 2008, it would not be economically feasible for a single distributor or publisher unilaterally to cut off supply to a major wholesaler.  Unless the individual distributor or publisher had reached an agreement with Hudson and News Group, and competitor distributors or publishers with substantial capacity, the individual distributor or publisher would have no assurances that the infrastructure necessary to distribute magazines in areas served by Anderson would be developed.  Indeed, for Hudson or News Group to do so based on the opportunity to distribute

the product of any individual publisher or distributor would be highly unprofitable for them -- and there would thus be no assurances that any wholesaler would be available for that product.

61. Moreover, to obtain cost efficiencies, retailers generally obtain all of their magazines from one wholesaler. If a single distributor or publisher threatened to cut off supply to Anderson, the retailer would still have no incentive to switch to another wholesaler, as the retailer would still be able to obtain substantially all magazines from Anderson. In other words, by unilaterally cutting off supply to Anderson, an individual distributor or publisher would be cutting itself off from the very retailers that sell its magazines and generate revenue. Thus, any such unilateral action would be against the publisher's business interest.

62. This is not the case, however, if -- as occurred here -- the publishers and their national distributors agreed in advance and acted in concert to cut off supply to Anderson at the same time and to replace Anderson with the two remaining wholesalers. Retailers, confronted with the group boycott by publishers and national distributors, would have no choice but to rely on Hudson and News Group for their supply of magazines necessary for sale to their customers. Only through such collusive action could defendants eliminate competition from Anderson and replace Anderson with one of the two remaining wholesalers, whom the publishers and wholesalers would be able to control and who, in furtherance of the conspiracy, would force upon retailers -- and away from publishers -- the costs of the publisher-imposed inefficiencies.

63. The result of defendants' collusive conduct against Anderson is the creation of an anti-competitive monopoly in the magazine distribution business. Curtis, to its publisher-

clients, has admitted that the destruction of Source and Anderson will create a "monopolistic wholesaler" with the power to dominate the market.

### E.    The Destruction of Anderson's Business

64.    Defendants' conspiracy was ruthlessly effective. Defendants, acting in concert, cut off Anderson from 80% of the magazines Anderson had for years delivered regularly to its retail customers. Faced with the loss of 80% of the nation's magazine titles -- including some of the most popular publications -- from their shelves, retailers like Wal-Mart could no longer support Anderson's efforts to introduce efficiencies in the market, and began seeking sources of product from other wholesalers. At the same time, the defendants were preying on the fears of Anderson's employees, relieving Anderson of some of its most experienced workers.

65.    Anderson's financial picture became dire. Without 80% of its product to distribute, the remaining 20% was insufficient to cover Anderson's high fixed costs, including payroll for thousands of employees, maintenance and fuel for multiple fleets of vehicles, and various other costs associated with running 47 separate distribution centers throughout the country. Anderson began to hemorrhage money, at a rate of between millions of dollars per week.

66.    With no end in sight to the defendants' collusive boycott -- and thus no end in sight to the string of weekly million-dollar losses caused thereby -- Anderson had no choice but to suspend its magazine wholesale business on February 7, 2009. Ultimately, the suspension of operations became permanent.

67.    As a result, Anderson has suffered substantial damages, including millions of dollars in lost revenues before the company shut down its operations. Moreover, defendants'

boycott has left Anderson in a position in which it will not be able to re-enter the market in the future, and it therefore stands to suffer $800 million in future lost revenue per annum. Anderson has lost relationships with its retailers that took years to develop, and the goodwill that disappeared with these relationships may never be recovered.  Because of its exit from the marketplace, Anderson was forced to lay off thousands of its employees -- many with years of experience in the industry.  Indeed, nearly a thousand of Anderson's former employees have yet to find new work in the industry, with the remainder employed by Anderson's competitors, including defendants News Group and Hudson.  And just as it was conceived by the defendants' conspiracy, Anderson's distribution-related assets have been sold to defendant News Group for well below market value -- at what can only be termed as "fire-sale" prices.

68.    Anderson's finances have continued to deteriorate.  On March 2, 2009, certain creditors of Anderson filed an involuntary bankruptcy petition, seeking to have the company liquidated under Chapter 7 of the United States Bankruptcy Code.  That action is pending in the United States Bankruptcy Court for the District of Delaware (No. 09-10695-CSS).

**F.     The Relevant Market**

69.    The relevant product market for the purposes of this action is the national market for the wholesale distribution of single-issue magazines.  Prior to the boycott, the four major wholesale distributors of single issue magazines in the United States -- Anderson, Source, Hudson and News Group -- sold hundreds of magazine titles to thousands of retailers across the country.  These wholesalers have introduced great efficiencies into the market.  By purchasing from wholesalers, retailers receive an enormous savings of time and expense by allowing them to purchase from a single source with an established distribution network.

