Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax.:   (212) 506-1800

*Attorneys for Plaintiff Anderson News, L.L.C.*

        - and -

Thomas P. Lynch (tlynch@lynchrowin.com)
Jennifer T. Chavez (jchavez@lynchrowin.com)

LYNCH ROWIN LLP
630 Third Avenue
New York, New York 10017
Tel:   (212) 682-4001
Fax:   (212) 682-4003

*Attorneys for Plaintiff Lloyd Whitaker, as the Assignee under an
Assignment for the Benefit of Creditors for Anderson Services, L.L.C.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- x

ANDERSON NEWS, L.L.C., and LLOYD WHITAKER, as the
Assignee under an Assignment for the Benefit of Creditors for
Anderson Services, L.L.C.,

                 Plaintiffs,

      - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING CO., LP.,
CURTIS CIRCULATION COMPANY,
DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI
MEDIA U.S., HEARST COMMUNICATIONS, INC., HUDSON
NEWS DISTRIBUTORS LLC, KABLE DISTRIBUTION
SERVICES, INC., RODALE, INC., TIME INC. and
TIME/WARNER RETAIL SALES & MARKETING, INC.,

              Defendants.

----------------------------------------------------------------------- x

09 CIV. 2227 (PAC)

JURY TRIAL DEMANDED

**AMENDED COMPLAINT**

Plaintiffs Anderson News, L.L.C. ("Anderson News") and Lloyd Whitaker ("Whitaker"), as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C. ("Anderson Services," and together with Anderson News, "Anderson"), for their complaint against defendants Bauer Publishing Co., L.P. ("Bauer"), American Media, Inc. ("AMI"), Hachette Filipacchi Media, U.S. ("Hachette"), Hearst Communications, Inc. ("Hearst"), Rodale, Inc. ("Rodale"), Time Inc. ("Time"), Time/Warner Retail Sales & Marketing Inc. ("TWR"), Curtis Circulation Company ("Curtis"), Kable Distribution Services, Inc. ("Kable"), Distribution Services, Inc. ("DSI"), and Hudson News Distributors LLC ("Hudson"), upon knowledge as to Anderson and otherwise upon information and belief, allege as follows:

## PRELIMINARY STATEMENT

1.     In this action, Anderson, a wholesaler of magazines to leading mass-merchandise retailers, and other retail outlets, seeks monetary damages arising from an illegal anti-competitive and collusive scheme by the defendant magazine publishers, their national distributors and two preferred and compliant wholesalers to destroy the business of Anderson and another magazine wholesaler, Source Interlink Distribution, L.L.C. ("Source").

2.     Defendants undertook their conspiracy -- which succeeded in destroying Anderson -- in a collusive effort to avoid individualized and competitive negotiations over surcharges with Anderson and Source, to maintain and increase their control over the wholesaler single-copy magazine distribution market, and to block technological and other changes sought by Anderson and Source to the publishers' continued use of an increasingly inefficient and outmoded magazine distribution system, that unreasonably imposed increasing costs on Anderson, Source, the retailers and consumers. Indeed, after defendants succeeded in destroying

Anderson, they immediately raised the prices they charged to the retailers, by as much as 12% or more.

3.      Evidenced by, among other things, numerous meetings and e-mails between and among the publisher competitors and their co-conspirators during the weeks immediately after Anderson (followed by Source) had proposed a temporary, stop-gap $.07 per copy surcharge to help offset some of the increasing publisher-induced costs, defendants illegally colluded in agreeing upon and implementing a coordinated response to the surcharge, cutting off Anderson (and Source) from their supply of magazines, agreeing on an allocation of Anderson and Source's business and within days driving Anderson out of business.

4.      Defendants responded to Anderson's proposed temporary surcharge with illegal, collusive actions, instead of engaging in individual negotiations.  As defendants well know, the proposed surcharge itself was negotiable.  Among other things, (a) Anderson had reached a compromise with one of the defendant publishers (Time) (who acted as the leader in the conspiracy) to obviate the need for the surcharge (an agreement it never intended to honor), and (b) as defendants knew, one national distributor, Comag Marketing Group LLC ("Comag"), which refused to join the conspiracy, reached agreements with Anderson and Source and continued to supply them with magazines.  As a result, one of the defendants, in an e-mail circulated between at least some of the conspiring competitors, described Comag as "dangerous" -- *i.e.*, dangerous to the defendants' conspiracy.

5.      During the two weeks following Anderson's surcharge proposal, the defendants repeatedly met and communicated, including after business hours and on weekends, to plan and carry out their conspiracy.  Defendants openly stated that they were working together, that they

knew what the others would do, and that as a result, Anderson and Source would be destroyed and defendants would "control this space."

6.      Then, within days of each other and shortly after their inter-competitor meetings and communications, the defendants acted uniformly in carrying out their common response to Anderson's surcharge and cutting off 80% of Anderson's magazine supply. At the same time, the defendants were stealing Anderson customers, poaching its employees, spreading negative rumors about its financial condition, and coercing Anderson into selling distribution facilities to one of the defendant wholesalers at fire-sale prices.

7.      Defendants had a clear and powerful economic incentive to engage in their conspiracy to control the magazine distribution system. Once the two co-conspirator wholesalers, defendant Hudson and non-party The News Group, LP ("News Group"), took over the business of Anderson and Source and acquired their operations at fire-sale prices, those preferred wholesalers would acquire the market power that allowed them to increase the prices charged to the retailers. The publishers' economic interests would be advanced by shifting to retailers and consumers -- and away from publishers -- the increasing distribution costs, including those resulting from publisher-induced inefficiencies. The publishers would also benefit tremendously because their preferred wholesalers had the market power to resist measures by retailers that would have curtailed defendants' practice of compelling wholesalers and retailers to pay for and handle an excessive number of magazine copies. As the cost to publishers under the current system for shipping excess copies is negligible -- indeed, the cost is borne by the wholesalers and retailers -- the publishers habitually ship excess copies in the hope of obtaining increased sales.

8.     As a direct result of their unlawful coordinated response to the proposed surcharge and boycott of Anderson, defendants achieved their anti-competitive goal of eliminating Anderson as a magazine wholesaler.  On February 7, 2009, Anderson announced that it had no recourse but to curtail normal business activities effective immediately.  Anderson later was forced to shut down its national distribution system, and Anderson's entire business, including its goodwill, reputation, employee work force and customer base, was destroyed. Source was able to survive because this Court issued a temporary restraining order requiring defendants to resume supplying Source, and after a number of defendants produced documents in discovery, they agreed to settle by entering into multi-year supply agreements.

9.     Defendants also succeeded in achieving their ultimate anti-competitive goal: raising the prices paid by magazine retailers, and forcing those retailers to abandon their efforts to introduce efficiencies into the market.  Defendants' illegal conduct has alleviated any pressure on the publisher and national distributor defendants to bear any of the increased costs of distributing their magazines, and correspondingly has severely injured retailers and consumers. It ensured that the publishers would continue to force the wholesalers to accept excessive and wasteful copies of magazines into the retail distribution channel, bolstering publisher circulation needs, while passing along that increased cost to the retailers through their preferred wholesalers.

10.     Anderson, therefore, seeks compensatory damages in an amount to be determined at trial, as well as treble and punitive damages, arising from the extraordinary harm caused by defendants' egregiously illegal conduct.

