UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDERSON NEWS, L.L.C. and LLOYD WHITAKER,
as the Assignee under an Assignment for the Benefit of
Creditors for Anderson Services, L.L.C.,

                    Plaintiffs,

   - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING               09-CIV-2227 (PAC)
CO., L.P., CURTIS CIRCULATION COMPANY,
DISTRIBUTION SERVICES, INC., HACHETTE
FILIPACCHI MEDIA U.S., INC., HEARST
COMMUNICATIONS, INC., HUDSON NEWS
DISTRIBUTORS LLC, KABLE DISTRIBUTION
SERVICES, INC., RODALE, INC., TIME INC., and
TIME/WARNER RETAIL SALES & MARKETING,
INC.,

                    Defendants.

---

AMERICAN MEDIA, INC., HEARST
COMMUNICATIONS, INC., and TIME INC.,

                    Counterclaim-Plaintiffs,

   - against -

ANDERSON NEWS, L.L.C. and CHARLES
ANDERSON, JR.,

                    Counterclaim-Defendants.

---

## COUNTERCLAIM-DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

KASOWITZ, BENSON, TORRES            KELLOGG, HUBER, HANSEN, TODD,
 & FRIEDMAN LLP                     EVANS & FIGEL, PLLC
1633 Broadway                       615 M Street NW #400
New York, New York 10019            Washington, DC 20036
Tel.: (212) 506-1700                Tel.: (202) 326-7900

*Attorneys for Counterclaim-Defendant*    *Attorneys for Counterclaim-Defendant*
*Anderson News, L.L.C..*                   *Charles Anderson, Jr*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................3

    A.    The Single-Copy Magazine Distribution Channel .................................3

    B.    The Anderson And Source Distribution Fee Announcements .............5

    C.    Counterclaim-Plaintiffs Did Not Pay Any Artificially-Inflated  Price As A Result Of The Surcharge Announcements ............................5

    D.    The Counterclaims .............................................................................6

    E.    Counterclaim-Plaintiffs Do Not Seek Damages Related To  Paying Either Anderson Or Source A Distribution  Surcharge Or Any Artificially-Inflated Price ..............................................................................6

    F.    Counterclaim-Plaintiffs And Their Co-Defendants Suspected  Collusion Between Anderson And Source As Early As January 2009 ....................7

ARGUMENT ...............................................................................................................8

I.    SUMMARY JUDGMENT STANDARD .......................................................8

II.    COUNTERCLAIM-PLAINTIFFS LACK ANTITRUST STANDING .........................9

    A.    Counterclaim-Plaintiffs Fail To Show Any Antitrust Injury ..............11

III.    TIME DOES NOT HAVE STANDING TO PURSUE DAMAGES ALLEGEDLY SUFFERED BY ITS CO-DEFENDANT TWR .....................................15

IV.    THE COUNTERCLAIMS AGAINST C. ANDERSON ARE TIME BARRED .....................16

CONCLUSION ..........................................................................................................20

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                                                       **Page(s)**

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) ................................................................................9, 14

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ......................................................................................9

*Bailey v. Holder*,
    2014 WL 4792099 (S.D.N.Y. Sept. 25, 2014) (Crotty, J.) ..........................8

*Berkson v. Del Monte Corp.*,
    743 F.2d 53 (1st Cir. 1984)..........................................................................18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ....................................................................................10

*In re Buspirone Patent Litig.*,
    185 F. Supp. 2d 363 (S.D.N.Y. 2002) .......................................................16

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005) ........................................................................9

*Donahue v. Pendleton Woolen Mills, Inc.*,
    633 F. Supp. 1423 (S.D.N.Y. 1986) ..........................................................17

*Feinberg v. Katz*,
    2002 WL 1751135 (S.D.N.Y. July 26, 2002)........................................2, 16

*G.K.A. Beverage Corp. v. Honickman*,
    55 F.3d 762 (2d Cir. 1995) ........................................................................14

*Gatt Commc'ns Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ...................................................................*passim*

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ....................................................................................13

*Kaplan v. Cnty. of Sullivan*,
    74 F.3d 398 (2d Cir. 1996) ........................................................................15

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................15

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d. Cir 1998) .........................................................................18

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ...................................................................... 9

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) ................................................................... 1, 10

*Reading Int'l, Inc. v. Oaktree Capital Mgmt.*,
  2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) ................................... 9

*Shaywitz v. Am. Bd. of Psychiatry and Neurology*,
  675 F. Supp. 2d 376 (S.D.N.Y. 2009) ....................................................... 9

*State of N.Y. v. Hendrickson Bros., Inc.*,
  840 F.2d 1065 (2d Cir. 1988) ............................................................ 10, 17

*Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,
  906 F. Supp. 876 (S.D.N.Y. 1995) ........................................................... 10

*Town of Poughkeepsie v. Espie*,
  402 F. Supp. 2d 443 (S.D.N.Y. 2005) ....................................................... 18

*Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*,
  2010 WL 4739938 (S.D.N.Y. Nov. 5, 2010) ............................................... 16

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
  381 F. Supp. 2d 334 (S.D.N.Y. 2005) ....................................................... 18

*Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*,
  2013 WL 6713999 (E.D. Mich. Dec. 20, 2013) ........................................... 11

*Yong Ki Hong v. KBS America, Inc.*,
  951 F. Supp. 2d 402 (E.D.N.Y. 2013) ........................................ 10, 11, 12, 13

*Zola v. Gordon*,
  685 F. Supp. 354 (S.D.N.Y. 1988) ........................................................... 17

**Statutes**

11 U.S.C.A. § 108(c) ...................................................................................... 2

11 U.S.C. § 362 ............................................................................................. 6

15 U.S.C. § 15(b) ......................................................................................... 16

**Other Authorities**

Fed. R. Civ. P. 56 ....................................................................................... 1, 8

Anderson News, L.L.C. ("Anderson") and Charles Anderson, Jr. ("C. Anderson," and together with Anderson, "Counterclaim-Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment, pursuant to Fed. R. Civ. P. 56, seeking dismissal of the counterclaims asserted by American Media, Inc. ("AMI"), Hearst, Inc., as successor-in-interest to Hachette Filipacchi Media U.S., Inc. ("Hearst") and Time, Inc. ("Time," and together with AMI and Hearst, "Counterclaim-Plaintiffs").[1]

## PRELIMINARY STATEMENT

The counterclaims -- which were brought almost five years after Anderson commenced this action and one year into discovery -- are premised upon the contention that Anderson and non-party Source Interlink Distribution, Inc. ("Source") engaged in a price-fixing conspiracy by seeking to impose on magazine publishers a $.07 per-copy distribution surcharge. Even assuming the truth of these allegations,[2] the counterclaims fail as a matter of law for two basic reasons.

First, Second Circuit precedent dictates that, to establish antitrust standing from an alleged horizontal price-fixing agreement, a private plaintiff must show that it suffered injury in the form of an artificially-inflated price. *See Gatt Commc'ns Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61-62 (2d Cir.

---

[1]  Submitted herewith are Counterclaim-Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("56.1 Stmt."), the Declaration of Leslie M. Marx dated December 19, 2014 and the Declaration of Kevin A. Cyrulnik, dated December 19, 2014.

[2]  The evidence is to the contrary and demonstrates that Anderson and Source never communicated with each other about their respective decisions to seek a distribution surcharge. Among other things, Source did not even know that Anderson would be seeking a $.07 surcharge from publishers until Anderson began announcing its proposal, and only then decided that it, too, would seek a $.07 surcharge. Moreover, Anderson's and Source's respective surcharge proposals differed materially -- Anderson's proposal included an additional requirement that publishers bear the carrying cost of magazine inventory in retail chains employing scan-based trading; Source's proposal contained no such request.

2012).  Counterclaim-Plaintiffs can show no such injury; instead, they seek to recover for business expenses that do not reflect the payment of any elevated prices.

Second, the counterclaims against C. Anderson are barred by the Clayton Act's four-year statute of limitations.[3]  Counterclaim-Plaintiffs cannot avoid the statute of limitations by claiming fraudulent concealment:  the undisputed evidence precludes Counterclaim-Plaintiffs from making the necessary showing that they either lacked suspicions of the alleged conspiracy or conducted due diligence in connection with any suspicions.  On the contrary, within days of the Anderson and Source surcharge announcements, each of the Counterclaim-Plaintiffs -- as well as certain of their co-defendants -- suspected that the two announcements had been coordinated by Anderson and Source.  Despite that suspicion, Counterclaim-Plaintiffs failed to conduct any due diligence within the four-year statutory period.

In addition, Time lacks constitutional standing in connection with ███ million of the ███ million it alleges in damages.  The entity that sustained those alleged damages was not Time but its wholly-owned subsidiary, Time/Warner Retail Sales & Marketing, Inc. ("TWR").  An injury to a company's wholly-owned subsidiary does not constitute the "injury in fact" necessary to establish constitutional standing.  *See Feinberg v. Katz*, No. 99 CIV. 45 (CSH), 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002).

At bottom, Counterclaim-Plaintiffs' eleventh-hour allegation that Anderson and Source engaged in a price-fixing conspiracy is a desperate attempt to divert attention away from the mountain of incriminating evidence demonstrating their and their co-defendants' liability in this

---

[3]  Though the counterclaims are barred by the four-year statute of limitations as to both Anderson and C. Anderson, pursuant to 11 U.S.C.A. § 108(c), the claims against Anderson are tolled.

2

action.[4]  In any event, the counterclaims should be dismissed as a matter of law because

Counterclaim-Plaintiffs lack standing, and the claims against C. Anderson should be dismissed

for the additional reason that they are barred by the statute of limitations.

