UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDERSON NEWS, L.L.C. and LLOYD WHITAKER,
as the Assignee under an Assignment for the Benefit of
Creditors for Anderson Services, L.L.C.,

                    Plaintiffs,

        - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING                    09 Civ. 2227 (PAC)
CO., L.P., CURTIS CIRCULATION COMPANY,
DISTRIBUTION SERVICES, INC., HACHETTE                     Filed Under Seal
FILIPACCHI MEDIA U.S., INC., HEARST
COMMUNICATIONS, INC., HUDSON NEWS
DISTRIBUTORS LLC, KABLE DISTRIBUTION
SERVICES, INC., RODALE, INC., TIME INC., and
TIME/WARNER RETAIL SALES & MARKETING,
INC.,

                    Defendants.

---

AMERICAN MEDIA, INC., HEARST
COMMUNICATIONS, INC., and TIME INC.,

                    Counterclaim-Plaintiffs,

        - against -

ANDERSON NEWS, L.L.C. and CHARLES
ANDERSON, JR.,

                    Counterclaim-Defendants.

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS
AMERICAN MEDIA, INC. AND DISTRIBUTION SERVICES, INC.**

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Plaintiff Anderson News, L.L.C.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

SUMMARY JUDGMENT STANDARD............................................................ 3

ARGUMENT ........................................................................................... 3

I.     The Antitrust Damage Standard................................................ 3

II.    Anderson Has Established a Reasonable Estimate of the Damages Caused By Defendants' Unlawful Antitrust Conspiracy.......................................................... 4

       A.    Anderson's Recent Accounting Losses Do Not Bar Recovery of Damages...................................................................... 4

       B.    Anderson's Damages Are Based on Historical Data and Fully Supported By the Evidence........................................ 9

       C.    Anderson's Damages Attributable to Publisher Concessions and Anderson Initiatives Are Well-Grounded in the Data and Other Evidence............................................... 13

             1.    Publisher Concessions ................................................. 13

             2.    Initiatives................................................................ 16

             3.    Anderson Has Properly Established a Reasonable Estimate of Damages Attributable to Projected Publisher Concessions and Anderson's Initiatives ...................................... 20

       D.    Dr. Lys's Methodology Properly Determines the Fair Market Value of Anderson's Total Assets ........................................ 21

CONCLUSION.......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.,*
    566 F. Supp. 2d 305 (S.D.N.Y. 2008)....................................................................25

*Amerinet Inc. v. Xerox Corp.,*
    972 F.2d 1483 (8th Cir. 1992) ...........................................................................6

*Argus Inc. v. Eastman Kodak Co.,*
    612 F. Supp. 904 (S.D.N.Y. 1985).....................................................................6

*Argus Inc. v. Eastman Kodak Co.,*
    801 F.2d 38 (2d Cir. 1986).................................................................................6

*Baush Mach. Tool Co. v. Aluminum Co. of Am.,*
    79 F.2d 217 (2d Cir. 1935).................................................................................6

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)...............................................................................4

*Bigelow v. RKO Radio Pictures, Inc.,*
    327 U.S. 251 (1946)......................................................................................4, 16

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,*
    175 F.3d 18 (1st Cir. 1999)................................................................................5

*Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.),*
    144 B.R. 663 (Bankr. S.D.N.Y. 1992)..............................................................13

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.,*
    No. 75-cv-1368, 1980 WL 1989 (S.D.N.Y. Sept. 30, 1980) ..........................5, 6

*Eleven Line, Inc. v. N. Texas State Soccer Ass'n,*
    213 F.3d 198 (5th Cir. 2000) .............................................................................6

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
    711 F.3d 68 (2d Cir. 2013)...............................................................................20

*Guggenheim v. Helvering,*
    117 F.2d 469 (2d Cir. 1941)..............................................................................13

*Herman Schwabe, Inc. v. United Shoe Machinery Corp.,*
    297 F.2d 906 (2d Cir. 1962)..............................................................................12

*In re High Pressure Laminates Antitrust Litig.*,
   No. 00 MDL 1368 (CLB), 2006 WL 931692 (S.D.N.Y. Apr. 7, 2006) ...................................4

*Indu Craft, Inc. v. Bank of Baroda*,
   47 F.3d 490 (2d Cir. 1995)..........................................................................................................5

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ............................................................................................6

*Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007)......................................................................................13

*Joseph E. Seagram & Sons Inc. v. Hawaiian Oke & Liquors Ltd.*,
   416 F.2d 71 (9th Cir. 1969) ......................................................................................................12

*Keener v. Sizzler Family Steak Houses*,
   597 F.2d 453 (5th Cir. 1979) ....................................................................................................12

*Lamborn v. Dittmer*,
   873 F.2d 522 (2d Cir. 1989)........................................................................................................5

*Laurie Visual Etude, Inc. v. Chesebrough-Pond's, Inc.*,
   473 F. Supp. 951 (S.D.N.Y. 1979)...........................................................................................21

*Matter of Lifschultz Fast Freight*,
   132 F.3d 339 (7th Cir. 1997) ......................................................................................................6

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003)..................................................................................................25

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
   700 F.2d 785 (2d Cir. 1983)........................................................................................................3

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
   500 F.3d 171 (2d Cir. 2007)......................................................................................................13

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
   910 F. Supp. 913 (S.D.N.Y. 1995)............................................................................................13

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
   172 F. Supp. 2d 680 (D. Md. 2000) ............................................................................................6

*Oscar Gruss & Son, Inc. v. Hollander*,
   337 F.3d 186 (2d Cir. 2003)......................................................................................................13

*Peda v. New York Univ. Hosps. Ctr., Hosp. for Joint Diseases*,
   No. 12 CIV. 0586 (PAC), 2014 WL 1013844 (S.D.N.Y. Mar. 17, 2014)................................3

*Peller v. Int'l Boxing Club, Inc.*,
   227 F.2d 593 (7th Cir. 1955) .................................................21

*Peltier v. Exxon Corp.*,
   527 F.2d 757 (9th Cir. 1975) ...................................................6

*Proteus Books Ltd. v. Cherry Lane Music Co.*,
   873 F.2d 502 (2d Cir. 1989)...............................................6, 7

*R.S.E., Inc. v. Pennsy Supply, Inc.*,
   523 F. Supp. 954 (M.D. Pa. 1981) ........................................12

*Raemco, Inc. v. Allegheny Airlines*,
   496 F. Supp. 546 (S.D.N.Y. 1980)........................................21

*In re Roblin Indus., Inc.*,
   78 F.3d 30 (2d Cir. 1996) .......................................................6

*Sharma v. Skaarup Ship Mgmt. Corp.*,
   916 F.2d 820 (2d Cir. 1990)...............................................5, 13

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931)........................................................3, 4, 16

*Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,
   906 F. Supp. 876 (S.D.N.Y. 1995)......................................20, 21

*U.S. Football League v. Nat'l Football League*,
   842 F.2d 1335 (2d Cir. 1988)...............................................4, 19

*Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*,
   98 CIV. 3251 (HB), 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000)..........................13

*Waldron v. British Petroleum Co., Ltd.*,
   231 F. Supp. 72 (S.D.N.Y. 1964).........................................21

*Webb v. Utah Tour Brokers Assoc.*,
   568 F.2d 670 (10th Cir. 1977) .............................................21

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
   126 F.3d 15 (2d Cir. 1997)........................................................5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969).................................................................3

**Other Authorities**

ASA, *Valuation of Intangible Assets for Financial Reporting Purposes* ..................................6, 25

Beaton & Fahlman, *Business damages measurement: Lost Profits or Business Valuation?* ......6, 7

Byron F. Egan, *Asset Acquisitions: Assuming and Avoiding Liabilities*,
116:3 PENN ST. L. REV. 913, 954 (2012) ................................................................24

Mard & Hitchner, *Valuation for Financial Reporting*, 2d ed. .................................23, 25

Pacioli, *The Rules of Double-Entry Bookkeeping* ...........................................................6

Pratt & Niculita, *Valuing a Business* ..............................................................................6

Reilly & Schwiehs, *The Handbook of Advanced Business Valuation* ................................6, 23, 25

Plaintiff Anderson News, LLC ("Anderson") respectfully submits this memorandum of law in opposition to the motion for summary judgment by American Media, Inc. (and Distribution Services, Inc. (collectively "AMI").[1]

## PRELIMINARY STATEMENT

AMI's motion is premised upon the patently erroneous contention that Anderson suffered no antitrust damages because, AMI claims, there is no genuine dispute that the 90-year-old company was valueless at the time of its destruction by defendants' unlawful conspiracy.  This contention is directly contrary to the evidence -- including the uncontroverted evidence showing that Anderson at that time had $750 million in annual revenues and had returned to profitability -- and contravenes applicable law.

