UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDERSON NEWS, L.L.C. and LLOYD WHITAKER,
as the Assignee under an Assignment for the Benefit of
Creditors for Anderson Services, L.L.C.,

                         Plaintiffs,

      - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING
CO., L.P., CURTIS CIRCULATION COMPANY,
DISTRIBUTION SERVICES, INC., HACHETTE
FILIPACCHI MEDIA U.S., INC., HEARST
COMMUNICATIONS, INC., HUDSON NEWS
DISTRIBUTORS LLC, KABLE DISTRIBUTION
SERVICES, INC., RODALE, INC., TIME INC., and
TIME/WARNER RETAIL SALES & MARKETING,
INC.,

                         Defendants.

---

AMERICAN MEDIA, INC., HEARST
COMMUNICATIONS, INC., and TIME INC.,

                         Counterclaim Plaintiffs,

     - against -

ANDERSON NEWS, L.L.C. and CHARLES
ANDERSON, JR.,

                         Counterclaim Defendants.

09 Civ. 2227 (PAC)

Filed Under Seal

---

**MEMORANDUM OF LAW OF PLAINTIFF ANDERSON NEWS, LLC IN OPPOSITION
TO DEFENDANT BAUER'S MOTION FOR SUMMARY JUDGMENT**

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700

*Attorneys for Plaintiff*
*Anderson News, L.L.C.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ...............................................................................................................3

I.      STANDARD ON A MOTION FOR SUMMARY JUDGMENT ..........................3

II.     OVERWHELMING EVIDENCE ESTABLISHES THAT
       BAUER PARTICIPATED IN AN UNLAWFUL CONSPIRACY.......................5

      A.     The Evidence Establishes A Plausible Conspiracy.....................................5

      B.     The Existence Of The Conspiracy Is,
           At Minimum, A Question Of Fact ............................................................8

           1.     Defendants' Conspiracy Unfolded
                 In A Series Of Overlapping Phases ................................................9

           2.     There Is Overwhelming Evidence Of "Additional
                 Circumstances" That Permit An Inference Of Conspiracy...........12

      C.     The Evidence Overwhelmingly Shows Bauer's Direct
           Participation In The Conspiracy Is, At Minimum, A Question Of Fact ....17

      D.     Bauer's Conduct Was Consistent With Collusion ....................................21

      E.     The Balance of Bauer's Arguments Have No Merit..................................24

CONCLUSION............................................................................................................25

# TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*AD/SAT v. Associated Press,*
   181 F.3d 216 (2d Cir. 1999)...........................................................................14

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.,*
   456 U.S. 556 (1982)...................................................................................21

*Anderson News, L.L.C. v. Am. Media, Inc.,*
   680 F.3d 162 (2d Cir. 2012)................................................................ passim

*Apex Oil Co. v. DiMauro,*
   822 F.2d 246, 252 (2d Cir. 1987)................................................................4

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.,*
   172 F. Supp. 2d 1060 (S.D. Ind. 2001).....................................................20

*H.L. Moore Drug Exch. v. Eli Lilly & Co.,*
   662 F.2d 935 (2d Cir. 1981)......................................................................21

*Holiday Wholesale Grocery Co. v. Philip Morris Inc.,*
   231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd sub nom.*
   *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ...............20

*Hyland v. HomeServices of Am., Inc.,*
   771 F.3d 310 (6th Cir. 2014) ...................................................................19

*In re Aspartame Antitrust Litig.,*
   2007 WL 5215231 (E.D. Pa. Jan. 18, 2007 .................................................5

*In re Baby Food Antitrust Litigation,*
   166 F.3d 112 (3d Cir. 1999),......................................................................20

*In re Dana Corp.,*
   574 F.3d 129 (2d Cir. 2009)........................................................................4

*In re Electronic Books Antitrust Litig.,*
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)........................................................25

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
   681 F. Supp. 2d 141 (D. Conn. 2009)................................................... 16-17

*In re Flat Glass Antitrust Litig.,*
   385 F.3d 350 (3d Cir. 2004)........................................................................4

ii

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51, 64 (2d Cir. 2012)..............................................................*passim*

*In re High Pressure Laminates Antitrust Litig.*,
    2006 WL 1317023 (S.D.N.Y. May 15, 2006) ......................................................4, 21

*Interborough News Co. v. Curtis Publ'g Co.*,
    225 F.2d 289 (2d Cir. 1955)...................................................................25

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003)...................................................................19

*Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*,
    416 F.2d 71 (9th Cir. 1969) ...................................................................25

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)...................................................................25

*Meredith Corp. v. SESAC LLC*,
    2014 WL 812795 (S.D.N.Y. Mar. 3, 2014) .........................................................4

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    673 F. Supp. 684 (S.D.N.Y. 1987) ...................................................... 17-18, 21

*O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.*,
    36 F.3d 565 (7th Cir. 1994) ...................................................................25

*Peda v. New York Univ. Hospitals Ctr., Hosp. for Joint Diseases*,
    2014 WL 1013844 (S.D.N.Y. Mar. 17, 2014) ......................................................3, 9

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .......................................................15

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ........................................................3, 12

*Ross v. Am. Express Co.*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011)...........................................................12

*Ross v. Bank of Am., N.A. (USA)*,
    2012 WL 401113 (S.D.N.Y. Feb. 8, 2012)...................................................... 11-12

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) ..........................................................12

*Thompson Everett, Inc. v. Nat'l Cable Adver. L.P.*,
    850 F. Supp. 470 (E.D. Va. 1994) .............................................................25

iii

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ....................................................16

*U.S. Info. Sys., Inc. v. Int'l Bhd. Of Elec. Workers Local Union Number 3*,
    2007 WL 2219513 (S.D.N.Y. August 3, 2007) ..................................................... 20-21

*United States v. Apple, Inc.*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013).......................................................15, 16, 17, 20

*Wallace v. Bank of Bartlett*,
    55 F.3d 1166 (6th Cir. 1995) ....................................................................................20

Plaintiff Anderson News, LLC ("Anderson") respectfully submits this memorandum of law in opposition to Bauer Publishing Co. L.P.'s ("Bauer") motion for summary judgment.[1]

## PRELIMINARY STATEMENT

The evidence demonstrates that defendants -- some of the most powerful magazine publishers in the nation and their national distributors, who are competitors of one another -- worked in "lock step" to cut off Anderson's magazine supply and destroy Anderson.

Defendants' collusive conduct was their reaction to Anderson's mid-January 2009 proposal for a reduction in the price Anderson paid for magazine distribution and for publishers to absorb certain inventory costs Anderson was incurring. Evidence uncovered during discovery shows how the conspiracy evolved through multiple overlapping phases: defendants initially shared with each other their reactions to Anderson's proposal and agreed to "simultaneously" use their "collective resources and influence" to move business away from Anderson.

When Source, another major wholesaler, made a proposal similar to Anderson, defendants also began using their collective resource and influence to move business away from Source as well. Defendants engaged in a coordinated campaign to convince retailers to accept magazines from wholesalers of defendants' choosing; they intensely monitored each other's commitment to the collective plan; they shared with each other the status of their negotiations with Anderson and Source and their distribution plans; and then -- within a few days of one another -- cut off Anderson's and Source's magazine supply, successfully and ruthlessly eliminating Anderson as a wholesaler. This confluence of events was unprecedented in the

---

[1]  Submitted in further support of Anderson's opposition is the Declaration of Seth Davis, dated March 9, 2015 (the "Davis Declaration"), and the Declarations of Charles C. Anderson, Jr., John Campbell and Bo Castle, all dated March 9, 2015.  References to "Ex. __" refer to the exhibits to the Davis Declaration.  References to "Pl. 56.1  ¶ __" refer to paragraphs of Anderson's response to Bauer's Statement of Uncontested Facts.  References to "¶ __" refer to paragraphs of Anderson's Statement of Additional Genuine Issues of Material Fact.

