UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDERSON NEWS, L.L.C. and LLOYD WHITAKER, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C., <br><br>       Plaintiffs, <br><br>   - against - <br><br> AMERICAN MEDIA, INC., BAUER PUBLISHING CO., L.P., CURTIS CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI MEDIA U.S., INC., HEARST COMMUNICATIONS, INC., HUDSON NEWS DISTRIBUTORS LLC, KABLE DISTRIBUTION SERVICES, INC., RODALE, INC., TIME INC., and TIME/WARNER RETAIL SALES & MARKETING, INC., <br><br>      Defendants. | 09 Civ. 2227 (PAC) <br><br> Filed Under Seal |
| AMERICAN MEDIA, INC., HEARST COMMUNICATIONS, INC., and TIME INC., <br><br>      Counterclaim Plaintiffs, <br><br>   - against - <br><br> ANDERSON NEWS, L.L.C. and CHARLES ANDERSON, JR., <br><br>      Counterclaim Defendants. | |

**MEMORANDUM OF LAW OF PLAINTIFF ANDERSON NEWS, LLC IN OPPOSITION TO DEFENDANT CURTIS' MOTION FOR SUMMARY JUDGMENT**

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700

*Attorneys for Plaintiff*
*Anderson News, L.L.C.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................3

I.      STANDARD ON A MOTION FOR SUMMARY JUDGMENT ..........................3

II.     OVERWHELMING EVIDENCE ESTABLISHES THAT
        CURTIS PARTICIPATED IN AN UNLAWFUL CONSPIRACY ......................4

        A.      The Evidence Establishes A Plausible Conspiracy.....................................4

        B.      The Existence Of The Conspiracy Is,
                At Minimum, A Question Of Fact ..............................................................11

                1.      Defendants' Conspiracy Unfolded
                        In A Series Of Overlapping Phases ................................................11

                2.      There Is Overwhelming Evidence Of "Additional
                        Circumstances" That Permit An Inference Of Conspiracy............14

        C.      The Evidence Overwhelmingly Shows Curtis' Direct Participation
                In The Conspiracy Is, At Minimum, A Question Of Fact ........................19

        D.      Curtis' Conduct Was Consistent With Collusion .....................................21

CONCLUSION..........................................................................................................25

## TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999)....................................................................16

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)............................................................. passim

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246, 252 (2d Cir. 1987)........................................................4, 19

*First National Bank of Arizona v. Cities Service Company*,
   391 U.S. 253 (1968)................................................................................24

*In re Aspartame Antitrust Litig.*,
   2007 WL 5215231 (E.D. Pa. Jan. 18, 2007 .............................................5

*In re Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009)....................................................................4

*In re Electronic Books Antitrust Litig.*,
   859 F. Supp. 2d 671, 684 (S.D.N.Y. 2012)............................................24

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009)....................................................18

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51, 64 (2d Cir. 2012)......................................................... *passim*

*In re High Pressure Laminates Antitrust Litig.*,
   2006 WL 1317023 (S.D.N.Y. May 15, 2006) .....................................4, 17

*Interborough News Co. v. Curtis Publ'g Co.*,
   225 F.2d 289 (2d Cir. 1955)...................................................................20

*Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*,
   416 F.2d 71 (9th Cir. 1969) ...................................................................20

*Meredith Corp. v. SESAC LLC*,
   2014 WL 812795 (S.D.N.Y. Mar. 3, 2014) .............................................4

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   673 F. Supp. 684 (S.D.N.Y. 1987) .........................................................19

*Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S 284 (1985).................................................................................20

*Peda v. New York Univ. Hospitals Ctr., Hosp. for Joint Diseases*,
    2014 WL 1013844 (S.D.N.Y. Mar. 17, 2014) ...............................................................3

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ........................................................ 16-17

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ...............................................................3, 13

*Ross v. Am. Express Co.*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011)..................................................................14, 17

*Ross v. Bank of Am., N.A. (USA)*,
    2012 WL 401113 (S.D.N.Y. Feb. 8, 2012).........................................................13, 21

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) .......................................................................13

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ...................................................17

*United States v. Apple, Inc.*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013).........................................................16, 17, 18

*Webster Rosewood Corp. v. Schine Chain Theatres*,
    263 F.2d 533 (2d Cir. 1959).......................................................................................25

Plaintiff Anderson News, LLC ("Anderson") respectfully submits this memorandum of law in opposition to Curtis Circulation Company's ("Curtis") motion for summary judgment.[1]

## PRELIMINARY STATEMENT

The evidence demonstrates that defendants -- some of the most powerful magazine publishers in the nation and their national distributors, who are competitors of one another -- worked in "lock step" to cut off Anderson's magazine supply and destroy Anderson.

Defendants' collusive conduct was their reaction to Anderson's mid-January 2009 proposal for a reduction in the price Anderson paid for magazine distribution and for publishers to absorb certain inventory costs Anderson was incurring.  Evidence uncovered during discovery shows how the conspiracy evolved through multiple overlapping phases:  defendants initially shared with each other their reactions to Anderson's proposal and agreed to "simultaneously" use their "collective resources and influence" to move business away from Anderson.

When Source, another major wholesaler, made a proposal similar to Anderson, defendants also began using their collective resource and influence to move business away from Source as well.  Defendants engaged in a coordinated campaign to convince retailers to accept magazines from wholesalers of defendants' choosing; they intensely monitored each other's commitment to the collective plan; they shared with each other the status of their negotiations with Anderson and Source and their distribution plans; and then -- within a few days of one another -- cut off Anderson's and Source's magazine supply, successfully and ruthlessly eliminating Anderson as a wholesaler.  This confluence of events was unprecedented in the

---

[1]  Submitted in further support of Anderson's opposition is the Declaration of Seth Davis, dated March 9, 2015 (the "Davis Declaration"), and the Declarations of Charles C. Anderson, Jr., John Campbell and Bo Castle, all dated March 9, 2015.  References to "Ex. __" refer to the exhibits to the Davis Declaration.  References to "Pl. 56.1  ¶ __" refer to paragraphs of Anderson's response to Curtis' Statement of Uncontested Facts.  References to "¶ __" refer to paragraphs of Anderson's Statement of Additional Genuine Issues of Material Fact.

To the extent relevant, Anderson hereby incorporates by reference its briefs in opposition to the motions for summary judgment filed by Curtis' co-defendants.

industry.  Discovery reveals how defendants secretly achieved their unlawful objectives: (i) an astoundingly high-level of inter-firm communications, including dozens of highly incriminating emails and other documents; (ii) inter-competitor in-person meetings; and (iii) over 150 inter-competitor telephone calls at unusual times of day, for suspiciously long durations, among competitors who otherwise rarely spoke with each other.

The objectives of defendants' antitrust conspiracy are not only plausible but, as discovery now discloses, clear and compelling.  By collectively resisting Anderson's and Source's proposed terms, defendants preserved their profits.  Moreover, admissions in defendants' internal documents confirm an additional motive -- the increased wholesaler concentration resulting from the elimination of Anderson and Source would enable the remaining major wholesalers, TNG and Hudson, to extract pricing concessions mostly, if not solely, from retailers, who relied heavily on inter-wholesaler competition, and not from publishers and national distributors, which did not rely on such inter-wholesaler competition.

The economic analysis of Dr. Leslie Marx, a Duke University economist with extensive expertise in the economics and detection of collusion, further confirms the economic motivation for defendants' conspiracy.  Dr. Marx's economic analysis of the structure and history of the single-copy magazine industry and the evidence shows that increased wholesaler concentration would benefit publishers and national distributors at the expense of retailers.  Indeed, after Anderson's elimination, the cost of magazines to retailers increased, while publishers were able to preserve their profits by maintaining their prices for the magazines sold to wholesalers.

