UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDERSON NEWS, L.L.C. and LLOYD WHITAKER,
as the Assignee under an Assignment for the Benefit of
Creditors for Anderson Services, L.L.C.,

       Plaintiffs,

  - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING
CO., L.P., CURTIS CIRCULATION COMPANY,
DISTRIBUTION SERVICES, INC., HACHETTE
FILIPACCHI MEDIA U.S., INC., HEARST
COMMUNICATIONS, INC., HUDSON NEWS
DISTRIBUTORS LLC, KABLE DISTRIBUTION
SERVICES, INC., RODALE, INC., TIME INC., and
TIME/WARNER RETAIL SALES & MARKETING,
INC.,

       Defendants.

---

AMERICAN MEDIA, INC., HEARST
COMMUNICATIONS, INC., and TIME INC.,

       Counterclaim Plaintiffs,

  - against -

ANDERSON NEWS, L.L.C. and CHARLES
ANDERSON, JR.,

       Counterclaim Defendants.

---

09 Civ. 2227 (PAC)

Filed Under Seal

---

**MEMORANDUM OF LAW OF PLAINTIFF ANDERSON NEWS, LLC IN OPPOSITION
TO DEFENDANT KABLE'S MOTION FOR SUMMARY JUDGMENT**

        KASOWITZ, BENSON, TORRES
         & FRIEDMAN LLP
        1633 Broadway
        New York, New York 10019
        Tel.: (212) 506-1700

        *Attorneys for Plaintiff*
        *Anderson News, L.L.C.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ..................................................................................................3

I.      STANDARD ON A MOTION FOR SUMMARY JUDGMENT ..........................3

II.     OVERWHELMING EVIDENCE ESTABLISHES THAT
        KABLE PARTICIPATED IN AN UNLAWFUL CONSPIRACY ......................5

        A.      Defendants' Conspiracy Unfolded In A Series Of Overlapping Phases
        B.      There Is Overwhelming Evidence Of "Additional Circumstances"
                That Permit An Inference Of Conspiracy ....................................5

        C.      The Evidence Overwhelmingly Shows Kable's Direct Participation
                In The Conspiracy Is, At Minimum, A Question Of Fact ..........................8

        D.      Kable's Conduct Was Consistent With Collusion ....................................17

CONCLUSION...............................................................................................22

## TABLE OF AUTHORITIES

CASES                                                                    Page(s)

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)................................................................. passim

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246, 252 (2d Cir. 1987)....................................................4, 13, 14

*In re Aspartame Antitrust Litig.*,
   2007 WL 5215231 (E.D. Pa. Jan. 18, 2007 ............................................10

*In re Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009).....................................................................4

*In re Electronic Books Antitrust Litig.*,
   859 F. Supp. 2d 671, 684 (S.D.N.Y. 2012)..............................................19

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009)................................................. 12-13

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51, 64 (2d Cir. 2012)......................................................... *passim*

*In re High Pressure Laminates Antitrust Litig.*,
   2006 WL 1317023 (S.D.N.Y. May 15, 2006) .......................................4, 12

*Meredith Corp. v. SESAC LLC*,
   2014 WL 812795 (S.D.N.Y. Mar. 3, 2014) ................................................4

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   673 F. Supp. 684 (S.D.N.Y. 1987) ..........................................................14

*Peda v. New York Univ. Hospitals Ctr., Hosp. for Joint Diseases*,
   2014 WL 1013844 (S.D.N.Y. Mar. 17, 2014) ........................................3, 5

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .............................................11

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
   2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ...................................................3

*Ross v. Am. Express Co.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011).......................................................12

*Ross v. Bank of Am., N.A. (USA)*,
   2012 WL 401113 (S.D.N.Y. Feb. 8, 2012).....................................7, 14, 17

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ....................................................12

*United States v. Apple, Inc.*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013)..............................................................11, 12, 13

*United States v. Hilton Hotels Corp.*,
    467 F.2d 1000 (9th Cir. 1972) ...........................................................................20-21

Plaintiff Anderson News, LLC ("Anderson") respectfully submits this memorandum of law in opposition to Kable Distribution Services, Inc.'s ("Kable") motion for summary judgment.[1]

## PRELIMINARY STATEMENT

The evidence demonstrates that defendants -- some of the most powerful magazine publishers in the nation and their national distributors, who are competitors of one another -- worked in "lock step" to cut off Anderson's magazine supply and destroy Anderson.

Defendants' collusive conduct was their reaction to Anderson's mid-January 2009 proposal for a reduction in the price Anderson paid for magazine distribution and for publishers to absorb certain inventory costs Anderson was incurring.  Evidence uncovered during discovery shows how the conspiracy evolved through multiple overlapping phases:  defendants initially shared with each other their reactions to Anderson's proposal and agreed to "simultaneously" use their "collective resources and influence" to move business away from Anderson.

When Source, another major wholesaler, made a proposal similar to Anderson, defendants also began using their collective resources and influence to move business away from Source as well.  Defendants engaged in a coordinated campaign to convince retailers to accept magazines from wholesalers of defendants' choosing; they intensely monitored each other's commitment to the collective plan; they shared with each other the status of their negotiations with Anderson and Source and their distribution plans; and then -- within a few days of one another -- cut off Anderson's and Source's magazine supply, successfully and ruthlessly

---

[1]   Submitted in further support of Anderson's opposition is the Declaration of Seth Davis, dated March 9, 2015 (the "Davis Declaration"), and the Declarations of Charles C. Anderson, Jr., John Campbell and Bo Castle, all dated March 9, 2015.  References to "Ex. __" refer to the exhibits to the Davis Declaration.  References to "Pl. 56.1  ¶ __" refer to paragraphs of Anderson's response to Kable's Statement Pursuant to Local Civil Rule 56.1.  References to "¶ __" refer to paragraphs of Anderson's Statement of Additional Genuine Issues of Material Fact.