70.   To obtain these savings, retailers obtain all of their product from the wholesale network, comprised of the four wholesale distributors, and do not deal directly with publishers or national distributors.  Because of the sheer number of publishers and their publications, it would be prohibitively expensive for retailers to obtain their magazines outside of the wholesale market, as it would require them to:  contact each individual publisher; negotiate prices for and order each individual publication; and physically transfer those magazines to their retail outlets -- that is, take over the functions performed by the wholesalers and national distributors.  Because of these costs, retailers are unable to substitute the magazines obtained through the wholesale network with magazines obtained from some other source.

71.   Because of the costs involved in developing and maintaining the distribution network necessary to transport millions of magazines to thousands of different retail outlets -- including distribution centers, freight depots, fleets of trucks, and thousands of employees -- the wholesale distribution market is characterized by high barriers to entry.  These entry barriers are reinforced through the exclusive distribution agreements involving wholesalers, national distributors and publishers.

**G.     Competition Has Been Injured By The Conspiracy**

72.   Defendants' actions unduly restrain, hinder and suppress competition among wholesalers in the national market for the wholesale distribution of single-copy magazines. Defendants, directly and proximately, have caused antitrust injury because their actions have resulted in the elimination of Anderson as a wholesale distributor, thereby directly and substantially reducing the output of magazines and directly and substantially reducing the ability of retailers to obtain those magazines.  Defendants' conduct also has allowed them to

force retailers to pay higher prices (in the form of reduced discounts) as already has been experienced with certain of the new agreements negotiated by Hudson and News Group.  The purposeful and wrongful destruction of Anderson's business by defendants directly has harmed both competition in the relevant market as well as Anderson.

73.    Defendants' conduct has reduced the output of magazines through the wholesale market.  Anderson and Source, combined, distributed 50 percent of all U.S. single-copy magazines, and in many instances were or are the only wholesale distributors operating in a numerous geographic regions.  Because of defendants' unlawful boycott, wholesale distributors are unavailable to serve retailers in those areas, and those retailers have been denied access to defendants' magazines -- which means, in turn, that the retailers' customers have access to fewer magazines as well.

74.    Moreover, as a direct result of Anderson leaving the market, many of the smaller publishers who depended on Anderson for regular nationwide distribution, may be forced to shut down.  These smaller publishers could not survive the disruption in sales that Anderson's collapse caused.  This permanently reduced the choices available to retailers and their customers, and correspondingly benefited the remaining large publishers in the marketplace -- including defendants AMI, Bauer, Hachette, Rodale and Time.

75.    Defendants already have begun charging retailers higher prices for the same products, and defendants will continue to raise the prices paid by retailers.  For example, as a result of the defendants' boycott, News Group has begun to distribute to retailers previously served by Anderson.  As it has done so, it has been "re-signing" those retailers at discounts lower than what they received from Anderson, forcing the retailers to pay a higher portion of

each magazine's cover price.  News Group's ability to charge these higher prices is not the result of any inherent or earned competitive advantage, but has instead arisen solely as a result of the increased market power it has obtained by participating in the collusive boycott of Anderson and Source.

76.    Indeed, News Group and Hudson stand to acquire monopolistic market power. With Anderson's exit from the business, more than a quarter of the market has been re-distributed to the remaining wholesalers, including defendants News Group and Hudson.  As a result, News Group and Hudson together now control more than 50% of the U.S. wholesale magazine distribution market.  If their conspiracy had succeeded in eliminating Source as well, the two defendants would have controlled more than 90% of the market.  Perhaps more importantly, each will control more than 90% of the market in its allocated territories.  In light of defendants' anti-competitive conduct in obtaining this market power, there are substantial grounds to believe that defendants' acquisition of market power will harm competition market-wide.

## FIRST CLAIM

### (Unlawful Restraint of Trade -- Sherman Act)

77.    Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.    Defendants have engaged in a conspiracy in unreasonable restraint of trade in violation of section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15).

79.   Defendants engaged in a conspiracy to eliminate competition in the wholesale market for single-issue magazines through the wrongful destruction of Anderson as a going concern, and the defendants did those things that they combined and conspired to do, including the following:

(a)   agreed to boycott the distribution of single-issue magazines to wholesalers Anderson and Source with the intent of destroying them as competitors;

(b)   agreed to, and did in fact, disparage Anderson's business to its retail customers for the purpose of interfering with Anderson's business relationships and contractual agreements with those customers with the intent of forcing Anderson's customers to move their business to defendants Hudson and News Group;

(c)   agreed to raid, and, in fact, did raid the employees of Anderson and Source for the purpose of stealing their trade secrets and eliminating them as competitors; and

(d)   agreed to destroy Anderson and Source as going concerns and to force those wholesalers to sell their distribution facilities and other assets -- at distressed prices -- to defendants Hudson and News Group.