## THE PARTIES

### A. Publishers

11.     Defendant Time, a Delaware corporation with its principal place of business in New York, New York, is the parent corporation of defendant TWR and the largest magazine publisher in the United States and publishes more than 120 magazines, including *Time, People, Entertainment Weekly, Sports Illustrated, Essence, Fortune, Golf, In Style, Money, People en Espanol, Real Simple, Sports Illustrated for Kids, This Old House, Coastal Living, Cooking Light, Health, Southern Accents, Business 2.0,* and *Southern Living.*

12.     Defendant Bauer, a Delaware partnership with its principal place of business in Englewood Cliffs, New Jersey, is the largest publisher of newsstand magazines in the United States. It publishes magazines such as *In Touch Weekly, Life & Style Weekly, Woman's World, First For Women* and *Soaps In Depth.*

13.     Defendant AMI, a Delaware corporation with its principal place of business in Boca Raton, Florida, is the fourth largest consumer magazine publisher, and the second largest publisher in retail magazine sales, in the United States. It publishes 16 titles, including 6 of the top 15 best selling weekly newsstand magazines. Its publications include *Country Weekly, FLEX, GLOBE, Men's Fitness, MUSCLE & FITNESS, National Enquirer, SHAPE,* and *Star.*

14.     Defendant Hearst is a Delaware corporation with its principal place of business in New York, New York. On information and belief, it is the successor in interest to, and assumed the liabilities of, defendant Hachette, a Delaware corporation with its principal place of business in New York, New York, and the publisher of *Car and Driver, Road & Track, ELLE, ELLEGirl, ELLE Décor, HOME, Metropolitan Home, Woman's Day, American Photo, Boating, Cycle World, Popular Photography* and *Sound & Vision.*

15.    Defendant Rodale, a Pennsylvania corporation with its principal place of business in Emmaus, Pennsylvania, is the publisher of *Men's Health, Prevention, Women's Health, Runner's World, Best Life, Bicycling, Running Times, Organic Gardening,* and *Mountain Bike.*

**B.    National Distributors**

16.    National magazine distributors are retained by magazine publishers as their agents to, among other things, broker and manage their relationships with their wholesalers. National distributors perform no physical distribution activities like warehousing, order assembly, delivery or in-store merchandising.

17.    Defendant Curtis, a Delaware corporation with its principal place of business in Pennsauken, New Jersey, is the leading national distributor of magazines in the United States, distributing hundreds of national titles for at least 400 publishers, including its then-affiliate, defendant Hachette, and defendants Rodale and AMI, and others. Publications distributed by Curtis include *Woman's Day, Car & Driver, Newsweek, Men's Health, Maxim, Elle,* and *The Economist.*

18.    Defendant Kable, a Delaware corporation with its executive offices in New York, New York, is a national distributor distributing more than 650 magazines, annuals and digests for over 250 different publishers, including defendant publisher Bauer, and others. Publications distributed by Kable include *In Touch, Woman World, First for Women, Tiger Beat,* and *WWE Magazine.*

19.    Defendant TWR, a New York corporation with its principal place of business in Parsippany, New Jersey, and an office in New York, New York, is a national magazine distributor whose publishing clients include its parent Time.

20.     Defendant DSI, a Delaware corporation with its principal place of business in Delray Beach, Florida, is a subsidiary of defendant AMI and a provider of marketing services to publishers, including AMI, Bauer, Hachette and Rodale.

### C.     Magazine Wholesalers

21.     Before Anderson was driven out of the business by defendants, four major wholesalers sold magazines to retail outlets for single-copy sales at such outlets, as follows.

22.     Plaintiff Anderson News is a Delaware limited liability company with its principal place of business in Knoxville, Tennessee. Before February 7, 2009, when defendants forced it to shut down its operations, Anderson News, along with its affiliate, Anderson Services, comprised the second largest magazine wholesaler in the United States, servicing 30,000 retail customer locations in 37 states. Anderson News was the sales and marketing company for the combined Anderson venture. Until defendants' conspiracy eliminated it from the market, Anderson had been a retailer and wholesaler of periodicals since 1917 and had approximately 6,000 employees. In the traditional single-copy magazine distribution market, Anderson conducted business throughout the United States, with the exception of certain areas in the mid-Atlantic, New England, Southern California, Alaska, Michigan, and North Dakota. Anderson and its predecessors have done business with the defendant national distributors since their formation.

23.     Anderson Services is a Delaware limited liability company with its principal place of business in Knoxville, Tennessee. Before February 7, 2009, when defendants forced it to begin to shut down its operations, Anderson Services provided warehousing, delivery and merchandising services for the combined Anderson venture. Anderson Services subsequently

assigned all of its assets to Plaintiff Whitaker under an Assignment for the Benefit of Creditors currently pending in the Chancery Court for Knox County, Tennessee.

24.     Defendant Hudson, a New Jersey limited liability company with its principal place of business in North Bergen, New Jersey, is a major magazine wholesaler.

25.     Non-party News Group, a Delaware limited partnership with its principal place of business in Texas, is a major magazine wholesaler.  News Group was originally named as a defendant in this action, but was dismissed voluntarily in accordance with a release executed by Anderson when Anderson was forced to sell certain distribution assets to News Group in February 2009.

26.     Non-party Source, a Delaware corporation with its principal place of business in Bonita Springs, Florida, is a major magazine wholesaler.  Source was a target of the conspiracy and a subject of the defendants' boycott, but after this Court granted Source's motion for a temporary restraining order and defendants produced documents in discovery, they agreed to enter into settlements with Source for the multi-year supply of magazines.

## JURISDICTION AND VENUE

27.     This action is brought to recover damages caused by defendants' violation of, among other things, Section 1 of the Sherman Act, 15 U.S.C. § 1.

28.     The Court has subject matter jurisdiction over this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; 28 U.S.C. § 1337, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

29.     Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, inasmuch as defendants transact business and are found

within this District, and a substantial part of the events giving rise to plaintiffs' claims occurred within this District.

## BACKGROUND

### A.   Overview:  Single-Copy Magazine Sales

30.   Defendants Time, Bauer, AMI, Hachette and Rodale publish magazines and set their cover prices.  To effectuate single-copy magazine sales (*i.e.*, non-subscription sales), each publisher retains a national distributor, which serves as an agent and broker to manage the publisher's relationship with its wholesalers, provides marketing and accounting services and may guarantee the wholesaler's payment obligations to the publisher.

31.   Defendants TWR, Kable and Curtis, and non-party Comag, the four principal U.S. national distributors, are compensated based on a percentage, typically two to five percent of the retail sales value of the magazines they handle.  Defendant DSI, a subsidiary of AMI, provides sales and marketing services to publishers.

32.   Pursuant to allotment orders provided by the national distributors (which typically greatly exceed the number ultimately purchased by consumers), the publishers' magazines are shipped from printers to wholesalers, which, in turn, ship the magazines to retailers, including traditional mass merchandisers and grocery store chains, such as Wal-Mart and Kroger, as well as newsstands, convenience stores, airport terminals and other retail outlets, and specialty retailers such as chain booksellers.

33.   Wholesalers are responsible for shipping to retailers, and then for picking up from the retailers and tabulating and destroying copies of unsold magazines.  Wholesalers typically buy the magazines from the publishers at a price of 50 to 60 percent of the cover price and sell to the retailers at a price of 70 to 80 percent of the cover price.