**STATEMENT OF FACTS**

**A.  The Single-Copy Magazine Distribution Channel**

This action concerns the distribution of single-copy magazines, which are magazines that

are sold at newsstands, convenience stores, supermarkets and mass-market retailers, as opposed

to those sold through subscriptions.  56.1 Stmt. ¶ 1.  The single-copy magazine distribution

channel is comprised of four primary levels:  (i) publishers; (ii) national distributors;

(iii) wholesalers; and (iv) retailers.  56.1 Stmt. ¶ 2.

*Publishers* write the articles that appear in a magazine, sell advertising, and hire

companies to print their magazines.  56.1 Stmt. ¶ 3.  Counterclaim-Plaintiffs, along with co-

defendants Bauer Publishing Co., LP ("Bauer") and Rodale, Inc. ("Rodale"), were magazine

publishers in 2008 and 2009.  56.1 Stmt. ¶ 4.

*National distributors* represent publishers and provide some combination of billing,

marketing and merchandising services.  56.1 Stmt. ¶ 5.  They also, in some instances, provide

credit protection to publishers to protect them in the event a wholesaler who purchased

magazines from a publisher on credit is unable to make payment.  56.1 Stmt. ¶ 6.  National

distributors do not physically distribute magazines.  56.1 Stmt. ¶ 7.  In 2008 and 2009, defendant

---

[4]  Discovery confirms that defendants, including Counterclaim-Plaintiffs, conspired to (i) resist pricing terms that
had been proposed by Anderson and Source, (ii) simultaneously cut off Anderson's and Source's magazine supply,
and (iii) ultimately gain even greater control over the distribution of single-copy magazines by eliminating
Anderson, a 90-year old business with thousands of employees, as a magazine wholesaler.  Evidence of this
conspiracy includes, among other things, dozens of inculpatory e-mails and other documents and more than 100
telephone calls, which show how defendants -- competitors of one another -- shared with each other confidential,
competitively sensitive information immediately after Anderson and then Source proposed new pricing terms and
continued to monitor each other through an intense level of inter-competitor communications until Anderson was
forced out of business.

3

TWR was a national distributor of single-copy magazines for Time and provided credit protection to Time.[5]  56.1 Stmt. ¶ 8.  In 2008 and 2009, defendant Curtis Circulation Company was a national distributor of single-copy magazines for AMI and Hachette.  56.1 Stmt. ¶ 9.  In 2008 and 2009, defendant Kable Distribution Services, Inc. was a national distributor of single-copy magazines for Bauer.  56.1 Stmt. ¶ 10.

*Wholesalers* purchase magazines from publishers and physically distribute them to retailers.  56.1 Stmt. ¶ 12.  In 2008 and 2009, Anderson and Source were wholesalers of single-copy magazines.  56.1 Stmt. ¶ 13.

*Retailers* such as Walmart, Kroger, Publix and Paradies receive magazines from wholesalers and sell those magazines to consumers.  56.1 Stmt. ¶ 14.

Publishers, wholesalers and retailers earn revenue as percentages of the cover price of each magazine sold.  56.1 Stmt. ¶ 15.  National distributors earn a commission from publishers on the total retail sales of the magazine titles they represent.  56.1 Stmt. ¶ 16.

During the mid-to-late 2000s, major retailers like Walmart began to require that wholesalers implement scan-based trading ("SBT"), which allows retailers to use bar codes for electronic scanning of magazines that are sold.  56.1 Stmt. ¶ 17.  SBT transformed the manner in which retailers purchased magazines from wholesalers.  Instead of purchasing magazines in bulk from wholesalers, as was the customary practice, SBT retailers entered into consignment relationships with wholesalers and would purchase magazines from wholesalers only after they were scanned and sold to consumers.  56.1 Stmt. ¶ 18.  By January 2009, Anderson held on its

---

[5]  In 2008 and 2009, defendant Distribution Services, Inc. ("DSI"), which was wholly owned by Counterclaim-Plaintiff AMI, served as a marketing agent for publishers and represented publishers in communications with wholesalers and retailers.  56.1 Stmt. ¶ 11.  DSI's clients included AMI, Bauer, Hachette and Rodale.  *Id.*

books, across all publishers, approximately $70 million of inventory attributable to magazines on the shelves of retailers that utilized SBT.  56.1 Stmt. ¶ 19.

**B.  The Anderson And Source Distribution Fee Announcements**

During the week of January 12, 2009, Anderson announced to magazine publishers and national distributors that it wanted publishers to (i) pay a $.07 per-copy distribution fee for each magazine distributed by Anderson to retailers; and (ii) bear their respective share of the cost of the $70 million of SBT inventory on Anderson's books ("the Surcharge").[6]  56.1 Stmt. ¶ 20.