AMI argues first that Anderson could not have suffered damages as a matter of law because it experienced years of accounting losses before it was destroyed by defendants' illegal conspiracy.  Apart from the fact that Anderson had returned to profitability, this argument contravenes fundamental finance theory and well-settled Second Circuit law, which confirms that the existence of some period of historical losses in no way precludes a positive valuation for a corporation.  Indeed, defendant Time itself had, on an earlier occasion, valued Anderson at $400 million -- at a time that similarly was preceded by a period of losses and before Anderson had returned to profitability.  Likewise, defendants ignore actual transactional data:  in 2006, again despite a period of historical losses, Anderson sold assets accounting for less than one-fifth

---

[1]  Submitted in further support of Anderson's opposition is the Declaration of Seth Davis, dated March 9, 2015 (the "Davis Declaration").  References to "Ex. __" refer to exhibits to the Davis Declaration.  References to "Pl. 56.1 ¶ __" refer to paragraphs of Anderson's responses to AMI's and DSI's Statements of Uncontested Facts.  References to "¶ __" refer to paragraphs of Anderson's Statement of Additional Genuine Issues of Material Fact.

To the extent relevant, Anderson hereby incorporates by reference its briefs in opposition to the motions for summary judgment filed by AMI's co-defendants.  Anderson also incorporates by reference its memoranda of law and each of the arguments made in response to defendants' motions to exclude the testimony of experts Dr. Thomas Z. Lys and Dr. Robert G. Picard.

In quotations, all emphasis supplied unless otherwise indicated.

of its revenues -- a relatively small fraction -- to rival Source Interlink Distribution, L.L.C.

("Source") for approximately $54 million.  Applying this same valuation approach to Anderson's

entire operations at that time would have resulted in a valuation of $300 million.

AMI attempts to discredit the analysis of Anderson's damages expert, Dr. Thomas Z.

Lys,[2] one of the world's leading business valuation experts, who determined that the value of

Anderson News' total assets, which were destroyed by defendants' conspiracy, was

approximately $419 million.  He then determined that Anderson News' damages in the case

constitute the difference between that value and Anderson News' liquidation value after

defendants achieved their illegal conspiracy, resulting in damages of approximately $371

million.  These opinions are based on the "business valuation" approach, the proper valuation

approach under the law in the Second Circuit and elsewhere in cases where a business, like

Anderson here, has been destroyed.  In trying to discredit Dr. Lys's opinion, AMI mistakenly

relies on inapplicable cases dealing with "lost profits" damages valuations, which are proper for

calculating damages only when a business is ongoing -- not where a business has been destroyed.

As shown in Anderson's opposition to defendants' motion to exclude his testimony, Dr.

Lys's analysis is exceptionally well-grounded in the facts, in finance and valuation theory and

practice, and is unquestionably admissible.

The evidence, including Dr. Lys's damages analysis, easily satisfies the well-established

reasonable estimate standard for antitrust damages articulated in *Story Parchment Co. v.

Paterson Parchment Paper Co.*, 282 U.S. 555 (1931).  AMI has not and cannot establish that

---

[2]  Dr. Lys, the Eric L. Kohler Chair in Accounting and Professor of Accounting and Information Management at the Kellogg School of Management at Northwestern University, earned his PhD in Accounting and Finance from the University of Rochester in 1982, an M.S. in Accounting, also from the University of Rochester in 1980, and a B.S. in Economics from the University of Berne, Switzerland in 1976.  Dr. Lys teaches business valuation as part of his courses on mergers and acquisitions, security analysis, and corporate governance.  Numerous multinational Fortune 500 corporations, the United States and foreign governments have all employed Dr. Lys as both a testifying expert and a consultant in matters involving business valuation.  (¶ 33.)

Anderson suffered no damages as a matter of law, and the motion should be denied and the issue of damages left to the jury to determine.

## SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is appropriate when, construing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Peda v. New York Univ. Hosps. Ctr.*, No. 12 CIV. 0586 (PAC), 2014 WL 1013844, at *7-8 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.) (internal quotations and citations omitted).  AMI bears the burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  *Id.* at *8.  Even where that burden is met, the nonmoving party may respond by demonstrating the existence of a genuine dispute as to material facts.  *Id.*

## ARGUMENT

### I.    The Antitrust Damage Standard

As the Second Circuit has noted, "damages in antitrust cases 'are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.'"  *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 823 (2d Cir. 1983) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969)).  Because of the inherent difficulty in proving damages in antitrust actions, courts employ a more lenient standard for the calculation of antitrust damages.  *Story Parchment* holds that, while the fact of damages in an antitrust case must be shown to a reasonable certainty, the threshold of proof as to the amount of damages is lower.  282 U.S. at 562-63 ("[T]here is a clear distinction between the measure of proof necessary to establish the *fact* that petitioner had sustained some damage and the measure of

proof necessary to enable the jury to fix the *amount*.").[3]  As the Second Circuit explained in *U.S. Football League v. National Football League*, 842 F.2d 1335 (2d Cir. 1988):

> [C]ourts have allowed antitrust plaintiffs considerable latitude in proving the *amount* of damages.  Proof of amount of damages thus need not conform to a particular theory or model, and exact proof of the amount of damages is not required. An antitrust plaintiff must thus provide only sufficient evidence to support a just and reasonable estimate of damages.

*Id.* at 1378.  While a jury "may not render a verdict based on speculation or guess work," it may "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.  In such circumstances, juries are allowed to act on probable and inferential as well as (upon) direct and positive proof."  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

## II.  Anderson Has Established a Reasonable Estimate of the Damages Caused By Defendants' Unlawful Antitrust Conspiracy

Anderson's damages model properly relies on Anderson's actual, historical data and information in existence as of the valuation date, and relies upon a well-established methodology for estimating antitrust damages under market conditions that would have developed "but for" defendants' illegal conspiracy.  AMI claims that Anderson could not have suffered damages because the company was valueless, ignoring the controlling legal principles and the facts in the record, which make clear that -- at the very least -- material fact issues exist.

### A.  Anderson's Recent Accounting Losses Do Not Bar Recovery of Damages

AMI's principal argument is based on the legally-flawed contention (AMI Br. 10-14) that Anderson -- a company with decades of profitability and one of the largest single-copy magazine

---

[3]  *See also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 304 (2d Cir. 1979) ("Where there is a basis on which a jury can reasonably infer significant antitrust injury, [the court] should be very hesitant before determining that damages cannot be awarded."); *In re High Pressure Laminates Antitrust Litig.*, No. 00 MDL 1368 (CLB), 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) (denying exclusion of an expert's damages model in an antitrust case referencing *Story Parchment* standard and stating "[a] plaintiff must not be denied relief, once he or she has proved injury, simply because of some difficulty in providing precise damages").

wholesalers (¶¶ 1, 12) -- was valueless as a matter of law in February 2009 merely because, AMI contends, it was unprofitable for a number of years before its business was destroyed by defendants' unlawful conduct.