To the extent relevant, Anderson hereby incorporates by reference its briefs in opposition to the motions for summary judgment filed by Bauer's co-defendants.

industry.  Discovery reveals how defendants secretly achieved their unlawful objectives: (i) an astoundingly high-level of inter-firm communications, including dozens of highly incriminating emails and other documents; (ii) inter-competitor in-person meetings; and (iii) over 150 inter-competitor telephone calls at unusual times of day, for suspiciously long durations, among competitors who otherwise rarely spoke with each other.

The objectives of defendants' antitrust conspiracy are not only plausible but, as discovery now discloses, clear and compelling.  By collectively resisting Anderson's and Source's proposed terms, defendants preserved their profits.  Moreover, admissions in defendants' internal documents confirm an additional motive -- the increased wholesaler concentration resulting from the elimination of Anderson and Source would enable the remaining major wholesalers, TNG and Hudson, to extract pricing concessions mostly, if not solely, from retailers, who relied heavily on inter-wholesaler competition, and not from publishers and national distributors, which did not rely on such inter-wholesaler competition.

The economic analysis of Dr. Leslie Marx, a Duke University economist with extensive expertise in the economics and detection of collusion, further confirms the economic motivation for defendants' conspiracy.  Dr. Marx's economic analysis of the structure and history of the single-copy magazine industry and the evidence shows that increased wholesaler concentration would benefit publishers and national distributors at the expense of retailers.  Indeed, after Anderson's elimination, the cost of magazines to retailers increased, while publishers were able to preserve their profits by maintaining their prices for the magazines sold to wholesalers.

Ignoring the overwhelming evidence of its participation in the conspiracy, Bauer erroneously contends that insufficient evidence exists concerning Bauer's involvement.  For a defendant who "led the league" with 64 calls with its direct competitors and/or TWR (who was

not Bauer's national distributor), participated in at least one in-person meeting with the president of its fiercest competitor, AMI, and whose internal documents show that its highest level executives explicitly ███████ that its competitors would ██████████ to resist Anderson's proposal, and ███████ Anderson would be ██████ that claim is astounding and demonstrably false.  There is far more than sufficient evidence to raise a question of fact as to Bauer's knowing participation in defendants' conspiracy.

In sum, as shown below, the overwhelming evidence of Bauer's participation in this illegal antitrust conspiracy compels denial of Bauer's summary judgment motion.

## ARGUMENT

## I.   STANDARD ON A MOTION FOR SUMMARY JUDGMENT

In its summary judgment motion, Bauer bears the burden of establishing that "'there is no genuine dispute as to any material fact,'" and must "produc[e] evidence on each material element of its claim or defense demonstrating that it is entitled to relief."  *Peda v. N. Y. Univ. Hosps. Ctr.*, 2014 WL 1013844, at *7-8 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.) (citations omitted).  Even then, summary judgment must be denied if Anderson, as the nonmoving party, meets its "'limited burden of production'" by demonstrating the existence of a genuine dispute as to material facts. *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) (citation omitted).

Summary judgment must be denied as long as "the totality of the evidence, viewed in the light most favorable to plaintiffs and with proper regard for the *Matsushita* standards, could support a reasonable inference of illegal collusive behavior."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012).  Anderson is not required to "'disprove all nonconspiratorial explanations for the defendants' conduct'" but must demonstrate that the existence of a

3

conspiracy is a "reasonable inference that the jury could draw," and may meet its burden by providing "'sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.'" *Id.* at 63 (citations omitted).

Moreover, because the evidence uncovered in discovery now establishes clearly that Anderson's claims are not only "plausible," but well-founded, the "strong evidence" standard upon which Bauer relies (Bauer Br. 16) is inapplicable.[2]  Therefore, summary judgment must be denied if Anderson "present[s] direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (citation omitted); *see also Meredith Corp. v. SESAC LLC*, 2014 WL 812795, at *208 (S.D.N.Y. Mar. 3, 2014) (summary judgment denied where "the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding") (citation and quotations omitted).[3]

Because Bauer clearly fails to meet its burden of establishing that no genuine issues of material fact exist, Bauer's summary judgment motion should be denied.

---

[2]  Citing *Publication Paper*, Bauer also asserts that the "strong evidence" standard applies because defendants' conduct was "procompetitive."  (Bauer Br. 16, 18.)  The law, however, articulates no such test.  *Publication Paper*, in fact, states the reverse -- that broader inferences are permitted where "'the challenged activities could not reasonably be perceived as procompetitive.'"  *Publ'n Paper*, 690 F.3d at 63 (*quoting In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004)).  Here, the evidence shows that objectives of the conspiracy were to maintain the price of magazines and to eliminate Anderson and Source, neither of which credibly can be characterized as "procompetitive."  (*See infra*)

[3]  Further, "[i]n considering whether there is sufficient evidence to create a genuine issue of fact, the district court may not properly consider the record in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'"  *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (citation omitted); *see also In re High Pressure Laminates Antitrust Litig.*, 2006 WL 1317023, at *4 (S.D.N.Y. May 15, 2006) ("A court deciding whether to grant summary judgment . . . should not view each piece of evidence in a vacuum.  Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place.") (citation and quotations omitted).

## II.   OVERWHELMING EVIDENCE ESTABLISHES THAT BAUER PARTICIPATED IN AN UNLAWFUL CONSPIRACY

### a.   The Evidence Establishes A Plausible Conspiracy

Bauer's motion essentially is premised on the contention -- already rejected by the Second Circuit -- that conspiring to eliminate Anderson and Source makes no economic sense because it would result in placing excessive power in the remaining two major wholesalers, TNG and Hudson.  (*See* Bauer Br. 17-18.)  But the evidence revealed during discovery proves the exact opposite -- Bauer and its co-conspirators had a powerful motive to conspire:  the profits that could be achieved -- and were achieved -- through eliminating Anderson and Source.[4]

<u>First</u>, by collectively resisting the Anderson and Source proposals, defendant publishers could avoid paying a distribution fee not only to Anderson and Source, but also to TNG and Hudson.[5]  They also would have no need to offset that cost by improving their selling efficiency and ending their practice of "stuffing the channel" with excess magazines, a practice that defendants claimed was necessary to maximize their profits.[6]  Defendant publishers also could avoid having to bear the cost of inventory that was on Anderson's books as a result of retailers utilizing scan-based trading ("SBT").  (¶ 50; Picard Report ¶ 125.)  This maintenance of profits alone provides not only a plausible but a compelling motivation and explanation for defendants' conduct.[7]

<u>Second</u>, as defendants' own documents confirm, defendants expected a significant economic benefit from eliminating Anderson and Source as wholesalers.  The more concentrated

---

[4]  This evidence is set forth more fully in Anderson's opposition to Curtis' motion (Anderson Curtis Opp. 4-11),

[5]  Defendants admit that they would have paid to TNG and Hudson any per-copy fee they paid to Anderson and Source.  (¶ 51.)

[6]  *See* ¶¶ 21-24, 42; Ex. 259 (April 16, 2014 Expert Report of Leslie M. Marx, PhD ("Marx Report")) ¶ 207 and n.367; Ex. 260 (April 16, 2014 Expert Report of Robert G. Picard, PhD ("Picard Report")) ¶¶ 121-23, 150.

[7]  *See In re Aspartame Antitrust Litig.*, 2007 WL 5215231, at *9 (E.D. Pa. Jan. 18, 2007) ("[A]s with almost any price-fixing conspiracy, the clear motive was to increase or maintain profits.") (citation omitted).

wholesaler sector, consisting primarily of TNG and Hudson, would significantly reduce competition among wholesalers. Because of the structure of the distribution chain, retailers -- but not publishers and national distributors -- relied heavily on inter-wholesaler competition. Thus, reduced wholesaler competition would enable the remaining wholesalers to extract pricing concessions from retailers -- not publishers and national distributors.