Ignoring the overwhelming evidence of its participation in the conspiracy, Curtis erroneously contends that insufficient evidence exists concerning Curtis' involvement.  The clearly inculpatory evidence as to Curtis includes its president's admission that Curtis was

working in "lock-step" with its direct competitor, TWR, to eliminate Anderson and Source from the market in order to create a "two-wholesaler system."  That alone -- without the mountain of other evidence implicating Curtis -- is sufficient evidence of Curtis' knowing participation in defendants' conspiracy.

Equally meritless is Curtis' argument that its conduct was inconsistent with collusion and consistent with its unilateral self-interest.  This argument rests on a fundamentally false premise that ignores the structure of the industry, *i.e.*, that Curtis "unilaterally" could resist Anderson's proposal, refuse to negotiate with Anderson and move its publisher clients' business away from Anderson.  The exact opposite is true.  As Curtis knew from past experience, it could not, acting unilaterally, compel retailers to accept magazines from alternative wholesalers.  Rather, the only way to effectuate such a switch was through collective action.

In sum, as shown below, the overwhelming evidence of Curtis' participation in this illegal antitrust conspiracy compels denial of Curtis' summary judgment motion.

## ARGUMENT

## I.    STANDARD ON A MOTION FOR SUMMARY JUDGMENT

In its summary judgment motion, Curtis bears the burden of establishing that "there is no genuine dispute as to any material fact," and must "produc[e] evidence on each material element of its claim or defense demonstrating that it is entitled to relief."  *Peda v. N. Y. Univ. Hosps. Ctr.*, 2014 WL 1013844, at *7-8 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.) (citations omitted).  Even then, summary judgment must be denied if Anderson, as the nonmoving party, meets its "limited burden of production" by demonstrating the existence of a genuine dispute as to material facts. *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) (citation omitted).

3

Summary judgment must be denied as long as "the totality of the evidence, viewed in the light most favorable to plaintiffs and with proper regard for the *Matsushita* standards, could support a reasonable inference of illegal collusive behavior." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012). Anderson is not required to "disprove all nonconspiratorial explanations for the defendants' conduct," but must demonstrate that the existence of a conspiracy is a "reasonable inference that the jury could draw," and may meet its burden by providing "sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* at 63 (citations omitted).[2]

Because Curtis clearly fails to meet its burden of establishing that no genuine issues of material fact exist, Curtis' summary judgment motion should be denied.

## II.   OVERWHELMING EVIDENCE ESTABLISHES THAT CURTIS PARTICIPATED IN AN UNLAWFUL CONSPIRACY

### a.   The Evidence Establishes A Plausible Conspiracy

Curtis's motion essentially is premised on the contention -- already rejected by the Second Circuit -- that conspiring to eliminate Anderson and Source makes no economic sense because it would result in placing excessive power in the remaining two major wholesalers, TNG and Hudson. (*See* Curtis Br. 7-8.) The evidence revealed during discovery proves the exact

---

[2]   Moreover, because the evidence uncovered in discovery now establishes clearly that Anderson's claims are not only "plausible," but well-founded, the "strong evidence" standard upon which Curtis relies (Curtis Br. 5-8) is inapplicable. Therefore, summary judgment must be denied if Anderson "present[s] direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (citation omitted); *see also Meredith Corp. v. SESAC LLC*, 2014 WL 812795, at *208 (S.D.N.Y. Mar. 3, 2014) (summary judgment denied where "the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding") (citation and quotation omitted).

Further, "[i]n considering whether there is sufficient evidence to create a genuine issue of fact, the district court may not properly consider the record in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (citation omitted); *see also In re High Pressure Laminates Antitrust Litig.*, 2006 WL 1317023, at *4 (S.D.N.Y. May 15, 2006) ("A court deciding whether to grant summary judgment . . . should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place.") (citation and quotation omitted).

opposite -- Curtis and its co-conspirators had a powerful motive to conspire:  the profits that could be achieved, and were achieved, through eliminating Anderson and Source.

First, by collectively resisting the Anderson and Source proposals, defendant publishers (including Curtis' clients) could avoid paying a distribution fee not only to Anderson and Source, but also to TNG and Hudson.[3]  They also would have no need to offset that cost by improving their selling efficiency and ending their practice of "stuffing the channel" with excess magazines -- a practice that defendants claimed was necessary to maximize their profits.[4]  Defendant publishers also could avoid having to bear the cost of inventory that was on Anderson's books as a result of retailers utilizing scan-based trading ("SBT").  (¶ 49; Picard Report ¶ 125.)  This maintenance of profits alone provides not only a plausible but a compelling motivation and explanation for defendants' conduct.[5]

Second, as defendants' own documents reveal, defendants expected a significant economic benefit from eliminating Anderson and Source as wholesalers.  The more concentrated wholesaler sector, consisting primarily of TNG and Hudson, would significantly reduce competition among wholesalers.  Because of the structure of the distribution chain, retailers -- but not publishers and national distributors -- relied heavily on inter-wholesaler competition.  Thus, reduced wholesaler competition would enable the remaining wholesalers to extract pricing concessions from retailers -- not publishers and national distributors.

Dr. Leslie Marx's economic analysis demonstrates how reducing the number of wholesalers economically would benefit defendants.  Before 1995, publishers dominated the

---

[3]   Defendants admit that they would have paid to TNG and Hudson any per-copy fee they paid to Anderson and Source.  (¶ 51.)

[4]   See ¶¶ 21-24, 42; Ex. 269 (July 16, 2014 Reply Expert Report of Leslie M. Marx, PhD ("Marx Reply")) ¶ 207 and n.367; Ex. 260 (April 16, 2014 Expert Report of Robert G. Picard, PhD ("Picard Report")) ¶¶ 118-20, 140.

[5]   See In re Aspartame Antitrust Litig., 2007 WL 5215231, at *9 (E.D. Pa. Jan. 18, 2007) ("[A]s with almost any price-fixing conspiracy, the clear motive was to increase or maintain profits.") (citation omitted).

single-copy distribution channel by using regionally-based wholesalers operating in exclusive territories.  After 1995, as retailers grew larger and had increased negotiating leverage, they insisted on working with one single wholesaler that operated in non-exclusive territories.  This led to the consolidation of the market from many regionally-based wholesalers operating in exclusive territories to four major wholesalers.  (¶ 26.)[6]  The absence of exclusive territories enabled retailers to rely on competition among major wholesalers to obtain greater margins from wholesalers and improved service.[7]  The resulting loss of margin to wholesalers led them to seek pricing concessions from publishers, including Curtis' clients.  (¶27; Picard Report ¶¶ 167-68.)  The elimination of the two proponents of those concessions, Anderson and Source -- and the de facto re-emergence of the publisher-favored exclusive territories -- would enable publishers and national distributors to swing the pendulum back in their direction.  Retailers, left with only two major wholesalers effectively operating in exclusive territories with the absence of any meaningful inter-wholesaler competition, would be compelled to absorb increased prices for magazines.  (¶¶ 242-73; Marx Report ¶¶ 132-40.)  Once they regained control, defendants could (and did) continue to "stuff the channel" with excess magazines, and resist the adoption of SBT and other efficiencies advocated by Anderson and retailers.  (¶¶ 226-28; Picard Report ¶¶ 118-25, 140; Marx Report ¶¶ 324-74.)