To the extent relevant, Anderson hereby incorporates by reference its briefs in opposition to the motions for summary judgment filed by Kable's co-defendants.

eliminating Anderson as a wholesaler.  This confluence of events was unprecedented in the industry.  Discovery reveals how defendants secretly achieved their unlawful objectives: (i) an astoundingly high-level of inter-firm communications, including dozens of highly incriminating emails and other documents; (ii) inter-competitor in-person meetings; and (iii) over 150 inter-competitor telephone calls at unusual times of day, for suspiciously long durations, among competitors who otherwise rarely spoke with each other.

The objectives of defendants' antitrust conspiracy are not only plausible but, as discovery now discloses, clear and compelling.  By collectively resisting Anderson's and Source's proposed terms, defendants preserved their profits.  Moreover, admissions in defendants' internal documents confirm an additional motive -- the increased wholesaler concentration resulting from the elimination of Anderson and Source would enable the remaining major wholesalers, TNG and Hudson, to extract pricing concessions mostly, if not solely, from retailers, who relied heavily on inter-wholesaler competition, and not from publishers and national distributors, which did not rely on such inter-wholesaler competition.

The economic analysis of Dr. Leslie Marx, a Duke University economist with extensive expertise in the economics and detection of collusion, further confirms the economic motivation for defendants' conspiracy.  Dr. Marx's economic analysis of the structure and history of the single-copy magazine industry and the evidence shows that increased wholesaler concentration would benefit publishers and national distributors at the expense of retailers.  Indeed, after Anderson's elimination, the cost of magazines to retailers increased, while publishers were able to preserve their profits by maintaining their prices for the magazines sold to wholesalers.

Ignoring the overwhelming evidence of its participation in the conspiracy, Kable erroneously contends that insufficient evidence exists concerning Kable's involvement.  The

clearly inculpatory evidence as to Kable includes, among many other things, numerous communications between its president and other high-level executives at Kable with Kable's direct competitors or with publishers who were not Kable's clients.  In these communications, Kable played a direct and significant role in crafting defendants' collusive strategy, exchanging competitively-sensitive information among defendants, and intensely monitoring defendants' commitment to the conspiracy.  Indeed, the evidence shows that Kable actually was encouraging its publisher clients not to agree to Anderson's proposal, and sought assurances from its direct competitors that they similarly did not intend to agree to Anderson's proposal or reach a negotiated agreement with Anderson.

In sum, as shown below, the overwhelming evidence of Kable's participation in this illegal antitrust conspiracy compels denial of Kable's summary judgment motion.

## ARGUMENT

### I.        STANDARD ON A MOTION FOR SUMMARY JUDGMENT

In its summary judgment motion, Kable bears the burden of establishing that "'there is no genuine dispute as to any material fact,'" and must "produc[e] evidence on each material element of its claim or defense demonstrating that it is entitled to relief."  *Peda v. New York Univ. Hospitals Ctr., Hosp. for Joint Diseases*, 2014 WL 1013844, at *7-8 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.) (citations omitted).  Even then, summary judgment must be denied if Anderson, as the nonmoving party, meets its "'limited burden of production'" by demonstrating the existence of a genuine dispute as to material facts.  *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) (citation omitted).

Summary judgment must be denied as long as "the totality of the evidence, viewed in the light most favorable to plaintiffs and with proper regard for the *Matsushita* standards, could

3

support a reasonable inference of illegal collusive behavior." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012). Anderson is not required to "'disprove all nonconspiratorial explanations for the defendants' conduct'" but must demonstrate that the existence of a conspiracy is a "reasonable inference that the jury could draw," and may meet its burden by providing "'sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.'" *Id.* at 63 (citations omitted).

Summary judgment must be denied if Anderson "present[s] direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (citation omitted); *see also Meredith Corp. v. SESAC LLC*, 2014 WL 812795, at *208 (S.D.N.Y. Mar. 3, 2014) (summary judgment denied where "the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding") (citation and quotations omitted).

Further, "[i]n considering whether there is sufficient evidence to create a genuine issue of fact, the district court may not properly consider the record in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (citation omitted).[2]

Because Kable clearly fails to meet its burden of establishing that no genuine issues of material fact exist, Kable's summary judgment motion should be denied.

---

[2] *See also In re High Pressure Laminates Antitrust Litig.*, 2006 WL 1317023, at *4 (S.D.N.Y. May 15, 2006) ("A court deciding whether to grant summary judgment . . . should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place.") (citation and quotations omitted).

## II.   OVERWHELMING EVIDENCE ESTABLISHES THAT KABLE PARTICIPATED IN AN UNLAWFUL CONSPIRACY

Because Kable essentially ignores the mountain of highly incriminating emails, sworn testimony and the more than 150 inter-competitor communications supporting an inference of a conspiracy, Kable has not satisfied -- and cannot satisfy -- its initial burden of demonstrating that there is no genuine dispute as to any material fact as to each material element of its defense. *See Peda*, 2014 WL 1013844, at *7-8.  In any event, summary judgment must be denied because, at a minimum, there is more than "'sufficient evidence to allow a reasonable fact finder to infer that [a] conspiratorial explanation is more likely than not.'"  *Publ'n Paper*, 690 F.3d at 63 (citation omitted).