80.   The ongoing conspiracy has the effect of restraining trade by suppressing and eliminating competition in the U.S. market for the wholesale distribution of single-issue magazines.  As a direct and proximate result of defendants' unlawful conduct, Anderson has suffered injury to its business.

81.   The continuation of defendants' unlawful conduct has had the immediate effect of destroying Anderson's ability to continue as a going concern, causing substantial damages to Anderson.

## SECOND CLAIM

### (Tortious Interference)

82.    Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

83.    Anderson maintains significant business relationships with the retail customers that are a part of its national retail distribution network.

84.    The retail supply and retail service agreements between Anderson and members of its retail distribution network, are valid, binding contracts.

85.    Defendants have at all relevant times been aware of the business relationships between Anderson and its retail customers of the retail supply and retail service agreements.

86.    Defendants intentionally and unjustifiably have interfered with Anderson's business relationships and contractual agreements with Anderson's retail customers by making false statements regarding Anderson's financial status and continued existence as a magazine wholesaler.

87.    Defendants also have intentionally and unjustifiably interfered with Anderson's business relationships and contractual agreements with Anderson's retail customers by boycotting the distribution of single-issue magazines to Anderson without a legitimate business justification with the intent of harming its business.

88.    Defendants interfered with Anderson's business relationships and contractual agreements with the intent of causing harm to Anderson by destroying its business and expelling Anderson from the marketplace.

89.    As a result of defendants' conduct, Anderson's retail customers have terminated their retail supply and retail service agreements and their business relationships with Anderson, and have obtained or sought to obtain magazine product from alternative sources, principally defendants Hudson and News Group.

90.    By reason of the foregoing, Anderson has been damaged in an amount to be determined at trial.

## THIRD CLAIM

### (Defamation)

91.    Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

92.    Defendants, individually and in conspiracy with each other, have published false statements to third parties about Anderson's financial status and continued existence as a magazine wholesaler, at a time when Anderson was still a viable going concern.

93.    Defendants have falsely and deceitfully, both orally and in writing, told third parties false statements regarding Anderson's financial status and continued existence as a magazine wholesaler, at a time when Anderson was still a viable going concern.

94.    The false and defamatory statements made by the defendants are injurious to the business reputation of Anderson and will tend to prejudice it in the conduct of its trade or business and will deter third persons from dealing with it.

95.   The false and defamatory statements made by the defendants have caused damages to plaintiffs in that the false statements have caused damage to the reputation of Anderson in its trade and business activities.

96.   By reason of the foregoing, Anderson has been damaged in an amount to be determined at trial.

## FOURTH CLAIM

### (Civil Conspiracy)

97.   Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 76, 83 through 89, and 92 through 95, as if fully set forth herein.

98.   The defendants conspired with one another to harm Anderson's reputation, to undermine Anderson's goodwill with its customers, to damage its business, and to destroy Anderson as a going concern.

99.   Each of the defendants have committed one or more of the following acts: boycotted the distribution of single-issue magazines to wholesaler Anderson with the intent of destroying it;  disparaged Anderson's business to its retail customers for the purpose of interfering with its business relationships and contractual agreements with those customers with the intent of forcing Anderson's customers to move their business to defendants Hudson and News Group;  and raided Anderson's employees for the purpose of stealing its trade secrets and eliminating it as a competitor.

100. Defendants undertook their wrongful, intentional and unjustifiable acts in furtherance of their ongoing conspiracy to destroy Anderson through, among other things, tortious interference and defamation.

101. By reason of the foregoing, Anderson has been damaged in an amount to be determined at trial.

WHEREFORE, Anderson demands judgment against defendants, jointly and severally, awarding Anderson:

        (a)     on its First Claim, treble its damages in an amount to be determined at trial;

        (b)     on its Second, Third and Fourth Claims, compensatory and punitive damages in amounts to be determined at trial;

        (c)     its costs in the prosecution of this action, including reasonable attorneys' fees; and

        (d)     such other and further relief as this Court deems just and proper.

## TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

Dated: March 10, 2009

                  KASOWITZ, BENSON, TORRES &
                  FRIEDMAN LLP

By: _____

                    Marc E. Kasowitz (mkasowitz@kasowitz.com)
                    Daniel R. Benson (dbenson@kasowitz.com)
                    Hector Torres (htorres@kasowitz.com)
                    Maria Gorecki (mgorecki@kasowitz.com)

                  1633 Broadway
                  New York, New York 10019
                  Tel.: (212) 506-1700
                  Fax: (212) 506-1800

                  Attorneys for Plaintiffs Anderson News, L.L.C.
                  and Anderson Services, L.L.C.