34.     Single-copy magazine sales constitute an integral and critical component of a publisher's economic business model because the visibility of the publisher's magazine titles at tens of thousands of locations across the country substantially enhances the ability of the publisher to launch, maintain and increase magazine circulation.  Maintaining and increasing such circulation is vital to the publisher's principal income source -- advertising.  Advertising rates are determined by the total number of magazine copies that are sold.

**B.     Historical Exclusive Agency Distribution System and Industry Consolidation**

35.     Until 1995, the magazine publishers -- and in particular, *TV Guide*'s publisher, which dominated the industry -- exercised substantial control over the magazine wholesale market, to the detriment of retailers.  They exercised this control through wholesalers -- then known as "agencies" -- which were each granted the exclusive right to distribute within designated geographical territories and which served as the agents of the publishers and national distributors.  This system was advantageous to and supported by the publishers and distributors, which exercised substantial control over the exclusive wholesalers, which were wholly dependent upon the publishers.

36.     However, the system was disfavored by the retailers, which were deprived of competition at the wholesale distribution level and thus were compelled to pay higher prices and to accept fewer services than if there had been wholesaler competition.

37.     In or about 1995, in response to the commencement of an antitrust investigation by the United States Department of Justice into the lack of geographic wholesaler competition in the magazine distribution business, the publisher of *TV Guide*, for the first time, allowed retailers to seek competitive bidding from wholesalers.  As a result, the wholesale market underwent a period of substantial consolidation, and by 2008, there remained four wholesalers which,

10

combined, had substantially all of the market for single-copy magazine distribution: Anderson, with 27% of the market; Source, with 31%; Hudson, with 11%; and News Group, with 21%.

38.     Retailers were beneficiaries of the elimination of the exclusive wholesaler distribution system.  Because wholesalers were required to compete for retailers' business, the prices wholesalers charged to retailers were significantly lower, and the services they offered more extensive, than was the case in the absence of wholesaler competition.  This also increased considerably the financial pressure on the wholesalers, which were confronted with reduced profit margins.

39.     Publishers also were adversely affected by the loss of the exclusive wholesalers, and the introduction of wholesaler competition.  The increased pressure on the wholesalers' profit margins caused the wholesalers to seek to recover their lost margin from the publishers. When publishers resisted pricing changes, wholesalers attempted to reduce their operating costs by eliminating or reducing waste or excess copies and by introducing changes in business practices like scan-based trading that would reduce non-value-added activities like expensive check-in and check-out routines at the retail level.  Anderson lead the charge in attempting to make these productive changes, which were resisted by major publishers.  Those wholesaler changes created friction in the distribution channel as the national distributors continued to ship to the wholesalers, and force wholesalers to accept, excessive copies of magazines.

40.     Unlike certain other manufacturers of products, publishers have a strong economic incentive to limit, to the maximum extent possible, the number of wholesalers distributing their magazines in any given geographic region.  Magazine titles -- unlike certain other products -- are supplied only by a single publisher -- in the case of *People* and *Sports Illustrated*, Time.  As a result, the large publishers, like defendants publishers here, have

substantial market power, which allows them to control and influence the wholesalers --
especially where that wholesaler has exclusive distribution rights. Such a wholesaler, in turn --
operating without competition -- is effectively granted the market power to increase the prices
charged to its retailers. Absent that market power (*i.e.*, in a market with more than one
wholesaler), the wholesaler either would have an incentive to join a conspiracy among the
publishers to restore exclusivity in its region -- just as Hudson and News Group have done -- or
would seek to obtain lost margin or pass along increased costs to the publishers -- just as
occurred in the industry after 1995.

41.     Publisher-induced supply practices were imposing onerous and unnecessary costs
on wholesalers. Because a substantial if not primary source of the publishers' revenue is
provided by advertisers whose payments are based on the actual number of magazines sold,
publishers are strongly incentivized to ensure that the magazine supply chain is more than
adequate to meet demand to avoid any lost sales. Moreover, the marginal revenue earned by the
publishers for each additional magazine sale -- both from the sale itself and from advertising --
was dramatically higher than the incremental cost of printing each magazine. Publishers,
therefore, customarily ship to wholesalers quantities of magazines that far exceed the number of
magazines sold by the retailers, as well as large numbers of unprofitable magazine titles. Indeed,
nearly half of all newsstand magazine titles have a "sell-through" percentage as low as 20% --
meaning that, of five magazines distributed by the wholesaler, only one is actually sold to a
consumer. Under this system, wholesalers -- which are paid only for copies that are sold -- are
forced to absorb the full cost of handling and tabulating unsold copies and transporting them
back to their own facilities for disposal or destruction.

42.     A different, more efficient system for distribution has been proposed and has been implemented by certain of the more powerful mass retailers, under which the retailers automatically would report sales of magazines through electronic check-out scanners and then dispose of unsold copies (known as "scan-based trading"). Retailers also were seeking the implementation of scan-based trading and other measures that would have increased efficiencies in the traditional distribution system and reduced the wholesalers' increasing costs. Both Anderson and Source were proponents of scan-based trading as a highly cost-effective and efficient measure for addressing the distribution costs resulting from the excessive supply of magazines.

43.     The publishers adamantly opposed scan-based trading, claiming that they would not be paid for, nor would their circulation numbers reflect, "shrinkage" -- *i.e.*, sales that are not scanned as a result of machine error, estimated to be approximately five percent of all sales. In addition, publishers opposed Anderson's and Source's attempts to require the publishers to assume the inventory costs associated with scan-based trading.

### C.     The Motivation for the Concerted Action and Conspiracy

44.     The major publishers had a powerful economic incentive to collude to regain control of the single-copy magazine distribution system -- control that had been eroded substantially because of the loss of the pre-1995 exclusive wholesaler system and the development of four competitive, non-exclusive wholesalers -- to ensure that the increasing costs of magazine distribution were covered by retailers instead of publishers. The most effective way to regain such control was to restore the wholesalers' regional exclusivity and to eliminate those wholesalers -- *i.e.*, Anderson and Source -- which had been seeking to obtain margin from the publishers and had been promoting scan-based trading and other measures that redounded to the

benefit of the retailers, and by dividing the Anderson and Source business among the two remaining, compliant wholesalers, *i.e.*, Hudson and News Group. Because defendants arranged for their two remaining wholesalers to be allocated separate geographic markets that did not overlap, retailers were compelled to accept the selected, preferred wholesalers and were deprived of competition in that market.

45. Indeed, confirming that such a result is in the economic interest of the publishers and other defendants, consultants retained by defendant Time had earlier prepared an analysis of the industry, and concluded that one option for enhancing the "stability" of the single-copy magazine distribution market was precisely to establish exclusive "regional franchises" for wholesaling. They warned, however, of the likelihood that this would result in "legal challenges," and recommended a different approach. The goal of defendants' conspiracy in 2009 was to accomplish just such illegal exclusive wholesalers through a collusive agreement among the defendants, which included unlawful market allocation.