During meetings with the heads of AMI, Time and other major publishers on January 12 and 13, 2009, C. Anderson explained Anderson's terms and advised that those terms would take effect on February 1, 2009.  56.1 Stmt. ¶ 22.  In a public conference call on January 14, 2009, C. Anderson explained the Surcharge to the single-copy magazine industry at large.  56.1 Stmt. ¶ 23.

On or about January 19, 2009, Source announced its own $.07 surcharge on magazine copies distributed.  56.1 Stmt. ¶ 24.  The Source announcement did not include any request from publishers to absorb the cost of SBT inventory on Source's books.  56.1 Stmt. ¶ 25.

**C.  Counterclaim-Plaintiffs Did Not Pay Any Artificially-Inflated Price As A Result Of The Surcharge Announcements**

None of the Counterclaim-Plaintiffs ever paid -- or even allege that they paid -- either Anderson or Source the $.07 surcharges, much less any distribution surcharge of any amount, and none ever absorbed the cost of SBT inventory on the books of Anderson.  56.1 Stmt. ¶ 26.

---

[6]  A January 26, 2009 Anderson letter that was sent to Counterclaim-Plaintiffs and defendants states that the proposed Surcharge was temporary and a stop-gap measure.  56.1 Stmt. ¶ 21.

### D. The Counterclaims

Five years after Anderson commenced this action -- and one year into discovery -- Counterclaim-Plaintiffs filed their counterclaims.[7]



### E. Counterclaim-Plaintiffs Do Not Seek Damages Related To Paying Either Anderson Or Source A Distribution Surcharge Or Any Artificially-Inflated Price

---

[7]  Specifically, on October 17, 2013 -- almost five years after Anderson commenced this action -- Counterclaim-Plaintiffs filed a motion in the Bankruptcy Action (defined *infra*) to lift the automatic stay pursuant to 11 U.S.C. § 362, to allow them to file price-fixing counterclaims against Anderson in this action. 56.1 Stmt. ¶ 28. The bankruptcy court granted Counterclaim-Plaintiffs' motion on November 6, 2013, and on November 25, 2013, Counterclaim-Plaintiffs moved this Court for leave to amend their answers to assert price-fixing counterclaims against Anderson and C. Anderson. 56.1 Stmt. ¶ 29. On January 23, 2014, the Court granted the leave sought by Counterclaim-Plaintiffs. 56.1 Stmt. ¶ 30. On February 7, 2014, Time filed its Amended Answer and Counterclaim of Time, Inc. ("Time Counterclaim"), 56.1 Stmt. ¶ 31; on February 14, 2014, AMI filed Defendants American Media, Inc.'s and Distribution Services Inc.'s Amended Answer to the Amended Complaint ("AMI Counterclaim"), 56.1 Stmt. ¶ 32; and, on February 19, 2014, Hearst filed its Amended Answer and Counterclaim of Hearst Communications, Inc. ("Hearst Counterclaim"). 56.1 Stmt. ¶ 33.

[8]  ███████████████████████████████ AMI and Anderson have stipulated -- and this Court has so-ordered -- that none of those non-price-fixing counterclaims will be pursued in this action. 56.1 Stmt. ¶ 35.

### F. Counterclaim-Plaintiffs And Their Co-Defendants Suspected Collusion Between Anderson And Source As Early As January 2009

Within days of the Anderson and Source announcements of their proposed pricing terms, Counterclaim-Plaintiffs and their co-defendants had suspicions that those pricing terms were the product of a conspiracy between Anderson and Source to fix the cost for the wholesale distribution of single-copy magazines. 56.1 Stmt. ¶ 44. The undisputed evidence includes testimony and e-mails from high-level executives at each of the Counterclaim-Plaintiffs:

- Brian Wolfe was the executive vice president of consumer marketing for Counterclaim-Plaintiff Time and a high-level executive to whom the president of TWR, Richard Jacobson, reported, and was someone who participated in formulating Time's response to the Anderson and Source proposed distribution surcharges. At deposition, Wolfe, *when asked whether he believed in January 2009 that "Anderson and Source were working together to announce the same surcharge on Time magazines," responded: "I guess I would say yes given that the charge was the same."*[11] 56.1 Stmt. ¶ 45.[12]

---

[9] On March 2, 2009, certain creditors of Anderson filed an involuntary bankruptcy petition in the United States Bankruptcy Court for the District of Delaware, seeking to have the company liquidated under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Action"). 56.1 Stmt. ¶ 42. Counterclaim-Plaintiffs are all parties to the Bankruptcy Action and many of the damages they seek in this action are duplicative of claims they have made in that action. 56.1 Stmt. ¶ 43.

[10] With respect to Time specifically, $11.3 million of the ▮▮▮ million in damages it is seeking is for unpaid invoices issued by Time's national distributor TWR to Anderson and are the subject of a proof of claim filed by TWR in the Bankruptcy Action. 56.1 Stmt. ¶ 40.

[11] All emphasis supplied unless otherwise noted.