This argument is both legally and factually meritless. As the Second Circuit unequivocally has held, a history of financial losses in no way means that a company cannot have a positive value. *See Lamborn v. Dittmer*, 873 F.2d 522, 533 (2d Cir. 1989) ("With regard to the initial question of whether plaintiffs proved the fact of damages, *we reject outright the suggestion in [defendant's] papers that a business with no history of profits is necessarily valueless*."); *see also Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 24 (2d Cir. 1997) ("Past losses do not necessarily negate any expectation of future profits.").[4]

The Second Circuit's holding is, of course, well-grounded in finance theory and practice, as is Dr. Lys's analysis. <u>First</u>, Dr. Lys has calculated Anderson's damages by employing a business valuation approach -- the proper method for valuing a destroyed business like Anderson's -- rather than a lost profits approach. (¶ 34); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995) ("[W]hen the [violation] results in the complete destruction of a business enterprise and the business is susceptible to valuation methods, such an approach [*i.e.*, the business valuation approach] provides the best method of calculating damages."). Further, a valuation expert determining the value of a destroyed business as a going concern must consider only information known or knowable as of that valuation date.[5]

---

[4]   *See also Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, No. 75-cv-1368, 1980 WL 1989, at *1 (S.D.N.Y. Sept. 30, 1980), *rev'd on other grounds*, 663 F.2d 405 (holding that despite a history of losses plaintiff company still had a positive going concern value and "that it [was] more likely than not that absent the defendant's conduct, plaintiff would have eventually turned the corner and become profitable"); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 30 (1st Cir. 1999) ("The mere fact that [plaintiff] had never earned profit to that point does not mean it had no value as a going concern").

[5]   *See Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825-26 (2d Cir. 1990) (holding that fair market value of vessel should based on "what knowledgeable investors anticipated the future conditions and performance to be" as of the valuation date, not "what the actual economic conditions and performance were in light of hindsight")

Neither AMI nor its experts question Dr. Lys's reliance on the business valuation approach.[6]  Specifically, Dr. Lys appropriately and correctly calculated the fair market value[7] of Anderson's total assets[8] as a going concern[9] as of February 10, 2009, and then subtracted liquidation proceeds to arrive at Anderson's total damages.  (¶ 34.)[10]  AMI nonetheless challenges the propriety of Anderson's claimed damages by citing inapposite case law involving a "lost profits" approach, which provides that a business without an established history of profitability cannot recover damages,[11] rather than the materially different "business valuation"

---

(quotations and citations omitted); *see also* Ex. 244 (AICPA Statement on Standards for Valuation Services) at pp. 20-21; Ex. 245 (Litigation Services Handbook) at p. 13.3; Ex. 237 (The Handbook of Advanced Business Valuation) at p. 287; Ex. 179 (Beaton & Fahlman, *Business damages measurement: Lost Profits or Business Valuation?* at pp. 2-4; *See* Ex. 246 (Deposition of Neil J. Beaton, defendants' own expert in this case, in *Horne v. World Publications, LLC, Bonnier Corp., and Terry Snow*, October 27, 2011, No. 07-005798-CI-008 (Fla. Cir. Ct. 2011)) 280:1-11 (Asked whether action taken subsequent to the valuation date matters to his valuation, defendants' own expert, Beaton, testified: "It does not.  I'm valuing the company as of March 2004."); Ex. 247 (Deposition of Neil J. Beaton in *KDC v. Kraklow*, November 5, 2008, No. 04-cv-742 (Wis. Ct. App. 2008)) 48:24-49:5 (testifying that events that occurred "much later" than the valuation date did not "have any effect on the value of the company").

[6] 

[7]  Fair market value is defined as "the amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts." Ex. 236 (Pratt & Niculita, *Valuing a Business*) at pp. 41-42.  It is generally accepted and undisputed that the "fair market value" of a company's assets is not equivalent to the "book value" of those assets as reflected in its financial statements.  *See In re Roblin Indus., Inc.*, 78 F.3d 30, 36 (2d Cir. 1996) ("[B]ook values are not ordinarily an accurate reflection of the market value of an asset.").

[8]  Total assets are equal to owner's equity plus liabilities. Ex. 248 (Pacioli, *The Rules of Double-Entry Bookkeeping*) at 93-96; Ex. 261 (Expert Report of Thomas Z. Lys, PhD, dated April 16, 2014 ("Lys Report")) ¶¶ 30-36, 63-74; Ex 271 (Reply Expert Report of Thomas Z. Lys, PhD, dated July 16, 2014 ("Lys Reply")) ¶¶ 152-75; Ex. 237 (Reilly & Schwiehs, *The Handbook of Advanced Business Valuation*) at pp. 340-41; Ex 249 (ASA, *Valuation of Intangible Assets for Financial Reporting Purposes*) at p. 74; *see also In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 312 (D.N.J. 2007) (recognizing that shareholders' equity equals the difference between total assets and total liabilities); *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 350 (7th Cir. 1997) (same).

[9]  A going concern premise is the "presumption that in the absence of evidence to the contrary, a firm will operate indefinitely."  (¶ 34.)  Such a premise acknowledges that a business in operation has value in its ability to make profits over time, and thus has value above and beyond its liquidation value. Ex. 236 (Pratt & Niculita, *Valuing a Business*) at pp. 47-48.

[10]  *See also Copy-Data*, 1980 WL 1989, at *1 (holding that where the antitrust plaintiff's business was destroyed, for the purpose of damages, "it is to be valued as a going concern  . . .  as of [the valuation date]").

[11]  In *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502 (2d Cir. 1989), which AMI cites to support its assertion that "a track record of success is often a prerequisite to [] recovery," (AMI Br. 8), the court applied a higher standard than that required under antitrust law to hold that plaintiff's lost profits could not be recovered.  *Id.*

approach employed by Dr. Lys.  (¶ 34.)[12]  The lost profits approach is employed only when a business continues to operate despite the alleged unlawful conduct in order to calculate the value of a discrete stream of profits that the ongoing business would have earned but for the unlawful conduct.[13]

    <u>Second</u>, the principal drivers of Dr. Lys's DCF model are Anderson's projected future free cash flows, not its past accounting profits or losses.  (¶ 36.).  AMI's focus on Anderson's past accounting losses (AMI Br. 7-14) misses this critical point.  Those losses resulted, in part, from past non-cash charges that already had been fully borne and do not affect future cash flows, including depreciation of assets acquired years before the valuation date as part of its wholesaler consolidation efforts and the amortization of goodwill, a non-cash charge that flowed from prior

---

at 510 (applying a "reasonable certainty" standard as to the amount of damages when calculating lost profits in the breach of contract context).  In *Amerinet*, the plaintiff sought recovery for lost profits flowing from a new product that had no sales history other than two test sales.  *See Amerinet Inc. v. Xerox Corp.*, 972 F.2d 1483, 1498 (8th Cir. 1992).  In the *Argus* case, which was decided and affirmed on the issue of causation not damages, plaintiff sought to recover lost profits from the sales of a specific line of cameras.  *See Argus Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 906 (S.D.N.Y. 1985); *see also Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 39 (2d Cir. 1986).  Moreover, the plaintiff in *Argus* put forward inconsistent legal opinions regarding what caused its lost profits, thus undermining its own claim.  *See id.* at 43.  In *Microbix*, the court held that plaintiff's "lost future profits" were speculative because plaintiff had not secured manufacturing facilities, obtained necessary regulatory approval, developed the product in commercial quantities or marketed the product during the relevant time frame.  *See Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 698 (D. Md. 2000).  In *Eleven Line*, plaintiff also sought to recover lost future profits but relied on assumptions that did not have support in the record.  *See Eleven Line, Inc. v. N. Texas State Soccer Ass'n*, 213 F.3d 198, 206-09 (5th Cir. 2000) (noting also that plaintiff "did not pay payroll and property taxes timely and only rarely reimbursed [plaintiff's owner/manager] for his firm's services").  In *Peltier*, the plaintiff, again, was seeking damages in the form of lost profits; however, unlike Anderson, plaintiff demonstrated a trend of increasing losses in the years leading up to the alleged violation -- a trend that plaintiff admitted at trial would likely continue.  *See Peltier v. Exxon Corp.*, 527 F.2d 757, 759-60 (9th Cir. 1975).  In *Baush*, plaintiff's expert was asked to calculate the property value of a manufacturing plant.  *See Baush Mach. Tool Co. v. Aluminum Co. of Am.*, 79 F.2d 217, 227 (2d Cir. 1935).  While arguably a business valuation case, *Baush*'s dated requirement of "substantial evidence of changed conditions" has not been adopted in any subsequent business valuation cases.  *Id.*  Indeed, a search for the phrase across all cases reveals only thirteen instances of its employ, none in the business valuation context and all wholly inapplicable.

[12]   Moreover, most of the cases AMI cite do not involve *antitrust* damages and thus apply a different and higher standard of proof as to the calculation of damages.  For example, in *Proteus Books*, the court applied a higher standard than the reasonable estimate required under antitrust law to hold that plaintiff's lost profits could not be recovered.  *See Proteus Books*, 873 F.2d at 510 (applying a "reasonable certainty" standard as to the amount of damages when calculating *lost profits* in the breach of contract context).