Dr. Leslie Marx's economic analysis demonstrates how reducing the number of wholesalers economically would benefit defendants. Before 1995, publishers dominated the single-copy distribution channel by using regionally-based wholesalers operating in exclusive territories. After 1995, as retailers grew larger and had increased negotiating leverage, they insisted on working with one single wholesaler that operated in non-exclusive territories. This led to the consolidation of the market from many regionally-based wholesalers operating in exclusive territories to four major wholesalers. (¶¶ 25-26.)[8] The absence of exclusive territories enabled retailers to rely on competition among major wholesalers to obtain greater margins from wholesalers and improved service. (*Id.*; Marx Report ¶ 124; Marx Reply ¶¶ 121-25.) The resulting loss of margin to wholesalers led them to seek pricing concessions from publishers. (¶ 27; Picard Report ¶¶ 167-68.) The elimination of the two proponents of those concessions, Anderson and Source -- and the de facto re-emergence of the publisher-favored exclusive territories -- would enable publishers and national distributors to swing the pendulum back in their direction. Retailers, left with only two major wholesalers effectively operating in exclusive territories with the absence of any meaningful inter-wholesaler competition, would be compelled to absorb increased prices for magazines. (¶¶ 223-42, 255-57; Marx Report ¶¶ 132-40.) Once

---

[8]   *See* Marx Report" ¶ 121 n. 177; Ex. 269 (July 16, 2014 Reply Expert Report of Leslie M. Marx, PhD ("Marx Reply")) ¶ 106. Dr. Marx's analysis is also supported by the analysis of the single-copy magazine industry by Dr. Robert Picard of the Reuters Institute at the University of Oxford, who is an expert in the economic and business dynamics of media, including the magazine industry. (*See* Picard Report.)

they regained control, defendants could (and did) continue to "stuff the channel" with excess magazines -- and resist the adoption of SBT and other efficiencies advocated by Anderson and retailers.  (¶ 226-28; Picard Report ¶¶ 118-25, 140; Marx Report ¶¶ 324-74.)

Dr. Marx's analysis is fully supported by the evidence uncovered during discovery.  (*See* Marx Report ¶¶ 125-42, 157-280.)  That evidence shows not only that publishers and national distributors recognized the benefits they would (and did) obtain from eliminating Anderson and Source, but also how an increase in wholesaler concentration would (and did) harm retailers. (¶¶ 223-32.)  Further, the evidence shows that defendants mitigated any risk to them of increased wholesaler concentration by, among other things, entering into long-term contracts that prevented wholesalers from using their increased market power to extract better prices from publishers and national distributors.  (¶¶ 244-38, 240; Marx Report ¶¶ 110, 141-42.)[9]

The rationale underlying the conspiracy recently was unequivocally affirmed by the president of defendant publisher AMI, David Pecker.  During a November 2014 earnings call discussing Source's 2014 bankruptcy, which left TNG controlling over 75% of the market, Pecker extolled the benefits of fewer wholesalers.  Specifically, Pecker explained that, with a single wholesaler distributing the vast majority of magazines, these are "the best times we've ever been [in] when it comes to the supply chain."  (¶ 240.)[10]

---

[9]  *See* Anderson's response to Curtis' motion for an examination of some of the evidence of:  (i) admissions by defendants regarding the benefits to them of eliminating Anderson and Source from the market; (ii) the views of retailers and other industry participants that the elimination of Anderson and Source was detrimental to retailers and beneficial to national distributors and publishers; (iii) the tools at defendants' disposal to mitigate the risk to them from increased wholesaler concentration; (iv) the actual impact of the elimination of Anderson from the market, including that the price paid by retailers for magazines purchased from wholesalers increased, that the discount applied to magazines sold by publishers to wholesalers remained virtually unchanged, that retailers no longer were able to engage wholesalers in a competitive bidding process and that service levels deteriorated.  (Anderson Curtis Opp. 8; *see also* ¶¶ 223-58.)  As also set forth more fully in Anderson's response to Curtis' motion (Anderson Curtis Opp. n.10), Dr. Marx's analysis shows that because the market for single copy magazines is a "two-sided market" in which publishers and national distributors "multi-home," and retailers "single-home," an increase in wholesaler concentration benefits publishers and national distributors, but harms retailers.  (Marx Report ¶¶ 117, 141-47.)

[10]  Pecker also explained that AMI's "long-term contracts that lock[] in [its] discount rates for both [TNG and

Also without merit is Bauer's argument that the risk of non-payment of receivables owed by Anderson renders implausible the conspiracy to eliminate Anderson.  (Bauer Br. 5.)  This argument ignores the actual conduct of Bauer and its co-defendants in early 2009 -- they collectively cut off Anderson's magazine supply despite this debt.  This demonstrates that Bauer concluded that it would benefit from forcing Anderson out of business notwithstanding any amounts Anderson allegedly owed.  Plainly, Bauer either believed Anderson would pay down these debts even if Anderson was eliminated as a magazine wholesaler, or it determined that the benefits of avoiding the proposal and eliminating Anderson outweighed the risks of any non-payment of these receivables.[11]  These facts compel rejection of Bauer's contention that these debts rendered defendants' conspiracy implausible.

In short, the evidence revealed during discovery and economic theory compels the conclusion that, not only did defendants' conspiracy make complete economic sense, but the benefits defendants expected from de facto exclusive territories in a distribution system with only two major wholesalers actually were realized.

### b.     The Existence Of The Conspiracy Is, At Minimum, A Question Of Fact

Because Bauer essentially ignores the mountain of highly incriminating emails, sworn testimony and the more than 150 inter-competitor communications supporting an inference of a

---

Hudson]" effectively mitigated any concern about TNG's increased market power.  (¶ 250.)

[11] ██████████████████████████████████████████████████████████████████
████████████████  (¶ 264.)  Given the high level of communications between Bauer and TWR during this period, it is reasonable to infer that Bauer understood that this was Time's view.

Further, Bauer incorrectly claims that Anderson owed $16 million to Bauer at the time it cut off Anderson's magazine supply.  (Bauer Br. 6, 8.)  This exaggerated claim improperly ignores returns Anderson submitted during its wind-down.  (Pl. 56.1 Resp. ¶ 619.)  In any event, even the inflated $16 million is less than the $27 million that Bauer claims it would have had to pay annually if the Anderson distribution fee was imposed by all wholesalers.  (Bauer Br. 19.)  Thus, avoiding this cost (which does not even account for the cost of SBT inventory) would have outweighed the risk of not collecting the $16 million in receivables allegedly owed by Anderson.

8

conspiracy, Bauer has not satisfied -- and cannot satisfy -- its initial burden of demonstrating that there is no genuine dispute as to any material fact as to each material element of its defense. *See Peda*, 2014 WL 1013844, at *7-8.  At a minimum, summary judgment must be denie because there is more than "'sufficient evidence to allow a reasonable fact finder to infer that [a] conspiratorial explanation is more likely than not.'"  *Publ'n Paper*, 690 F.3d at 63.

### i.    Defendants' Conspiracy Unfolded In A Series Of Overlapping Phases

The evidence shows that, as soon as defendants learned of Anderson's proposal, they engaged in a high level of communication with direct competitors or other market participants with no legitimate business justification.  Initially, defendants shared with each other their reaction to Anderson's proposal and agreed to work collectively to resist the proposal.  Indeed, less than 24 hours after Anderson publicly announced its proposal, the country's major publishers already had exchanged their reactions to the proposal.  (¶¶ 56-60, 62-65, 67.)