Dr. Marx's analysis is fully supported by the evidence uncovered during discovery, including defendants' own contemporaneous documents.  (*See* ¶¶ 223-57; Marx Report ¶¶ 125-42, 157-280.)  For example, an internal Hachette email observed that one benefit of eliminating

---

[6]  *See* Ex. 259 (April 16, 2014 Expert Report of Leslie M. Marx, PhD ("Marx Report")) ¶ 121 n. 177; Marx Reply ¶ 106.  Dr. Marx's analysis is also supported by the analysis of the single-copy magazine industry by Dr. Robert Picard of the Reuters Institute at the University of Oxford, who is an expert in the economic and business dynamics of media, including the magazine industry.  (*See* Picard Report.)

[7]  *See id.*; Marx Report ¶ 124; Marx Reply ¶¶ 121-25.

Anderson and Source would be that " ███████████████████████████
██████████████████" (¶ 227.)  Likewise, Bob Castardi of Curtis communicated to
Hachette that, with increased wholesaler concentration, the remaining wholesalers would be able
to get better terms from retailers.  (¶ 226) ("fewer w/s[,] will go to retailers to get better terms.")
███████████████████████████████████████████████████████
██████████████████████████████████████████ because they could avoid
participating in SBT relationships and the remaining wholesalers could force reduced margins
down to the retailers rather than to the publishers.  (¶ 228.)[8]  Rick Parker of Bauer succinctly
articulated the advantages of eliminating Anderson and Source:  discussing the possibility that
Anderson or Source might negotiate agreements allowing them to continue to be supplied with
magazines, he wrote in an internal document, ██████████████████████ (¶ 225.)

That eliminating Anderson and Source made economic sense to defendants is also
confirmed by contemporaneous documents from other industry participants.  For example, David
Rustad, a magazine buyer for Kroger -- one of the largest magazine retailers in the nation --
testified that defendants were trying to put Anderson and Source out of business and dictate to
Kroger who they would have to use as wholesalers.  According to Rustad, Kroger ████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████. (¶ 235.)[9]



---

[8]  *See Anderson News*, 680 F.3d at 194 (finding plausible "that this statement claiming 'control' evinced satisfaction
with the reduction of the number of national wholesalers to two").

[9] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████ " (¶ 238.)

The evidence thus unequivocally confirms that the alleged conspiracy, as the Second Circuit recognized, is plausible because defendants would obtain control over the industry:

> With only two national wholesalers, each with its own allocated territory, many retailers would have no other supplier choice; wholesalers could increase their profits by raising prices to the retailers, and not seek, as Anderson and Source had, to increase charges to the publishers.

*Anderson News*, 680 F.3d at 194.  Defendants' admissions, Dr. Marx's economic analysis, and the other evidence all confirm another percipient observation of the Second Circuit:  "in the near term at the very least, the conspiracy alleged by Anderson could be expected to benefit the publishers, the distributors, and the two wholesalers . . . ."  *Anderson News*, 680 F.3d at 194. Indeed, the court was correct:  the price retailers paid wholesalers for magazines increased immediately after Anderson's forced exit, while publishers' discount to wholesalers remained virtually unchanged.  (¶¶ 251-55; Marx Report ¶¶ 148-156; Marx Reply ¶ 10.)  Moreover, testimony from retailers establishes that they no longer were able to engage wholesalers in a competitive bidding process and service levels deteriorated.  (¶¶ 256-57; Marx Report ¶¶ 132-40, 326, 341, 353, 363.)[10]

Defendants also had tools available to mitigate the potential risks of increased wholesaler concentration.  One such tool was the market power of defendants acting collectively.  As the Second Circuit declared:

---

▮▮▮▮▮▮▮"  (¶ 240.)  As industry consultant Linda Ruth clearly summarized in an email exchange with Michelle Ingenito of Curtis:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (¶ 242.)

[10]   Economic theory also demonstrates that eliminating Anderson and Source made economic sense for defendants. The market for magazine wholesaling is a "two-sided market," in which wholesalers act as "platforms," facing both retailers and publishers/distributors.  (Marx Report ¶ 111, and n. 139.)  In such markets, "it is possible that an increase in the market power of platforms leads to higher prices on one side of the market, while having a much smaller impact on prices on the other side."  (*Id.* ¶ 113.)  Generally, the side of the market that "single-homes," or does business with only one platform, feels the brunt of higher prices when platforms gain market power.  (*Id.*) Since retailers of magazines use one only wholesaler to service a retail location, they are on the "single-homing side of the platform," and thus pay higher prices when wholesalers gain market power.  (*Id.* ¶¶ 114-18.)

> [T]he defendant publishers and distributors own or control 80 percent of the
> nation's magazines, including, apparently, those that are the most popular.  We
> doubt that it can be said as a matter of law that these publishers and distributors
> would have less market power than wholesalers who themselves produce no
> goods and who, without these publishers and distributors, would lack the most
> popular magazines to offer to retailers.

*Anderson News*, 680 F.3d at 193 (citations omitted).

Further, defendants took concrete steps to contain any risk of increased wholesaler

market power, including, contrary to historical practice, entering into long-term contracts with

replacement wholesalers.  (¶¶ 244-48, 250-54; Marx Report ¶¶ 110, 141-44.)  These contracts

provided security that those wholesalers would be precluded from using their increased market

power to extract better prices from publishers and distributors.  (*Id.*)  Defendants also explicitly

recognized that they could use smaller wholesalers should TNG or Hudson attempt to utilize

their market power against them.  (¶¶ 248-49; Marx Report ¶¶ 145-47.)

The rationale underlying the conspiracy recently was unequivocally affirmed by the

president of defendant publisher AMI, David Pecker.  During a November 2014 earnings call

discussing Source's 2013 bankruptcy, which left TNG controlling over 75% of the market,

Pecker extolled the benefits of fewer wholesalers.  Specifically, Pecker explained that, with a

single wholesaler distributing the vast majority of magazines, these are "the best times we've

ever been [in] when it comes to the supply chain."  (¶ 250.)[11]

Further, the evidence establishes that the conspiracy was triggered by Anderson's

proposal, thus belying Curtis' contention that this timing somehow renders the conspiracy

implausible.  (Curtis Br. 6-7.)  Indeed, Curtis clearly knew -- because of its February 2008

dispute with Anderson (*see* ¶ 260-62) -- that it lacked the power unilaterally to compel Walmart

---

[11]  Pecker also explained that AMI's "long-term contracts that lock[] in [its] discount rates for both [TNG and
Hudson]" effectively mitigated any concern about increased wholesaler concentration.  (¶ 250.)

or other large retailers to switch wholesalers.  Only through collective and coordinated action with other national distributors and publishers could Curtis shift business away from Anderson to Curtis' preferred wholesalers.  Thus, Anderson's announcement provided Curtis both motive and opportunity -- a clear and concise event around which to rally and, in the words of Roscoe, AMI's consultant and the chairman of DSI, get ████████████████████████████ ███████████████████████████████ and convince retailers to switch wholesalers.  (¶ 58; *see also* ¶ 77 (███████████████████████████████████ ██████████████████████████████).)[12]

    Also without merit is Curtis' argument that the risk of non-payment of receivables owed by Anderson renders implausible the conspiracy to eliminate Anderson.  (Curtis Br. 8.)  This argument ignores the actual conduct of Curtis and its co-defendants in early 2009 -- they collectively cut off Anderson's magazine supply despite the existence of this debt.[13]  This demonstrates that Curtis concluded that it would benefit from eliminating Anderson notwithstanding any amounts Anderson allegedly owed.  Plainly, Curtis either believed Anderson would pay these debts even if Anderson was eliminated as a magazine wholesaler, or it

---

[12]   Curtis also argues that its intention to use Source as an alternative for Anderson before Source announced its own per-copy distribution fee proposal necessarily means that Curtis did not want to see Source eliminated from the market.  (Curtis Br. 13.)  The evidence, however, is directly to the contrary.  Even after Source rescinded its per-copy distribution fee proposal, Curtis still cut off Source's magazine supply.  (¶¶ 138, 189.)