### a.   Defendants' Conspiracy Unfolded In A Series Of Overlapping Phases

The evidence shows that, as soon as defendants learned of Anderson's proposal, they engaged in a high level of communication with direct competitors or other market participants with no legitimate business justification.  Initially, defendants shared with each other their reaction to Anderson's proposal and agreed to work collectively to resist the proposal.  Indeed, less than 24 hours after Anderson publicly announced its proposal, the country's major publishers already had exchanged their reactions to the proposal.  Thus, by January 15, Bauer's Rick Parker was able to report internally to the president of Bauer that ██████████████████

██████████████████████████████████████████████████[3]

---

[3]   *See also* ¶¶ 56-58, 60, 62-69 for additional evidence of defendants' initial response to the Anderson announcement, including (i) █████████████████████████████████████████████████ ██████████████████████ (¶ 57); (ii) e███████████████████████████████████████████ ███████████████████████████████████████ (¶ 63); (iii) telephone calls between ████████████████████████████████████████████████ (¶¶ 62, 67-71); and (iv) an internal Kable email reflecting that ███████████████████ ████████████████████████████████████████████ (¶ 100-01).

5

Defendants then began the next phase -- a coordinated effort to convince retailers to accept magazines from wholesalers of defendants' choosing.  Bob Castardi of Curtis agreed with Mike Porche of DSI that these retailer contacts were critical because "the more companies that get on the record saying they do not intend to pay the 7¢ fee the better." (¶ 77.)  As David Rustad of Kroger testified, when speaking with Castardi and Rich Jacobsen of TWR -- who were direct competitors -- ██████████████████████ (¶ 80.)  ████████ jointly developed by competitors AMI and Bauer is precisely what defendants were using in conveying a collective and uniform message to retailers.  (¶¶ 73-80, 209.)[4]

In the third phase, Kable and its co-conspirators focused on developing an alternative distribution plan that included sharing competitively-sensitive information about each others' historical distribution practices.  (¶¶ 88-93; Marx Report ¶¶ 190-99.)[5]  The fourth phase involved defendants' monitoring each other to ensure they maintained their commitment to the collective plan, and to confirm that no one would deviate from it by reaching a negotiated agreement with Anderson or Source.  (¶¶ 103-36; Marx Report ¶¶ 200-64; Marx Reply ¶¶ 60-61.)  As Porche of DSI warned, such an agreement would ██████████████████[6] (¶ 115.)[7]

---

[4]  *See also* Ex. 259 (April 16, 2014 Expert Report of Leslie M. Marx, PhD ("Marx Report") ¶ 175; Ex. 269 (July 16, 2014 Reply Expert Report of Leslie M. Marx, PhD ("Marx Reply")) ¶ 15 n.14.)  The evidence also includes a highly-incriminating internal debate between AMI and Bauer concerning whether they should call Walmart together or separately.  (¶¶ 74-76.)  Recognizing that calling together would be viewed as "team[ing] up" and could result in "lawsuits," AMI and Bauer chose to have separate calls with Walmart and then share with each other the results of their conversations.  (¶¶ 75-76)  *See also* ¶¶ 77-78, 212 for evidence reflecting defendants' coordinated effort to convince retailers to abandon their relationship with Anderson and Source and use wholesalers of defendants' choosing, and showing that defendants not only coordinated on scripts, but shared the results of their calls with retailers in which scripts were used.

[5]  The evidence of this phase includes, for example, emails revealing that Curtis and DSI were coordinating with Bauer (who was not a Curtis client) on a plan combining historical distribution data from Curtis with historical distribution data from Curtis' direct competitor, Kable.  (*See also* ¶¶ 63, 88-93.)

[6]  The evidence of defendants' extensive efforts to monitor each other to detect potential deviations from their collective plan includes their seeking confirmation that they were committed to cutting off Anderson and Source, using sources outside of the members of the conspiracy to test the veracity of what defendants were telling each other and constantly communicating with each other regarding the status of negotiations.  (¶¶ 103-36.)

As the Second Circuit stated, on the basis of far fewer alleged facts, defendants' inter-competitor coordination culminated in defendants, in virtual lock step and within days of one another, cutting off both Anderson's and Source's magazines supply, and forcing Anderson from the magazine wholesaling business.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012).  (*See* ¶¶ 137, 185-89.)  Such parallel conduct, particularly when combined with extensive strategic, inter-competitor communications in which competitively-sensitive information is exchanged, is a hallmark of an antitrust conspiracy and provides a strong inference of collusion.  *See Ross v. Bank of Am., N.A. (USA)*, 2012 WL 401113, at *5 (S.D.N.Y. Feb. 8, 2012) ("Given the temporal proximity between the meetings and the adoption of arbitration clauses, this parallel conduct is probative of an antitrust conspiracy."); Marx Report ¶¶ 321-23.[8]

---

The evidence of Kable's monitoring is extensive and is exemplified by Kable's communications immediately before, during and after Jacobsen of TWR met with Charlie Anderson and then Greg Mays of Source on Saturday, January 31, to discuss their respective proposals.  In the approximately two hours before Jacobsen met with Charlie Anderson, ███████████████████████████████████████████████████████ (¶¶ 168-69.)  Parker and Duloc spent the balance of that day emailing each other about whether the other had heard from Jacobsen on the results of his meetings with Anderson and Source.  ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████

B███████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████

[7]  For a period of time, the strategy contemplated by defendants shifted to one in which they would continue to ship to Anderson, but not pay the surcharge, so that defendants could blame Anderson for not delivering magazines and causing any disruption in service and, ██████████████████████ David Pecker of AMI and Porche of DSI opposed this strategy because they were concerned that, if defendants shipped to Anderson but did not pay, Anderson may ship one defendant's magazines, but not the others, and "piece us … apart." (¶ 102.)  Parker of Bauer, on the other hand, continued to believe in the value of this strategy and, therefore, Porche had to "convinc[e]" him not to ship to Anderson.  (*Id.*)

[8]  The conspiracy continued even after defendants collectively cut off Anderson's and Source's magazine supply. For example, DSI and TWR -- direct competitors -- worked together to ensure that each other's clients' magazines were on display.  (¶¶ 213-14.)  Defendants also continued to share with each other the results of their efforts to

b.   **There Is Overwhelming Evidence Of "Additional Circumstances" That Permit An Inference Of Conspiracy**

Beyond defendants' parallel conduct and the inculpatory documents and other evidence, there exists overwhelming evidence of "additional circumstances" that would "permit a fact-finder to infer a conspiracy," including circumstances and evidence commonly characterized as "plus factors" by courts and economists. *See Publ'n Paper*, 690 F.3d at 62.