46. In 2008, defendant Curtis, the nation's largest magazine distributor by volume, attempted unilaterally to eliminate Anderson as a wholesaler of its magazines, which include some of the most popular titles. Curtis attempted to do so by informing Wal-Mart, one of Anderson's primary retail clients, that Curtis would no longer supply magazines to Anderson. Wal-Mart, however, like all or nearly all retailers, uses a single wholesaler to supply a given store. Wal-Mart responded by telling Curtis that it preferred to remain with Anderson, even if that meant it had to accept discontinuance of the supply of Curtis's magazines. Curtis promptly reversed course and resumed supply. Curtis's failed unilateral attempt to eliminate Anderson as a wholesaler confirmed to Curtis that concerted action among the major publishers and national distributors was essential to achieve that objective. Only exclusive wholesale service areas, as

14

existed before 1995, could neutralize retailer power -- the wholesalers had to resume their pre-1995 role as the publishers' exclusive "agencies."

47.     During approximately the same time as Curtis's unilateral attack against Anderson, James Cohen, the president and CEO of Hudson, telephoned Anderson's CEO, Charles Anderson ("Mr. Anderson"), and reported that Robert Castardi ("Castardi"), the president of Curtis, had told him, in words or in substance, that Castardi was going "to get back" at Anderson and that "Anderson was done" because Curtis would find a way to put Anderson out of business.

48.     Regaining control over the single-copy wholesale distribution system would require concerted action among the publishers, national distributors and Hudson and News Group.  Concerted action was required because individual publishers could not risk losing circulation by cutting off the supply of its magazines to the geographic regions serviced by the wholesalers.  The temporary surcharge proposals of Anderson and Source in 2009 provided defendants the opportunity to undertake precisely such concerted action under the pretext of responding to those proposals, and defendants undertook their conspiracy to seek to eliminate Anderson and Source and reassert control over the wholesale distribution system.

49.     In early January 2009, Anderson proposed measures to make the magazine distribution system less burdensome and more efficient, goals that had been hampered by the refusal of the national distributors and publishers to adopt the efficiency-oriented measures that were being requested by Anderson, Source and many retailers.  Anderson announced that, as a temporary, stop-gap measure, it would apply a $.07 per-copy distribution surcharge for all magazine copies it received, and would pass on to the publishers the carrying costs of inventory

in retail chains where it had negotiated scan-based trading terms. The surcharge would be applied to all magazines distributed on or after February 1, 2009.

50.    Anderson's proposed $.07 per copy surcharge was designed to increase the overall efficiency of the magazine distribution industry. One of the primary aims of the surcharge was to create an incentive to eliminate the waste and inefficiency caused by the insistence of the publishers and distributors on shipping excessive copies of their magazines to wholesalers, and requiring that the wholesalers physically collect unsold copies. The publishers and distributors benefited from this inefficiency -- because shipping excessive magazines could increase their sales but the costs of this excessive supply were borne entirely by the wholesalers.

51.    The proposed temporary surcharge was not a non-negotiable mandate imposed by Anderson, as evidenced by, among other things, the fact that Mr. Anderson, the CEO of Anderson, flew to New York on January 12 and 13, 2009 and met with some of Anderson's largest publisher clients, including: Ann Moore, CEO of Time (Anderson's largest publisher client); David Pecker, President of AMI; Hubert Boehle, the president and CEO of Bauer; and Cathie Black, CEO of Hearst Magazines. At those meetings, Mr. Anderson informed the publishers of Anderson's proposed temporary stop-gap measure. These meetings -- which clearly constituted merely the initial stages of the negotiating process -- were cordial, and the publishers appeared -- at least on the surface -- to respond amicably.

52.    The next day, January 14, 2009, Mr. Anderson had a call-in interview with the representative of an industry publication, *The New Single Copy*, during which he publicly announced the surcharge and explained the industry constraints underlying that measure.

53.    Anderson made clear to all publishers and national distributors that the surcharge was a temporary, stop-gap measure, and that their agreement to this temporary measure would

not be irrevocable. Moreover, Anderson was willing to work with the publishers and national distributors to implement alternatives to the surcharge. Indeed, Anderson had commenced to work with Comag -- the only major national distributor not to join the group boycott of the publishers and national distributors -- toward a mutually-acceptable resolution of the issue concerning the costly publisher-imposed inefficiencies in the distribution system.

54.     Five days later, on January 19, 2009, Source initiated a similar proposal, also seeking a $.07 per-copy surcharge.

### D.     The Conspiracy to Eliminate Anderson and Source

55.     Immediately after Anderson, and later Source, proposed the $.07 surcharge, the major publishers and national distributors engaged in an intense series of inter-competitor communications that resulted in an agreement to formulate a coordinated response to the Anderson and Source proposals designed to force those two wholesalers out of business. Their objective was to regain greater control of the single-copy distribution market. To achieve that objective, they met, coordinated and agreed upon a common response to the proposed surcharges -- collectively they would reject the proposed surcharges and, using that as a pretext, they would cut off the magazines supplied by defendant publishers and national distributors, which comprised approximately 80% of the magazines distributed by Anderson and Source. That decision would force Anderson and Source into fire sales of their distribution assets to the only remaining viable wholesalers, News Group and Hudson, who also met with the publishers and national distributors and had agreed collectively to allocate the Anderson and Source business and customers.

56.     Thus, four days after Anderson's public announcement of the surcharge, the presidents of the two largest national distributors, Castardi, the president of Curtis, and Michael

Duloc ("Duloc"), the president and CEO of Kable, attended a meeting on Sunday, January 18, 2009 to plan their collusive action. Those two competitors represent and act on behalf of all but one of the defendant publishers: Curtis represents and acts on behalf of AMI, Hachette and Rodale; and Kable represents and acts on behalf of Bauer. The only publisher not present or represented at the Sunday meetings was defendant Time and its national distributor, TWR.

57.    On January 22, 2009, however, four days after the Sunday meeting, Kable, pursuant to the conspiracy, communicated with its competitor, TWR, ostensibly to "catch up on a few" unspecified "IPDA type items." The IPDA -- or International Periodical Distributors Association -- is precisely the type of trade organization that has been used perennially by competitors to attempt to mask their illegal, anti-competitive communications.

58.    In at least two instances during January 2009, after Source had also proposed a $.07 surcharge, certain defendants invited Anderson to join the conspiracy to eliminate Source as a wholesaler by pointing out that Anderson could profit by taking over Source's business and obtaining its profits through price increases imposed on the retailers. Thus, Castardi of Curtis told Mr. Anderson that "you need to let Source go out first." In certain areas -- Arizona, for example -- Anderson and Source were the only wholesalers. Once Source was excluded from the market and its business destroyed, Castardi told Mr. Anderson, in words or substance, that Anderson could use its regional market power to "get all your [Anderson's] profits from the retailers." And in a phone call with Frank Stockard, President of Anderson, Duloc of Kable discussed the idea of offering Anderson exclusivity in certain territories in exchange for Anderson retracting the proposed surcharge. According to Duloc, Anderson could obtain the profits it desired by using its exclusivity arrangement to increase the prices to retailers. Anderson refused to participate in this blatantly unlawful market allocation. Kable responded by

reaffirming its participation in defendants' boycott of Anderson, thereby refusing to supply Anderson with the magazines it distributes, including those published by defendant Bauer.

59.   On January 22, 2009, Duloc from Kable also contacted and attempted -- unsuccessfully -- to solicit the president and CEO of national distributor Comag to join defendants' conspiracy. Comag refused to join in an illegal conspiracy and instead continued to ship its magazines to Anderson and Source.