[12] This testimony was elicited when Wolfe was asked to review a January 21, 2009 internal Time/TWR e-mail authored by Christine Hennessey, TWR's Regional Vice President for the Northeast, wherein Hennessey writes

- Michael Roscoe of MR Consulting, a consultant for Counterclaim-Plaintiff AMI, testified that he "thought it was an *incredible coincidence that [Source] came up with the exact same program, 7 cents, like two or three days"* after Anderson.  *"It would be like me winning the lottery today and two days later winning the lottery again.  I would think that was odd.  I thought it was odd that they came up with the same exact program two days apart."*[13]  56.1 Stmt. ¶ 47; and

- Thomas Masterson, senior vice president of Hachette (predecessor-in-interest to Counterclaim-Plaintiff Hearst), who was a high-level executive and someone who participated in formulating Hachette's response to the Anderson and Source proposed distribution surcharges, testified that *"Source sent us a remarkably similar letter* to Anderson's a few days after Anderson's letter."  56.1 Stmt. ¶ 51.[14]

Evaluation of these undisputed facts under the controlling case law, as shown below, requires dismissal of all the counterclaims as a matter of law.

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where, as here, there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has met that burden, "summary judgment is appropriate if the nonmoving party has failed to make a sufficient showing on an essential element of [its] case

---

"Interesting that the Source's "ask" is ALSO 7 cents/copy!"  56.1 Stmt. ¶ 46.  While Wolfe then states that he did not "necessarily" suspect collusion, his initial response is to the contrary.  *Id.*

[13]  ████████████████████████████████████████████████████████████████  David Pecker, the president of AMI, testified that Roscoe participated in AMI's response to the Anderson and Source surcharge announcements.  56.1 Stmt. ¶ 49.  Pecker also testified that, in January 2009, he considered Roscoe to be the chairman of AMI's wholly owned subsidiary and co-defendant in this action, DSI.  DSI was responsible for and coordinated with its clients AMI, Hachette, Bauer and Rodale in responding to the Anderson and Source proposed pricing terms.  56.1 Stmt. ¶ 50.

[14]  Counterclaim-Plaintiffs' co-defendants provided similar testimony.  ████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████  Brian Beaudry, a vice president of distribution at DSI, characterized the proposed pricing terms as ████████████████████████

with respect to which [it] has the burden of proof." *Bailey v. Holder*, No. 13 CIV. 5016 PAC, 2014 WL 4792099, at *3 (S.D.N.Y. Sept. 25, 2014) (Crotty, J.) (quotations and citations omitted); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (once the moving party has met its burden, "the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial.") (quotations and citations omitted). In this context, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 CIV 1895 PAC, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) (quotations and citations omitted).

## II.  COUNTERCLAIM-PLAINTIFFS LACK ANTITRUST STANDING

Counterclaim-Plaintiffs fail to demonstrate any antitrust injury that would confer standing. "As the Supreme Court explained in its seminal decision addressing § 4 actions . . . Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Gatt*, 711 F.3d at 75 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)) (quotations omitted). "Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to -- and potentially in disservice of -- the purpose of the antitrust laws: to protect competition." *Id.*

Consistent with the Supreme Court's ruling in *Associated General Contractors*, a showing of antitrust standing is a prerequisite in all private antitrust actions.[15] *See Gatt*, 711 F.3d at 75-76; *see also Daniel*, 428 F.3d at 436-38 (affirming dismissal of private antitrust action

---

[15]  Antitrust standing must be established even if a *per se* antitrust violation is alleged. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990); *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005) ("[T]he fact that the plaintiffs charge the defendants, at least in part, with a *per se* violation of the antitrust laws does not absolve them of the obligation to demonstrate standing.").

for lack of antitrust standing); *Shaywitz v. Am. Bd. of Psychiatry and Neurology,* 675 F. Supp. 2d 376, 387 (S.D.N.Y. 2009). To meet this requirement, a plaintiff must show an injury that is "of the type the antitrust laws were intended to prevent *and* that flows from that which makes or might make defendants' acts unlawful." *Gatt,* 711 F.3d at 76 (quotations and citations omitted); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 477-78 (1977) ("The injury must reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation."). Allegations of an injury that merely is "causally linked" to the alleged violation are legally insufficient. *Gatt,* 711 F.3d at 76; *see also Yong Ki Hong v. KBS America, Inc.*, 951 F. Supp. 2d 402, 415-19 (E.D.N.Y. 2013) (same).

The Second Circuit has declared that the only antitrust injury stemming from a price-fixing conspiracy that gives a plaintiff antitrust standing is the payment by the plaintiff of an artificially-inflated price that it would not have paid absent the conspiracy. *See, e.g., In re Publ'n Paper Antitrust Litig.,* 690 F.3d 51, 61-62 (2d Cir. 2012) ("To prevail on a claim of horizontal price fixing . . . the evidence *must* show that: (1) the defendants conspired to raise prices, and (2) this conspiracy caused injury to the plaintiff in the form of artificially inflated prices."); *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988) ("Where the antitrust violation is a price-fixing conspiracy, the measure of damages to one of the coconspirators' customers is the difference between the prices actually paid and the prices that would have been paid absent the conspiracy."); *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 906 F. Supp. 876, 885 (S.D.N.Y. 1995) (price-fixing "damages are measured by the difference between the price paid and the uninflated price"). Counterclaim-Plaintiffs have not -- and cannot -- meet this requirement.