[13]   *See* Ex. 179 (Beaton & Fahlman, *Business damages measurement: Lost Profits or Business Valuation?*) at p. 2.

acquisitions.  (¶ 2.)[14]

Third, incontrovertible evidence conclusively establishes that a company with past accounting losses nonetheless may have a significant going concern value.[15]  In 2001, during a period when Anderson was experiencing losses, defendant Time itself valued Anderson at $400 million.  (¶ 31.)  Two years later, in 2003, despite Anderson having sustained some of its largest one-time losses due to its acquisition of numerous independent wholesalers, Time again valued Anderson at $400 million.  (Id.)  In 2006, following years of annual losses, Anderson sold its Anderson SCN and Anderson Mid-Atlantic operations -- which represented less than one-fifth of Anderson's revenue at the time -- to a competitor for approximately $54 million.  (¶ 32.)[16]

In short, AMI's argument should be rejected because it contravenes Second Circuit law, is predicated on an inapplicable valuation approach, and ignores contemporaneous transactional data which demonstrate Anderson's significant value at the time of its destruction.  Anderson has presented more than sufficient evidence of a "just and reasonable" estimate of damages that is not even remotely speculative.  At a minimum, evidence that Anderson had a positive value at the time of its destruction creates a material fact issue regarding whether it suffered damages in this case, requiring denial of AMI's motion.

---

[14]   AMI misleadingly relies (AMI Br. 5) on a single January 15, 2009, e-mail from Jay Maier to Joel Anderson which contained a "back-of-the-envelope" estimate of cumulative losses of $236 million from non-party Brookvale Holding -- not Anderson News and Anderson Services -- over the previous ten years.  (Pl. 56.1 ¶ 310.)  Mr. Maier's "hurried calculation" includes the operating losses that flowed from the operations of certain Anderson assets sold to a competitor in 2006 and were no longer part of Anderson News or Anderson Services.  (Id.)  The estimate of losses also excludes the $54 million in consideration Anderson received in 2006 from the sale of those assets.  (Id.)

[15]   For example, Amazon.com Inc.'s stock currently trades at approximately $380 per share and the company has a market capitalization of approximately $175 billion even though in 2014 it suffered a loss of $241 million.  Ex. 280 (yahoo finance: AMZN, available at http://finance.yahoo.com/q?s=AMZN, last visited 2/24/15); Ex. 256 (Amazon.com, Inc., Form 10-K, Jan. 30, 2015).

[16]   At the time of the sale, the Anderson SCN and Anderson Mid-Atlantic operations had current liabilities that exceeded current assets by approximately $48 million, and yet they were still ascribed a significant positive value.  (¶ 34.)  Applying the same revenue multiple of 22% that was used to value Anderson SCN and Anderson Mid-Atlantic to Anderson's entire operation in 2006 yields an implied valuation of approximately $300 million for Anderson.  (Id.)

### B.  Anderson's Damages Are Based on Historical Data and Fully Supported By the Evidence

AMI's argument (AMI Br. 10) that Anderson had no reliable basis to project positive value as a going concern is also unsupported by the record.  The argument ignores the evidence showing that Anderson invested approximately $200 million to expand substantially its geographic operations through consolidation of smaller local wholesalers, and had, by early 2009, turned the corner and returned to profitability through aggressive revenue-enhancing and cost-saving measures.  (¶¶ 1-4.)[17]  Thus, the actual results from the first quarter of Anderson's fiscal-year 2009[18] reveal a *substantial* improvement from prior years, and positive EBITDA (earnings before income tax, depreciation and amortization), a critical financial metric.  (¶¶ 12-14.)  That Anderson had turned the corner is clear from the final three quarters of Anderson's operations in 2008.  (¶ 14.)  It was precisely because of these actual financial results that Anderson's Chief Financial Officer for Anderson, John Campbell, testified that "we were very optimistic of the company at this time."  (¶ 14.)

AMI ignores this irrefutable evidence to claim (AMI Br. 10) that Anderson actually gained $6 million by going out of business simply because its liquidation proceeds of $47 million exceeded the value of Anderson's organic cash flows of $41 million by $6 million.  This argument, which essentially compares apples to oranges, is nonsensical.  AMI improperly compares the value of Anderson's total assets following defendants' illegal conspiracy (the $47 million liquidation proceeds) against just a small portion of Anderson's enterprise value -- which itself, by definition, encompasses only one component of the value of Anderson's total assets --

---

[17]  *See* Ex. 270 (July 16, 2014 Reply Expert Report of Philip J. Gund, CPA, CIRA ("Gund Report")) Exhibit 1; Ex. 261 (Lys Report) Figures 61, 67; Ex. 213 (Deposition of Charles Anderson, Jr. ("Anderson Jr. Dep.")) 57:11-12 ("The company had positive EBITDA at the end of 2008").

[18]  Anderson had a fiscal year that ended in September; the first quarter of fiscal year 2009 in fact reflects the last three months of 2008.  (¶ 14 n.4.)

(the $41 million figure representing only Anderson's DCF-derived organic cash flows).  (¶ 42.)

AMI entirely ignores Dr. Lys's actual determination of the value of Anderson's total assets prior

to defendants' illegal conspiracy -- approximately $419 million, which is nearly $371 million

more than the value of those total assets in liquidation and represents the actual measure of

Anderson's damages here.  (*Id.*)  AMI's comparison also ignores the millions of dollars in

expected cost savings from anticipated publisher concessions and Anderson's initiatives.[19]

AMI also improperly characterizes as "undisputed facts" (AMI Br. 2) certain general

statements by Charles Anderson, Jr. ("Charlie Anderson") regarding Anderson's financial

condition that were made -- in the context of negotiations -- during the January 14, 2009

industry-wide conference call when Anderson disclosed its proposed new pricing terms, which

included a reduction in the price Anderson would pay to publishers for magazines.  Nothing in

these statements, however, negates the actual, contemporaneous financial data, which show that

the company had turned the corner and returned to profitability.  (Pl. 56.1 ¶ 300.)  AMI also

ignores the context of those statements:  business negotiations between Anderson and powerful

publishers over pricing terms.  (*Id.*)

Moreover, AMI's claim that Anderson "had no ability to service its current liabilities"

(AMI Br. 3) is directly contravened by the record: on January 1, 2009 -- just one month prior to

Anderson's destruction -- ████████████████████████████████████; Anderson

continued to make millions of dollars in payments to defendant national distributors throughout

January 2009; and Anderson generated sufficient cash flow from day to day operations to meet

---

[19]   Ex. 261 (Lys Report) ¶¶ 276-94.  To be sure, AMI's contention that Anderson had no goodwill value is unfounded.  (*See* AMI Br. 10-11.)  Conspicuously, AMI does not cite to any record evidence to support its statement.  *See id.*  This is because Anderson *did* have goodwill value in early 2009.  As shown in its financial statements, Anderson was still amortizing the goodwill it received from its acquisitions during the period of wholesaler consolidation.  *See* Ex. 199 (Deposition of Jay Maier ("Maier Dep.")) 295:8-296:11.  Beyond accounting goodwill, Anderson also derived intangible value from its strong relationships with retailers (notably, market-giant Walmart) and the efficiencies gained from its vast network of trucks and distribution centers.

its operating expenses.  (¶ 15.)  Though not without the occasional dispute over timing, the record is clear:  Anderson always paid its bills before defendants forced it out of business.  (*Id*.).