Bauer was at the heart of these communications.  Even before Charlie Anderson met in-person with Bauer's Rick Parker and Hubert Boehle to discuss Anderson's proposal, Parker had already had an ▮▮▮▮▮ telephone conversation with Mike Porche of DSI, during which Parker and Porche agreed that AMI, Bauer and DSI should "start simultaneously using our collective resources and influence to direct business towards [TNG]."  (¶ 57.)[12]  Also, before Anderson publicly announced its proposal, Bauer already had called, among others, Richard Jacobsen of TWR to discuss Anderson's announcement.  (¶ 60.)  Thus, by January 15, Bauer's Parker was

---

[12]   This conversation took place at the behest of Pecker of AMI, who instructed Porche to contact Parker so that Pecker and Parker could meet to discuss the Anderson announcement.  (¶ 56.)  Two days later, Pecker and Parker -- direct competitors -- ▮▮▮▮▮▮▮▮▮▮▮▮.  (¶ 63.)  Along with Porche of DSI, they agreed at that meeting that neither company would agree to Anderson's proposal and that they would work collectively to move their business away from Anderson and toward TNG.  (*Id.*)

able to report internally to Boehle that ██████████████████████████████████

████████████████████████████████████

Defendants then began the next phase -- a coordinated effort to convince retailers to

accept magazines from wholesalers of defendants' choosing.  Bob Castardi of Curtis agreed with

Porche of DSI that these retailer contacts were critical because "the more companies that get on

the record saying they do not intend to pay the 7¢ fee the better."  (¶77.) ██████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████  A ████████ jointly developed

by competitors AMI and Bauer, is precisely what defendants were using in conveying a

collective and uniform message to retailers.  (¶¶ 73-80, 209.)[14]

In the third phase, Bauer and its co-conspirators focused on developing an alternative

distribution plan that included sharing competitively-sensitive information about each others'

historical distribution practices.  (¶¶ 88-95; Marx Report ¶¶ 190-99.)[15]  The fourth phase

involved defendants' monitoring each other to ensure they maintained their commitment to the

collective plan, and to confirm that no one would deviate from it by reaching a negotiated

agreement with Anderson or Source.  (Marx Report ¶¶ 200-264; Marx Reply ¶¶ 60-61.)[16]  As

---

[13] █████████████████████████████████████████████████████████

██████████████████████████████████████████████████  (¶ 65.) █████

[14]  The evidence also includes a highly-incriminating internal debate between AMI and Bauer concerning whether they should call Walmart together or separately.  (¶¶ 74-76.)  Recognizing that calling together would be viewed as "team[ing] up" and could result in "lawsuits," AMI and Bauer chose to have separate calls with Walmart and then share with each other the results of their conversations.  (¶¶ 75-76)  *See also* ¶¶ 77-78, 212 for evidence reflecting defendants' coordinated effort to convince retailers to abandon their relationship with Anderson and Source and use wholesalers of defendants' choosing, and showing that defendants not only coordinated on scripts, but shared the results of their calls with retailers in which the scripts were used.

[15]  Emails reveal Bauer coordinated with DSI and Curtis (who was not Bauer's distributor) on a plan combining distribution data from Bauer and Kable with data from Kable's direct competitor, Curtis.  (*See* ¶¶ 63, 88-93.)

[16]  *See also* ¶¶ 103-136.  The voluminous evidence of Bauer's monitoring includes two internal emails from Boehle, asking whether ████████████████████████████████████████████████████

████████████████████████████████████████ (¶ 115.)[17]

As the Second Circuit stated, on the basis of far fewer alleged facts, defendants' inter-competitor coordination culminated in defendants, in virtual lock step and within days of one another, cutting off both Anderson's and Source's magazines supply, and forcing Anderson from the magazine wholesaling business. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012). (¶¶ 137, 185-79.) Such parallel conduct, particularly when combined with extensive strategic, inter-competitor communications in which competitively-sensitive information is exchanged, is a hallmark of an antitrust conspiracy and provides a strong inference of collusion. *See Ross v. Bank of Am., N.A. (USA)*, 2012 WL 401113, at *5 (S.D.N.Y. Feb. 8, 2012) ("Given the temporal proximity between the meetings and the adoption of arbitration clauses, this parallel conduct is probative of an antitrust conspiracy."); Marx Report ¶¶ 321-23.[18]

---

████████████████ Further evidence is provided by the intense level of monitoring Bauer engaged in immediately before, during, and after Jacobsen of TWR met with Charlie Anderson and then Greg Mays of Source on Saturday, January 31, to discuss their respective proposals. In the approximately two hours before Jacobsen met Charlie Anderson, ████████████████████████ (¶ 168), ████████████ (*id.*), and ████████████████████████ (¶¶ 168-69). Parker and Duloc spent the balance of the day emailing each other about whether they had heard from Jacobsen on the results of his meetings. (¶¶ 170-77.)

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

---

[17]  For a period of time, the strategy contemplated by defendants shifted to one in which they would continue to ship to Anderson, but not pay the surcharge, so that defendants could blame Anderson for not delivering magazines and causing any disruption in service and, as Duloc of Kable explained, ████████████████████████████ ████████ David Pecker of AMI and Porche of DSI opposed this strategy because they were concerned that, if defendants shipped to Anderson but did not pay, Anderson may ship one defendant's magazines, but not the others, and "piece us ... apart." (¶ 102.) Parker of Bauer, on the other hand, continued to believe in the value of this strategy and, therefore, Porche had to "convinc[e]" him not to ship to Anderson. (*Id.*)

[18]  The conspiracy continued even after defendants collectively cut off Anderson's and Source's magazine supply. For example, DSI and TWR -- direct competitors -- worked together to ensure their clients' magazines were on

The evidence also belies Bauer's contention that purported differences in how Bauer and some of its co-defendants responded to Anderson's proposal is somehow inconsistent with an inference of conspiracy.  (Bauer Br. 13-14.)  While certain defendants purported to negotiate with Anderson and others (including Bauer) did not, this distinction is meaningless because defendants ultimately engaged in collective and uniform conduct in cutting off Anderson.  As the Second Circuit concluded in rejecting this argument, "there is nothing implausible about coconspirators' starting out in disagreement as to how to deal conspiratorially with their common problem."  *Anderson News*, 680 F.3d at 191.  What matters is that, in the end, "notwithstanding their responses initially, some two weeks later every defendant publisher and distributor acted, within a span of three business days, to cut Anderson off."  *Id.*[19]

### ii.     There Is Overwhelming Evidence Of "Additional Circumstances" That Permit An Inference Of Conspiracy

Beyond defendants' parallel conduct and the inculpatory documents and other evidence, there exists overwhelming evidence of "additional circumstances" that would "permit a fact-finder to infer a conspiracy," including circumstances and evidence commonly characterized as "plus factors" by courts and economists.  *See Publ'n Paper*, 690 F.3d at 62.

First, defendants' conduct was against each of their individual economic self-interests, which is a "plus factor" that strongly supports an inference of conspiracy.  *See id.* at 62.[20]  By

---

display.  (¶¶ 215-16.)  Defendants also shared with each other the results of their efforts to convince retailers to abandon their relationships with Anderson and Source and use defendants' chosen wholesalers.  (¶¶ 212-15.)

[19]   *See also Ross v. Am. Express Co.*, 773 F. Supp. 2d 351, 368 (S.D.N.Y. 2011) (concluding that "a jury could find parallel conduct" even though defendants' actions were "several months apart").  Bauer's cases are not to the contrary.  *See RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231-32 (E.D.N.Y. 2009) (plaintiff made no factual allegations of conspiratorial conduct and relied solely on defendants' purportedly parallel conduct, which court found was not in parallel); *Reading Int'l, Inc.*, 2007 WL 39301, at *8 (summary judgment granted where -- unlike here -- very limited evidence provided by plaintiff in support of its conspiracy theory indicated that defendants were not, in fact, conspiring).