[13]   The $35 million Curtis claims that Anderson owed at the time Curtis cut off Anderson's magazine supply is artificially inflated by at least $20 million in interest charges that Anderson never agreed to pay.  (*See* Pl. 56.1 Resp. ¶ 442.)  ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ (¶ 263.) ████████████████████████████████████████████████████████████████████████ (¶ 264.) Given the high level of communications between Curtis and TWR during this period, it is reasonable to infer that Curtis understood that this was Time's view.

Likewise meritless is Curtis' claim that it made no economic sense to eliminate Anderson and Source because this would concentrate any outstanding debt owed to Curtis with the two remaining wholesalers.  (*See* Curtis Br. 8.)  If Curtis truly considered this a risk, it either would have made Anderson a counteroffer directly or would have honored the agreement Jacobsen of TWR reached on Curtis' behalf on January 31.  In any event, Curtis believed that eliminating Anderson would ██████ the wholesaler marketplace, thereby making the credit risk associated with TNG and Hudson less of a concern.  (*See* ¶¶ 226-27, 250; *see also* Marx Report ¶¶ 125-31.)

determined that the benefits of avoiding the proposal and eliminating Anderson outweighed the risks of any non-payment of these receivables.  These facts compel rejection of Curtis' contention that these debts rendered defendants' conspiracy implausible.

In short, the evidence revealed during discovery and economic theory compels the conclusion that, not only did defendants' conspiracy make complete economic sense, but the benefits defendants expected from de facto exclusive territories in a distribution system with only two major wholesalers actually were realized.

> **b.     The Existence Of The Conspiracy Is, At Minimum, A Question Of Fact**

Because Curtis essentially ignores the mountain of highly incriminating emails, sworn testimony and the more than 150 inter-competitor communications supporting an inference of a conspiracy, Curtis has not satisfied -- and cannot satisfy -- its initial burden of demonstrating that there is no genuine dispute as to any material fact as to each material element of its defense. *See Peda*, 2014 WL 1013844, at *7-8.  In any event, as demonstrated below, summary judgment must be denied because, at a minimum, there is more than "sufficient evidence to allow a reasonable fact finder to infer that [a] conspiratorial explanation is more likely than not." *Publ'n Paper*, 690 F.3d at 63 (citation omitted).

> **i.     Defendants' Conspiracy Unfolded In A Series Of Overlapping Phases**

The evidence shows that, as soon as defendants learned of Anderson's proposal, they engaged in a high level of communication with direct competitors or other market participants with no legitimate business justification.  Initially, defendants shared with each other their reaction to Anderson's proposal and agreed to work collectively to resist the proposal.  Indeed, less than 24 hours after Anderson publicly announced its proposal, the country's major publishers already had exchanged their reactions to the proposal.  Thus, by January 15, Bauer's

Rick Parker was able to report internally to the president of Bauer that ███████████████████████

███████████████████████████████████████████████████  (¶ 65.)[14]

Defendants then began the next phase -- a coordinated effort to convince retailers to accept magazines from wholesalers of defendants' choosing.  Castardi of Curtis agreed with Porche of DSI that these retailer contacts were critical because "the more companies that get on the record saying they do not intend to pay the 7¢ fee the better."  (¶ 77.)  ████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████  (¶ 80.)  A "██████," jointly developed by competitors AMI and Bauer, is precisely what defendants were using to convey a collective and uniform message to retailers.  (¶¶ 73-80, 209.)[15]

In the third phase of the conspiracy, Curtis and its co-conspirators focused on developing an alternative distribution plan that included sharing competitively-sensitive information about each others' distribution practices.  (¶¶ 87-92; Marx Report ¶¶ 190-99.)[16]  The fourth phase involved defendants' monitoring each other to ensure that they maintained their commitment to their collective plan, and to confirm that no one would deviate from it by reaching a negotiated

---

[14]  *See also* ¶¶ 56-58, 60, 62-70 for additional evidence of defendants' initial response to the Anderson announcement, including (i) an email in which Porche of DSI reported to Pecker of AMI that Parker of Bauer agreed that AMI, DSI and Bauer ████████████████████████████████████████████████████
████████████████  (¶ 57); (ii) evidence of █████████████████████████████████
████████████████████  (¶ 63); (iii) telephone calls between ███████████████████
██████████████████████  (¶¶ 62, 67-71); and (iv) an internal Kable email reflecting that Bauer's Parker shared with Kable's Duloc a strategy ██████████████████████████████████████
███████████████████  (¶¶ 100-01).

[15]  The evidence also includes a highly-incriminating internal debate between AMI and Bauer concerning whether they should call Walmart together or separately.  (¶ 74-76.)  Recognizing that calling together would be viewed as "team[ing] up" and could result in "lawsuits," AMI and Bauer chose to have separate calls with Walmart and then share with each other the results of their conversations.  (¶¶ 75-76; *see also* ¶¶ 77-78, 212 for evidence reflecting defendants' coordinated effort to convince retailers to abandon their relationship with Anderson and Source and use wholesalers of defendants' choosing, and showing that defendants not only coordinated on scripts, but shared the results of their calls with retailers in which the scripts were used.

[16]  The evidence of this phase includes, for example, emails revealing that Curtis and DSI were coordinating with Bauer (a Kable client) on a plan combining historical distribution data from Curtis with historical distribution data from Curtis' direct competitor, Kable.  (*See* ¶¶ 88-93.)

agreement with Anderson or Source.  (¶¶ 103-136; Marx Report ¶¶ 200-264; Marx Reply ¶¶ 60-61.)  As Porche of DSI warned, such an agreement ██████████████████████ (¶ 115.)[17]

As the Second Circuit stated, on the basis of far fewer alleged facts, defendants' inter-competitor coordination culminated in defendants, in virtual lock step and within days of one another, cutting off both Anderson's and Source's magazines supply, and forcing Anderson from the magazine wholesaling business.  *See Anderson News*, 680 F.3d at 191. (*See* ¶¶ 137, 185-89.) Such parallel conduct, particularly when combined with extensive strategic, inter-competitor communications in which competitively-sensitive information is exchanged, is a hallmark of an antitrust conspiracy and provides a strong inference of collusion.[18]  *See Ross v. Bank of Am. N.A. (USA)*, 2012 WL 401113, at *5 (S.D.N.Y. Feb. 8, 2012) ("Given the temporal proximity between the meetings and the adoption of arbitration clauses, this parallel conduct is probative of an antitrust conspiracy."); Marx Report ¶¶ 321-23.[19]

The evidence also belies Curtis' contention that purported differences in how Curtis and some of its co-defendants responded to Anderson's proposal is inconsistent with an inference of conspiracy.  (Curtis Br. 13-14.)  While certain defendants purported to negotiate with Anderson

---

[17]  For a period of time, the strategy contemplated by defendants shifted to one in which they would continue to ship to Anderson, but not pay the surcharge, so that defendants could blame Anderson for not shipping and causing any disruption in service and, as Duloc of Kable explained, ████████████████████████" (¶ 100.)  David Pecker of AMI and Porche of DSI opposed this strategy because they were concerned that, if defendants shipped to Anderson but did not pay, Anderson may ship one defendant's magazines, but not the others, and "piece us . . . apart." (¶ 102.)  Parker of Bauer, on the other hand, continued to believe in the value of this strategy and, therefore, Porche had to "convinc[e]" him not to ship to Anderson.  (*Id.*)

[18]  Curtis' cases are not to the contrary.  *See RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231-32 (E.D.N.Y. 2009) (plaintiff made no factual allegations of conspiratorial conduct and relied solely on defendants' purportedly parallel conduct, which court found was not in parallel); *Reading Int'l, Inc.,* 2007 WL 39301, at *8 (summary judgment granted where -- unlike here -- very limited evidence provided by plaintiff in support of its conspiracy theory indicated that defendants were not, in fact, conspiring).