<u>First</u>, defendants' conduct was against each of their individual economic self-interests, which is a "plus factor" that strongly supports an inference of conspiracy. *See id.* at 62.[9]  By adhering to the collective plan, each defendant denied itself the economic benefit of reaching an agreement with Anderson, avoiding disruption and continuing to ship magazines through Anderson and gaining increased display space at retailers, while their competitors' magazines sit idle in warehouses.  (Marx Report ¶¶ 281, 285, 305-14, 318; Marx Reply ¶¶ 62-67.)  The benefits of continuing to ship Anderson clearly are demonstrated by the decision of Comag -- the only major national distributor that did not participate in the conspiracy -- to ship to Anderson and Source.  The net result was that Comag's publishers' titles remained on retailers' shelves, unlike those of its competitors who cut off Anderson's and Source's magazine supply.  As a DSI executive complained:

> [B]ecause CoMag took the easiest and weakest position, they continue to receive distribution and display and in reality they now receive dramatically better display because they are in our pockets!!! … [H]ard to accept CoMag not feeling any disruption and then actually gaining display and sale for being so weak during this crisis.   And then in the end if we've somehow created a stronger, better wholesaler network, they'll reap that benefit too.

---

convince retailers to abandon their relationships with Anderson and Source and use defendants' chosen wholesalers. (¶¶ 212-15.)

[9]   *See also* Marx Report ¶ 66.  In their joint motion to exclude certain of Dr. Marx's testimony, Kable and its co-defendants take issue with Dr. Marx's reference to certain "plus factors" as "super-plus factors."  As shown in the opposition to that motion (at pp. 12-16), this argument is completely meritless.  Nevertheless, whether characterized as "super-plus factors" or "plus factors," the conclusion is the same – the evidence is consistent with collusion.

(¶ 204.)[10]

That defendants recognized that it was in their self-interest to continue to ship to Anderson and Source, but consciously refrained from doing so, is also demonstrated by an email from Porche of DSI to a colleague in which he explained that David Pecker of AMI was upset because "████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████ (¶ 205.) According to Dr. Marx, "[i]n a competitive market, AMI should not need the permission of its competitor Bauer, ████████ ████████████████████████. This statement only makes sense in the context of the collusive plan of Defendants." (Marx Report ¶ 306.)[11]

Further, even though Source rescinded its per-copy distribution fee proposal, defendants nonetheless cut off Source's magazine supply, which was against their respective individual economic self-interests. (¶¶ 138, 189, 195; Marx Report ¶¶ 307-14.) The only reasonable explanation for this uniform response to the Source rescission was defendants' collective agreement to eliminate Source from the market.

<u>Second</u>, defendants had a common and widely-recognized motive to resist Anderson's proposal and eliminate Anderson from the market: maintaining and increasing their profits.

---

[10]  Another reason that continuing to ship to Anderson was in defendants' individual economic self-interest is because, even if Anderson ultimately was unable to survive, any publisher who continued to ship through Anderson could simply switch wholesalers after Anderson's exit. Indeed, Comag reached a negotiated agreement with Anderson pursuant to which Comag agreed to continue to ship magazines, but when it became clear that Anderson would be forced out of business after defendants cut off the supply of magazines to Anderson, Comag then independently moved its business to TNG and other wholesalers. (¶¶ 151-55, 183-88, 218-22, 213-41.)

[11]  Dr. Marx also conducted an empirical analysis of the economic benefits to Comag's publisher clients from increased sales during the period that defendants stopped shipping to Source. (Marx Reply ¶¶ 62-67, App. B.) This analysis demonstrates that it was in each defendant's individual economic self-interest to continue to ship to Anderson and Source while their competitors did not. (<i>Id.</i>) In addition to the benefit of increased sales in the short term, publishers who shipped could permanently convert readers to their magazines. (<i>See</i> Marx Report ¶ 305, n. 452 (observing that in an email from Porche to Pecker, Porche wrote, ████████████████████████████████ ████████████████████████████████████████████

*See Publ'n Paper*, 690 F.3d at 62 (recognizing "a common motive to conspire" as a "plus factor").  By collectively resisting Anderson's and Source's per-copy distribution fee proposals, defendant publishers could avoid not only paying that fee to Anderson and Source, but also to TNG and Hudson.[12]  They also would have no need to offset that cost by improving their selling efficiency and ending their practice of "stuffing the channel" with excess magazines -- a practice that defendants claimed was necessary to maximize their profits.  (¶¶ 21-24, 42; Marx Reply ¶ 207 and n. 367; Picard Report ¶¶ 118-20, 140.)  Defendant publishers also could avoid having to bear the cost of inventory that was on Anderson's books as a result of retailers utilizing scan-based trading ("SBT").  (¶ 49; Picard Report ¶ 125.)  This maintenance of profits alone provides not only a plausible but a compelling motivation and explanation for defendants' conduct.[13]

Moreover, as defendants' own documents reveal, defendants expected a significant economic benefit from eliminating Anderson and Source as wholesalers.  The more concentrated wholesaler sector, consisting primarily of TNG and Hudson, would significantly reduce competition among wholesalers.  Because of the structure of the distribution chain, retailers -- but not publishers and national distributors -- relied heavily on inter-wholesaler competition.  Thus, reduced wholesaler competition would enable the remaining wholesalers to extract pricing concessions from retailers -- not publishers and national distributors.[14]

Third, defendants engaged in an extremely "high level of interfirm communications," another important plus factor.  *Publ'n Paper*, 690 F.3d at 62.  These communications included

---

[12]   Defendants admit that they would have paid to TNG and Hudson any per-copy fee they paid to Anderson and Source.  (¶ 51.)