60.   E-mail exchanges and transmissions among defendants Rodale, DSI, AMI and Bauer, show that defendants perceived Comag's actions as a potential threat to the cohesion and unity of their conspiracy and to defendants' goal for 100% participation by the publishers and national distributors in the boycott of Anderson and Source. On January 29, 2009, Richard Alleger, a vice president at Rodale, sent an e-mail to Michael Porche ("Porche"), the president and CEO of DSI, stating that he had just read an e-mail from Comag to its clients: "they have reached an understanding with BOTH Anco [*i.e.,* Anderson] and Source and will continue to SHIP! Sullivan [the CEO of Comag] is dangerous." Porche forwarded the message to the president of AMI -- Rodale's competitor -- who in turn forwarded it to Michael Roscoe, a consultant and former DSI employee, who was one of the conduits through which the conspiracy was effectuated.

61.   Two days later, on Saturday, January 31, Rodale complained again, this time to Bauer, another of its co-conspirators and competitors, that Comag had agreed to continue to supply Source. Confirming the intent, and obviously anticipating the success, of the conspiracy, Bauer reassured Rodale, stating: "Doesn't matter [S]ource won't be around much longer."

62.   On or about January 25, 2009, the presidents of competitors TWR and Kable scheduled a breakfast meeting for Thursday, January 29, 2009 to discuss the conspiracy.

63.     Hudson was at the heart of the conspiratorial meetings. After business hours on or about January 29, 2009, key employees of certain defendants -- ostensible competitors -- including Dennis Porti of Curtis and Michael Cvrlje of TWR, met at Hudson's offices in North Bergen, New Jersey. David Parry of News Group -- a competitor of Hudson -- and John Rafferty of DSI, also were present at that January 29 meeting at Hudson's offices. At this and the other meetings among the defendants, they discussed and planned their collusive activity, including their market allocation agreement with respect to the Anderson and Source business and customers.

### 1.     Defendants' Common Response to Anderson's Proposed Surcharge

64.     During and after the week of January 21, 2009 -- during the precise time of the inter-competitor meetings and communications -- Mr. Anderson met or had telephone calls with executives of many of the defendants and began to hear their common objections in response to Anderson's proposed surcharge, which the defendants knew was negotiable.

65.     On Friday, January 30, 2009, Wal-Mart representatives asked Mr. Anderson to try to reach an agreement with Rich Jacobsen ("Jacobsen"), the president and CEO of TWR, over the proposed surcharge. The next day, Mr. Anderson met Jacobsen at his office in New Jersey. By the end of the meeting, Mr. Anderson was led by Jacobsen to believe that TWR and Anderson had an agreement that would obviate the need for a surcharge, an agreement for an increase of 2.00% in the discount to Anderson of the magazines' cover prices for all *Time* weeklies, and 2.75% for all *People* weeklies. Anderson also was led to believe by Jacobsen that TWR also agreed to discuss scan-based trading on Monday, February 2, 2009, in return for which, after the scan-based trading call, Anderson would make a $13 million payment to TWR

for amounts supposedly due. Anderson rescinded its fee proposal as a result of this compromise settlement.

66.     Curtis, on behalf of publishers Hachette, Rodale and AMI, and Kable, on behalf of publisher Bauer, acting in concert with the other defendants and pursuant to and in furtherance of defendants' conspiracy to eliminate Anderson as a wholesaler, refused to enter into any substantive negotiations with Anderson (notwithstanding the long history in the single-copy magazine industry of working out differences with respect to increased cost and other financial pressures through negotiation) and cut Anderson off from its supply of their magazines. Thus, on the morning of January 29, 2009, Curtis sent an e-mail to its publisher clients, informing them that, "effective immediately, Curtis is suspending all further shipments of magazines to all Anco [*i.e.*, Anderson] wholesaler operations." Curtis clients AMI and Hachette cut off Anderson soon afterward, and although a limited number of magazines published by AMI and Hachette that were already "in the pipeline" from the magazine printers and could not be diverted -- arrived at Anderson's warehouses in early February, AMI and Hachette otherwise followed through on Curtis's declaration and cut off their supply of magazines to Anderson.

67.     On February 2, Time and TWR -- acting in concert with the other defendants, and pursuant to and in furtherance of defendants' conspiracy to eliminate Anderson as a wholesaler -- reneged on its agreement to continue to supply Time's magazines to Anderson. Jacobsen informed Anderson that TWR and Time executives had decided "to change the channel," that "they were going to have to use two wholesalers," and that "that was the way it was going to be."

68.     Jacobsen then told Mr. Anderson that he was free to appeal to Time CEO, Ann Moore, to discuss the matter. Anderson then phoned Moore. During that call, Anderson reviewed the terms of the agreement he thought he had reached with Jacobsen on January 31,

2009. Moore responded that: "Charlie, I wished we had had this conversation two weeks ago" -- precisely the two weeks during which defendants were intensively meeting and communicating in order to agree upon, plan and implement their conspiracy -- and that "we have decided to consolidate the channel" -- *i.e.*, reduce the number of wholesalers -- and that "we are moving forward and eliminating Anderson and Source." When Mr. Anderson protested that such an action would destroy Anderson and result in the loss of thousands of jobs, Moore responded that Jimmy Pattison, the owner of News Group -- precisely the co-conspiring wholesaler to which defendants had agreed to allocate Anderson's business -- "was a nice person and maybe would buy some of Anderson's assets."

69.     Time and TWR never had any intention of honoring their commitment to continue to work with Anderson. Indeed, their conduct with regard to Anderson -- stringing Anderson along with sham negotiations to attempt to induce Anderson to make payments before it was cut off entirely -- mirrors their conduct toward Source. TWR, along with certain other defendants, succeeding in inducing Source to make payments on their accounts by engaging in negotiations without ever intending to continue supplying magazines to Source.

70.     Statements made by the defendants to Anderson also make clear that the defendants, as a result of their inter-competitor meetings and communications, had agreed to a coordinated boycott of Anderson and Source. On or about January 21, 2009, after talking with representatives of TWR and Kable, Mr. Anderson spoke with Castardi, the president and CEO of defendant Curtis. Castardi, acting on behalf of Curtis as well as all the publishers represented by Curtis -- including publisher defendants AMI, Hachette, and Rodale -- told Mr. Anderson, in words or substance, that "I [Castardi] don't want a problem. I would like to get this worked out. But I'm going to have to go with whatever Rich [Jacobsen, CEO of defendant TWR] does."

When Mr. Anderson later told Jacobsen on January 31, 2009 what Castardi had told him -- that "[Castardi's] going whatever way you [Jacobsen] go" -- Jacobsen did not deny it, but instead crossed his arms, nodded in agreement and smiled.

71.     At the January 31 meeting with Jacobsen, Jacobsen told Mr. Anderson that he "ha[d] Greg Mays [the CEO of Source] flying in at 1:00 pm to meet with me. And I'm going to deliver the message that, as long as I'm at TWR or Ann Moore is at Time, we will never, ever do business with Source again." Indeed, TWR's competitor, Curtis, was already aware of this information -- the same day, a Source executive was advised by Castardi, the president of Curtis that, on January 31, he (Castardi) knew, with "100% certainty," that TWR, Bauer and AMI would refuse to supply product to Source -- even though, by this time, Source had publicly rescinded its surcharge proposal.