### A. Counterclaim-Plaintiffs Fail To Show Any Antitrust Injury

Counterclaim-Plaintiffs fail to show any antitrust injury arising from the alleged price-fixing conspiracy. There is no dispute that Counterclaim-Plaintiffs did not pay the proposed distribution surcharge -- or indeed any artificially-inflated price -- as a result of the alleged price-fixing conspiracy. The damages asserted by Counterclaim-Plaintiffs -- lost profits and expenses incurred when they moved their business away from Anderson and Source -- do not confer antitrust standing.

The Second Circuit has held that to show antitrust injury from a price-fixing conspiracy, a plaintiff must prove that its alleged harm results from payment of artificially-increased prices -- and not from lost revenues or profits that did not stem directly from the payment of higher prices. *See Gatt*, 711 F.3d at 77 ("[Plaintiff]'s lost revenue . . . is not an injury that flows from that which makes bid-rigging unlawful. [Plaintiff] has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might."); *Yong*, 951 F. Supp. 2d at 418 (no antitrust injury where, although plaintiffs suffered "lost profits," they "never paid higher prices . . . as a result of the alleged price-fixing arrangement"); *see also Willie McCormick & Assocs., Inc. v. Lakeshore Eng'g Servs., Inc.*, No. 12-15460, 2013 WL 6713999, at *4-5 (E.D. Mich. Dec. 20, 2013) ("The direct harm in this case is to the [consumer] which had to pay increased prices for its work as a result of [the] fraudulent activity. . . . In contrast, [plaintiff]'s injury stems from its exclusion from [certain] contracts, and is thus better stated as a harm to a competitor, rather than to competition itself.").

In *Gatt*, the Second Circuit held that the plaintiff lacked antitrust standing because the plaintiff -- like the Counterclaim-Plaintiffs here -- failed to allege that it paid an artificially-inflated price, but instead sought profits lost after the plaintiff was deprived of the opportunity to

distribute the price-fixed product.  In particular, the plaintiff alleged defendants cut off its supply

of radios after it refused to participate in their conspiracy to fix radio prices.  The plaintiff sued

under Section 1 of the Sherman Act seeking to recover lost profits from, among other things, a

putative radio contract it allegedly would have won had defendants not cut off its supply.  In

affirming dismissal due to lack of antitrust standing, the Second Circuit held that a plaintiff has

standing to sue based on unlawful price-fixing only when the plaintiff suffers the harm that the

*per se* rule against horizontal price-fixing is intended to prevent -- *i.e.*, increased prices.  *Gatt*,

711 F.3d at 77-78.

      Likewise, in *Yong Ki Hong*, the plaintiffs, owners of a video rental store, alleged that the

defendants, distributors of videos, had engaged in a price-fixing conspiracy intended to set the

price at which the videos would be rented to the public.  Because plaintiffs refused to adhere to

the purported price-fixing agreement -- and charged less than defendants' artificially-inflated

price -- defendants cut off their supply of videos.  Plaintiffs, like the Counterclaim-Plaintiffs

here, sought to recover lost profits.  The court dismissed plaintiffs' claim for lack of standing:

> [T]he only injury that plaintiffs claim to have suffered as a result of
> defendants' allegedly unlawful activities is lost revenue due to the
> termination of plaintiffs' access to their KBS video supply.  But, as
> *Gatt Communications* makes crystal clear, *a competitor's lost
> profits is not an injury "of the type the antitrust laws were intended
> to prevent."*  Rather, horizontal price-fixing schemes are illegal
> under the antitrust laws "only because of the harm [they] may
> cause -- *increased prices* -- to *purchasers*" of the product for
> which prices have been fixed.  Plaintiffs never paid higher prices
> for KBS videos as a result of the alleged price-fixing arrangement.
> They claim, instead, and more grievously to them, that their supply
> of KBS videos was simply cut off when they refused to participate,
> just as Gatt's supply of Vertex radios was terminated after it
> abandoned the bid-rigging scheme that fixed prices there. . . .  In
> *Gatt Communications*, the court held that *lost profits, though an
> economic injury, is simply not the type of injury that confers
> antitrust standing on a claimant.*  That is the case here.

*Id.* at 418.