AMI also mistakenly characterizes as an "undisputed fact" (AMI Br. 3) a single statement in a 2007 PowerPoint presentation Anderson provided to publishers in an effort to obtain improved pricing, which notes that "[s]hareholders refuse to make additional capital available because future prospects are negative."  AMI ignores entirely evidence indisputably showing that Anderson's shareholders did in fact make additional capital contributions after the presentation, both later that year in 2007 and again in December 2008.  (Pl. 56.1 ¶ 305.)[20]

Similarly, AMI improperly relies (AMI Br. 4) on a Patrick Bowman[21] draft spreadsheet titled "Break-even Analysis" to argue that Anderson needed a 5-6 cent per copy surcharge just to break even.  That spreadsheet, however, does not account for the significant cost savings from other initiatives already being implemented, such as the 2008 headcount reductions, the elimination of unprofitable titles, revenue from Anderson Services, or changes in cover price.  (Pl. 56.1 ¶ 308.)  Nothing in the spreadsheet negates the actual financial data showing that Anderson had turned the corner and returned to profitability.[22]

Moreover, contrary to AMI's assertions (AMI Br. 12), Anderson embraced and did not "consciously avoid historical data" in projecting its future earnings.  Indisputably, Dr. Lys's damages model -- as required by the Second Circuit -- properly relies on Anderson's actual, historical data and information in existence as of its valuation date.  (¶ 37.)  While defendants

---

[20]   Capital was also made available to Anderson in the form of increased factoring and loans from affiliated Anderson companies.  (*Id*.)

[21]   In 2009, Mr. Bowman was the vice president of category management at Anderson.  (AMI 56.1 Stmt. ¶ 307.) Mr. Bowman is not an accountant, holds no certifications in financial analysis, and never even saw Anderson's financial statements which he used in his analysis.  (Pl. 56.1 ¶ 307-08) ("I wasn't aware of what Anderson News' specific financial performance was for any time period.").

[22]   *See, e.g.,* Ex. 270 (Gund Report) Exhibit 1; Ex. 213 (Anderson Jr. Dep.) at 57:11-12 ("The company had positive EBITDA at the end of 2008").

argue that Dr. Lys should have used a greater date range when calculating the cover price growth rate that was factored into his calculation of Anderson's wholesale costs for magazines (AMI Br. 11-12), Dr. Lys explained that the absence of reliable data for years before 2007 constrained his choice of date range.[23]  The cases that AMI cites in support of its argument that Dr. Lys improperly avoided historical data are all highly distinguishable; in each instance, the suspect projections did not come from the most recent and best available historical data.[24]

Additionally, AMI's contention (AMI Mot. at 16-17) that Dr. Lys should have relied on *ex post* data or information concerning cover prices (that was not known or knowable as of the valuation date) is premised upon clearly inapposite case law involving "lost profit" damages and has been rejected by the Second Circuit.  Because events occurring after the unlawful conduct cannot aid in discerning what was known or knowable as of the valuation date, courts consistently have held that such *ex post* data should not be considered when determining the fair market value as of a date certain.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) ("The district court's inquiry into GEM's performance and market conditions in the months *following* the acquisition was improper because events subsequent to

---

[23]   Ex. 234 (Deposition of Thomas Z. Lys ("Lys Dep.")) at 123:23-24 ("[T]he pre-'07 data were unreliable so I couldn't use it."). <span style="background:black">▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮</span>

Moreover, AMI's argument that Dr. Lys did not properly consider Dr. Marx's testimony that "nominal cover prices generally track CPI during this period" is meritless because Dr. Marx was testifying about a review of data from the years 2007 to 2013, which largely consists of irrelevant *ex post* data.  Ex. 259 (Expert Report of Leslie M. Marx, dated April 16, 2014 ("Marx Report")) ¶ 373 n. 545.

[24]   *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 912 (2d Cir. 1962) (rejecting projections selecting and applying the highest profit to revenue ratio ever experienced by the firm, which was from outside the relevant damages period and represented a six-fold increase over the ratios experienced during the that period); *Joseph E. Seagram & Sons Inc. v. Hawaiian Oke & Liquors Ltd.*, 416 F.2d 71, 86-87 (9th Cir. 1969) (rejecting projections that relied exclusively on one "extraordinary month" of sales, whose extraordinariness was known to all in the industry at the time as it was the result of the stockpiling of inventory in anticipation of a looming tax hike); *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 457 (5th Cir. 1979) (rejecting projections of lost sales not based on *any* historical data but rather upon plaintiff's feelings); *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F. Supp. 954, 967-68 (M.D. Pa. 1981) (rejecting projections based on the best sales year out of several for each separate business segment of its operations).  Further, all of these cases involve lost profits valuation models, not business valuation models.

the breach, viewed in hindsight, may neither offset nor enhance Allegheny's general damages.")
(citation omitted).[25]

In short, as required by the Second Circuit, Dr. Lys properly relied on actual, historical
data and reasonable assumptions concerning growth rates drawn from that data.  Further, the case
law that forms the basis of AMI's summary judgment on damages is inapposite and certainly not
a basis for a judgment on damages as a matter of law.

### C.       Anderson's Damages Attributable to Publisher Concessions and Anderson Initiatives Are Well-Grounded in the Data and Other Evidence

Anderson's damages attributable to publisher concessions and its initiatives that
Anderson already had planned and begun to implement in the months before its destruction are
reasonable, fully supported by the evidence and are not, as AMI contends, speculative as a matter
of law.

### 1.       Publisher Concessions

That Anderson would have received the equivalent of 2% in additional discount off the
cover price across all publishers, but for defendants' conspiracy, is supported by the opinions of
Dr. Lys and Dr. Picard, which were formed after their review and analysis of documentary and

---

[25]    *See also MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 939
(S.D.N.Y. 1995) (upholding valuation based on projections that were developed using appropriate methodology at
the time they were made rather than dismissing them because hindsight proved them to be inaccurate); *Oscar Gruss
& Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("New York courts have rejected awards based on what
the actual economic conditions and performance were in light of hindsight.") (citations and quotations omitted);
*Sharma*, 916 F.2d at 826 (same); *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283,
345 (Bankr. S.D.N.Y. 2007) (value must be determined "as of the time of the alleged transfer and not at what assets
turned out to be worth at some time after the bankruptcy intervened") (citations and quotations omitted); *Coated
Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.)*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992) (same);
*Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, 98 CIV. 3251 (HB), 2000 WL 178278 at *10 (S.D.N.Y.
Feb. 16, 2000) (same); *Guggenheim v. Helvering*, 117 F.2d 469, 472-73 (2d Cir. 1941) ("Only so far as present
opinion is composed in part of a forecast of the future can the future be supposed to have anything to do with it; and
it really has none even then, because a forecast of the future is an entirely different thing from the actual future
which will confirm or falsify it.").

testimonial evidence from plaintiffs, defendants and third parties.[26]

Dr. Lys's and Dr. Picard's opinions are supported by, among other things, evidence of concessions offered to Anderson in January 2009 by national distributors TWR and Comag, █████████████████████████████████████████████████████████. (¶¶ 17-27.)  It is also based on the testimony of Charlie Anderson concerning the deal he struck for an additional 2% concession from Time and Curtis' publisher clients on January 31, 2009.  (*Id.*)

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████ Time offered (and Anderson accepted) an additional discount of 2% on weekly magazines, and 2.75% for *People* magazine during the course of their negotiations with Anderson in January 2009.  (¶¶ 20-24.)  Based on multiple conversations with Bob Castardi, president and COO of Curtis, Charlie Anderson understood that Castardi had given his "proxy" to Rich Jacobsen at TWR to negotiate with Anderson, which led Charlie Anderson to believe that an agreement with Time was also an agreement with Curtis and its publisher clients.  (¶¶ 25-27.)[27]  Separately, in early 2009, through its IMPACT II program, ████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████[28]  Based on these facts, Dr. Lys

---

[26]   *See* Ex. 260 (Expert Report of Robert G. Picard, PhD, dated April 16, 2014 ("Picard Report")) ¶¶ 161-68; Ex. 261 (Lys Report) ¶¶ 276-87.

[27]   That Charlie Anderson and Jacobsen disagree on the exact contours of the deal reached between them does not invalidate Anderson's damages calculations; rather, it demonstrates the existence of a material fact issue that must be decided by the jury.

[28]   *See* Ex. 260 (Picard Report) ¶¶ 164-65. ████████████████████████████████████████████
████████████████████████████████ (¶ 19.) ███████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████  While Anderson and Comag had not formally executed an IMPACT II agreement before Anderson's demise, the parties had reached a 30-day standstill agreement to enable further negotiations -- negotiations that were cut short due to defendants' illegal conspiracy.  (¶ 19.)

estimated that the additional value to Anderson from the anticipated publisher concessions was approximately $150 million.  (¶¶ 38, 40, 42.)