[20]   *See also* Marx Report ¶ 66.  In their joint motion to exclude certain of Dr. Marx's testimony, Bauer and its co-defendants take issue with Dr. Marx's reference to certain "plus factors" as "super-plus factors."  As shown in the

adhering to the collective plan, each defendant denied itself the economic benefit of reaching an agreement with Anderson, avoiding disruption and continuing to ship magazines through Anderson and gaining increased display space at retailers, while their competitors' magazines sit idle in warehouses.  (Marx Report ¶¶ 281, 285, 305-14, 318; Marx Reply ¶¶ 62-67.)  The benefits of continuing to ship to Anderson clearly are demonstrated by the decision of Comag -- the only major national distributor that did not participate in the conspiracy -- to ship to Anderson and Source.  The net result was that Comag's publishers' titles remained on retailers' shelves, unlike those of its competitors who cut off Anderson's and Source's magazine supply. As a DSI executive complained:

> [B]ecause CoMag took the easiest and weakest position, they continue to receive distribution and display and in reality they now receive dramatically better display because they are in our pockets!!! … [H]ard to accept CoMag not feeling any disruption and then actually gaining display and sale for being so weak during this crisis.    And then in the end if we've somehow created a stronger, better wholesaler network, they'll reap that benefit too.  (¶ 204.)[21]

That defendants recognized that it was in their self-interest to continue to ship to Anderson and Source, but consciously refrained from doing so, is also demonstrated by an email from Porche of DSI to a colleague in which he explained that Pecker of AMI was upset because



(¶ 205.)  According to Dr. Marx, "[i]n a competitive

---

opposition to that motion (at pp. 12-16), this argument is completely meritless.  Nevertheless, whether characterized as "super-plus factors" or "plus factors," the conclusion is the same -- the evidence is consistent with collusion.

[21]   Another reason that continuing to ship to Anderson was in defendants' individual economic self-interest is because, even if Anderson ultimately was unable to survive, any publisher who continued to use Anderson could simply switch wholesalers after Anderson's exit.  Indeed, Comag reached a negotiated agreement with Anderson pursuant to which Comag agreed to continue to ship magazines, but when it became clear that Anderson would be forced out of business after defendants cut off the supply of magazines to Anderson, Comag then independently moved its business to TNG and other wholesalers.  (¶ 151-55, 183-88, 218-222, 240.)  These facts demonstrate why Bauer's claim that shipping to Anderson was a risk Bauer was unwilling to take is so unpersuasive.  Indeed, even if Anderson's financial condition was, as Bauer claims (Bauer Br. 3), "dubious" -- which it was not -- that did not stop Comag from continuing to use Anderson, nor did it provide any legitimate reason for Bauer to stop shipping to Anderson.

market, ███████████████████████████████████████████████████████████

███████████████████████. This statement only makes sense in the context of the collusive

plan of Defendants."[22]  (Marx Report ¶ 306.)[23]

      _Second_, defendants had a common and widely-recognized motive to resist Anderson's

proposal and eliminate Anderson from the market:  maintaining and increasing their profits.  _See_

_Publ'n Paper_, 690 F.3d at 62 (recognizing "a common motive to conspire" as a "plus factor").[24]

      _Third_, defendants engaged in an extremely "high level of interfirm communications,"

another important plus factor.  _See id._ at 62.  These communications included 156 inter-

competitor phone calls or text messages among key high-level executives in the approximately

one month after Anderson's announcement.  (¶ 283.)[25]  _See Publ'n Paper_, 690 F.3d at 67

---

[22]  Dr. Marx also conducted an empirical analysis of the economic benefits to Comag's publisher clients from increased sales after defendants stopped shipping to Source.  (Marx Reply ¶¶ 62-67, App. B.)  This analysis demonstrates that it was in each defendant's individual economic self-interest to continue to ship to Anderson and Source while their competitors did not.  (_Id._)  In addition to the benefit of increased sales in the short term, publishers who shipped could permanently convert readers to their magazines.  (_See_ Marx Report ¶ 305, n. 452 (███████████████████████████████████████████████████████████████████████████

████████████████████████████).)

[23]  Further, even though Source rescinded its per-copy distribution fee proposal, defendants nonetheless cut off Source's magazine supply, which was against their respective individual economic self-interests.  (¶¶ 138, 189, 192; Marx Report ¶¶ 307-14.)  The only reasonable explanation for this uniform response to the Source rescission was defendants' collective agreement to eliminate Source from the market.

Bauer's decision to cut off Source after Source rescinded its proposal also undermines Bauer's false claim (Bauer Br. 1) that it actually wanted Anderson to stay in business, so long as Anderson rescinded its proposal.  Bauer's assertion also is contradicted by internal emails in which Parker writes that ████████████████████████████ ████████████████.  (¶ 177.)  Further, the isolated piece of evidence Bauer cites in support of its argument, a vague two-word snippet from an email, actually provides no support at all. ████████████ ██████████████████████████████████████████████████████████████████████████████████████████

[24]  Because defendants plainly had a common motive to destroy Anderson and Source, Bauer's purported reliance on _AD/SAT, Div. of Skylight, Inc. v. Associated Press_, 181 F.3d 216 (2d Cir. 1999) (Bauer Br. 18), is misplaced.

[25]  Specifically, the evidence establishes that between January 12, 2009 and February 12, 2009, there were 120 calls between direct competitor defendant publishers or national distributors, and 36 calls between defendant national distributors and non-client defendant publishers.  (¶ 283.)

(communications between high-level executives have more probative weight).[26]

Fourth, defendants engaged in extensive monitoring of each others' intentions and sought assurances from each that they all were committed to their collective plan -- another plus factor. (¶¶ 102-136; Marx Report ¶¶ 71, 49, 163.)  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *23 (E.D.N.Y. Jan. 4, 2011) (allegation that "defendants monitored each others' compliance with the agreement through subsequent meetings and email exchanges . . . 'raise[s] a suggestion of a preceding agreement'") (citation omitted).[27] The importance of such monitoring is exemplified by an internal Hachette email in which a high-level Hachette executive underscored the need to ███████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████[28]

Fifth, defendants shared with each other confidential, competitively-sensitive information, another well-recognized plus factor.  *See Apple*, 952 F. Supp. 2d at 690 ("the 'use of facilitating practices' like information sharing" supports an inference of conspiracy) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)).[29]  This included providing each other

---

[26]   This is in marked contrast to the level of communications before Anderson's announcement.  Based on defendants' telephone records, there were only 39 inter-competitor calls placed in the entire month before Anderson's announcement of its proposal, with a total duration of approximately 82.4 minutes, while the total duration of the 156 inter-competitor calls in the month after Anderson's announcement was approximately 801.1 minutes.  (¶ 283.)  Further, the participants on many of the calls admitted that they rarely, if ever, spoke with one another before that announcement.  (¶¶ 269-73.)  *See also United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14  (S.D.N.Y. 2013) ("telephone calls among the Publisher Defendants during the period of their negotiations with Apple represented a departure from the ordinary pattern of calls among them.").

[27]   *See also* Marx Report ¶ 63 ("Monitoring and enforcement structures" constitute a "typical building block[] of collusion"); Ex. 635 (May 28, 2014 Expert Report of Janusz Ordover) ¶ 49 ("a successful cartel must have the means to monitor its members").

[28]   Indeed, the monitoring increased even after defendants had confirmed to each other that they were cutting off Anderson.  For example, on January 30, Rodale's Alleger monitored Bauer's commitment to the plan, asking Jay Wysong of DSI whether "[o]ur man in bauerland still solid."  Wysong replied: "He's solid alright."  (¶¶ 125-26.)