[19]  The conspiracy continued even after defendants collectively cut off Anderson's and Source's magazine supply. For example, DSI and TWR -- direct competitors -- worked together to ensure that each other's clients' magazines were on display.  (¶¶ 215-16.)  Defendants also continued to share with each other the results of their efforts to convince retailers to abandon their relationships with Anderson and Source and use defendants' chosen wholesalers. (¶¶ 212-15.)

and others did not, this distinction is meaningless because defendants ultimately engaged in collective and uniform conduct.  As the Second Circuit concluded in rejecting this argument, "there is nothing implausible about coconspirators' starting out in disagreement as to how to deal conspiratorially with their common problem."  *Anderson News*, 680 F.3d at 191.  What matters is that, in the end, "notwithstanding their responses initially, some two weeks later every defendant publisher and distributor acted, within a span of three business days, to cut Anderson off."  *Id.*[20]

### ii.    There Is Overwhelming Evidence Of "Additional Circumstances" That Permit An Inference Of Conspiracy

Beyond defendants' parallel conduct and the inculpatory documents and other evidence, there exists overwhelming evidence of "additional circumstances" that would "permit a fact-finder to infer a conspiracy," including circumstances and evidence commonly characterized as "plus factors" by courts and economists.  *See Publ'n Paper*, 690 F.3d at 62.

First, defendants' conduct was against each of their individual economic self-interests, which is a "plus factor" that strongly supports an inference of conspiracy.  *See id.* at 62.[21]  By adhering to the collective plan, each defendant denied itself the economic benefit of reaching an agreement with Anderson, avoiding disruption and continuing to ship magazines through Anderson and gaining increased display space at retailers, while their competitors' magazines sat idle in warehouses.  (Marx Report ¶¶ 281, 285, 305-14, 318; Marx Reply ¶¶ 62-67.)  The benefits of continuing to ship to Anderson clearly are demonstrated by the decision of Comag -- the only major national distributor that did not participate in the conspiracy -- to ship to

---

[20]  *See also Ross v. Am. Express Co.*, 773 F. Supp. 2d 351, 368 (S.D.N.Y. 2011) (concluding that "a jury could find parallel conduct" even though defendants' actions were "several months apart").

[21]  *See also* Marx Report ¶ 66.  In their joint motion to exclude certain of Dr. Marx's testimony, Curtis and its co-defendants take issue with Dr. Marx's reference to certain "plus factors" as "super-plus factors."  As shown in the opposition to that motion (at pp. 12-16), this argument is completely meritless.  Nevertheless, whether characterized as "super-plus factors" or "plus factors," the conclusion is the same -- the evidence is consistent with collusion.

Anderson and Source.  The net result was that Comag's publishers' titles remained on retailers' shelves, unlike those of its competitors who cut off Anderson's and Source's magazine supply. As a DSI executive complained:

> [B]ecause CoMag took the easiest and weakest position, they continue to receive distribution and display and in reality they now receive dramatically better display because they are in our pockets!!! … [H]ard to accept CoMag not feeling any disruption and then actually gaining display and sale for being so weak during this crisis.  And then in the end if we've somehow created a stronger, better wholesaler network, they'll reap that benefit too.  (¶ 214.)[22]

That defendants recognized that it was in their self-interest to continue to ship to Anderson and Source, but consciously refrained from doing so, is also demonstrated by an email from Porche of DSI to a colleague in which he explained that Pecker of AMI was upset because ████████████████████████████████████████████████████████████ ████████████████████████████████ (¶ 205.)  According to Dr. Marx, "[i]n a competitive market, AMI should not need the permission of its competitor Bauer, to supply Source LA with magazines to increase its profits.  This statement only makes sense in the context of the collusive plan of Defendants."  (Marx Report ¶ 306.)[23]

Further, even though Source rescinded its per-copy distribution fee proposal, defendants nonetheless cut off Source's magazine supply, which was against their respective individual

---

[22]  Another reason that continuing to ship to Anderson was in defendants' individual economic self-interest is because, even if Anderson ultimately was unable to survive, any publisher who continued to ship through Anderson could simply switch wholesalers after Anderson's exit.  Indeed, Comag reached a negotiated agreement with Anderson pursuant to which Comag agreed to continue to ship magazines, but when it became clear that Anderson would be forced out of business after defendants cut off the supply of magazines to Anderson, Comag then independently moved its business to TNG and other wholesalers.  (¶¶ 151-55, 183-88, 218-222, 240.)

[23]  Dr. Marx also conducted an empirical analysis of the economic benefits to Comag's publisher clients from increased sales during the period that defendants stopped shipping to Source.  (Marx Reply ¶¶ 62-67, App. B.)  This analysis demonstrates that it was in each defendant's individual economic self-interest to continue to ship to Anderson and Source while their competitors did not.  (*Id.*)  In addition to the benefit of increased sales in the short term, publishers who shipped could permanently convert readers to their magazines.  (*See* Marx Report ¶ 305, n. 452 (observing that in an email from Porche to Pecker, Porche wrote, "████████████████████████████████████ ████████████████████████████████)

economic self-interests.  (¶¶ 138, 189, 195; Marx Report ¶¶ 307-14.)  The only reasonable explanation for this uniform response to the Source rescission was defendants' collective agreement to eliminate Source from the market.

Second, as shown above (pp. 4-11), defendants had a common and widely-recognized motive to resist Anderson's proposal and eliminate Anderson from the market:  maintaining and increasing their profits.  *See Publ'n Paper*, 690 F.3d at 62 (recognizing "a common motive to conspire" as a "plus factor").[24]

Third, defendants engaged in an extremely "high level of interfirm communications," another important plus factor.  *Id.* at 62.  These communications included 156 inter-competitor phone calls or text messages among key high-level executives in the approximately one month after Anderson's announcement.  (¶¶ 283.)[25]  *See Publ'n Paper*, 690 F.3d at 67 (communications between high-level executives have more probative weight).[26]

Fourth, defendants engaged in extensive monitoring of each others' intentions and sought assurances from each that they all were committed to their collective plan -- another plus factor. (¶¶ 103-136; Marx Report ¶¶ 71, 49, 163.)  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *23 (E.D.N.Y. Jan. 4, 2011) (allegation that

---

[24]  Curtis' purported reliance on *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999), is misplaced.  Unlike the defendants in that case, here, defendants plainly had a common motive to destroy Anderson. Moreover, that motive also undermines the self-serving deposition testimony of Porti and Castardi of Curtis, which Curtis cites for the proposition that Curtis supposedly wanted more rather fewer wholesalers.  (*See* Curtis Br. 7.)

[25]  Specifically, the evidence establishes that between January 12, 2009 and February 12, 2009, there were 120 calls between direct competitor defendant publishers or national distributors, and 36 calls between defendant national distributors and non-client defendant publishers.  (¶ 283.)

[26]  This is in marked contrast to the level of communications before Anderson's announcement.  Based on defendants' telephone records, there were only 39 inter-competitor calls placed in the entire month before Anderson's announcement of its proposal, with a total duration of approximately 82.4 minutes, while the total duration of the 156 inter-competitor calls in the month after Anderson's announcement was approximately 801.1 minutes.  (¶ 283.)  Further, the participants on many of the calls admitted that they rarely, if ever, spoke with one another before that announcement.  (¶¶ 269-73.)  *See also United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14  (S.D.N.Y. 2013) ("telephone calls among the Publisher Defendants during the period of their negotiations with Apple represented a departure from the ordinary pattern of calls among them.").