[13]   *See In re Aspartame Antitrust Litig.*, 2007 WL 5215231, at *9 (E.D. Pa. Jan. 18, 2007) ("[A]s with almost any price-fixing conspiracy, the clear motive was to increase or maintain profits.") (citation omitted).

[14]   Evidence of Kable and its co-conspirators' strong motive to conspire is set forth more fully in Anderson's opposition to Bauer's and Curtis' summary judgment motions.  (Anderson Bauer Opp. 5-8; Anderson Curtis Opp. 4-11.)

156 inter-competitor phone calls or text messages among key high-level executives in the approximately one month after Anderson's announcement.  (¶ 283.)[15]  *See Publ'n Paper*, 690 F.3d at 67 (communications between high-level executives have more probative weight).[16]

 <u>Fourth</u>, defendants engaged in extensive monitoring of each others' intentions and sought assurances from each that they all were committed to their collective plan -- another plus factor. (¶¶ 103-136; Marx Report ¶¶ 71, 49, 163.)  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *23 (E.D.N.Y. Jan. 4, 2011) (allegation that "defendants monitored each others' compliance with the agreement through subsequent meetings and email exchanges . . . 'raise[s] a suggestion of a preceding agreement'") (citation omitted).[17] The importance of such monitoring is exemplified by an internal Hachette email in which a high-level Hachette executive underscored the need ██████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████  (¶ 105.)[18]

 <u>Fifth</u>, defendants shared with each other confidential, competitively-sensitive

---

[15]  Specifically, the evidence establishes that between January 12, 2009 and February 12, 2009, there were 120 calls between direct competitor defendant publishers or national distributors, and 36 calls between defendant national distributors and non-client defendant publishers.  (¶ 283.)

[16]  This is in marked contrast to the level of communications before Anderson's announcement.  Based on defendants' telephone records, there were only 39 inter-competitor calls placed in the entire month before Anderson's announcement of its proposal, with a total duration of approximately 82.4 minutes, while the total duration of the 156 inter-competitor calls in the month after Anderson's announcement was approximately 801.1 minutes.  (¶ 283.)  Further, the participants on many of the calls admitted that they rarely, if ever, spoke with one another before that announcement.  (¶ 269-73.)  *See also United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14 (S.D.N.Y. 2013) ("[T]elephone calls among the Publisher Defendants during the period of their negotiations with Apple represented a departure from the ordinary pattern of calls among them.").

[17]  *See also* Marx Report ¶ 63 ("[m]onitoring and enforcement structures" constitute a "typical building block[] of collusion"); Ex. 635 (May 28, 2014 Expert Report of Janusz Ordover) ¶ 49 ("a successful cartel must have the means to monitor its members").

[18]  Indeed, the monitoring increased even after defendants had confirmed to each other that they were cutting off Anderson.  For example, on January 30, Rodale's Alleger monitored Bauer's commitment to the plan, asking Jay Wysong of DSI whether "[o]ur man in bauerland still solid."  Wysong replied: "He's solid alright."  (¶ 125-26.) Similarly, Kable's Duloc, cognizant that Jacobsen of TWR was still negotiating with Anderson even after TWR had announced that Time would no longer be shipping to Anderson, ████████████████████████████████ ██████████████████████████████████████████████████████████████  (¶ 174.)

information, another well-recognized plus factor.  *See Apple*, 952 F. Supp. 2d at 690 ("the 'use of

facilitating practices' like information sharing" supports an inference of conspiracy) (quoting

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)).[19]  This included providing each other

with updates on the status of negotiations with Anderson and Source.[20]  Absent collusion, there

would be no reason for Kable or its co-conspirators to apprise each other of whether they were

negotiating or whether they intended to ship magazines to Anderson or Source.[21]

Sixth, defendants made a conscious effort to conceal their conspiracy by, among other

things, urging that they communicate orally rather than in writing and that they fax, or attempt to

fax, information instead of using email.[22]  Such deliberate efforts to conceal their unlawful

conduct, particularly when coupled with all the other evidence here, provide strong evidence of

defendants' conspiracy.  *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,

681 F. Supp. 2d 141, 173-76 (D. Conn. 2009) (efforts to conceal conspiracy together with other

---

[19]  *See also Ross v. Am. Express Co.*, 773 F. Supp. 2d 351, 369 (S.D.N.Y. 2011) ("Amex has failed to offer a compelling rationale for why it would disclose such information."); *In re High Pressure Laminates*, 2006 WL 1317023, at *11  ("Plaintiffs' evidence supports an inference that Wilsonart was in possession of, and that it made no economic sense for Wilsonart to share, as it did, competitors' confidential information . . . .").

[20]  *See* ¶¶ 56-58, 64-65, 67-69, 84, 95-96, 103-36, 141, 150, 153-54, 167-78, 181-82, 193-94.

[21]  Marx Report ¶ 14 ("[I]nformation that a firm is not supplying certain wholesalers is competitively sensitive because rival publishers and national distributors could take advantage of that information by shipping additional magazines to those wholesalers.").

(¶ 282.)

(¶ 281.)

[22]  A

evidence "would permit a fact-finder to conclude that the defendants engaged in more than mere conscious parallelism or tacit collusion").