**2.     Defendants' Conduct Was Contrary to
Their Economic Self Interest Absent Collusion**

72.     Defendants acted in concert and not unilaterally. As Curtis learned in 2008, it would not be economically feasible for a single distributor or publisher unilaterally to cut off supply to a major wholesaler. Unilateral action by any single publisher that resulted in that publisher's product not being distributed through a wholesaler would make no economic sense, unless the other publishers previously had agreed to join in the boycott of the disfavored wholesaler and jointly had agreed to secure an alternative favored wholesaler to distribute their product in the region previously served by the disfavored wholesaler. Absent such coordination and agreement, the single publisher faced the unacceptable risk that its product would not be distributed to retailers in the areas where Anderson was the only viable wholesaler. Unless the publishers and their national distributors had reached an agreement among themselves, along with the favored wholesalers, Hudson and News Group, the publisher would have no assurances

that the infrastructure necessary to distribute magazines in areas served by Anderson would be developed. Indeed, for Hudson or News Group to distribute the product of any individual publisher would be highly unprofitable -- and there would thus be no assurances that any wholesaler would be available to distribute that publisher's magazines.

73.     The publishers are especially sensitive to interruptions in the distribution of their magazines, because a substantial if not the primary source of their revenue -- the sale of advertising -- is largely based on an audited circulation "rate base." If a publisher fails to meet the base circulation rate -- due to, for example, a disruption in the distribution channel -- it faces a significant drop in advertising revenue.

74.     Moreover, to obtain cost efficiencies, retailers generally obtain all of their magazines from a single wholesaler. If a single publisher or distributor threatened to terminate its relationship with Anderson, there would be a substantial risk -- as was the case with Wal-Mart when Curtis had threatened unilaterally to cut off Anderson in 2008 -- that the retailer would not switch to another wholesaler, but simply forgo that publisher's magazines. As Curtis discovered in 2008, by unilaterally terminating its relationship with Anderson, an individual publisher risked depriving itself of Anderson's retail outlets that sell its magazines and generate revenue. Thus, any such unilateral action would be against any single publisher's economic self-interest.

75.     This is not the case, however, if -- as occurred here -- the publishers and their national distributors, acting in concert, agreed in advance to terminate their relationships with Anderson at the same time, and also agreed to divide the Anderson business among the two remaining and favored wholesalers. Retailers, confronted with the group boycott by publishers and national distributors, would have no choice but to rely on Hudson and News Group for their supply of magazines necessary for sale to their customers. Only through such collusive action

could defendants eliminate Anderson and replace Anderson with one of the two remaining wholesalers.

76.     The goal of the conspiracy was straightforward:  avoid individualized negotiations with Anderson, drive Anderson out of business and ensure that the publishers and national distributors gained control over the single-copy magazine distribution channel.  The consequence of defendants' collusive action would be to reduce competition in magazine wholesaling, to force price increases on retailers, and to place the economic burden of preserving the existing distribution model on retailers instead of on publishers and their captive national distributors and wholesalers.  To achieve that goal, defendants needed to eliminate Anderson and Source, and to grant the remaining wholesalers -- co-conspirators Hudson and News Group -- exclusivity in the respective geographic regions serviced by the disfavored wholesalers.  With that exclusivity, Hudson and News Group would have the market power to force retailers to accept higher prices.  To eliminate Anderson -- and thus to eliminate competition in the market for the distribution of single-copy magazines -- the conspirators cut off the life blood of Anderson's business -- 80% of its magazine supply.

77.     Defendants also intended that, as a result of the conspiracy, Anderson and Source would be forced to sell at a "fire sale" their business infrastructure -- including their trucking fleet, distribution equipment and distribution centers -- to its wholesaler competitors, Hudson and News Group.

78.     Thus, at the same time TWR was reneging on its agreement with Anderson, one of the wholesaler defendants was poaching Anderson's employees.  Anderson's president, Frank Stockard received numerous reports that News Group associates -- or the associates of one or more of its affiliates -- were inducing Anderson associates to leave the employ of Anderson and

work for News Group, notwithstanding that News Group knew they had signed covenants not to compete with Anderson. In at least several of these cases, News Group's solicitations were based on false statements about Anderson's financial situation and future prospects. Defendant Hudson also attempted to poach employees of Anderson, and flew one of Anderson's key employees to its headquarters in New Jersey in an attempt to convince him to leave Anderson.

79.     At the same time that it was raiding Anderson's employees, News Group also was poaching key employees of Source. By Friday, February 6, News Group already had employed two Source directors and was poised to take more than 100 of Source's other employees from various of Source's territories. News Group also reportedly was attempting to exploit Source's employees' fear of unemployment through job offers premised on the condition that the jobs be accepted immediately.

80.     That the goal of the conspiracy was to drive Anderson and Source out of business and that the proposed surcharge was merely a convenient pretext for collusion, is clear from, among other things, the facts that: (a) the defendant publishers and national distributors refused to supply magazines to Source *even after* Source rescinded its surcharge in late January, and (b) TWR refused to supply magazines to Anderson *even after* Anderson negotiated a reduced surcharge with Jacobson, the president of TWR. The surcharge simply provided the pretext the defendants needed to regain control of the single-copy distribution system -- one in which the publishers and distributors granted their favored wholesalers exclusive territories effectively controlled by the publishers through their ownership and control of 80% of the nation's magazines, including some of the most popular titles in the market. Through that control, the publishers ensured that their favored wholesalers, the exclusive source of magazines to the retailers, would be able to use that exclusivity to force excessive copies into the distribution

channel in the hopes of obtaining increased sales, increase the prices charged to retailers and discourage the use of scan-based trading and other similar measures.

81.     During a February 2, 2009 dinner meeting in New York, TWR's Jacobsen admitted to Source's CEO, Greg Mays, the motivation for the termination and elimination of Source and Anderson.  When Jacobsen told Mays that TWR would not be supplying any magazines to Source, Mays asserted to Jacobsen that with the distribution system being created by defendants, there would be no scan-based trading, the two remaining wholesalers would force reduced margins down to the retailers rather than to the publishers, and there would be absolute control over the market.  Jacobsen's response, in words or substance, was:  "Exactly -- we now control this space."

82.     Defendants' collusive conduct in furtherance of their conspiracy already has succeeded by enabling Hudson and News Group to charge retailers higher prices, and at the same time impose defendants' will regarding measures such as scan-based trading.  News Group, which has begun to serve retailers previously served by Anderson, has demanded and obtained from those retailers reduced discounts -- *i.e.*, higher prices -- for approximately 80% of that business.  Such price increases have ranged as high as 12% or more over the prior rates -- including increases of up to 12.5% in the prices charged to Kroger, one of the largest grocery retailers in the nation, and 12.7% in the prices charged to Western Supermarkets, and increases of between 2.9% and 7.1% in the prices charged to certain airport retailers, including Ayala and NewsLink.  Hudson has already imposed price increases in Pennsylvania.

83.     The result of defendants' collusive conduct against Anderson is the creation of an anti-competitive monopoly controlled by the publishers in the magazine distribution business.

Curtis has admitted, to its publisher-clients, that the destruction of Source and Anderson will create a "monopolistic wholesaler" with the power to dominate the market.