As in *Gatt* and *Yong Ki Hong*, the damages sought by Counterclaim-Plaintiffs as a result of Anderson's alleged price-fixing conspiracy are not the result of paying a higher price for distribution services, but are for lost profits. There is no genuine issue of material fact that the Counterclaim-Plaintiffs never paid any of the proposed surcharges -- or indeed any artificially-inflated price -- as a result of the alleged price-fixing conspiracy. The economic injury they allegedly sustained is simply not the type of injury that confers antitrust standing on a claimant. *Gatt*, 711 F.3d at 78.

Counterclaim-Plaintiffs' other damages -- expenses incurred due to switching wholesalers, unpaid invoices by Anderson, and attorneys' fees incurred in an entirely separate litigation -- are even more attenuated from the alleged conspiracy and also insufficient to confer antitrust standing on Counterclaim-Plaintiffs. *Id.*

The rule that limits antitrust standing to those private plaintiffs who have directly paid an alleged overcharge reflects the goal of promoting efficient enforcement of the antitrust laws. Courts have recognized that the lure of treble damages may lead plaintiffs to dress up ordinary business losses as the product of a supposed antitrust violation. *Cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746-47 (1977) ("[W]e are unwilling to carry the compensation principle to its logical extreme by attempting to allocate damages among all those within the defendant's chain of distribution, especially because we question the extent to which such an attempt would make individual victims whole for actual injuries suffered.") (quotations and citations omitted). By insisting that a plaintiff show that it directly paid an unlawful overcharge, courts avoid claims of damage that may reflect business choices that had little to do with the alleged conspiracy.

That Counterclaim-Plaintiffs' damages are attenuated from the alleged price-fixing conspiracy and not the type of damages the antitrust laws were intended to address is demonstrated by Time's claim that it is entitled to damages from a settlement payment made to Hudson. Time made that payment in consideration for Hudson withdrawing its claim for costs associated with setting up distribution routes in areas that Hudson would have taken over from Source had Source not obtained a temporary restraining order from this Court requiring Time to continue using Source as a wholesaler. *See supra* at 7, n.10.

Even assuming, *arguendo*, that the alleged antitrust violation can be considered a but-for cause of such damages, settled limitations on antitrust standing preclude relying on such attenuated injuries as the basis for an antitrust claim. *See Associated General*, 459 U.S. at 534 ("[F]ederal courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.") (quotations and citations omitted); *Gatt*, 711 F.3d at 75 ("It is not enough for the actual injury to be causally linked to the asserted violation . . . in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful."); *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995) ("[M]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing.").

Accordingly, the counterclaims should be dismissed.

**III.   TIME DOES NOT HAVE STANDING TO PURSUE DAMAGES
ALLEGEDLY SUFFERED BY ITS CO-DEFENDANT TWR**

Time's alleged damages are legally deficient as a matter of law for an additional and

independent reason.  While Time seeks ███ million in damages, ███ million of those

damages were incurred not by Time, but by its wholly-owned subsidiary, co-defendant TWR.

To establish constitutional standing, a plaintiff must show injury in fact.  *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (holding that summary judgment should be

granted for lack of constitutional standing where no injury in fact is demonstrated); *see also*

*Kaplan v. Cnty. of Sullivan*, 74 F.3d 398, 399-400 (2d Cir. 1996) (same).  A showing of injury in

fact is one of the three elements that comprise "the irreducible constitutional minimum of

standing," and thus requires "more than an injury to a cognizable interest."  *Lujan*, 504 U.S. at

560, 563.  Indeed, injury in fact requires that a plaintiff "be himself among the injured."  *Id.* at

563.

Here, Time did not suffer any injury with respect to the $11.3 million in unpaid invoices

allegedly owed by Anderson for magazines sold to Anderson on credit because any such

amounts were owed to Time's national distributor TWR -- not Time.  *Supra* at 7, n.10.  ███

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████  Thus, because Time cannot show injury in fact as to ███ million of its

claimed damages, its claim for those damages should be dismissed for lack of constitutional

standing.

Nor is there any legal basis for Time to contend that the ███ million in alleged damages

incurred by its wholly-owned subsidiary is sufficient to confer constitutional standing on Time.

An injury sustained by a corporate parent's wholly-owned subsidiary does not constitute an

injury in fact to the parent corporation. *See, e.g.*, *Feinberg v. Katz*, No. 99 CIV. 45 (CSH), 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002) ("Defendants correctly posit that [the parent corporation] cannot bring claims to recover for damages incurred by its subsidiary. This conclusion follows from the principle that a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent."); *Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*, No. 09 CIV. 10343 (WHP), 2010 WL 4739938, at *9 (S.D.N.Y. Nov. 5, 2010) (holding that where the alleged harm "is directed at the subsidiary and not the parent, the parent has no standing to bring a claim").

Consequently, $13.4 million of Time's alleged damages should be dismissed as a matter of law.

## IV.   THE COUNTERCLAIMS AGAINST C. ANDERSON ARE TIME BARRED

A claim for damages under the Clayton Act must be asserted in an action that is commenced within four years from the date on which the violation occurred. 15 U.S.C. § 15(b). An antitrust cause of action "accrues as soon as a defendant's allegedly unlawful act causes injury to a plaintiff's business." *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002).