AMI's argument that the concessions are unreasonable also contravenes the standard for antitrust damages:  Anderson's damages calculations model the world but for defendants' illegal conspiracy.  Defendants eliminated Anderson from the market specifically to avoid paying these concessions.  The fact that they were not offered by certain publishers after Anderson's elimination would only reflect the success of defendants' conspiracy and in no way undermines the reasonableness of Anderson's damages estimate regarding publisher concessions.

Further, AMI's argument ignores the fact that Anderson does not purport to predict the *precise* outcome of all potential publisher negotiations, nor does it claim that all publishers would have agreed to this precise concession.  In fact, the concessions offered to Anderson by Time and Comag in the actual world differed in their precise details, but their value was consistent with a 2% discount.  Working from the concessions already being offered by the industry's key players, which accounted for ███ of Anderson's single-copy magazine business,[29] Anderson arrived at the conclusion that, on average, it would have enjoyed concessions equivalent to a 2% improvement in discount from publishers in the world but for defendants' illegal conspiracy.[30]

In sum, the publisher concessions represent a reasonable estimate, based upon the relevant evidence in the record, as to what Anderson would have received but for defendants'

---

[29]   *See* Ex. 259 (Marx Report) Fig. 2.

[30]   Disregarding the data and evidence supporting the publisher concessions, AMI argues (AMI Br. 16-17) that irrelevant *ex post* data somehow entitles it to summary judgment on the publisher concessions.  But, AMI's argument that the wholesalers remaining after Anderson's destruction did not receive such concessions is both legally incorrect and factually meritless.  Legally, that argument is contrary to Second Circuit law which, as discussed above, expressly proscribes business valuations based on *ex post* data.  Factually, the evidence demonstrates that the wholesalers toward whom most defendants unlawfully directed Anderson's business did in fact receive additional discounts from Time ranging from 2 to 2.75% after Anderson was eliminated from the market.  (¶ 28.)

illegal conspiracy.  *See Bigelow*, 327 U.S. at 264.  AMI's disagreement with the testimony supporting publisher concessions does not entitle AMI to summary judgment as a matter of law; it merely highlights the existence of a material fact issue requiring denial of the motion.

### 2.      Initiatives[31]

That Anderson would have received the benefit of cost-cutting and revenue-enhancing initiatives, but for the defendants' conspiracy, is supported by Dr. Picard,[32] who formed his opinions based on contemporaneous documentation and other relevant evidence and, as required by *Story Parchment*, the damages calculation for the initiatives represents a reasonable estimate, based upon the relevant evidence in the record, as to what Anderson would have received but for defendants' illegal conspiracy.  *See Bigelow*, 327 U.S. at 264. [33]

Anderson's initiatives[34] are supported by the evidence, including internal emails, board minutes for Anderson News, Anderson Services, and ProLogix East, contemporaneous financial documents and calculations and deposition testimony of Anderson executives and employees. (¶¶ 4-11.)[35]  This wealth of support is a far cry from "a two-page list of words and phrases,"

---

[31]  AMI does not seek summary judgment as to Anderson Services with respect to damages.  (AMI Br. 7.) However, the benefits from certain initiatives accrued to Anderson Services, not Anderson.  For instance, the revenues from third-party logistics are unique to Anderson Services.  Ex. 260 (Picard Report) ¶ 175; Ex. 270 (Gund Report) Exhibit 4.  Therefore, the damages that flow from third-party logistics are not under consideration in this motion.

[32]  Anderson's refutation of defendants' baseless attacks against Dr. Picard, as set forth in Plaintiff's Opposition to Defendants' Joint Motion to Exclude the Testimony of Dr. Robert G. Picard at 14-25.

[33]  *See also* Ex. 210 (Deposition of Robert G. Picard ("Picard Dep.")) at 202-03 ("I felt that these were *reasonable estimations* they met, they made, that the process they went through were reasonable to support it, and that what was happening in distribution industries generally was supportive of these kinds of moves.  And all of those things increase what you've determined as likelihood of success and they made it so that it was highly reasonable to believe that they would achieve the implementation of these initiatives.")

[34]  For a more detailed discussion of Anderson's initiatives, *see* Ex. 260 (Picard Report) ¶¶ 169-236.

[35]  *See, e.g.*, Ex. 642 (ANEWS0089377-407) at 378, 391; Ex. 142 (ANEWS0089408-83) at 408, 409, 412, 417, 419, 469, 480; Ex. 143 (ANEWS0089485-89); Ex. 144 (ANEWS0092943-3131) at 2964; Ex. 145 (ANEWS0093132-48) at 147; Ex. 146 (ANEWS0099860-934) at 863; Ex. 589 (ANEWS0099963-100074) at 99996; Ex. 147 (ANEWS0141598-614) at 599; Ex. 643 (ANEWS0142182-85); Ex. 655 (ANEWS0151860-900) at 868; Ex. 323 (ANEWS0188026-27); Ex. 562 (ANEWS0188163); Ex. 324 (ANEWS0188574); Ex. 435 (MBHN00016188-211); Ex. 436 (MBHN00047071-103); Ex. 644 (MBHN00127532); Ex. 645 (MBHN00123789); Ex. 646

which AMI falsely contends (AMI Br. 18) -- ignoring the entirety of Dr. Picard's testimony -- provided the primary support for Anderson's initiatives.

Anderson's initiatives were thoroughly vetted, interrelated cost-cutting and revenue-enhancing measures that Anderson had been discussing for years and whose implementation had already begun, and in some cases were well under way by early 2009.  For example, starting in late 2007, and over the course of the following year, Anderson purchased and distributed handheld scanning devices to all of Anderson's 1,200 delivery and merchandising employees.  (¶ 6.)  These handheld devices -- which already had been distributed and field tested by the time of Anderson's exit, and whose expense already was borne[36] -- were an integral and necessary part of the implementation of the majority of Anderson's initiatives, such as third-party logistics, systems and process improvements, elimination of check-in/check-out, elimination of claims, elimination of paper proof of delivery, and rationalizing store hours.  (¶ 6.)  For those initiatives not centered upon the use of handhelds, field tests had already been conducted (expansion of delivery window), the necessary software was already purchased and installed (geo-routing), and/or the initiative had been successfully implemented with Anderson's largest retail client (elimination of fixtures).  (*Id*.)

Dr. Picard's opinions also were informed and supported by numerous academic articles and studies regarding the implementation of identical, or similar, initiatives within the single-copy magazine industry and related logistic-based industries.  ████████████████

████████████████████████████████████████████████████████

---

(MBHN00123791); Ex. 656 (MBHN00123794); Ex. 647 (MBHN00123798); Ex. 648 (MBHN00123799); Ex. 649 (MBHN00123800); Ex. 650 (MBHN0014020-25); Ex. 651 (MBHN00124319-21); Ex. 653 (MBHN00124332-33); Ex. 654 (MBHN00124812).

[36]   Anderson had not only paid for the hardware necessary for its handheld devices, but had also invested substantially in the software costs related to implementing the handheld-based initiatives.  (¶ 6.)

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[37]   Ultimately, Dr. Picard

opined that it was "reasonably certain" that Anderson would successfully implement these

initiatives.[38]

That Anderson did not maintain detailed written plans for each initiative does not render

the initiatives speculative or incapable of implementation.  As Dr. Picard states, Anderson's flat,

hierarchical management structure, with hands-on managers, reduced the need for voluminous

internal reporting before the implementation of a cost-saving initiative.[39]  ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████[40]

Nor is there any requirement under the antitrust laws for the nature and extent of



[37] ██████████████████████████████████████████████████████████████

[38]   Ex. 210 (Picard Dep.) 203:21-204:12. ██████████████

[39]   *See* Ex. 272 (Reply Expert Report of Robert G. Picard, PhD, dated July 16, 2014 ("Picard Reply")) ¶ 39; Ex. 210 (Picard Dep.) at 161-63 ("One of the things about the way Anderson conducted their business is that it was a very interrelated company business and it was, and the decisions were made by very few people spread across those companies, and they did not prepare large-scale plans and pass them around, they discussed them with each other. And so they were not thirty-page analyses for each venture produced by the company.  So this was -- I would have loved to see that, but that's just not the way they do business.  It's a family company and it's a rather horizontal company rather than vertical, so they don't have to produce as much reporting because they're dealing daily with each other."), 240-41 ("Q.  And an example of that be the test that Wal-Mart and Anderson Services ran in the Dallas-Fort Worth area in 2008?  A.  Yes.  Q.  Are you aware of any documentation of the results of that test?  A. No, I'm not.  I discussed it with them, I asked them if they had a report, if they had written a report, they did not. They did not feel they needed to write a report to management on it, because management was intimately involved in the test, and so they did not write a report.").