[29]   *See Ross*, 773 F. Supp. 2d at 369 ("Amex has failed to offer a compelling rationale for why it would disclose such information."); *High Pressure Laminates*, 2006 WL 1317023, at *4 ("Plaintiffs' evidence supports an inference

with updates on the status of negotiations with Anderson and Source.[30]  Absent collusion, there would be no reason for Bauer or its co-conspirators to apprise each other whether they were negotiating or whether they intended to ship magazines to Anderson or Source.[31]

Sixth, defendants made a conscious effort to conceal their conspiracy by, among other things, urging that they communicate orally rather than in writing and that they fax, or attempt to fax, information instead of using email.[32]  Such deliberate efforts to conceal their unlawful conduct, particularly when coupled with all the other evidence here, provide strong evidence of defendants' conspiracy.  *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 173-76 (D. Conn. 2009) (efforts to conceal conspiracy together with other evidence "would permit a fact-finder to conclude that the defendants engaged in more than mere conscious parallelism or tacit collusion").

Seventh, defendants' decision to stop shipping to Anderson constituted an unprecedented shift in defendants' business practices, another widely-recognized plus factor.  *See Apple*, 952 F. Supp. 2d at 690 (unprecedented change in business practices "may provide sufficient evidence of an illegal conspiracy").  As explained by Dr. Marx, defendants demonstrated an "abrupt shift[]

---

that Wilsonart was in possession of, and that it made no economic sense for Wilsonart to share, as it did, competitors' confidential information . . . .").

[30]  *See* ¶¶ 56-59, 62-65, 67-71, 73- 84, 89-97, 103-136, 150, 153-54, 167-78, 181-82, 193-94.

[31]  Marx Report ¶ 14 ("[I]nformation that a firm is not supplying certain wholesalers is competitively sensitive because rival publishers and national distributors could take advantage of that information by shipping additional magazines to those wholesalers.").  Indeed, Castardi of Curtis conceded ██████████████████████████████
████████████████████████████████████████████████████████
                                                                    (¶ 282.)

[32]  At the very outset of the inter-competitor communications ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

from past behavior" as early 2009 appears "to be the only time in the history of the industry in which, in response to [a] surcharge request from a wholesaler, publishers and national distributors representing" about ▮▮▮ of the industry "collectively cut off supply to that wholesaler." *See* Marx Report ¶¶ 69, 104-07.[33]

In short, the combination of defendants' parallel conduct, inculpatory documents and the existence of these plus factors provides further compelling support for a "reasonable inference of illegal collusive behavior." *Publ'n Paper*, 690 F.3d at 64.

### c.   The Evidence Overwhelmingly Shows Bauer's Direct Participation In The Conspiracy Is, At Minimum, A Question Of Fact

The evidence indisputably shows that Bauer played a central role in the conspiracy.  As a result, there can be no reasonable dispute that Anderson's burden of providing "slight evidence" that Bauer had actual knowledge of the "essential nature and general scope" of defendants' conspiracy easily is met.  *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 688-89 (S.D.N.Y. 1987) ("[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it.") (citation omitted).

Nevertheless, Bauer contends, based on a gross mischaracterization of the facts and the law, that there is insufficient evidence to link it to the conspiracy because it supposedly never attended a "group meeting among co-conspirators" (Bauer Br. 21), its communications with Kable and DSI concerned only identifying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.*), and any

---

[33]   Bauer's contention that "the single copy magazine business is not conducive to coordination" (Bauer Br. 21) is demonstrably erroneous and belied by the evidence.  Although Bauer claims that single-copy magazines are not a "commodity product," this is irrelevant.  That some (but certainly not all) magazines may have characteristics that make them less than perfect substitutes does not mean that the publishers of those magazines did not conspire, particularly in light of the evidence establishing that they did so.  *See Apple*, 952 F. Supp. 2d at 690 (finding that publishers conspired to fix the prices of e-books).  Further, Bauer's argument that "wholesalers are supplied by hundreds of publishers" (Bauer Br. 21) is misleading because a small number of major publishers -- consisting primarily of defendants here -- account for the vast majority of sales.  (Marx Report Fig. 1.)

communications with its competitors, or its competitors' national distributors, concerned

███████████████████████████████████████ (*id.* at 22).

First, while participation in a "group meeting" is not a prerequisite to inferring

participation in a conspiracy, Bauer's contention that it attended no such meeting is

demonstrably false.[34]  In fact, within hours of Anderson's public announcement of its proposal,

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████ (¶¶ 56-57, 63.)[35]

Second, equally false is Bauer's contention (Bauer Br. 22) that its communications with

Kable and DSI concerned nothing more than ensuring that ██████████████████████████

████████  To the contrary, the evidence shows those communications were improper

information exchanges by and among Bauer, DSI and Kable, with DSI and Kable often serving

as conduits of information obtained from Bauer and its competitors and their national

---

[34] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████It is hardly
surprising, given the intentional efforts to conceal their unlawful conduct, that the participants at this meeting denied
being present.  In any event, whether this meeting took place is meaningless in view of all of the evidence of
defendants' conspiracy that has been revealed since the Amended Complaint was filed.

[35]   This is not the only in-person meeting among competitor defendants.  For example, Duloc of Kable, Bauer's
national distributor and agent, had a face-to-face meeting with Jacobsen of Kable's direct competitor TWR on
January 29. ( ¶ 122.) ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████. *See* ¶¶ 63, 70-71, 90, 122 for additional evidence of
in-person meetings among competitor defendants.

distributors.  Those communications included, among other things, sharing information about each others' commitment to their collusive plan (¶¶ 57-58, 103-04, 113-15, 126), the status of Time's and other's negotiations with Anderson and Source (¶¶ 104-114, 116, 118, 122, 167-71, 174-78), the status of Bauer's competitors' magazine shipments (¶¶ 108, 113-14), and coordinating on a distribution plan that combined historical distribution information from Curtis' files with historical information from Bauer's national distributor Kable's files ¶¶ 88, 92-93.[36]

Nor can it be said that Bauer's 64 telephone calls and other communications it had with its direct competitor defendants and TWR (who was not Bauer's national distributor) concerned "ideas" about possible "alternative distribution.  For example, when AMI and Bauer debated whether it made more sense to ship to Anderson, but not agree to Anderson's terms  (¶¶ 99-102) -- because t



-- this was not an exchange of "ideas" about alternative distribution.  Similarly, when

[37]  Nor can it be said that Bauer's constant monitoring of the status

---

[36]   For this reason, *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (communications between real estate brokers are necessary for sales to be made) and *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 165 (3d Cir. 2003) (no evidence of inter-competitor communications; plaintiff attempted to draw inference from deposition testimony that ignored manner in which defendants' market worked), are inapposite.  (See Bauer Br. 22.)

[37]   *See, e.g.*, 56-60, 63, 65, 73-77, 84, 89-95, 102, 107, 110-18, 122, 129-34, 136, 150, 153, 168-71, 173-79, 201-08, 212-13, 225, 225, 237. Bauer also cannot credibly claim that its 64 calls with defendants AMI, Hachette, Rodale, Time and TWR did not concern the Anderson or Source announcements.  The timing and sequence of these calls unquestionably provides a reasonable inference that they concerned the Anderson and Source proposals.  Also, Bauer does not even attempt to address the 37 calls it had with its competitors other than defendants (¶ 130), or why, for example, on January 20 -- within 24 hours of Source's announcement -- it called every one of its co-defendant publishers, and placed three more calls to a non-defendant competitor (¶ 95).  *See Apple*, 952 F. Supp. 2d at 655, 674, 704-05, App. A (emphasizing importance of inter-competitor calls to inference of conspiracy).