"defendants monitored each others' compliance with the agreement through subsequent meetings and email exchanges . . . 'raise[s] a suggestion of a preceding agreement'") (citation omitted).[27] The importance of such monitoring is exemplified by an internal Hachette email in which a high-level Hachette executive underscored the need to ████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████ (¶ 105.)[28]

Fifth, defendants shared with each other confidential, competitively-sensitive information, another well-recognized plus factor. See Apple, 952 F. Supp. 2d at 690 ("the 'use of facilitating practices' like information sharing" supports an inference of conspiracy) (quoting Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001)).[29]  This included providing each other with updates on the status of negotiations with Anderson and Source.[30]  Absent collusion, there would be no reason for Curtis or its co-conspirators to apprise their competitors of whether they were negotiating or whether they intended to ship magazines to Anderson or Source.[31]

---

[27]  See also Marx Report ¶ 63 ("[m]onitoring and enforcement structures" constitute a "typical building block[] of collusion"); Ex. 635 (May 28, 2014 Expert Report of Janusz Ordover) ¶ 49 ("a successful cartel must have the means to monitor its members").

[28]  Indeed, the monitoring increased even after defendants had confirmed to each other that they were cutting off Anderson's magazine supply.  For example, on January 30, Rodale's Alleger monitored Bauer's commitment to the plan, asking Jay Wysong of DSI whether "[o]ur man in bauerland still solid," prompting the reassuring reply that "He's solid alright."  (¶ 126.)  Similarly, Kable's Duloc, cognizant that Jacobsen of TWR was still negotiating with Anderson even after TWR had announced that Time would no longer be shipping to Anderson, received confirmation from Jacobsen that Time was committed to the plan, writing to a colleague that he had ██████████ (¶ 174.)

[29]  See also Ross, 773 F. Supp. 2d at 369 ("Amex has failed to offer a compelling rationale for why it would disclose such information."); High Pressure Laminates, 2006 WL 1317023, at *2  ("Plaintiffs' evidence supports an inference that Wilsonart was in possession of, and that it made no economic sense for Wilsonart to share, as it did, competitors' confidential information . . . .").

[30]  See ¶¶ 56-59, 62-65, 67-71, 73-84, 89-98, 103-136, 150, 153-54, 167-89, 181-82, 193-94.

[31]  Marx Report ¶ 14 ("[I]nformation that a firm is not supplying certain wholesalers is competitively sensitive because rival publishers and national distributors could take advantage of that information by shipping additional magazines to those wholesalers.").  Indeed, Castardi of Curtis conceded ██████████████████████████ ████████████████████████████████████████ (¶ 282.)  And, Ann Moore of Time testified that it would have been "inappropriate" to share her response to Anderson's proposal with

17

Sixth, defendants made a conscious effort to conceal their conspiracy by, among other things, urging that they communicate orally rather than in writing and that they fax, or attempt to fax, information instead of using email.[32]  Such deliberate efforts to conceal their unlawful conduct, particularly when coupled with all the other evidence here, provide strong evidence of defendants' conspiracy.  *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 173-76 (D. Conn. 2009) (efforts to conceal conspiracy together with other evidence "would permit a fact-finder to conclude that the defendants engaged in more than mere conscious parallelism or tacit collusion").

Seventh, defendants' decision to stop shipping to Anderson constituted an unprecedented shift in defendants' business practices, another widely-recognized plus factor.  *See Apple*, 952 F. Supp. 2d at 690 (unprecedented change in business practices "may provide sufficient evidence of an illegal conspiracy") (citation omitted).  As explained by Dr. Marx, defendants demonstrated an "abrupt shift[] from past behavior," as early 2009 appears "to be the only time in the history of the industry in which, in response to surcharge request from a wholesaler, publishers and national distributors representing" about ▮▮▮ of the industry "collectively cut off supply to that wholesaler."  (*See* Marx Report ¶¶ 69, 104-07.)

---

Time's competitors.  (¶ 281.)

32



In short, the combination of defendants' parallel conduct, inculpatory documents and the existence of these plus factors provides further compelling support for a "reasonable inference of illegal collusive behavior." *Publ'n Paper*, 690 F.3d at 64.

### c.    The Evidence Overwhelmingly Shows Curtis' Direct Participation In The Conspiracy Is, At Minimum, A Question Of Fact

Curtis' contention that there is insufficient evidence as to its role in the conspiracy (Curtis Br. 15) ignores both the controlling legal standard in antitrust conspiracy cases and the evidence that Curtis was an active, knowing participant in the conspiracy.  Indeed, it is well-established that, "'once a conspiracy is shown, only slight evidence is needed to link another defendant with it.'"  *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 688 (S.D.N.Y. 1987) (quoting *Apex Oil Co.*, 822 F.2d at 258).  All that is required is that there be a showing that Curtis had actual knowledge of the "essential nature and general scope" of the conspiracy.  *Id.* at 689.  That standard is easily satisfied as to Curtis.

Here, the evidence of Curtis' knowing participation is extensive and includes Charlie Anderson's testimony that Curtis' Castardi admitted to Anderson that Castardi was "working together" with his direct competitor, Jacobsen of TWR, in responding to Anderson's proposal. (¶ 145.)[33]  Curtis' participation in defendants' conspiracy is further evidenced by telephone calls between Curtis and its direct competitor national distributors, or with defendant publishers who were not Curtis' clients, in the month after Anderson's announcement, and by emails and other documents that are not only highly-incriminating, but demonstrate that these calls related to

---

[33]   *See Anderson News*, 680 F.3d at 191 (finding that this admission supports an inference of conspiracy).  That testimony is corroborated by ███████████████████████████████████████████████████████████████████████ (¶ 98.) ███████████████████████████████████████████████████████████

19

defendants' coordinated response to Anderson's and Source's announcements.  (¶¶ 62, 67-71, 95-96, 104, 110, 127-29.)[34]

Contrary to Curtis' contention, the testimony cited above is unambiguous.  "Working together" to create a two-wholesaler system is not and cannot reasonably be explained, as Curtis argues (Curtis Br. 19), as Castardi and Jacobsen "exploring ways to keep Anderson in business."[35]  Nor can it be said that by "going along with" Jacobsen, Castardi meant to suggest that Curtis -- which itself controlled 28% of the market for single copy magazines (¶ 11) --

---

[34]  F███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████  (¶ 128.)  Later that evening, Duloc emailed Parker of Bauer that he had spoken to Castardi of Curtis, who ███████████████████████████████████████████████████████████████████████
████████████████████████████  (¶ 114.)  This and other evidence also demonstrates that the calls that Curtis had with its direct competitors were not "discussions of potential business deals, trade association business communications, or social or personal matters," as Curtis claims. (Curtis Br. 17 n.11.)  And, while Curtis speculates as to other "possible" explanations for its communications with its direct competitors and other of its co-conspirators (Curtis Br. 17 n.11), such speculation provides no basis for summary judgment.  *See Publ'n Paper*, 690 F.3d at 63 (a plaintiff is not required to "'disprove all nonconspiratorial explanations for the defendants' conduct'") (citation omitted).  Curtis' speculation that its communications may have concerned "information gathering," at most, raises a question of fact, and is belied by the record, including testimony of Curtis' witnesses that they did not recall discussing the Anderson or Source announcements with their competitors.  (¶ 279.)  Further, Curtis' contention that "[m]ere evidence of inter-firm communications" and "information gathering" "is not sufficient to demonstrate a conspiracy" (Curtis Br. 15, 17 n.11), misses the point. The content, context and frequency of Curtis' communicates suggests far more than "information gathering," and Curtis' involvement in the conspiracy is demonstrated by extensive evidence and not "merely" the evidence of inter-competitor communications.