Seventh, defendants' decision to stop shipping to Anderson constituted an unprecedented shift in defendants' business practices, another widely-recognized plus factor. *See Apple*, 952 F. Supp. 2d at 690 (unprecedented change in business practices "may provide sufficient evidence of an illegal conspiracy") (citation omitted). As explained by Dr. Marx, defendants demonstrated an "abrupt shift[] from past behavior" as early 2009 appears "to be the only time in the history of the industry in which, in response to [a] surcharge request from a wholesaler, publishers and national distributors representing" about ██ of the industry "collectively cut off supply to that wholesaler." *See* Marx Report ¶¶ 69, 104-07.

In short, the combination of defendants' parallel conduct, inculpatory documents and the existence of these plus factors provides further compelling support for a "reasonable inference of illegal collusive behavior." *Publ'n Paper*, 690 F.3d at 64.

### c.  The Evidence Overwhelmingly Shows Kable's Direct Participation In The Conspiracy Is, At Minimum, A Question Of Fact

Despite the overwhelming evidence demonstrating that defendants' conspiracy was plausible, that defendants acted in parallel, and that plus factors exist that strongly support an inference of conspiracy, Kable nevertheless erroneously, and ignoring the controlling legal standard, contends that there is no "evidence that there was any agreement between Kable and any other person or entity to drive Anderson out of business." (Kable Br. 2) Kable is wrong. There is overwhelming evidence that Kable had a "'conscious commitment to a common scheme designed to achieve an unlawful objective'" -- to resist Anderson's and Source's proposals and eliminate them from the market. *See Apex Oil Co.*, 822 F.2d at 252 (citation omitted). That is all that is required to infer an antitrust conspiracy at the summary judgment stage. *See id.*

13

Moreover, it is well established that, "'once a conspiracy is shown, only slight evidence is needed to link another defendant with it.'"  *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 688 (S.D.N.Y. 1987) (quoting *Apex Oil Co.*, 822 F.2d at 258).  All that is required is that there be a showing that Kable had actual knowledge of the "essential nature and general scope" of the conspiracy.  *Id.* at 689.  That standard is easily satisfied as to Kable.

Kable's participation in defendants' conspiracy is evidenced by, among other things, the multiple in-person meetings that its president, Mike Duloc, had with Kable's direct competitors, or with publishers who were not Kable clients, in the period between Anderson's announcement and the day on which Kable cut off Anderson from the magazines of Kable's clients.  For example, ███████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████ ███████  (¶¶ 69-70, 109, 122.)  *See Ross*, 2012 WL 401113, at *8 (denying summary judgment in part because of "the high degree of inter-firm communications," including "[d]efendants' frequent attendance at . . . meetings," which along with "the voluminous record . . . could suggest that Defendants used the meetings to concoct a conspiracy").[23]

---

[23]   These meetings clearly were related to the Anderson and Source proposals.  ████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

It is also evidenced by the dramatic increase in telephone calls between Kable and its direct competitors, or with defendant publishers who were not Kable's clients, in the month after Anderson's announcement (¶ 242; Marx Reply Fig. 40), and by emails and other documents that are not only highly-incriminating standing alone, but demonstrate that Kable's calls related to defendants' coordinated response to Anderson's and Source's announcements (¶¶ 60, 62, 66, 68-70, 90, 92, 95, 99-101, 104, 106, 109-10, 113-14, 121-23, 127-28, 136-37, 143, 154, 167-80, 190-91, 197-99, 215, 266, 269-273).

Indeed, the email evidence and surrounding context demonstrates that Kable's calls clearly related to defendants' coordinated response to the Anderson and Source proposals.  For example, on January 27, a call was placed from ███████████ to ████ . (¶ 128.)  Immediately after that ███████ call ended, █████ called ███████████████ to discuss Anderson's proposal.  (*Id.*)  Later that evening Duloc emailed Parker of Bauer that he had spoken ████ ████████████████████████████████████████████ (¶ 110.)[24]

Also, as demonstrated above, Kable cannot avoid the reasonable inference that Duloc's calls with Jacobsen of TWR immediately before and after Jacobsen met with Charlie Anderson of Anderson and Greg Mays of Source on Saturday, January 31 concerned defendants' collective response to Anderson's proposal.  (¶¶ 167-75.)  Duloc's emails make the content of those calls abundantly clear.  For example, as Duloc waited to hear from Jacobsen about the results of his meetings with Anderson and Source, he wrote to Bauer's Parker that, ████████████████████

████████████████████████████████████████████████████████

---

[24]  Any contention that this information was volunteered by Castardi and not solicited by Duloc would not diminish the importance of this communication.  It is still the case that Duloc elected to share with Bauer what Kable's direct competitor Curtis knew about Bauer's intentions.  Further, if Duloc genuinely wanted to avoid discussing the Anderson and Source proposals with Kable's competitors -- which should have been the case -- ███████████████████ ████████████████████████████████████



(¶ 170.)

There is no merit to Kable's unsupported and conclusory claim that, even if its communications with its competitors concerned the Anderson proposal, they were "necessary to obtain information to determine how Kable would be able to distribute for its clients."  (Kable Br. 1.)  <u>First</u>, that explanation is inconsistent with the testimony of Kable's witnesses:  Roberts testified that it would have been inappropriate to discuss the Anderson proposal with Kable's competitors (¶ 55), and Duloc testified that the only thing he may have discussed with his competitors is whether Anderson had made the same proposal to them (¶ 55).

<u>Second</u>, the speculative and conclusory explanation Kable now proffers for its unlawful communications is belied by the record.  Indeed, the content, context and frequency of Kable's communications demonstrate that it was, among other things, actively exchanging confidential, competitively-sensitive information with its co-conspirators, and was intensely monitoring its co-conspirators to ensure they did not deviate from defendants' collective plan.  For example, on

---

25 

¶ 277.)