### E.     The Destruction of Anderson's Business

84.     Defendants' conspiracy was ruthlessly effective with respect to Anderson. Defendants, acting in concert, terminated their relationship with Anderson and deprived Anderson of 80% of the magazines Anderson had for years delivered regularly to its retail customers.  Faced with the loss of 80% of the nation's magazine titles -- including some of the most popular publications -- from their shelves, retailers like Wal-Mart could no longer support Anderson's efforts to introduce efficiencies in the market, and began seeking sources of product from other wholesalers.  At the same time, the defendants were preying on the fears of Anderson's employees, poaching some of Anderson's most experienced workers.

85.     Anderson's financial picture became dire as a result of defendants' collusive conduct.  Without 80% of its product to distribute (with the exception of certain monthly titles, such as those of AMI and Hachette, which were already in the pipeline from the magazine printers, and which comprised only a small portion of AMI's and Hachette's titles), the remaining 20% was insufficient to cover Anderson's fixed costs, including payroll for thousands of employees, maintenance and fuel for multiple fleets of vehicles, and various other costs associated with running 47 separate distribution centers throughout the country.  Anderson began to hemorrhage money, at a rate of millions of dollars a week.

86.     With no end in sight to the defendants' collusive boycott -- and thus no end in sight to the resulting weekly millions of dollars in losses -- Anderson had no choice but to suspend its magazine wholesale business on February 7, 2009.

87.    As a result of defendants' unlawful concerted conduct, Anderson has suffered substantial damages, including millions of dollars in lost revenues before the company shut down its operations.  Anderson lost relationships with its retailers that took years to develop, and the goodwill that disappeared with these relationships can never be recovered.  Because of its forced exit from the market, thousands of Anderson's employees have lost their jobs -- many with years of experience in the industry.  Consistent with the goal of defendants' conspiracy, Anderson was forced to sell its distribution-related assets to News Group at prices substantially below their fair market value -- at "fire-sale" prices.  The net result is that Anderson has been damaged to the extent of the hundreds of millions of dollars that it had invested in its business, and the loss of $800 million per annum in future lost revenue.

88.    On March 2, 2009, certain creditors of Anderson News filed an involuntary bankruptcy petition, seeking to have the company liquidated under Chapter 7 of the United States Bankruptcy Code.  That action is pending in the United States Bankruptcy Court for the District of Delaware.

### F.    The Relevant Market

89.    The relevant product market for the purposes of this action is the national market for the wholesale distribution of single-copy magazines.  Before the boycott, the four major wholesale distributors of single issue magazines in the United States -- Anderson, Source, Hudson and News Group -- sold thousands of magazine titles to tens of thousands of retailers across the country.  These wholesalers have introduced great efficiencies into the market.  By purchasing from wholesalers, retailers receive an enormous savings of time and expense by allowing them to purchase from a single source with an established distribution network.

90.     To obtain these savings, retailers obtain all of their product from the wholesale network, comprised of the four wholesale distributors, and do not deal directly with publishers or national distributors.  Because of the sheer number of publishers and their publications, it would be prohibitively expensive for retailers to obtain their magazines outside of the wholesale market, as it would require them to:  contact each individual publisher; negotiate prices for and order each individual publication; and physically transfer those magazines to their retail outlets -- that is, take over the functions performed by the wholesalers and national distributors.  Because of these costs, retailers are unable to substitute the magazines obtained through the wholesale network with magazines obtained from some other source.

91.     Because of the costs involved in developing and maintaining the distribution network necessary to transport millions of magazines to thousands of different retail outlets -- including distribution centers, freight depots, fleets of trucks, and thousands of employees -- the wholesale distribution market is characterized by high barriers to entry.  These entry barriers are reinforced through the exclusive distribution agreements involving wholesalers, national distributors and publishers.

### G.     Competition Has Been Injured by the Conspiracy

92.     Defendants' actions unduly restrained, hindered and suppressed competition among wholesalers in the national market for the wholesale distribution of single-copy magazines.  Defendants, directly and proximately, caused antitrust injury because their actions have resulted in the elimination of Anderson as a wholesale distributor, and allowed the favored wholesalers to force retailers to pay higher prices (in the form of reduced discounts) as already has been experienced with certain of the new agreements negotiated by News Group.  The

purposeful and wrongful destruction of Anderson's business by defendants directly has harmed both competition in the relevant market, in addition to Anderson itself.

93.    Defendants' conduct has reduced the output of magazines through the wholesale market. Anderson and Source, combined, distributed approximately 50 percent of all U.S. single-copy magazines, and in many instances were or are the only wholesale distributors operating in numerous geographic regions. Because of defendants' unlawful boycott, wholesale distributors were temporarily unavailable to serve retailers in those areas, and those retailers were denied access to defendants' magazines -- which means, in turn, that for a significant period of time the retailers' customers had access to fewer magazines as well.

94.    Moreover, as a direct result of Anderson leaving the market, many of the smaller publishers who depended on Anderson for regular nationwide distribution, may be forced to shut down. These smaller publishers could not survive the disruption in sales that Anderson's collapse caused. This permanently reduced the choices available to retailers and their customers, and correspondingly benefited the remaining large publishers in the marketplace -- including defendants AMI, Bauer, Hachette, Rodale and Time.

95.    Defendants and their co-conspirators already have begun charging retailers higher prices for the same products, and defendants will continue to raise the prices paid by retailers. For example, as a result of the defendants' boycott, News Group has begun to distribute to retailers previously served by Anderson. As it has done so, it has been "re-signing" those retailers at discounts lower than what they received from Anderson, forcing the retailers to pay prices higher than those previously charged by Anderson. News Group's ability to charge those higher prices is not the result of any inherent or earned competitive advantage, but has instead arisen solely as a result of the increased market power it was granted by the publishers and

national distributors in exchange for facilitating the collusive boycott of Anderson by agreeing with Hudson to allocate among themselves, and to provide distribution services to, the Anderson retailers.

96.     With the elimination of Anderson, more than a quarter of the market has been reallocated to defendant News Group. As a result, News Group and Hudson together now control more than 50% of the U.S. wholesale magazine distribution market. If Source had not obtained a TRO ordering defendant publishers and national distributors to continue supplying Source, they would have succeeded in eliminating Source, allocating its business to Hudson and News Group, and would have obtained control over more than 90% of the market through their two favored and exclusive wholesalers. In any event, Hudson and News Group each control more than 90% of the market in their respective territories. In light of defendants' anti-competitive conduct in obtaining this market power, defendants' acquisition of market power will harm competition market-wide.

## FIRST CLAIM

### (Unlawful Restraint of Trade -- Sherman Act)

97.     Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 96 as if fully set forth herein.

98.     Defendants have engaged in a conspiracy in unreasonable restraint of trade in violation of section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15).

99.     Defendants engaged in a conspiracy to eliminate competition in the wholesale market for single-copy magazines through the wrongful destruction of Anderson as a going

concern, and the defendants did those things that they combined and conspired to do, including the following:

(a)     agreed to reject Anderson's and Source's proposed surcharges;

(b)     agreed to boycott the distribution of single-copy magazines to wholesalers Anderson and Source with the intent of destroying them as competitors;

(c)     agreed to, and did in fact, disparage Anderson's business to its retail customers for the purpose of interfering with Anderson's business relationships and contractual agreements with those customers with the intent of forcing Anderson's customers to move their business to News Group and defendant Hudson;

(d)     agreed to raid, and, in fact, did raid the employees of Anderson and Source for the purpose of stealing their trade secrets and eliminating them as competitors; and

(e)     agreed to destroy Anderson and Source as going concerns and to force those wholesalers to sell their distribution facilities and other assets -- at distressed prices -- to News Group and defendant Hudson.