To establish fraudulent concealment, an equitable tolling principle, a plaintiff must prove with particularity: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, *and* (3) that his continuing ignorance was not attributable to lack of diligence on his part." *Hendrickson,* 840 F.2d at 1083. When invoking the equitable doctrine of fraudulent concealment to toll a statute of limitations, the burden of proof "rests squarely on the party pleading fraudulent concealment." *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986).

████████████████████████████████████████████████████████████ It is well-established that equitable tolling ceases when facts emerge sufficient to arouse a *suspicion* of price-fixing. Facts arousing suspicion are equated with actual knowledge. *See, e.g., Hendrickson,* 840 F.2d at 1085 (holding that courts will not apply fraudulent concealment tolling where plaintiff had *suspicion* of antitrust conspiracy); *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) ("Facts that should arouse suspicion . . . are equated with actual knowledge of the claim."); *Zola v. Gordon,* 685 F. Supp. 354, 367 (S.D.N.Y. 1988) ("All that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing.").

Here, as shown above, *supra* at 7-8, there is no genuine issue of material fact that Counterclaim-Plaintiffs had *suspicions* of the existence of the alleged price-fixing conspiracy no later than February 2009. The evidence includes testimony and e-mails from high-level executives at each of the Counterclaim-Plaintiffs who indisputably were involved in and responsible for formulating responses to the proposed Anderson and Source pricing terms. *Id.*

Brian Wolfe, an executive vice president at Time, confirmed in his testimony that, in announcing the same pricing terms, he believed in early 2009 that Anderson and Source were "working together."  Michael Roscoe, a consultant to AMI and the chairman of DSI, testified that the chances of Anderson and Source proposing the same pricing terms were about as likely as "winning the lottery today and two days later winning the lottery again."[16]  Thomas Masterson, a senior vice president at Hachette, testified that the Anderson and Source proposals were "remarkably similar."[17]

The Second Circuit expressly has declared that a party attempting to invoke the doctrine of fraudulent concealment must make *specific* allegations as to "when [inquiries regarding the alleged conspiracy] were made, to whom, regarding what, and with what response."  *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d. Cir 1998); *see also Berkson v. Del Monte Corp.*, 743 F.2d 53, 56-57 (1st Cir. 1984) (affirming summary judgment and holding that plaintiffs' conclusory allegations of due diligence were not sufficient to invoke the doctrine of

---

[16]  Roscoe's suspicions should not only be attributed to AMI, but, given his position as chairman of DSI, his suspicions should also be attributed to Hachette because Hachette relied on DSI in responding to the Anderson and Source surcharge announcements. *See, e.g., Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 455 (S.D.N.Y. 2005) ("[R]ule imputing knowledge or notice of an agent to the principal includes and applies to . . . actual or constructive notice communicated to the agent."); *see also Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 381 F. Supp. 2d 334, 339 (S.D.N.Y. 2005) ("Knowledge by an agent is sufficient to start the limitations period running on a claim held by the agent's principal").

[17]  The suspicion that Anderson and Source had coordinated in announcing their pricing terms was not limited to AMI, Hachette and Time, but rather was also the view of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Additionally, Brian Beaudry, vice president of DSI, sent an e-mail in February 2009 in which he expressed his view that Anderson and Source were coordinating with each other "behind closed doors."  Similar to Roscoe, given Beaudry's position as a vice president of DSI. Beaudry's suspicions likewise should be attributed to AMI and Hachette.

fraudulent concealment).  Here, none of the Counterclaim-Plaintiffs has even alleged that it conducted any due diligence in connection with its suspicions.  Nor is there any evidence that any Counterclaim-Plaintiffs conducted any due diligence in connection with their suspicions. That is fatal to their attempt to invoke fraudulent concealment tolling.

Accordingly, all the counterclaims asserted against C. Anderson should be dismissed because they are time-barred as a matter of law.

## CONCLUSION

Based on the foregoing, Counterclaim-Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the counterclaims in their entirety and grant such other relief as is just and proper.

Dated: New York, New York
       December 19, 2014

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By: _____

Marc E. Kasowitz (mkasowitz@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Seth Davis (sdavis@kasowitz.com)
Constantine Z. Pamphilis (dpamphilis@kasowitz.com)
Seth A. Moskowitz (smoskowitz@kasowitz.com)
Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Counterclaim-Defendant*
*Anderson News, L.L.C.*


KELLOGG, HUBER, HANSEN, TODD, EVANS
  & FIGEL, PLLC

By: _____

Michael K. Kellogg (mkellogg@khhte.com)
Steven F. Benz (sbenz@khhte.com)

1615 M Street NW #400
Washington, DC 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999

*Attorneys for Counterclaim-Defendant*
*Charles Anderson, Jr.*

20