[40]   *See* Ex. 250 (Whittman Dep.) 49:4-12, 54:10-13.

documentation that defendants are demanding.  The law is precisely to the opposite, and recognizes that "exact proof of the amount of damages is not required.  An antitrust plaintiff must thus provide only sufficient evidence to support a just and reasonable estimate of damages."  *U.S. Football League*, 842 F.2d at 1378 (quotations and citations omitted).

AMI's contention (AMI Br. 18) that there were a "complete absence of agreements necessary to implement" Anderson's initiatives is patently false.  First, Anderson had already implemented or tested many of these SBT-related initiatives with its largest retail client Walmart without an agreement.  (¶¶ 7-9.)  Second, as AMI itself recognizes, several initiatives were entirely internal to Anderson and did not require retailer participation to be implemented.  (AMI Br. 19-20.)  Retailer adoption regarding Anderson's other initiatives was largely predicated on the implementation of SBT.  Dr. Picard's assessment of the reasonableness of management's projections relating to SBT -- that, by the end of 2010, 80% of Anderson's accounts (by sales) would have converted to SBT -- was based on Anderson's expectations as evidenced in contemporaneous documents; the testimony of the retail partners with whom the expected SBT relationships were contemplated; and academic articles and studies regarding SBT in the single-copy magazine industry and other related industries.[41]

In sum, there is ample support in the record to establish the viability and success of Anderson's initiatives.  Where certain initiatives were contingent on retailer adoption, Anderson had either already secured such adoption or was in the process of negotiations or testing such

---

[41] *See* Ex. 126 (PICARD012); Ex. 562 (ANEWS0188163); Ex. 193 (Deposition of David Rustad ("Rustad Dep.")) 126-28; Ex. 211 (Deposition of David Addison ("Addison Dep.")) 147:4-150:22, 174:21-175:1; Ex. 221 (30(b)(6) Deposition of The Paradies Shops, LLC, Represented by Lou Bottino ("Bottino Dep.")) 20:20-22:19.  Anderson already had reached over half of their projected 80% participation in SBT by early 2009, and was in contract negotiations with its second-largest client, Kroger, which "very much wanted to get to SBT."  Ex. 193 (Rustad Dep.) 126:7-128:22.  To retailers' pleasure, Anderson was a market leader in the championing and adoption of SBT.  *See* Ex. 221 (Bottino Dep.) 20:20-22:19.  Had defendants not destroyed Anderson through their illegal conspiracy, Anderson likely would have met or even exceeded its projections.

adoption.  AMI does not cite to any legal authority that bars recovery of these damages as a

matter of law; the likely success of the initiatives and their attendant savings is a material fact

issue that should therefore be left for the jury.

> ### 3.      Anderson Has Properly Established a Reasonable Estimate of Damages Attributable to Projected Publisher Concessions and Anderson's Initiatives

AMI's contention (AMI Br. 14) that both the anticipated publisher concessions and

Anderson initiatives are predicated upon the execution of "hoped for future agreements and un-

implemented cost savings" is false.  With respect to future agreements, AMI's argument

misconstrues what the publisher concessions component represents: it does not reflect the precise

outcome of a given contract.  Instead, it encompasses the likely average value of the concession

that publishers would have offered if defendants had not resorted to their illegal conspiracy.

AMI's citation to *Gatt Communications*, which contemplated the loss of certain specific

competitive bids, is therefore unavailing.  *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711

F.3d 68, 79 (2d Cir. 2013) (affirming the lower court's dismissal on antitrust standing not

damages grounds).  Further, the court in *Three Crown* held that its denial of recovery for the

damages to which AMI cites was expressly due to the absence of a specific intent to injure,

which does not exist here.  *See Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 906 F. Supp.

876, 885 (S.D.N.Y. 1995) (noting that specific intent to harm is present in cases, like this one,

that involve "boycotts, refusals to deal, terminations, and exclusions").

The remainder of the cases upon which AMI relies for its argument all involve fledgling

or new businesses, and are thus inapplicable to Anderson, which had been in the magazine

wholesaling business since 1917.  In *Waldron*, the plaintiff was not a business at all -- plaintiff

argued unsuccessfully that "he was engaged as a principal in the business of importing and

selling oil" on the strength of a single letter of credit which plaintiff admitted he did not have the

requisite assets to implement. *Waldron v. British Petroleum Co., Ltd.*, 231 F. Supp. 72, 82-83 (S.D.N.Y. 1964). *Raemco*, *Laurie Visual*, and *Peller* all involved the calculation of damages for new businesses or product lines and therefore applied the "preparedness rule" requiring plaintiffs to show: "(1) plaintiff's background and experience in the proposed business; (2) any affirmative action by plaintiff to engage in the activity; (3) plaintiff's ability to finance the enterprise; and (4) consummation of contracts to enter the business." *Raemco, Inc. v. Allegheny Airlines*, 496 F. Supp. 546, 553-54 (S.D.N.Y. 1980) (holding that plaintiff could not satisfy the third and fourth prongs of the preparedness standard).[42]  Unlike these cases, there are decades of prior experience and an ample evidentiary foundation from which to make a reasonable projection of Anderson's damages. *See Webb v. Utah Tour Brokers Assoc.*, 568 F.2d 670, 678 (10th Cir. 1977) (stating that antitrust damages theories "will not be rejected where there is some prior experience with which to make a comparison.  With such evidentiary foundation there can be a projection").[43]

### D. Dr. Lys's Methodology Properly Determines the Fair Market Value of Anderson's Total Assets

Without any legal basis and in contravention of widely-recognized and generally accepted valuation and accounting principles set forth in valuation texts, which have been

---

[42]  *See also Laurie Visual Etude, Inc. v. Chesebrough-Pond's, Inc.*, 473 F. Supp. 951, 955-58 (S.D.N.Y. 1979) (holding that plaintiff could not satisfy the first, third or fourth prongs of the preparedness standard); *Peller v. Int'l Boxing Club, Inc.*, 227 F.2d 593, 594-96 (7th Cir. 1955) (pre-dating the preparedness standard but nonetheless holding that plaintiff could not recover damages because he lacked background and experience in the proposed business, did not have the necessary finances for the endeavor and did not consummate any contracts).

[43]  Moreover, despite its inapplicability, Anderson's damages components related to publisher concessions and its initiatives both easily satisfy the preparedness rule.  First, Anderson and its management indisputably possessed decades of experience in the single-copy magazine industry.  (¶ 12).  Second, with respect to publisher concessions, Anderson had begun successfully negotiating these concessions with publishers and/or their national distributors. (*See supra* at 13-16.)  For its initiatives, Anderson had already made the necessary expenditures, had conducted field tests, and was already in the process of their implementation.  (*See supra* at 16-20.)  Third, due to its deep-pocketed parent organization, and its credit revolver, Anderson had ample access to capital.  (Pl. 56.1 ¶ 305-06).  Fourth, with respect to consummation, for concessions Anderson had already arrived at a "handshake deal" with TWR and was already being offered an estimated 2% discount by Comag in their proposed IMPACT II agreement.  (*See supra* at 14-15.)  On the initiatives front, where initiatives were predicated on retailer adoption, in many instances Anderson had already secured the participation of Walmart, the nation's largest retailer and Anderson's biggest customer, as well as other retail customers.  (*See supra* at 19.)

recognized as authoritative in the Second Circuit, AMI challenges Dr. Lys's addition of

Anderson's non-interest-bearing liabilities to the result of his DCF-derived enterprise value to

obtain the fair market value of Anderson's total assets as of the valuation date.  When a business

is destroyed -- as is the case here -- total assets, and not just enterprise value, are destroyed.