Further, the two "information-gathering" cases on which Bauer purports to rely (Bauer Br. 17) are wholly inapposite.  In *In re Baby Food Antitrust Litigation*, 166 F.3d 112 (3d Cir. 1999), the court found that the only inter-

of its competitors' magazine shipments (¶¶ 105, 107, 110-111, 116-17) was an exchange of

"ideas" about alternative distribution.  Ultimately, however, as the Second Circuit declared, it is

the task of the "factfinder" to determine whether Bauer's facially-incredible alternative

explanation for its communications with its direct competitors is valid.  *See Anderson News*, 680

F.3d at 190 ("[T]he choice between or among plausible interpretations of the evidence will be a

task for the factfinder.").[38]

     In short, the highly incriminating content, context and frequency of Bauer's

communications with its co-conspirators, including an inter-competitor meeting with its principal

competitor, far exceeds that necessary to raise a question of fact as to Bauer's actual knowledge

of the essential elements of the conspiracy.  *See Minpeco*, 673 F. Supp. at 688-89.[39]

---

competitor communications identified by the plaintiff constituted "sporadic exchanges of shop talk" between "lower level employees," and there was no evidence that these communications affected the defendants' actual pricing decisions.  *Id.* at 125.  Here, there were extensive communications among senior executives of Bauer and its competitors.  In *Wallace v. Bank of Bartlett*, 55 F.3d 1166 (6th Cir. 1995), there was no evidence that the defendants ever communicated directly with each other.  *See id.* at 1169.  Here, of course, the exact opposite is true.

[38]  There is no merit to Bauer's argument that "different and more extensive communications" would be required to infer a conspiracy here.  (Bauer Br. 23-24.)  To the contrary, the evidence here is far more compelling than the evidence in the cases Bauer purports to rely on for this contention.  For example, Judge Cote in *Apple* found highly relevant the fact that defendants exchanged 105 inter-competitor calls, *Apple*, 952 F. Supp. 2d at 655, 674, 704-05, App. A -- but Bauer and its co-defendants engaged in even more calls than those found in *Apple* -- 156 in all. (¶¶ 283.)  Moreover, in *Publication Paper*, the court reversed a summary judgment order even though "the totality of the evidence admit[ted] of alternative interpretations."  690 F.3d at 65.  In *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 172 F. Supp. 2d 1060 (S.D. Ind. 2001), the court found that plaintiff's circumstantial evidence, consisting of "documents possibly alluding to illegal agreements," was sufficient to withstand summary judgment, even though the documents were "'subject to interpretation'" and "'ambiguous.'"  *Id.* at 1073 (citation omitted).

Further, the evidence of conspiracy adduced in this case is overwhelmingly greater than that in the other cases cited by Bauer in which summary judgment was granted.  *See Hyland*, 771 F.3d at 321 (plaintiff presented "no evidence that individuals with pricing authority shared or discussed their respective commission[s]"); *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1317 (N.D. Ga. 2002) *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (plaintiff demonstrated only parallel conduct and opportunity to conspire); *U.S. Info. Sys., Inc. v. Int'l Bhd. Of Elec. Workers Local Union Number 3*, 2007 WL 2219513, at *10-13 (S.D.N.Y. August 3, 2007) (only inter-competitor communication identified by plaintiff was commonplace and permissible meeting between contractors and union representatives); *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 942-44 (2d Cir. 1981) (plaintiff's evidence of conspiracy consisted solely of ambiguous memo sent two years before plaintiff was terminated and meeting between defendant and one of its wholesalers (*i.e.*, not among competitors), and insufficient evidence of price maintenance).  *Compare In re High Pressure Laminates Antitrust Litig.*, 2006 WL 1317023, at *4 (denying summary judgment where defendants possessed sensitive information of their competitors even though "some information might have been gathered through innocuous customer chatter").

[39]  Even if there were not more than enough evidence to raise a genuine issue of fact that Bauer was a knowing

### d.       Bauer's Conduct Was Consistent With Collusion

Ignoring the evidence, Bauer also argues that its conduct is inconsistent with participation in a conspiracy because Anderson's proposal supposedly was a non-negotiable demand with "onerous" and unacceptable terms.  (Bauer Br. 2-3, 7, 10.)  From this demonstrably false premise, Bauer argues that it unilaterally decided to reject Anderson's "demand" and use alternative wholesalers who were not seeking a price increase.  (*Id.*)

First, the evidence that Anderson's announcement was negotiable is overwhelming and includes Anderson's repeated invitations to publishers and national distributors to discuss its proposal (¶¶ 61, 139-43, 147, 149), and Anderson's negotiation with other publishers and national distributors and the negotiated compromise agreements reached with at least Comag and Time (¶¶ 151-52, 159).  This alone constitutes irrefutable evidence that Anderson's proposal was a bid to initiate negotiations -- not a non-negotiable demand.[40]

Second, Bauer's assertion that it made a unilateral decision to reject Anderson's proposal as soon as it was announced is false.  The evidence shows that Bauer's initial response was not unilateral, and that Bauer immediately recognized that it would need the support of its co-conspirators, acting collectively, to reject the proposal.  In fact, even before Bauer met with Anderson to hear Anderson's terms, Bauer's Parker already had agreed with AMI and DSI that

---

participant in the conspiracy, Bauer nonetheless would remain liable for the unlawful collusive conduct of Bauer's agents, Kable and DSI, on which Bauer admittedly relied in responding to Anderson's announcement.  (Bauer 56.1 Statement ¶¶ 649-50.)  *See Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 570 (1982).

[40]   Bauer was managed by highly sophisticated and experienced business executives.  (¶ 165.)  It is thus nonsensical for Bauer to argue, as it does (Bauer Br. 2), that Bauer concluded that Anderson's proposal was a non-negotiable demand.  If Bauer genuinely wanted Anderson to stay in business, as it now professes, Bauer, like Comag and others, would have attempted to negotiate with Anderson or make a counteroffer.  Bauer did not do so.  Instead, the evidence shows that Bauer used Anderson's announcement as an opportunity to work collectively with its co-defendants, including its principal competitor (AMI), to eliminate Anderson from the market.  In any event, even if Anderson's proposal was a non-negotiable demand, as the Second Circuit declared, "the mere fact that an offer of goods or services at a given price may be nonnegotiable does not mean that the offerees, in responding to it, cannot violate the antitrust laws."  *Anderson News*, 680 F. 3d at 192.

t█████████████████████████████████████████████████████

██████████████████████████████████ This evidence alone, which is merely the tip

of the iceberg, demonstrates that Bauer's decision was not "unilateral" or "independent."

After the initial meeting with Anderson, Bauer's coordination with its co-conspirators

and its intense monitoring of their intentions well after Anderson's announcement (*supra*,

pp. 15), also demonstrates that even Bauer's joint decision as to the Anderson proposal could

change if there was significant deviation from the conspiracy by Bauer's co-conspirators.  That is

exemplified by the statement from Bauer's Boehle to the CEO of Hachette on January 20, seven

days after Bauer's so-called "decision," █████████████████████████ (¶ 105.)[41]

Moreover, if Bauer's decision had been unilateral and irrevocable, Parker would have had

no reason to call Jacobsen of TWR on January 31, hours before Jacobsen was scheduled to meet

with Charlie Anderson to discuss Anderson's proposal.  (¶ 168.)  Nor would he have had any

reason to contact Jacobsen after that meeting to determine whether Time had, in the words of

Kable's Duloc, "███████████████████." (¶ 170.)  For that matter, if Bauer's decision to cut off

Anderson was unilateral and irrevocable, none of Bauer's 64 calls to its direct competitors would

have been necessary.  (¶ 130.)  Similarly, there would have been no need for Parker to wait until

February 1 to advise Bauer's sales executives that Bauer would no longer be supplying Anderson

or Source (¶ 178) -- that would have been old news.  Further, Parker would not have emailed

Bauer's logistics company that Sunday evening at 7:17 pm -- during the Super Bowl -- to instruct

that "████████████████████████████████████████████. (*Id.*)  Those

instructions, logically, would have been provided days, if not weeks, earlier.

---

[41]  It is further confirmed by Porche's concern that, ████████████████████████████
████████████████████████. Further corroboration also is found in the evidence that Bauer,
P███████████████████████████████████████████████ (¶¶ 107, 115.)