[35]  Nor can it reasonably be explained as Curtis and TWR "working together" to secure alternative distribution. (Curtis Br. 19.)  To the contrary, the only reasonable inference from this highly incriminating admission, particularly in light of all of the other evidence, is that Castardi meant he and Jacobsen were "working together" to resist the Anderson and Source proposals, to eliminate them from the market and create a "two-wholesaler system."

Further, this argument, and Curtis' reliance on *Interborough News Co. v. Curtis Publ'g Co.*, 225 F.2d 289 (2d Cir. 1955) and *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), is misguided for the reasons explained in Anderson' response to Bauer's motion.  (Anderson Bauer Resp. n.48.)  *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S 284 (1985), also provides no support to Curtis.  Here, defendants were operating as a cartel of sellers resisting reductions in prices paid by wholesalers, reducing competition and increasing the prices paid by retailers.  Thus, their conduct is not, as Curtis claims, analogous to "[w]holesale purchasing cooperatives" seeking "'to increase economic efficiency.'"  *Id.* at 295 (citation omitted).

would be compelled to do whatever its competitor Time or TWR did because Anderson and Source no longer would be "viable wholesalers."  (Curtis Br. 18-19.)[36]

Similarly unavailing is Curtis' attempt to mischaracterize other incriminating evidence of its participation as innocent communications with its publisher clients or with DSI.  (Curtis Br. 17).  To the contrary, the evidence shows that, in the course of many of these communications, Curtis facilitated the conspiracy by, among other things, exchanging competitively-sensitive information, including information about the intentions and distribution plans of national distributors or publishers who were not even Curtis' clients.  (¶¶ 72, 78-81, 88, 90, 108, 114, 120.)[37]  Further, apart from the facial implausibility of Curtis' purported explanations for these communications, Curtis ignores the Second Circuit's admonition that it is the jury's task -- and not that of Curtis or this Court -- to make "factual findings."  *See Anderson News*, 680 F.3d at 190 ("[T]he choice between or among plausible interpretations of the evidence will be a task for the factfinder.").

### d.    Curtis' Conduct Was Consistent With Collusion

Also without merit is Curtis's contention that its conduct was consistent with its unilateral self interest and inconsistent with collusion.  (Curtis Br. 8-14.)  Curtis ignores the evidence, the reasoning of the Second Circuit, and the controlling summary judgment standard requiring that facts must be viewed in the light most favorable to Anderson, and that Anderson is entitled to every reasonable inference in its favor.  *See Publ'n Paper*, 690 F.3d at 64.[38]

---

[36]   Indeed, by January 29, Comag had confirmed that it would continue to use Anderson.  Combined with Curtis, supply from Comag -- which represented ▮▮ of the market -- would have represented ▮▮ of the market.  (¶ 11).

[37]   Curtis' communications with DSI also are highly incriminating because they show that DSI served as a conduit for information exchanges between, among others, Curtis and Bauer.  Those communications included sharing information about Curtis' and Bauer's commitment to defendants' plan (¶¶ 103-104, 114, 118, 125-26), coordinating to convince retailers to switch wholesalers (¶¶ 78, 212), and coordinating on a distribution plan that combined distribution information from competing publishers and national distributors.  (¶¶ 63, 88-93.)

[38]   *See Ross*, 2012 WL 401113, at *9 (summary judgment denied because, while "the unilateral benefits of

First, Curtis' contention that Anderson's "demand" was "a common stimulus that generated a predictable response," *i.e.*, "[a] negative, unilateral reaction" is meritless. (Curtis Br. 9.) Regardless of how others may have reacted to Anderson's announcement, Curtis' and its co-conspirators "reaction" was anything but "unilateral." Rather, their reaction was a collusive response that eliminated Anderson from the market. Indeed, as the Second Circuit stated, "[t]he presentation of a common economic offer may well lend itself to innocuous, independent, parallel responses; but it does not provide antitrust immunity to respondents who get together and agree that they will boycott the offeror." *Anderson News*, 680 F.3d at 192.[39]

Second, ignoring the indisputable evidence, Curtis argues that the fact that TNG and Hudson were not seeking a per-copy distribution fee, together with their publishers clients' purported rejection of Anderson's terms, renders the decision to use TNG and Hudson as "alternative wholesaler[s] … more indicative of self-motivated independent action than of conspiracy." (Curtis Br. 11.) Yet, absent collusion, TNG and Hudson were not the viable "alternatives" that Curtis professes. (Marx Reply ¶ 120.)[40] Because no national distributor, let alone a publisher, acting unilaterally could force retailers to switch from their desired

---

arbitration to each Defendant are great," in the time period in which they adopted arbitration clauses, "Defendants arguably acted against their respective self-interest by attending numerous meetings with direct competitors where at least some sensitive business information was shared").

[39] Also contrary to the evidence is Curtis' argument that because Anderson anticipated that publishers would have a negative reaction to its proposal and retailers purportedly began looking for new wholesalers shortly after January 14, the rejection of Anderson's proposal does not constitute evidence of a conspiracy. (Curtis Br. 9.) First, while Anderson expected an initial "negative reaction" to its proposal, it also reasonably expected that publishers and national distributors would engage in meaningful negotiations with Anderson and agree upon compromise terms, as occurred with Comag. (¶¶ 44, 46, 61, 139-43, 147, 149, 151-52, 156-61, 184.) Comag's initial negative reaction to Anderson's proposal nonetheless resulted in an agreement on compromised terms. (¶151.) Defendants, in contrast, used their "negative reaction" as an impetus to engage in an unlawful conspiracy that resulted in Anderson's destruction. Also, contrary to Curtis' claim, retailers did not begin looking for new wholesalers, but rather instead expected a resolution could be achieved and resisted defendants' efforts to replace Anderson. (¶¶ 201-04.)

[40] The argument that Curtis and its co-defendants needed an "alternative" to Source also makes no sense because Source had rescinded its proposal. (¶ 138.) Defendants obviously were not forced into using TNG and Hudson as competitive alternatives, but affirmatively and collectively decided to do so.

wholesalers, collusion was essential to induce retailers to abandon their relationship with Anderson and to accept magazines from TNG -- the "alternative wholesaler" designated by defendants.  As Castardi himself stated in a meeting with DSI, "[o]bviously, disagreement among publishers and national distributors with regard to alternative distribution will make it difficult to execute the alt distribution plan."  (¶ 103.)[41]

Curtis and its co-defendants learned this lesson during its publicly-reported dispute with Anderson in February 2008, when Curtis attempted unilaterally to move its business in Texas from Anderson to TNG.  (¶ 260-62.)   Walmart, a strong proponent of Anderson, simply refused to accede to this proposed wholesaler change and Curtis relented.  (*Id.*; Marx Report ¶ 104; Marx Reply ¶ 150.)  Thus, Curtis understood that it would be impossible for any one national distributor unilaterally to compel retailers to switch wholesalers.[42]

The intense, coordinated efforts by defendants to induce retailers to terminate their relationship with Anderson and/or Source -- by conveying the collective message that Anderson and Source no longer would be able to distribute their magazines -- underscores this point.