Moreover, this email exchange demonstrates why Kable's claim that its decision to stop supplying Anderson was not  the result of Anderson's refusal to rescind its "demand," or its purported refusal to pay any debt owed to Kable. (Duloc Decl. ¶ 14.)  If that were so, Duloc would have had no reason to write that he would ████████████████████████████████. (¶ 174.)  There would be nothing more for him to "think" about, and certainly nothing that should have been influenced by ██████████████████.

January 16, Duloc sent an internal email to James Roberts, ██████████████████████

███████████████████████████████████████████████████

██████████████████████ (¶ 100.)  This communication cannot reasonably be construed as "necessary to obtain information to determine how Kable would be able to distribute for its clients."

Even if it were "necessary" for Kable to communicate with its direct competitors, that would not address why Kable communicated directly, and repeatedly, with the publisher defendants who were not Kable clients.  (¶¶ 55, 100, 109.)  In any event, interpreting the content and "necessity" of Kable's inter-competitor communications present quintessential factual issues.  As the Second Circuit's admonition makes clear, it is the jury's task -- and not that of Kable or this Court -- to make "factual findings."  *See Anderson News*, 680 F.3d at 190 ("[T]he choice between or among plausible interpretations of the evidence will be a task for the factfinder.").

### d.   Kable's Conduct Was Consistent With Collusion

Despite the overwhelming evidence of its participation in defendants' plausible conspiracy, Kable nevertheless contends that, under its interpretation of the facts, it made no economic sense for publishers to agree to Anderson's proposal because "there were other wholesalers willing to distribute" publishers' magazines without paying an "additional charge[]." (Kable Br. 1.)

This argument ignores the reasoning of the Second Circuit's decision and the controlling summary judgment standard, which establishes that the facts must be viewed in the light most favorable to Anderson, and that Anderson is entitled to every reasonable inference in its favor. *See Pub'l Paper*, 690 F.3d at 64; *Ross*, 2012 WL 401113, at *9 (summary judgment denied

17

because, while "the unilateral benefits of arbitration to each Defendant are great," in the time period in which they adopted arbitration clauses, "Defendants arguably acted against their respective self-interest by attending numerous meetings with direct competitors where at least some sensitive business information was shared.").

Moreover, the factual premise of Kable's contention is demonstrably false. Kable's argument ignores the indisputable evidence that, absent collusion, TNG and Hudson were not the viable "alternatives" that Kable professes. (Marx Reply ¶ 120.)[26] Because no national distributor or publisher, acting unilaterally, could force retailers to switch from their desired wholesalers, collusion was essential to induce retailers to abandon their relationship with Anderson and to accept magazines from TNG and Hudson -- the "alternative wholesalers" designated by defendants.

The industry learned this lesson during Curtis' publicly-reported dispute with Anderson in February 2008, when Curtis attempted unilaterally to move its business in Texas away from Anderson and toward TNG. (¶¶ 260-62.) Walmart, a strong proponent of Anderson, simply refused to accede to this proposed wholesaler change and Curtis relented. (*Id.*; Marx Report ¶ 104; Marx Reply ¶ 150.) Thus, Kable understood that it would be impossible for any one national distributor unilaterally to compel retailers to switch wholesalers.[27]

The intense, coordinated efforts by defendants to induce retailers to terminate their relationship with Anderson and/or Source -- by conveying the collective message that Anderson

---

[26] The argument that Kable and its co-defendants needed an "alternative" to Source also makes no sense because Source had rescinded its proposal. (¶ 138.) Defendants obviously were not forced into using TNG and Hudson as competitive alternatives, but affirmatively and collectively decided to do so.

[27] A 1999 dispute, which also was publicly reported, further confirms the inability of publishers and national distributors, acting unilaterally, to compel retailers to switch wholesalers. In that dispute, two national distributors refused to ship magazines to Anderson and TNG, the wholesalers selected by Kroger for certain of its stores; when Kroger threatened to refuse to accept magazines from those national distributors at all of its stores, they immediately backed down. (¶ 258-59.)

and Source no longer would be able to distribute their magazines -- underscores this point.

(¶¶ 72-84, 207-08.) 

(¶ 208.)

" (¶ 207.)[28]

The importance of collective and coordinated conduct is precisely the reason that Rodale's Alleger viewed Comag's commitment to continue to ship to Anderson and Source, instead of joining defendants' conspiracy, to be so "dangerous" (¶ 153): this meant that about ▮▮ of the market (represented by Comag) was not "moving business away from Anderson" (¶ 58), which potentially undermined defendants' efforts to portray TNG and Hudson as the only method of distribution. *See Anderson News*, 680 F.3d at 190.[29] In short, absent collusion by defendants, TNG and Hudson were not the actual alternatives professed by Kable.

Kable also argues that, because publishers who are not alleged to have participated in defendants' conspiracy rejected Anderson's proposal, "Anderson could not have obtained its additional charges with or without a conspiracy, and therefore cannot prove causation...." (Kable Br. 1.) Kable's contention is meritless for at least several reasons.

---

[28] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (¶ 77.)