100.     The ongoing conspiracy has had the effect of restraining trade by suppressing and eliminating competition in the U.S. market for the wholesale distribution of single-copy magazines. As a direct and proximate result of defendants' unlawful conduct, Anderson has suffered injury to its business.

101.     The continuation of defendants' unlawful conduct has had the immediate effect of destroying Anderson's ability to continue as a going concern, causing substantial damages to Anderson.

## SECOND CLAIM

### (Tortious Interference)

102.     Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 96 as if fully set forth herein.

103.     Anderson maintains significant business relationships with the retail customers that are a part of its national retail distribution network.

104.     The retail supply and retail service agreements between Anderson and members of its retail distribution network are valid, binding contracts.

105.     Defendants have at all relevant times been aware of the business relationships between Anderson and its retail customers of the retail supply and retail service agreements.

106.     Defendants intentionally and unjustifiably have interfered with Anderson's business relationships and contractual agreements with Anderson's retail customers by making false statements regarding Anderson's financial status and continued existence as a magazine wholesaler.

107.     Defendants also have intentionally and unjustifiably interfered with Anderson's business relationships and contractual agreements with Anderson's retail customers by boycotting the distribution of single-copy magazines to Anderson without a legitimate business justification with the intent of harming its business.

108.     Defendants interfered with Anderson's business relationships and contractual agreements with the intent of causing harm to Anderson by destroying its business and expelling Anderson from the marketplace.

109.     As a result of defendants' conduct, Anderson's retail customers have terminated their retail supply and retail service agreements and their business relationships with Anderson, and have obtained or sought to obtain magazine product from alternative sources, principally News Group and defendant Hudson.

110.     By reason of the foregoing, Anderson has been damaged in an amount to be determined at trial.

## THIRD CLAIM

### (Civil Conspiracy)

111.    Anderson hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 96, 98 through 101, and 103 through 110, as if fully set forth herein.

112.    The defendants conspired with one another to harm Anderson's reputation, to undermine Anderson's goodwill with its customers, to damage its business, and to destroy Anderson as a going concern.

113.    Each of the defendants have committed one or more of the following acts: boycotted the distribution of single-copy magazines to wholesaler Anderson with the intent of destroying it; disparaged Anderson's business to its retail customers for the purpose of interfering with its business relationships and contractual agreements with those customers with the intent of forcing Anderson's customers to move their business to News Group and defendant Hudson; and raided Anderson's employees for the purpose of stealing its trade secrets and eliminating it as a competitor.

114.    Defendants undertook their wrongful, intentional and unjustifiable acts in furtherance of their ongoing conspiracy to destroy Anderson through, among other things, tortious interference.

115.    By reason of the foregoing, Anderson has been damaged in an amount to be determined at trial.

WHEREFORE, Anderson demands judgment against defendants, jointly and severally, awarding Anderson:

(a)     on its First Claim, treble its damages in an amount to be determined at trial;

(b)     on its Second and Third Claims, actual, compensatory, consequential and punitive

damages in amounts to be determined at trial;

(c)     pre-judgment and post-judgment interest;

(d)     its costs in the prosecution of this action, including reasonable attorneys' fees; and

(e)     such other and further relief as this Court deems just and proper.

## TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

Dated: September 7, 2012

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____

Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Plaintiff Anderson News, L.L.C.*

- and -

LYNCH ROWIN LLP

By: _____ (TPL 4865)

Thomas P. Lynch (tlynch@lynchrowin.com)
Jennifer T. Chavez (jchavez@lynchrowin.com)

630 Third Avenue
New York, New York 10017
Tel:    (212) 682-4001
Fax:    (212) 682-4003

*Attorneys for Plaintiff Lloyd Whitaker, as the Assignee
under an Assignment for the Benefit of Creditors for
Anderson Services, L.L.C.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

ANDERSON NEWS, L.L.C., and LLOYD WHITAKER, as the    :
Assignee under an Assignment for the Benefit of Creditors for    :
Anderson Services, L.L.C.,    :
             :   No. 09 CIV. 2227 (PAC)
         Plaintiffs,    :
   :
     - against -    :
   :
AMERICAN MEDIA, INC., BAUER PUBLISHING CO., LP.,    :
CURTIS CIRCULATION COMPANY,    :    **CERTIFICATE OF**
DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI   :        **SERVICE**
MEDIA U.S., HEARST COMMUNICATIONS, INC., HUDSON : 
NEWS DISTRIBUTORS LLC, KABLE DISTRIBUTION    :
SERVICES, INC., RODALE, INC., TIME INC. and    :
TIME/WARNER RETAIL SALES & MARKETING, INC.,    :
   :
         Defendants.    :

------------------------------------------------------------------------x

      I, Gavin D. Schryver, an attorney admitted to practice before this Court, hereby certify

that on September 7, 2012, a true and correct copy of the Amended Complaint in this action was

served by Federal Express Overnight Mail upon the following counsel of record:

      Rowan D. Wilson
      Heather L. Cannady
      CRAVATH, SWAINE & MOORE LLP
      Worldwide Plaza
      825 Eighth Avenue
      New York, NY 10019-7475
      rwilson@cravath.com
      hcannady@cravath.com
      *Counsel for Defendants Time Inc. and Time/Warner Retail Sales & Marketing, Inc.*

George G. Gordon
Steven G. Bradbury
Joseph F. Donley
Paul H. Friedman
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036-6797
george.gordon@dechert.com
steven.bradbury@dechert.com
joseph.donley@dechert.com
paul.friedman@dechert.com
*Counsel for Defendant Curtis Circulation Company*

Cynthia E. Richman
Daniel W. Nelson
D. Jarrett Arp
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
crichman@gibsondunn.com
dnelson@gibsondunn.com
jarp@gibsondunn.com
*Counsel for Defendant Hudson News Distributors LLC*

Meir Feder
JONES DAY
222 East 41st Street
New York, NY 10017
mfeder@jonesday.com
*Counsel for Defendant Hachette Filipacchi Media, U.S.*

I. Michael Bayda
MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
New York, NY 10005
Ibayda@mdmc-law.com
*Counsel for Defendant Kable Distribution Services, Inc.*

David G. Keyko
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
david.keyko@pillsburylaw.com
*Counsel for Defendants American Media, Inc. and Distribution Services, Inc.*

John M. Hadlock
ROSENBERG & ESTIS, P.C.
733 Third Ave.
New York, New York 10017
jhadlock@rosenbergestis.com
*Counsel for Defendant Rodale, Inc.*

Barry J. Brett
Daniel Anziska
TROUTMAN SANDERS
405 Lexington Avenue
New York, NY 10174-0700
barry.brett@troutmansanders.com
daniel.anziska@troutmansanders.com
*Counsel for Defendant Bauer Publishing Co., L.P.*

Dated: New York, New York
        September 7, 2012

                                    _____
                                    Gavin D. Schryver