      Thus, to determine Anderson's total damages, Dr. Lys calculated the difference in the fair

market value of Anderson's total assets as of February 10, 2009, and the fair market value of

Anderson's assets after it was forced out of business by defendants -- the liquidation proceeds

Anderson received in bankruptcy.  (¶ 40-42.)[44]  AMI mistakenly argues (AMI Br. 21-23),

however, that it was improper for Dr. Lys to add Anderson's non-interest-bearing liabilities to

Anderson's enterprise value.[45]  That argument is contrary to authoritative valuation treatises,

finance theory and the case law and ignores the fundamental difference between the value of

total assets and enterprise value.

      Dr. Lys determined Anderson's enterprise value based on his DCF analysis, which

indisputably excludes Anderson's non-interest-bearing liabilities -- a form of short-term

operating credits.[46]  This exclusion reflects the function of a DCF analysis: to determine the

excess cash flow that the company can generate after paying its operating liabilities (such as

---

[44] ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

[45]   Here, as is common in the valuation industry and as Dr. Lys explains in his report, the enterprise value derived from his DCF calculations is equal to the value of owner's equity plus interest-bearing liabilities.  Ex. 261 (Lys Report) ¶¶ 35, 63, n. 10; Ex. 234 (Lys dep.)  88:11-89:4; *see also* Ex. 236 (Pratt & Niculita) at pp. 37, 216; Ex. 235 (Mard & Hitchner, *Valuation for Financial Reporting*, 2d ed.) at p. 67.

[46]   *See* Ex. 635 Financial Reporting, Financial Statement Analysis and Valuation, by James M. Wahlen, Stephen P. Baginski, and Mark Bradshaw, at 264-65: "non-interest-bearing liabilities (such as accounts payable and accrued liabilities) … are sources of indirect financing" and "items that are not directly invested capital."

trade payables), and then to discount those excess cash flows to derive enterprise value.  In essence, the DCF analysis assumes that the company continues to operate.

Here, however, defendants' conspiracy destroyed Anderson's business.  Anderson lost the ability to satisfy both its operating liabilities owed to trade vendors and its ability to generate excess cash flow to pay equity and debt investors.  The value provided from the DCF model does not reflect the fair market value of Anderson's total assets because the DCF computes enterprise value (the value of equity and interest-bearing liabilities) and excludes non-interest-bearing liabilities.[47]  Thus, to obtain Anderson's total damages, *i.e.*, the fair market value of its total assets, it was necessary for Dr. Lys to add Anderson's non-interest-bearing liabilities to the DCF-derived enterprise value.  This is entirely consistent with the fundamental accounting and valuation principle, that assets are equal to the sum of owner's equity plus liabilities.[48]

A simple example explains this fundamental principle: if a company has an enterprise value of $1 billion (for simplicity), no interest-bearing debt and $100 million of trade payables, a buyer has the option of (i) paying $1 billion for the equity and assuming liability for the $100 million in trade payables, or (ii) paying $1.1 billion with the understanding that the seller will satisfy the trade payables from the proceeds.[49]  The valuation is the same ($1.1 billion free and

---

[47]   *See* Ex. 261 (Lys Report) ¶¶ 30-36, 63-74; *See also* Ex. 237 (Reilly & Schwiehs, *The Handbook of Advanced Business Valuation*) at 340-41; Ex. 235 (Mard & Hitchner, *Valuation for Financial Reporting*, 2d ed.) at 67.

[48]   The fundamental accounting identity states that Assets = Owner's Equity + Liabilities.  Ex. 261 (Lys Report) ¶¶ 30-36, 63-74; Ex 271 (Lys Reply) ¶¶ 152-75.  In that identity, liabilities can be further broken down as interest-bearing liabilities plus non-interest-bearing liabilities (Liabilities = Interest-Bearing Liabilities + Non-Interest-Bearing Liabilities).  Ex. 261 (Lys Report) ¶¶ 30-36.  As Dr. Lys's DCF-derived enterprise value accounts for owner's equity and interest-bearing liabilities (Enterprise Value = Owner's Equity + Interest-Bearing Liabilities), that fundamental accounting identity now reads Assets = Enterprise Value + Non-Interest-Bearing Liabilities.  Ex. 261 (Lys Report) ¶ 170.

[49]   Byron F. Egan, *Asset Acquisitions: Assuming and Avoiding Liabilities*, 116:3 PENN ST. L. REV. 913, 954 (2012) ("In any transaction in which a buyer is acquiring an ongoing business, the buyer is likely to be assuming certain of the seller's liabilities, especially obligations incurred by seller in the ordinary course of seller's business. Indeed, it is likely to be very important to the buyer in dealing with the seller's creditors, vendors, customers, etc. that the asset purchase be viewed in a seamless process in which the buyer hopes to get the benefit of seller's goodwill for which the buyer has paid.").

clear or $1 billion plus assumed liabilities of $100 million), but the accounting for liabilities

hinges on whether the buyer is acquiring only the equity of the company or -- as is the case here

-- buying the assets free and clear of liabilities.[50]

In addition, AMI's contention ignores the fact that Anderson remained liable for all of the

companies' unsatisfied liabilities, despite having been forced out of business, including the trade

payables.  Defendants' unlawful conspiracy directly interfered with Anderson's ability to satisfy

its trade payables and other liabilities, causing explicit harm to Anderson.  Moreover, those

liabilities -- certain of which are owed to defendants -- must be satisfied from any recovery in

this action.  The addition of non-interest-bearing liabilities to the DCF-derived enterprise value is

necessary to place Anderson -- as required under the law in the Second Circuit -- in the position

it would have been absent defendants' unlawful conduct.

Not surprisingly, AMI has provided no legal authority whatsoever which holds that Dr.

Lys's indirect determination of Anderson's total assets in this manner was in any way improper.

The complete absence of such legal authority establishes that AMI simply is not entitled to

judgment as a matter of law in this regard.[51]  Dr. Lys's calculation of Anderson's damages by

---

[50]   Thus, to determine properly Anderson's total assets, Dr. Lys necessarily had to account for non-interest-bearing liabilities in the precise manner he did here.  Anderson did not incur those liabilities in a vacuum, but instead only did so in exchange for assets of equal value, which is precisely why the value of those liabilities must be measured when determining Anderson's damages.  AMI's conclusory argument to the contrary not only is factually baseless but unsupported by any legal authority.

[51]   The fact that the decisions in *Lippe* and *24/7 Records* make no mention of non-interest-bearing liabilities is unsurprising and of no moment.  In *Lippe* the court discussed the fact that the precluded expert did not apply the DCF method whatsoever, not the mechanics of how one properly employs the DCF method to calculate total asset value as a going concern.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003).  Similarly, in *24/7 Records*, the court does not discuss the proper use of the DCF method to calculate the total asset value of a going concern but rather mentions that "fair market value of the business before its destruction is the most common method of measuring destruction of business damages" and that "fair market value is usually determined by the capitalization of expected future profits," before holding that the plaintiff had not offered any evidence to support its business valuation.  *See 24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 316-17 (S.D.N.Y. 2008).  Dr. Lys's calculation of damages is entirely consistent with the statement of the *24/7 Records* Court.

computing its total asset value is supported by valuation treatises and defendants' own experts.[52]

As such, AMI's request for summary judgment on this component of Anderson's damages

should be denied.

## CONCLUSION

Based on the foregoing, Anderson respectfully requests that the Court deny AMI's

motion for summary judgment.

Dated:  New York, New York
        March 9, 2015

                            Respectfully submitted,

                            KASOWITZ, BENSON, TORRES &
                             FRIEDMAN LLP

                            By:_____
                                Marc E. Kasowitz (mkasowitz@kasowitz.com)
                                Hector Torres (htorres@kasowitz.com)
                                Constantine Z. Pamphilis
                                (dpamphilis@kasowitz.com)
                                Seth Davis (sdavis@kasowitz.com)

                            1633 Broadway
                            New York, New York 10019
                            Tel.: (212) 506-1700
                            Fax: (212) 506-1800

                            *Attorneys for Plaintiff Anderson News, L.L.C.*

_____

*See also* Ex. 236 (Pratt & Niculita) at pp. 37, 216; Ex. 235 (Mard & Hitchner, *Valuation for Financial Reporting*, 2d ed.) at p. 67; Ex. 237 (Reilly & Schwiehs, *The Handbook of Advanced Business Valuation*) pp. 340-41; Ex 249 (ASA, *Valuation of Intangible Assets for Financial Reporting Purposes*) at p. 74.