There is a simple reason why Bauer's "decision" could not have been unilateral and irrevocable: absent collusion, TNG was not the "alternative wholesaler" Bauer professes.  (Marx Reply ¶ 120.)[42]  Because no national distributor, let alone a publisher, acting unilaterally could force retailers to switch from their desired wholesalers, collusion was essential to induce retailers to abandon their relationship with Anderson and to accept magazines from TNG -- the "alternative wholesaler" designated by defendants.  (*Id.*)[43]

The intense, coordinated efforts by defendants to induce retailers to terminate their relationship with Anderson and/or Source -- by conveying the collective message that Anderson and Source no longer would be able to distribute their magazines -- underscores this point. (¶¶ 72-84, 209.)  Parker of Bauer emphasized this point in his email to Boehle of Bauer, declaring ██████████████████████████████████████████████████████████ ███████████████████████████████████████████.  (¶ 208.)  Porche affirmed that, with all of the defendants cutting off Anderson's and Source's magazine supply, he could "████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████"  (¶ 207.)[44]

---

[42]   The argument that Bauer needed an "alternative" to Source also makes no sense because Source had rescinded its proposal.  (¶ 138.)  Defendants obviously were not forced into using TNG and Hudson as competitive alternatives.

[43]   The industry learned this lesson during Curtis' publicly-reported dispute with Anderson in February 2008, when Curtis attempted unilaterally to move its business in Texas away from Anderson and toward TNG.  ¶¶ 260-62. Walmart, a strong proponent of Anderson, refused to accede to Curtis' proposed wholesaler change and Curtis relented.  (*Id.*; Marx Report ¶ 104; Marx Reply ¶ 150.)  Thus, defendants understood that it would be impossible for any one publisher or national distributor unilaterally to compel retailers to switch wholesalers.

A publicly-reported 1999 dispute further confirms the inability of publishers and national distributors to unilaterally compel retailers to switch wholesalers.  In that dispute, two national distributors refused to ship magazines to Anderson and TNG, the wholesalers selected by Kroger for certain of its stores; when Kroger threatened to refuse to accept magazines from those national distributors at all of its stores, they immediately backed down.  (¶¶ 258-59.)

[44]   ████████████████████████████████████████████████ (¶ 58.) █████████████████████████████████████████████████████████████ (¶ 77.)  That TNG and Hudson were not viable alternatives (absent collusion) further demonstrates why *AD/SAT* is inapposite.

The importance of collective and coordinated conduct is precisely the reason that Rodale's Alleger viewed Comag's commitment to continue to ship to Anderson and Source, instead of joining defendants' conspiracy, to be so "dangerous" (¶ 153):  this meant that about 25% of the market (represented by Comag) was not "███████████████████████████" (¶ 58), which potentially undermined defendants' efforts to portray TNG and Hudson as the only method of distribution.  *See Anderson News*, 680 F.3d at 190.  In short, absent collusion by defendants, TNG and Hudson were not the actual alternatives professed by Bauer.

### e.    The Balance of Bauer's Arguments Have No Merit

Bauer makes a series of additional conclusory arguments that are meritless.[45]

<u>First</u>, Bauer falsely asserts that Anderson has "not proffered evidence supporting the requisite preceding agreement," and that Anderson's expert, Dr. Marx, testified that the defendants did not reach an agreement until "the end of January."  (Bauer Br. 19-20.)  Contrary to Bauer's claim, the evidence indisputably shows that defendants -- who communicated with each other immediately before and after Anderson's announcement -- agreed that they would collectively resist Anderson's proposal and then set in motion a plan to do just that.[46]

<u>Second</u>, Bauer argues that Anderson's proposal was "a common stimulus" that "necessitat[ed] quick responses" from defendants.  (Bauer Br. 20.)  The Second Circuit already has rejected this argument:   "The presentation of a common economic offer may well lend itself

---

[45]   Bauer also asserts that Anderson "chose" not to seek a temporary restraining order ("TRO") as Source did on February 9, and that Anderson "[i]nstead … closed its doors."  (Bauer Br. 11.)  As set forth more fully in Anderson's opposition to the summary judgment motion of Time, TWR and Hearst, this is a mischaracterization of the facts.  Anderson Time/TWR/Hearst Opp. 13-15.

[46]   Dr. Marx's testified that defendants' collusive conduct began in the week following Anderson's announcement (Ex. 204 (Marx Dep.) 155:21-156:15, 158:24-159:12, 159:18-160:2), which is when AMI, DSI and Bauer agreed to "simultaneously" use their "collective resources and influence" to move business away from Anderson.  (¶ 57.)  As a result, Bauer's citation to *Thompson Everett, Inc. v. Nat'l Cable Adver. L.P.*, 850 F. Supp. 470 (E.D. Va. 1994) (Bauer Br, 16) is inapposite.  *See id.* at 480 (defendants' communications occurred well after defendants entered into challenged agreements).

to innocuous, independent, parallel responses; but it does not provide antitrust immunity to respondents who get together and agree that they will boycott the offeror." *Anderson News*, 680 F.3d at 192. Moreover, the argument ignores the mountain of highly-incriminating evidence of defendants' collusion.[47]

Third, Bauer argues that "there can be no claim of a boycott in this case" because Bauer "reject[ed] a higher priced distributor" and was "not aiming to destroy the replaced distributor." (Bauer Br. 22-23.) But Bauer's argument is contrary to the law and to the facts of this case. First, because Bauer could not unilaterally "reject" and replace Anderson, Anderson was not the "higher priced distributor" Bauer claims. Second, even if Anderson were a "higher priced distributor," this would not excuse Bauer and its co-conspirators' collusion. (*See* Anderson Time/TWR/Hachette Opp. at 20-23.) Bauer's argument is further inapposite because Bauer and its co-defendants specifically conspired not only to resist Anderson's and Source's proposal but also to eliminate them from the market. (*Supra* n.23).[48]

## CONCLUSION

Based on the foregoing, Anderson respectfully requests that Bauer's motion be denied.

---

[47] *Mayor & Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) (Bauer Br. 20), is entirely distinguishable, since there the plaintiffs "essentially pleaded only parallel conduct, with little more." *Id.* at 138.

[48] For this reason, the cases on which Bauer relies are completely inapposite. In *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), the court found that defendants were not "motivated by a desire to damage plaintiff or put it out of business." *Id.* at 78. Further, in *O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc.*, 36 F.3d 565, 573 (7th Cir. 1994), the plaintiff's boycott claims were frivolous because the plaintiff had not attempted to do business with the defendant. By contrast, here Anderson did attempt to do business with Bauer, but was rebuffed because Bauer instead pursued Anderson's elimination. *Interborough News Co. v. Curtis Publ'g Co.*, 225 F.2d 289 (2d Cir. 1955), is also distinguishable because, unlike here, there was no evidence of an agreement on the part of co-conspirators. *See id.* at 293.

Further, that defendants conspired to eliminate Anderson and Source from the market further belies Bauer's claim that its conduct was somehow procompetitive. Even Bauer concedes that its "procompetitive" argument is based on the false factual premise that its communications related to the "replacement of infrastructure." (Bauer Br. 16, 18.) The highly incriminating content, context and frequency of Bauer's communications (*supra* at 9-12, 17-21) establish that the evidence is to the contrary. In any event, whether Bauer's conduct was procompetitive is, at most, a question of fact.

Dated:  New York, New York
        March 9, 2015

Respectfully submitted,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By: _____
    Marc E. Kasowitz (mkasowitz@kasowitz.com)
    Hector Torres (htorres@kasowitz.com)
    Seth Davis (sdavis@kasowitz.com)
    Seth A. Moskowitz (smoskowitz@kasowitz.com)
    Gavin D. Schryver (gschryver@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Plaintiff Anderson News, L.L.C.*

26