---

[41]   Curtis claims that it received verbal confirmation from its publisher clients that they would not agree to Anderson's terms.  (Curtis Br. 11, n.8.)  That is wrong.  The testimony cited by Curtis is nothing more than vague references to conversations with publishers about Anderson's proposal.  (*See* Durand Decl. Exs. 6, 11, 17.)  Moreover, as with the handful of written confirmations upon which Curtis relies, these conversations likely represent nothing more than an initial negative reaction to a price increase.  (*See* Durand Decl. Exs. 59, 62-64, 67.)  *Cf. Anderson News*, 680 F.3d at 191.  In any event, even if Curtis' publisher clients all explicitly stated they would not agree to Anderson's proposal and maintained that view on the eve of the Anderson deadline, that still does not constitute evidence that Curtis and its co-defendants -- who collectively represent 73% of the market (¶ 11) -- did not conspire.  Nor does it mean that, if defendants had not conspired but instead reached negotiated agreements with Anderson, Curtis' other publisher clients -- who together only made up 14% of the market (Marx Report Figs. 1, 2) -- likewise would have had to do the same thing, or face the prospect that their magazines would not be on display.

Further, even the handful of emails Curtis relies on to support its argument that its publishers independently decided to reject Anderson's terms show that Curtis was endorsing that decision by advising publishers that other publishers had the same view.  (*See* Durand Decl. Ex. 60.)  This type of information was clearly shared as part of Curtis' effort to get "more companies … on the record saying they do not intend to pay the 7¢ fee."  (¶ 77.)

[42]   A publicly-reported 1999 dispute further confirms the inability of publishers and national distributors unilaterally to compel retailers to switch wholesalers.  In that dispute, two national distributors refused to ship magazines to Anderson and TNG, the wholesalers selected by Kroger for certain of its stores; when Kroger threatened to refuse to accept magazines from those national distributors at all of its stores, they immediately backed down.  (¶ 258-59.)

(¶¶ 72-84, 206-08.) ██████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████ Porche definitively affirmed that, with all of the

defendants cutting off Anderson's and Source's magazine supply, ███████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████[43]

The importance of collective and coordinated conduct is precisely the reason that

Rodale's Alleger viewed Comag's commitment to continue to ship to Anderson and Source,

instead of joining defendants' conspiracy, ████████████████████████████████

███████████████████████████████████████████████████

(¶ 58), which potentially undermined defendants' efforts to portray TNG and Hudson as the only

method of distribution. *See Anderson News*, 680 F.3d at 190.[44]  In short, absent collusion by

defendants, TNG and Hudson were not the actual alternatives professed by Curtis.[45]

---

[43]  Roscoe likewise ███████████████████████████████████████████████

██████████████████████████████████████████████ (¶ 77.)  That TNG and Hudson were
not viable alternatives (absent collusion) further demonstrates why *AD/SAT* and *First National Bank of Arizona v.
Cities Service Company*, 391 U.S. 253 (1968), upon which Curtis relies, are inapposite.

[44]  Defendants, in many respects, were confronted with the same "classic collective action problem" that book
publishers faced in *In re Electronic Books Antitrust Litigation*.  There, Judge Cote found that defendants' parallel
actions in signing identical agreements with Apple gave rise to an inference of conspiracy.  859 F. Supp. 2d 671
(S.D.N.Y. 2012).  Just as in *Apple*, "in order to compel [retailers to abandon their support of Anderson and Source],
a critical mass of publishers was needed.  No single publisher would have had the leverage to force [retailers] to
make the switch."  *Id.* at 684.

[45]  Curtis erroneously contends that two facts supposedly indicate that Curtis acted in its unilateral self-interest in
using alternative wholesalers: Castardi's attempt to contact Charlie Anderson to discuss Anderson's proposal and the
non-rescission of Anderson's proposal.  (Curtis Br. 13.)  These arguments ignore the evidence showing that
Curtis did not have the unilateral market power to use alternative wholesalers, and that before Castardi made these
purported attempts to negotiate, he had already told Charlie Anderson that he was "working" with Jacobsen of
TWR.  (¶¶ 145-46.)  Thus, Charlie Anderson understood that Castardi had given Jacobsen his "proxy" to negotiate
on behalf of Curtis' publisher clients.  From past experience, Charlie Anderson understood that Castardi had this
authority from his clients and that, by delegating that authority to Jacobsen, Charlie Anderson had no reason to
return Castardi's calls or emails.  (¶ 146.)  Charlie Anderson's understanding was validated when, on January 31,
Jacobsen confirmed that he and Castardi were working together.  (¶ 158.)  With this confirmation, Charlie Anderson
then proceeded to negotiate a compromise agreement with Jacobsen that would cover both Time and Curtis'

Equally baseless is Curtis' contention (Curtis Br. 13) that Curtis' adoption of a number of prior Anderson "initiatives" is "inconsistent with the alleged conspiracy":  Even if Curtis had agreed to these initiatives, that in no way constitutes evidence that Curtis did not conspire in this instance.  (Pl. 56.1 Resp. ¶ 441.)  Similarly irrelevant is the purported fact that Curtis supposedly facilitated the shipment of magazines for certain of its publisher clients who had purportedly agreed to Anderson's proposal on a "one-time-only basis":  Any willingness to ship certain publishers' titles on a one-time-basis, did not include all titles or all Anderson locations, and certainly did not include the key weekly titles of Curtis' largest client, and co-conspirator, AMI.  (Pl. 56.1 Resp. ¶ 445.)  And, even if certain publishers were willing to pay the surcharge in the short term, Curtis advised its publisher clients and Anderson and Source that it was no longer shipping to Anderson and Source, making any such willingness meaningless.  (¶¶ 187-89.)

Thus, none of the conduct identified by Curtis in its futile attempt to portray its conduct as inconsistent with collusion, individually or collectively, is sufficient to counter the overwhelming evidence that Curtis participated in an unlawful antitrust conspiracy.

## CONCLUSION

Based on the foregoing, Anderson respectfully requests that Curtis' motion be denied.

---

publisher clients.  (¶¶ 157-61.)  Of course, as the record shows, Time (and, by extension, Curtis) reneged on this agreement and ultimately forced Anderson out of business.  (¶¶ 185-86.)

Curtis' related argument (Curtis Br. 21) that "Anderson never offered to distribute magazines in return for [] an additional 2% discount for [Curtis' publishers]" is factually and legally incorrect.  Once Castardi gave Jacobsen his "proxy" to negotiate on behalf of Curtis' publisher clients, any deal Anderson made with TWR would apply to Curtis.  (¶¶ 145-46.)  Further, the evidence -- including Curtis' decision to cut off Source even after it rescinded -- shows that Curtis ultimately conspired to refuse to deal with Anderson and Source at any price.  (*See supra* pp. 15.)  Curtis also ignores the testimony of Dr. Picard that Anderson never expected to achieve an average of 2% in additional discount, rather than precisely 2% in additional discount from each and every publisher.  (Ex. 210 (Picard Dep.) 102:17-103:13.)  Curtis' reliance on *Webster Rosewood Corp. v. Schine Chain Theatres*, 263 F.2d 533 (2d Cir. 1959), is also misplaced.  There, plaintiff never asked defendants for the product (first-run films) it claims it was denied, *id.* at 536.  Here, Anderson expressly sought the magazines of Curtis' clients.

Dated: New York, New York
        March 9, 2015

                    Respectfully submitted,

                    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

                    By: _____
                        Marc E. Kasowitz (mkasowitz@kasowitz.com)
                        Hector Torres (htorres@kasowitz.com)
                        Seth Davis (sdavis@kasowitz.com)
                        Seth A. Moskowitz (smoskowitz@kasowitz.com)
                        Gavin D. Schryver (gschryver@kasowitz.com)

                    1633 Broadway
                    New York, New York 10019
                    Tel.: (212) 506-10700
                    Fax: (212) 506-1800

                    *Attorneys for Plaintiff Anderson News, L.L.C.*