[29] Defendants, in many respects, were confronted with the same "classic collective action problem" that book publishers faced in *In re Electronic Books Antitrust Litigation*. There, Judge Cote found that defendants' parallel actions in signing identical agreements with Apple gave rise to an inference of conspiracy. 859 F. Supp. 2d 671, 684 (S.D.N.Y. 2012). Just as in *Apple*, "in order to compel [retailers to abandon their support of Anderson and Source], a critical mass of publishers was needed. No single publisher would have had the leverage to force [retailers] to make the switch." *Id.*

First, Kable ignores the fact that, to the extent publishers other than defendants did not agree to Anderson's proposal, that response cannot be divorced from defendants' unlawful conduct, including, in particular, Kable's effort to dissuade its publisher clients from agreeing to Anderson's terms.  Indeed, contemporaneous internal Kable documents confirm that Kable engaged in a campaign to ███████████ its publisher clients to reject Anderson's proposal.[30]  For example, on the day of Anderson's public announcement, Kable's Robert wrote in an internal email that Kable did █████████████████████████████████

██████████████████████  A day later, Kable's Charlie Walker wrote to one of Kable's clients that "████████████████████████████████

████████  And, on January 16, Roberts instructed Kable's Maurice "Chip" Smith that ███████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████[31]

---

[30]  There also is overwhelming evidence that Kable's conduct was designed to pursue the interests of its major client Bauer, who refused to negotiate with Anderson and used its proposal as an opportunity to eliminate Anderson from the market.  This evidence includes Duloc's close and constant communication with Parker of Bauer in the weeks following Anderson's announcement.  (See ¶¶ 110, 122, 167-71, 179, 213).  For example, before Kable sent a letter on February 2, advising its clients that they would no longer be supplying Anderson and Source, ████████ (¶ 179.)  There was absolutely no reason for Kable to consult with Bauer about a letter Kable intended to send to Bauer's competitors -- other than the fact that Kable was pursuing, first and foremost, Bauer's interests.

[31]  ████████████████████████████████████████████████████ (Duloc Decl. ¶ 7.)  These documents show that high-level executives at Kable, including Roberts and Walker, explicitly instructed Kable personnel to ████████ Kable's clients to reject Anderson's proposal.  (¶¶ 66, 266.)  Kable plainly is responsible for the conduct of these high-level executives.  *See United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1007 (9th Cir. 1972) ("[A]s a general rule a corporation is liable under the Sherman Act for the acts of its agents in the scope of their employment . . . ."). ████████████████████████████████████████████████████████████████████████████████████████████████████████████ (¶ 101.)  The latter point was consistent with a strategy about which Duloc had told Roberts an hour earlier, which he described as the "plan" AMI and Bauer intended to pursue -- *i.e.*, continue to ship Anderson, but not agree to Anderson's terms so that Anderson ████████████████████████████. (¶ 100.)

Kable's claim also is undermined by the fact that, when Kable told its publisher clients that it was going to cut off Anderson's and Source's magazine supply, it advised them that if they wanted to continue to use either wholesaler, that would be against their recommendation and that Kable would no longer provide any such publisher with credit protection -- a fundamental and essential service that national distributors often provide to client publishers. (¶ 185; Marx Reply ¶ 78; Picard Report ¶ 85.)[32]  Through this action, Kable effectively made the decision for its publisher clients.[33]

Moreover, even assuming *arguendo* that certain publisher clients of Kable independently -- and without any influence from Kable -- decided to reject Anderson's proposal, that fact would be completely irrelevant to Anderson's claims.  The mere fact of certain independent publisher decisions in no way refutes or negates the overwhelming evidence that Kable and its co-defendants -- who are national distributors representing 73% of the market, and publishers representing 48% of all single-copy magazines sold (¶¶ 4, 11) -- conspired and caused Anderson's destruction.  Moreover, if defendants had not conspired but instead reached negotiated agreements with Anderson, Kable's non-Bauer clients -- who together comprise only 5% of the market (Marx Report Figs. 1, 2) -- likewise would have had to do the same thing, or face the prospect that their magazines would not be on display.

Also without merit is Kable's argument that it did not make sense for it to conspire to force Anderson out of business because Anderson owed Kable a "substantial amount of

---

[32]  TWR took similar action, advising its publisher clients that, if they wanted to continue to use Anderson or Source, TWR would assist them in doing so, but would no longer provide them with credit protection.  (¶ 188.) Curtis did not even give its publisher clients the option of shipping to Anderson and Source, without credit protection.  Rather, Curtis simply told them that they would no longer be shipping to either wholesaler.  (*Id.*)

[33]  Demonstrating that Kable's actions were inconsistent with the desire of its publisher clients other than Bauer is an email exchange between Kable and one of its publisher clients, who characterized Kable's plan as █████████ ███████████████████████████████   As this Kable publisher wrote, " ██████████████████ ██████████████████████   (*Id.*)

money."[34]  This argument ignores the actual conduct of Kable and its co-defendants in early 2009 -- they simultaneously and collectively cut off Anderson's magazine supply despite the existence of this debt.  This conduct demonstrates conclusively that Kable concluded that it would benefit from forcing Anderson out of business notwithstanding any amounts Anderson allegedly owed.  Plainly, Kable either believed Anderson would pay down these debts even if Anderson was eliminated as a magazine wholesaler or it determined that the benefits of avoiding the surcharge outweighed the risks of any non-payment of these receivables.[35]  This conclusion is also supported by the fact that, even assuming non-payment of this debt, it remained in the interest of Kable to cut off Anderson's magazine supply because that clearly was the desire of its major client, Bauer.

## CONCLUSION

Based on the foregoing, Anderson respectfully requests that Kable's motion be denied.

---

[34]  ██████████████████████████████████████.  (Duloc Decl. ¶ 15.)

[35]  Indeed, an internal Time accounting memo, dated February 2, reflects that ████████ ████████████████████████████████████████████████████████████

Dated: New York, New York
       March 9, 2015

                      Respectfully submitted,

                      KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

                      By: _____
                          Marc E. Kasowitz (mkasowitz@kasowitz.com)
                          Hector Torres (htorres@kasowitz.com)
                          Seth Davis (sdavis@kasowitz.com)
                          Seth A. Moskowitz (smoskowitz@kasowitz.com)
                          Gavin D. Schryver (gschryver@kasowitz.com)

                      1633 Broadway
                      New York, New York 10019
                      Tel.: (212) 506-1700
                      Fax: (212) 506-1800

                      *Attorneys for Plaintiff Anderson News, L.L.C.*