UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDERSON NEWS, L.L.C. and LLOYD WHITAKER, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C.,

　　　　　　　　　　Plaintiffs,

　　- against -

AMERICAN MEDIA, INC., BAUER PUBLISHING CO., L.P., CURTIS CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI MEDIA U.S., INC., HEARST COMMUNICATIONS, INC., HUDSON NEWS DISTRIBUTORS LLC, KABLE DISTRIBUTION SERVICES, INC., RODALE, INC., TIME INC., and TIME/WARNER RETAIL SALES & MARKETING, INC.,

　　　　　　　　　　Defendants.

09 Civ. 2227 (PAC)

Filed Under Seal

---

AMERICAN MEDIA, INC., HEARST COMMUNICATIONS, INC., and TIME INC.,

　　　　　　　　　　Counterclaim Plaintiffs,

　　- against -

ANDERSON NEWS, L.L.C. and CHARLES ANDERSON, JR.,

　　　　　　　　　　Counterclaim Defendants.

---

# MEMORANDUM OF LAW OF PLAINTIFF ANDERSON NEWS, LLC IN OPPOSITION TO DEFENDANT RODALE'S MOTION FOR SUMMARY JUDGMENT

KASOWITZ, BENSON, TORRES
　& FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700

*Attorneys for Plaintiff*
*Anderson News, L.L.C.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT ................................................................................................................3

I.      STANDARD ON A MOTION FOR SUMMARY JUDGMENT ...........................3

II.     OVERWHELMING EVIDENCE ESTABLISHES THAT
       RODALE PARTICIPATED IN AN UNLAWFUL CONSPIRACY .....................5

      A.     The Evidence Establishes A Plausible Conspiracy.....................................5

      B.     The Existence Of The Conspiracy Is,
           At Minimum, A Question Of Fact ..............................................................8

           1.     Defendants' Conspiracy Unfolded
                 In A Series Of Overlapping Phases ................................................9

           2.     There Is Overwhelming Evidence Of "Additional
                 Circumstances" That Permit An Inference Of Conspiracy...........11

      C.     The Evidence Overwhelmingly Shows Rodale's Direct Participation
           In The Conspiracy Is, At Minimum, A Question Of Fact ........................15

      D.     The Evidence Also Demonstrates The Direct Participation
           Of Rodale's Agents Curtis And DSI In Defendants' Conspiracy..............19

CONCLUSION..............................................................................................................22

# TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
   37 F.3d 996 (3d Cir. 1994)..........................................................................17

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*,
   456 U.S. 556 (1982)....................................................................................20

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)............................................................... passim

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246, 252 (2d Cir. 1987)...........................................................4, 16

*H.L. Moore Drug Exch. v. Eli Lilly & Co.*,
   662 F.2d 935 (2d Cir. 1981)........................................................................17

*Hyland v. HomeServices of Am., Inc.*,
   771 F.3d 310 (6th Cir. 2014) ......................................................................18

*In re Aspartame Antitrust Litig.*,
   2007 WL 5215231 (E.D. Pa. Jan. 18, 2007 .................................................6

*In re Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009)..................................................................... 4-5

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009).........................................................15

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51, 64 (2d Cir. 2012)............................................................ *passim*

*In re High Pressure Laminates Antitrust Litig.*,
   2006 WL 1317023 (S.D.N.Y. May 15, 2006) .......................................5, 14

*Meredith Corp. v. SESAC LLC*,
   2014 WL 812795 (S.D.N.Y. Mar. 3, 2014) .................................................4

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   673 F. Supp. 684 (S.D.N.Y. 1987) ................................................16, 19, 20

*Peda v. New York Univ. Hospitals Ctr., Hosp. for Joint Diseases*,
   2014 WL 1013844 (S.D.N.Y. Mar. 17, 2014) .........................................4, 8

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ..............................................13

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
  2007 WL 39301 (S.D.N.Y. Jan. 8, 2007) ...................................................................4

*Ross v. Am. Express Co.*,
  773 F. Supp. 2d 351 (S.D.N.Y. 2011) .........................................................................14

*Ross v. Bank of Am., N.A. (USA)*,
  2012 WL 401113 (S.D.N.Y. Feb. 8, 2012) ................................................... 10-11, 18

*Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) .................................................14

*U.S. Info. Sys., Inc. v. Int'l Bhd. Of Elec. Workers Local Union Number 3*,
  2007 WL 2219513 (S.D.N.Y. August 3, 2007) ...................................................... 1-18

*United States v. Apple, Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013).............................................................13, 14, 15

*United States v. Koppers Co., Inc.*,
  652 F.2d 290 (2d Cir. 1981)......................................................................................20

Plaintiff Anderson News, LLC ("Anderson") respectfully submits this memorandum of law in opposition to Rodale Inc.'s ("Rodale") motion for summary judgment.[1]

## PRELIMINARY STATEMENT

The evidence demonstrates that defendants -- some of the most powerful magazine publishers in the nation and their national distributors, who are competitors of one another -- worked in "lock step" to cut off Anderson's magazine supply and destroy Anderson.

Defendants' collusive conduct was their reaction to Anderson's mid-January 2009 proposal for a reduction in the price Anderson paid for magazine distribution and for publishers to absorb certain inventory costs Anderson was incurring.  Evidence uncovered during discovery shows how the conspiracy evolved through multiple overlapping phases:  defendants initially shared with each other their reactions to Anderson's proposal and agreed to "simultaneously" use their "collective resources and influence" to move business away from Anderson.

When Source, another major wholesaler, made a proposal similar to Anderson, defendants also began using their collective resources and influence to move business away from Source as well.  Defendants engaged in a coordinated campaign to convince retailers to accept magazines from wholesalers of defendants' choosing; they intensely monitored each other's commitment to the collective plan; they shared with each other the status of their negotiations with Anderson and Source and their distribution plans; and then -- within a few days of one another -- cut off Anderson's and Source's magazine supply, successfully and ruthlessly eliminating Anderson as a wholesaler.  This confluence of events was unprecedented in the

---

[1]   Submitted in further support of Anderson's opposition is the Declaration of Seth Davis, dated March 9, 2015 (the "Davis Declaration"), and the Declarations of Charles C. Anderson, Jr., John Campbell and Bo Castle, all dated March 9, 2015.  References to "Ex. __" refer to the exhibits to the Davis Declaration.  References to "Pl. 56.1  ¶ __" refer to paragraphs of Anderson's response to Rodale' Statement of Uncontested Facts.  References to "¶ __" refer to paragraphs of Anderson's Statement of Additional Genuine Issues of Material Fact.

To the extent relevant, Anderson hereby incorporates by reference its briefs in opposition to the motions for summary judgment filed by Rodale's co-defendants.

industry.  Discovery reveals how defendants secretly achieved their unlawful objectives: (i) an astoundingly high-level of inter-firm communications, including dozens of highly incriminating emails and other documents; (ii) inter-competitor in-person meetings; and (iii) over 150 inter-competitor telephone calls at unusual times of day, for suspiciously long durations, among competitors who otherwise rarely spoke with each other.

The objectives of defendants' antitrust conspiracy are not only plausible but, as discovery now discloses, clear and compelling.  By collectively resisting Anderson's and Source's proposed terms, defendants preserved their profits.  Moreover, admissions in defendants' internal documents confirm an additional motive -- the increased wholesaler concentration resulting from the elimination of Anderson and Source would enable the remaining major wholesalers, TNG and Hudson, to extract pricing concessions mostly, if not solely, from retailers, who relied heavily on inter-wholesaler competition, and not from publishers and national distributors, which did not rely on such inter-wholesaler competition.

The economic analysis of Dr. Leslie Marx, a Duke University economist with extensive expertise in the economics and detection of collusion, further confirms the economic motivation for defendants' conspiracy.  Dr. Marx's economic analysis of the structure and history of the single-copy magazine industry and the evidence shows that increased wholesaler concentration would benefit publishers and national distributors at the expense of retailers.  Indeed, after Anderson's elimination, the cost of magazines to retailers increased, while publishers were able to preserve their profits by maintaining their prices for the magazines sold to wholesalers.

Nevertheless, Rodale erroneously contends that insufficient evidence exists of its knowing participation in the conspiracy, and that, to the extent its liability is premised upon the conduct of its agents Curtis and DSI, the evidence of their participation is, likewise, insufficient.

2

Rodale is wrong on both counts.  Rodale's extensive communications with its direct competitors, which clearly concerned Anderson's proposal, belies any claim that it was oblivious to what was happening around it.  Rather, that evidence shows not only that Rodale was aware of the "essential nature and general scope" of the conspiracy, but that Rodale was an active participant in the conspiracy.  Indeed, Richard Alleger, who was responsible for Rodale's single-copy magazine business, was in constant communication with his co-conspirators about the collusive plan, and kept Rodale's management aware as it unfolded.

Further, as even Rodale concedes, it relied on Curtis and DSI to help it in responding to Anderson's proposal.  That was a fatal mistake, as there is overwhelming evidence that Curtis and DSI played a central role in the conspiracy, from its inception until it achieved its ultimate objective -- the elimination of Anderson as a wholesaler.  That evidence includes a clearly inculpatory admission by Curtis's president that he was working in "lock-step" with Curtis' direct competitor, TWR, to eliminate Anderson and Source from the market to create a "two-wholesaler system," as well as highly incriminating emails that show how DSI was, in many respects, driving defendants' strategy from beginning to end.  Under well-established law, Rodale is liable for the collusive and anticompetitive acts of its agents.

In sum, as shown below, the overwhelming evidence of Rodale's participation in this illegal antitrust conspiracy compels denial of Rodale's summary judgment motion.

**ARGUMENT**

## I.   STANDARD ON A MOTION FOR SUMMARY JUDGMENT

In its summary judgment motion, Rodale bears the burden of establishing that "'there is no genuine dispute as to any material fact,'" and must "produc[e] evidence on each material element of its claim or defense demonstrating that it is entitled to relief."  *Peda v. New York*

*Univ. Hospitals Ctr., Hosp. for Joint Diseases*, 2014 WL 1013844, at *7-8 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.) (citations omitted).  Even then, summary judgment must be denied if Anderson, as the nonmoving party, meets its "'limited burden of production'" by demonstrating the existence of a genuine dispute as to material facts.  *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) (citation omitted).

Summary judgment must be denied as long as "the totality of the evidence, viewed in the light most favorable to plaintiffs and with proper regard for the *Matsushita* standards, could support a reasonable inference of illegal collusive behavior."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012).  Anderson is not required to "'disprove all nonconspiratorial explanations for the defendants' conduct'" but must demonstrate that the existence of a conspiracy is a "reasonable inference that the jury could draw," and may meet its burden by providing "'sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.'"  *Id.* at 63 (citations omitted).

Summary judgment must be denied if Anderson "present[s] direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (citation omitted); *see also Meredith Corp. v. SESAC LLC*, 2014 WL 812795, at *208 (S.D.N.Y. Mar. 3, 2014) (summary judgment denied where "the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding") (citation and quotation omitted).

Further, "[i]n considering whether there is sufficient evidence to create a genuine issue of fact, the district court may not properly consider the record in piecemeal fashion, giving credence

to innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (citation omitted).[2]

Because Rodale clearly fails to meet its burden of establishing that no genuine issues of material fact exist, Rodale's summary judgment motion should be denied.

## II.   OVERWHELMING EVIDENCE ESTABLISHES THAT RODALE PARTICIPATED IN AN UNLAWFUL CONSPIRACY

### a.   The Evidence Establishes A Plausible Conspiracy

Rodale contends that it had "no interest" in seeing Anderson eliminated from the market because this would "further" increase wholesaler concentration.  (*See* Rodale Br. 3, 9.)  But the evidence revealed during discovery proves the exact opposite -- Rodale and its co-conspirators had a powerful motive to conspire: the profits that could be achieved, and were achieved, through eliminating Anderson and Source.

First, by collectively resisting the Anderson and Source proposals, defendant publishers could avoid paying a distribution fee not only to Anderson and Source, but also to TNG and Hudson.[3]  They also would have no need to offset that cost by improving their selling efficiency and ending their practice of "stuffing the channel" with excess magazines, a practice that defendants claimed was necessary to maximize their profits.[4]  Defendant publishers also could avoid having to bear the cost of inventory that was on Anderson's books as a result of retailers utilizing scan-based trading ("SBT").  (¶¶ 50; Picard Report ¶ 125.)  This maintenance of profits

---

[2]  *See also In re High Pressure Laminates Antitrust Litig.*, 2006 WL 1317023, at *4 (S.D.N.Y. May 15, 2006) ("A court deciding whether to grant summary judgment . . . should not view each piece of evidence in a vacuum. Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place.") (citation and quotation omitted).

[3]  Defendants admit that they would have paid to TNG and Hudson any per-copy fee they paid to Anderson and Source.  (¶ 51.)

[4]  *See* ¶¶ 21-24, 42; Ex. 259 (April 16, 2014 Expert Report of Leslie M. Marx, PhD ("Marx Report")) ¶ 207 and n.367; Ex. 260 (April 16, 2014 Expert Report of Robert G. Picard, PhD ("Picard Report")) ¶¶ 118-20, 140.

alone provides not only a plausible but a compelling motivation and explanation for defendants' conduct.[5]

Second, as defendants' own documents confirm, defendants expected a significant economic benefit from eliminating Anderson and Source as wholesalers. The more concentrated wholesaler sector, consisting primarily of TNG and Hudson, would significantly reduce competition among wholesalers. Because of the structure of the distribution chain, retailers -- but not publishers and national distributors -- relied heavily on inter-wholesaler competition. Thus, reduced wholesaler competition would enable the remaining wholesalers to extract pricing concessions from retailers -- not publishers and national distributors.

Dr. Leslie Marx's economic analysis demonstrates how reducing the number of wholesalers economically would benefit defendants. Before 1995, publishers dominated the single-copy distribution channel by using regionally-based wholesalers operating in exclusive territories. After 1995, as retailers grew larger and had increased negotiating leverage, they insisted on working with one single wholesaler that operated in non-exclusive territories. This led to the consolidation of the market from many regionally-based wholesalers operating in exclusive territories to four major wholesalers. (¶¶ 25-26.)[6] The absence of exclusive territories enabled retailers to rely on competition among major wholesalers to obtain greater margins from wholesalers and improved service. (Id.; Marx Report ¶ 124; Marx Reply ¶¶ 121-25.) The resulting loss of margin to wholesalers led them to seek pricing concessions from publishers. (¶ 27; Picard Report ¶¶ 167-68.)

---

[5]   See In re Aspartame Antitrust Litig., 2007 WL 5215231, at *9 (E.D. Pa. Jan. 18, 2007) ("[A]s with almost any price-fixing conspiracy, the clear motive was to increase or maintain profits.") (citation omitted).

[6]   See Ex. 259 (Marx Report) ¶ 121 n.177; Ex. 269 (Reply Expert Report of Leslie M. Marx, PhD, July 16, 2014 ("Marx Reply")) ¶ 106. Dr. Marx's analysis is also supported by the analysis of the single-copy magazine industry by Dr. Robert Picard, of the Reuters Institute at the University of Oxford, who is an expert in the economic and business dynamics of media, including the magazine industry. (See Picard Report.)

The elimination of the two proponents of those concessions, Anderson and Source -- and the de facto re-emergence of the publisher-favored exclusive territories -- would enable publishers and national distributors to swing the pendulum back in their direction.  Retailers, left with only two major wholesalers effectively operating in exclusive territories with the absence of any meaningful inter-wholesaler competition, would be compelled to absorb increased prices for magazines.  (¶¶ 223-42, 255-57; Marx Report ¶¶ 132-40.)  Once they regained control, defendants could (and did) continue to "stuff the channel" with excess magazines -- and resist the adoption of SBT and other efficiencies advocated by Anderson and retailers.  (¶ 226-28; Picard Report ¶¶ 118-125, 140; Marx Report ¶¶ 324-74.)

Dr. Marx's analysis is fully supported by the evidence uncovered during discovery, including defendants' own contemporaneous documents and similar internal documents from retailers and other industry participants.  (*See* Marx Report ¶¶ 125-42, 157-280.)  That evidence shows not only that publishers and national distributors recognized the benefits they would (and did) obtain from eliminating Anderson and Source, but also how an increase in wholesaler concentration would (and did) harm retailers.  (¶¶ 225-33.)  Further, the evidence shows that defendants mitigated any risk to them of increased wholesaler concentration by, among other things, entering into long-term contracts that prevented wholesalers from using their increased market power to extract better prices from publishers and national distributors.  (¶¶ 244-48, 250; Marx Report ¶¶ 110, 141-42.)

The rationale underlying the conspiracy recently was unequivocally affirmed by the president of defendant publisher AMI, David Pecker.  During a November 2014 earnings call discussing Source's 2014 bankruptcy, which left TNG controlling over 75% of the market, Pecker extolled the benefits of *fewer* wholesalers.  Specifically, Pecker explained that, with a

single wholesaler distributing the vast majority of magazines, these are "the best times we've ever been [in] when it comes to the supply chain." (¶ 250.)[7]

In short, the evidence revealed during discovery and economic theory compels the conclusion that, not only did defendants' conspiracy make complete economic sense, but the benefits defendants expected from de facto exclusive territories in a distribution system with only two major wholesalers actually were realized.

### b.   The Existence Of The Conspiracy Is, At Minimum, A Question Of Fact

Because Rodale essentially ignores the mountain of highly incriminating emails, sworn testimony and the more than 150 inter-competitor communications supporting an inference of a conspiracy, Rodale has not satisfied -- and cannot satisfy -- its initial burden of demonstrating that there is no genuine dispute as to any material fact as to each material element of its defense. *See Peda*, 2014 WL 1013844, at *7-8.  In any event, summary judgment must be denied because, at a minimum, there is more than "'sufficient evidence to allow a reasonable fact finder to infer that [a] conspiratorial explanation is more likely than not.'"  *Publ'n Paper*, 690 F.3d at 63 (citation omitted).

---

[7]   Pecker also explained that AMI's "long-term contracts that lock[] in [its] discount rates for both [TNG and Hudson]" effectively mitigated any concern about TNG's increased market power.  (¶ 250.)  *See* Anderson's response to Curtis' motion for an examination of some of the evidence of:  (i) admissions by defendants regarding the benefits to them of eliminating Anderson and Source from the market; (ii) evidence that retailers and other industry participants viewed the elimination of Anderson and Source to be to the detriment of retailers and to the benefit of national distributors and publishers; and (iii) the tools at defendants' disposal to mitigate the risk to them from increased wholesaler concentration.  (Anderson Curtis Opp. 4-11; *see also* ¶¶ 223-54.)  Anderson's response to Curtis' motion also provides an examination of the actual impact of the elimination of Anderson from the market, including that the price paid by retailers for magazines increased immediately after Anderson's forced exit, while the discount applied to magazines sold by publishers to wholesalers remained virtually unchanged.  (Anderson Curtis Opp. 8.)  Further, testimony from retailers establishes that after Anderson's exit, retailers no longer were able to engage wholesalers in a competitive bidding process and service levels deteriorated.  (*Id.*; *see also* ¶¶ 254-57.)

  As also set forth more fully in Anderson's response to Curtis' motion (Anderson Curtis Opp. 8 n.10), Dr. Marx's analysis shows that because the market for single copy magazines is a "two-sided market" in which publishers and national distributors "multi-home," and retailers "single-home," an increase in wholesaler concentration benefits publishers and national distributors, but harms retailers.  (Marx Report ¶¶ 117, 141-47.)

###### i.        Defendants' Conspiracy Unfolded In A Series Of Overlapping Phases

The evidence shows that, as soon as defendants learned of Anderson's proposal, they engaged in a high level of communication with direct competitors or other market participants with no legitimate business justification.  Initially, defendants shared with each other their reaction to Anderson's proposal and agreed to work collectively to resist the proposal.  Indeed, less than 24 hours after Anderson publicly announced its proposal, the country's major publishers already had exchanged their reactions to it.  Thus, by January 15, Bauer's Rick Parker was able to report internally to the president of Bauer that "██████████████████ ████████████████████████████████████████."

Defendants then began the next phase -- a coordinated effort to convince retailers to accept magazines from wholesalers of defendants' choosing.  ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████  A "██████," jointly developed by competitors AMI and Bauer, is precisely what defendants were using in conveying a collective and uniform message to retailers.  (¶¶ 73-80, 207-08.)[9]

---

[8]   *See also* ¶¶ 56-58, 60, 62-71 for additional evidence of defendants' initial response to the Anderson announcement, including (i) an email in which ████████████████████████████████████ ██████████████████████████████████ (¶ 57); (ii) evidence of a ██████████████ ███████████████████████████████████████████████ (¶ 63); (iii) telephone calls between ████████████████████████████████████████████████████ (¶¶ 62, 67-71); and (iv) an internal Kable email reflecting that ██████████████████████ ████████████████████████████████████████████ (¶¶ 100-01).

[9]   The evidence also includes a highly-incriminating internal debate between AMI and Bauer concerning whether they should call Walmart together or separately.  (¶¶ 74-76.)  Recognizing that calling together would be viewed as "team[ing] up" and could result in "lawsuits," AMI and Bauer chose to have separate calls with Walmart and then share with each other the results of their conversations.  (¶¶ 75-76).  *See also* ¶¶ 77-78, 212 for evidence reflecting defendants' coordinated effort to convince retailers to abandon their relationship with Anderson and Source and use

In the third phase of the conspiracy, Rodale and its co-conspirators focused on developing an alternative distribution plan that included sharing competitively-sensitive information about each others' historical distribution practices.  (¶¶ 87-92; Marx Report ¶¶ 190-99.)[10]  The fourth phase involved defendants' monitoring each other to ensure they maintained their commitment to the collective plan, and to confirm that no one would deviate from it by reaching a negotiated agreement with Anderson or Source.  (Marx Report ¶¶ 200-64; Marx Reply ¶¶ 60-61.)  As ██████████████████████████████████████

████████████[1]

As the Second Circuit stated, on the basis of far fewer alleged facts, defendants' inter-competitor coordination culminated in defendants, in virtual lock step and within days of one another, cutting off both Anderson's and Source's magazines supply, and forcing Anderson from the magazine wholesaling business.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191(2d Cir. 2012).  (*See* ¶¶ 137, 185-89.)  Such parallel conduct, particularly when combined with extensive strategic, inter-competitor communications in which competitively-sensitive information is exchanged, is a hallmark of an antitrust conspiracy and provides a strong inference of collusion.[12]  *See Ross v. Bank of Am., N.A. (USA)*, 2012 WL 401113, at *5

---

wholesalers of defendants' choosing, and ████████████████████████████████

[10]   The evidence of this phase includes, for example, emails revealing that Curtis and DSI were coordinating with Bauer (who was not a Curtis client) on a plan combining historical distribution data from Curtis with historical distribution data from Curtis' direct competitor, Kable.  (*See* ¶¶ 63, 88-93.)

[11]   For a period of time, the strategy contemplated by defendants shifted to one in which they would continue to ship to Anderson, but not pay the surcharge, so that defendants could blame Anderson for not delivering magazines and causing any disruption in service and, as Duloc of Kable explained, ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

[12]   The conspiracy continued even after defendants collectively cut off Anderson's and Source's magazine supply. For example, DSI and TWR -- direct competitors -- worked collectively to ensure that each other's clients'

(S.D.N.Y. Feb. 8, 2012) ("Given the temporal proximity between the meetings and the adoption of arbitration clauses, this parallel conduct is probative of an antitrust conspiracy."); Marx Report ¶¶ 321-23.

### ii.    There Is Overwhelming Evidence Of "Additional Circumstances" That Permit An Inference Of Conspiracy

Beyond defendants' parallel conduct and the inculpatory documents and other evidence, there exists overwhelming evidence of "additional circumstances" that would "permit a fact-finder to infer a conspiracy," including circumstances and evidence commonly characterized as "plus factors" by courts and economists.  *See Publ'n Paper*, 690 F.3d at 62.

<u>First</u>, defendants' conduct was against each of their individual economic self-interests, which is a "plus factor" that strongly supports an inference of conspiracy.  *See id.* at 62.[13]  By adhering to the collective plan, each defendant denied itself the economic benefit of reaching an agreement with Anderson, avoiding disruption and continuing to ship magazines through Anderson and gaining increased display space at retailers, while their competitors' magazines sit idle in warehouses.  (Marx Report ¶¶ 281, 285, 305-14, 318; Marx Reply ¶¶ 62-67.)  The benefits of continuing to ship Anderson clearly are demonstrated by the decision of Comag -- the only major national distributor that did not participate in the conspiracy -- to ship to Anderson and Source.  The net result was that Comag's publishers' titles remained on retailers' shelves, unlike those of its competitors who cut off Anderson's and Source's magazine supply.  As a DSI executive complained:

---

magazines were on display, and DSI shared the fact that they were doing so with their clients, including Rodale. (¶¶ 215-16.)  Defendants also continued to share with each other the results of their efforts to convince retailers to abandon their relationships with Anderson and Source and use defendants' chosen wholesalers.  (¶¶ 212-15.)

[13]   *See also* Marx Report ¶ 66.  In their joint motion to exclude certain of Dr. Marx's testimony, Rodale and its co-defendants take issue with Dr. Marx's reference to certain "plus factors" as "super-plus factors."  As shown in the opposition to that motion (at pp. 12-16), this argument is completely meritless.  Nevertheless, whether characterized as "super-plus factors" or "plus factors," the conclusion is the same – the evidence is consistent with collusion.

> [B]ecause CoMag took the easiest and weakest position, they continue to receive distribution and display and in reality they now receive dramatically better display because they are in our pockets!!! ... [H]ard to accept CoMag not feeling any disruption and then actually gaining display and sale for being so weak during this crisis.   And then  in  the  end  if  we've  somehow  created  a  stronger,  better wholesaler network, they'll reap that benefit too.

(¶ 204.)[14]

That defendants recognized that it was in their self-interest to continue to ship to Anderson and Source, but consciously refrained from doing so, is also demonstrated by an email from Porche of DSI to a colleague in which he explained that Pecker of AMI was upset because

"███████████████████████████████████████████████

██████████████████████████ -- *i.e.*, Los Angeles, a particularly large and important market

for single-copy magazines.  (¶ 205.)  According to Dr. Marx, "[i]n a competitive market, ████

████████████████████████████████████████████████████

█████████████ This statement only makes sense in the context of the collusive plan of

Defendants."  (Marx Report ¶ 306.)[15]

Further, even though Source rescinded its per-copy distribution fee proposal, defendants nonetheless cut off Source's magazine supply, which was against their respective individual economic self-interests.  (¶¶ 138, 189, 195; Marx Report ¶¶ 307-14.)  The only reasonable

---

[14]   Another reason that continuing to ship to Anderson was in defendants' individual economic self-interest is because, even if Anderson ultimately was unable to survive, any publisher who continued to ship through Anderson could simply switch wholesalers after Anderson's exit.  Indeed, Comag reached a negotiated agreement with Anderson pursuant to which Comag agreed to continue to ship magazines, but when it became clear that Anderson would be forced out of business after defendants cut off the supply of magazines to Anderson, Comag then independently moved its business to TNG and other wholesalers.  (¶¶ 151-55, 183-88, 118-222, 240.)

[15]   Dr. Marx also conducted an empirical analysis of the economic benefits to Comag's publisher clients from increased sales during the period that defendants stopped shipping to Source.  (Marx Reply ¶¶ 62-67, App. B.)  This analysis demonstrates that it was in each defendant's individual economic self-interest to continue to ship to Anderson and Source while their competitors did not.  (*Id.*)  In addition to increased sales in the short term, publishers who shipped could permanently convert readers to their magazines.  (*See* Marx Report ¶ 305, n. 452 ████████████████████████████████████████████████████████
████████████████████████████████████████████████

explanation for this uniform response to the Source rescission was defendants' collective agreement to eliminate Source from the market.

Second, defendants had a common and widely-recognized motive to resist Anderson's proposal and eliminate Anderson from the market: maintaining and increasing their profits. *See Publ'n Paper*, 690 F.3d at 62 (recognizing "a common motive to conspire" as a "plus factor").

Third, defendants engaged in an extremely "high level of interfirm communications," another important plus factor. *See id.* at 62. These communications included 156 inter-competitor phone calls or text messages among key high-level executives in the approximately one month after Anderson's announcement. (¶ 283.)[16] *See Publ'n Paper*, 690 F.3d at 67 (communications between high-level executives have more probative weight).[17]

Fourth, defendants engaged in extensive monitoring of each others' intentions and sought assurances from each that they all were committed to their collective plan -- another plus factor. (¶¶ 103-136; Marx Report ¶¶ 71, 49, 163.) *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *23 (E.D.N.Y. Jan. 4, 2011) (allegation that "defendants monitored each others' compliance with the agreement through subsequent meetings and email exchanges . . . 'raise[s] a suggestion of a preceding agreement'") (citation omitted).[18]

---

[16] Specifically, the evidence establishes that between January 12, 2009 and February 12, 2009, there were 120 calls between direct competitor defendant publishers or national distributors, and 36 calls between defendant national distributors and non-client defendant publishers. (¶ 284.)

[17] This is in marked contrast to the level of communications before Anderson's announcement. Based on defendants' telephone records, there were only 39 inter-competitor calls placed in the entire month before Anderson's announcement of its proposal, with a total duration of approximately 82.4 minutes, while the total duration of the 156 inter-competitor calls in the month after Anderson's announcement was approximately 801.1 minutes. (¶ 284.) Further, the participants on many of the calls admitted that they rarely, if ever, spoke with one another before that announcement. (¶¶ 269-73.) *See also United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14 (S.D.N.Y. 2013) ("[T]elephone calls among the Publisher Defendants during the period of their negotiations with Apple represented a departure from the ordinary pattern of calls among them.").

[18] *See also* Marx Report ¶ 63 ("Monitoring and enforcement structures" constitute a "typical building block[] of collusion"); Ex. 635 (May 28, 2014 Expert Report of Janusz Ordover) ¶ 49 ("a successful cartel must have the means to monitor its members").

The importance of such monitoring is exemplified by an internal Hachette email in which a high-level Hachette executive underscored the need to "█████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

    Fifth, defendants shared with each other confidential, competitively-sensitive information, another well-recognized plus factor. *See Apple*, 952 F. Supp. 2d at 690 ("the 'use of facilitating practices' like information sharing" supports an inference of conspiracy) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)).[19]  This included providing each other with updates on the status of negotiations with Anderson and Source.[20]  Absent collusion, there would be no reason for Rodale or its co-conspirators to apprise each other whether they were negotiating or whether they intended to ship magazines to Anderson or Source.[21]

    Sixth, defendants made a conscious effort to conceal their conspiracy by, among other things, urging that they communicate orally rather than in writing and that they fax, or attempt to fax, information instead of using email.[22]  Such deliberate efforts to conceal their unlawful

---

[19] *See also Ross v. Am. Express Co.*, 773 F. Supp. 2d 351, 369 (S.D.N.Y. 2011) ("Amex has failed to offer a compelling rationale for why it would disclose such information."); *In re High Pressure Laminates*, 2006 WL 1317023, at *11 ("Plaintiffs' evidence supports an inference that Wilsonart was in possession of, and that it made no economic sense for Wilsonart to share, as it did, competitors' confidential information . . . .").

[20] *See* ¶¶ 56-59, 62-65, 67-71, 73-84, 89-98, 103-136, 150, 153-54, 167-75, 181-82, 193-94.

[21] Marx Report ¶ 14 ("[I]nformation that a firm is not supplying certain wholesalers is competitively sensitive because rival publishers and national distributors could take advantage of that information by shipping additional magazines to those wholesalers.").  Indeed, Castardi of Curtis conceded it was ████████████████████████████████ ██████████████████████████████████████ (¶ 282.)██████████████

[22] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

conduct, particularly when coupled with all the other evidence here, provide strong evidence of defendants' conspiracy.  *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 173-76 (D. Conn. 2009) (efforts to conceal conspiracy together with other evidence "would permit a fact-finder to conclude that the defendants engaged in more than mere conscious parallelism or tacit collusion").

Seventh, defendants' decision to stop shipping to Anderson constituted an unprecedented shift in defendants' business practices, another widely-recognized plus factor.  *See Apple*, 952 F. Supp. 2d at 690 (unprecedented change in business practices "may provide sufficient evidence of an illegal conspiracy").  As explained by Dr. Marx, defendants demonstrated an "abrupt shift[] from past behavior" as early 2009 appears "to be the only time in the history of the industry in which, in response to [a] surcharge request from a wholesaler, publishers and national distributors representing" about ███ of the industry "collectively cut off supply to that wholesaler."  *See* Marx Report ¶¶ 69, 104-07.

In short, the combination of defendants' parallel conduct, inculpatory documents and the existence of these plus factors provides further compelling support for a "reasonable inference of illegal collusive behavior."  *Publ'n Paper*, 690 F.3d at 64.

### c.    The Evidence Overwhelmingly Shows Rodale's Direct Participation In The Conspiracy Is, At Minimum, A Question Of Fact

Rodale's contention that there is insufficient evidence as to its role in the conspiracy (Rodale Br. 6-10) ignores both the controlling legal standard in antitrust conspiracy cases and the evidence that Rodale was an active, knowing participant in the conspiracy.

Indeed, it is well established that, "'once a conspiracy is shown, only slight evidence is needed to link another defendant with it.'"  *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 673 F. Supp. 684, 688 (S.D.N.Y. 1987) (quoting *Apex Oil Co.* 822 F.2d at 258).  All that is required is that there be a showing that Rodale had actual knowledge of the "essential nature and general scope" of the conspiracy.  *Id.* at 689.  That standard is easily satisfied as to Rodale.

Throughout every single phase of the conspiracy, Rodale was directly involved and acutely aware of the "essential nature and general scope of" the conspiracy.  Even before Anderson made its public announcement, Rodale's Senior Vice President of Retail Sales, Rich Alleger, was discussing it with a direct competitor and advising them of what he had heard from another of its direct-competitors, its co-defendant AMI, about Anderson's proposal.  (¶60; *compare* Rodale Br. 3 (stating incorrectly that "Rodale (specifically, Richard Alleger…) first heard about the Surcharge Demand by listening to Charles Anderson, Jr.'s January 14, 2009 conference call…").)  By January 16 -- only two days after Anderson publicly announced its proposal -- Rodale executives had four calls with Rodale's direct competitor and co-defendant Bauer, and two calls with its direct competitor and co-defendant AMI, or with AMI's consultant and the chairman of DSI, Michael Roscoe.  (¶ 286.)

Alleger's and Rodale's communications with its co-defendants did not end there.  Rather, over the course of the next several weeks, █████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

16

t ████████████████████████████████████████████████████████████

████████████ (¶ 286.) [23]

The email trail Rodale left behind belies any contention that these calls did not directly relate to defendants' coordinated response to the Anderson and Source proposals.  For example, ██████████████████████████████████████████, Alleger emailed Porti of TWR's direct competitor, Curtis, to seek confirmation that ████████████████████████ ████████████████████████████████████████████████

(¶ 182.)

Other of Rodale emails also demonstrate that Rodale was an active, knowing participant in the conspiracy.  For example, on January 26, Alleger ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ [24]

---

[23]  Alleger's communications with Rodale's direct competitors concerning the Anderson and Source proposals were not limited to it co-defendants, but also included communications with other of Rodale's direct-competitors.  Indeed, ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  (¶¶ 60, 135, 275.)  Rodale did not preserve any of the text messages that Alleger sent or received from direct competitors during this time period.  (¶ 275.)

[24]  Rodale's cases are not to the contrary, because they did not involve inter-competitor communications as frequent, or in conjunction with as many incriminating emails and other documents, as is the case here.  *See H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 942-44 (2d Cir. 1981) (plaintiff's evidence of conspiracy consisted solely of an ambiguous memo sent two years before plaintiff was terminated, insufficient evidence that defendant's termination of plaintiff was a sham, a meeting between defendant and one of its wholesalers (*i.e.*, not among competitors), and insufficient evidence of price maintenance); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir. 1994) (communications at convention were not sufficient to evidence conspiracy where, unlike here, there was no evidence that defendants' actions were contrary to their self-interest); *U.S. Info. Sys., Inc. v. Int'l Bhd. Of Elec. Workers Local Union Number 3*, 2007 WL 2219513 (S.D.N.Y. August 3, 2007) (sole inter-

Rodale's emails also show a deep concern that its co-conspirators remained committed to their collective plan and that outside forces not disrupt defendants' plan.  For example, on January 29, immediately after learning that Comag was going to continue to ship Anderson and Source, Alleger wrote Parker of Rodale's direct competitor, Bauer, and Porche of DSI.  (¶ 152-53.)  In his email to Porche, which the Second Circuit found to be compelling evidence, Alleger characterized Comag's decision to "SHIP" Anderson and Source as "dangerous" -- i.e., "dangerous" to defendants' collective plan.  (*Id.*)  *See Anderson News*, 680 F.3d at 190.[25]

Rodale's acute knowledge of defendants' conspiracy and its direct efforts to monitor any possible disruptions also are demonstrated by an email exchange between Alleger and Jay Wysong of DSI.  (¶¶ 125-26.)  In that exchange, on January 30, after Wysong wrote that "everyone just needs to stick to their guns," Alleger asked Wysong whether "[o]ur man in bauerland still solid?"  (*Id.*)  Though Wysong should not have responded to this email -- particularly by sharing the intentions of Rodale's direct competitor, Bauer -- he did precisely that, responding, "He's solid alright."  (*Id.*)[26]

---

competitor communication identified by plaintiff was unremarkable meeting between contractors and union representatives); *cf. Ross*, 2012 WL 401113, at *8 (noting that "[i]t is well settled that 'a high level of inter[-]firm communications' is probative of a conspiracy in instances of parallel conduct among competitors[.]") (citation omitted).

[25]   Rodale's argument that Alleger's emails are subject to a more "benign" interpretation ignores the Second Circuit's ruling that "the choice between or among plausible interpretations of the evidence will be a task for the finder of fact."  *Anderson News*, 680 F.3d at 190.  Rodale's authority is not to the contrary.  *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 321 (6th Cir. 2014) (defendant's public statement not sufficient where the more reasonable interpretation was non-conspiratorial, and where plaintiff provided little in the way of additional evidence of conspiracy).

[26]   This example, standing alone, demonstrates not just that Rodale's calls and other communications with its direct competitors concerned defendants' collusive plan, but also undermines Rodale's conclusory and self-serving claim that its communications with its direct competitors were "eminently reasonable."  (Rodale Br. 8.)  As demonstrated, the content, context and frequency of Alleger's communications with its direct competitors were anything but "eminently reasonable."  Further, this claim is inconsistent with another claim made by Rodale -- that no one at Rodale communicated with anyone outside of Rodale, Curtis and DSI about Anderson's proposal and the development of alternative distribution plan.  (Rodale Br. 8.) ████████████████████████████████████████████████████████████████████████████████████ (¶ 276.)

Thus, Rodale's contention that it was not directly involved in responding to Anderson's proposal and that Alleger ███████████████████████████████████████████ ████████████████████ is demonstrably false.  Contrary to Rodale's contention, the evidence demonstrates not only that Rodale was aware of and an active participant in defendants' collusive plan, but also that Alleger kept Rodale's senior management abreast of those plans as they were being developed and executed.  (¶¶ 119, 187, 232.)

In short, the highly incriminating content, context and frequency of Rodale's communications with its co-conspirators far exceeds that necessary to raise a question of fact as to Rodale's actual knowledge of the essential elements of the conspiracy.  *See Minpeco*, 673 F. Supp. at 688-89.[27]

### d.     The Evidence Also Demonstrates The Direct Participation Of Rodale's Agents Curtis And DSI In Defendants' Conspiracy

Even assuming *arguendo* that none of the inculpatory evidence summarized above existed, Rodale nonetheless remains liable under the Sherman Act for the unlawful collusive conduct of Rodale's agents, Curtis and DSI.

---

Thus, the purported justification for Rodale's calls with its direct competitors is nothing more than a *post hoc*, contrived excuse that is belied by the evidence in the record.  In any event, to the extent Rodale contends that these calls were "eminently reasonable" because they were "pro-competitive" or related to "information gathering," for the reasons set forth in Anderson's response to Bauer's and Curtis' summary judgment motions (*see* Anderson Bauer Opp. 20-21; Anderson Curtis Opp. 20), those claims are meritless, and at minimum raise a question of fact that must be resolved by the fact finder.  Further, this claim erroneously assumes that every time Rodale communicated with Curtis or DSI, those communications were lawful.  The opposite is the case. There is nothing innocent, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████  (¶ 119.)

[27]   Rodale also makes the conclusory claims that, until Anderson made its purported "demand," Rodale wanted to continue to use Anderson as a wholesaler.  (Rodale Br. 9.)  In Alleger, Rodale relied on a sophisticated business executive with extensive experience addressing issues surrounding the distribution of single-copy magazines, who personally knew Anderson's high-level executives.  (¶165.)  As a result, it is utterly incredible for Rodale to contend, as it does, that it understood the Anderson proposal to be non-negotiable and one that foreclosed any discussions with Anderson.  If Rodale truly wanted Anderson to stay in business, at minimum, it would have attempted to negotiate with Anderson or make a counteroffer.  Rodale did not do so.  Instead, the evidence shows that Rodale decided to use Anderson's announcement as an opportunity to work collectively with its co-conspirators to eliminate Anderson from the market.  In any event, as the Second Circuit held, even if Anderson's proposal was a non-negotiable demand, "the mere fact that an offer of goods or services at a given price may be nonnegotiable does not mean that the offerees, in responding to it, cannot violate the antitrust laws."  *Anderson News*, 680 F.3d at 192.

It is well-established that a principal can be held liable under the Sherman Act for the acts of its agents.  *See Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 570 (1982); *United States v. Koppers Co., Inc.*, 652 F.2d 290, 298 (2d Cir. 1981) (upholding district court's instruction that corporation may be liable under antitrust laws for acts of its agents).  Therefore, even if there were not substantial evidence of Rodale's direct knowledge of the "essential nature and general scope" of the conspiracy, *Minpeco*, 673 F. Supp. at 689, Rodale would still be responsible for the acts of its agents Curtis and DSI, who unquestionably were knowing and active participants in the conspiracy.

The evidence of Curtis' participation in the conspiracy is overwhelming and includes numerous calls between Curtis and its direct competitors in the month after Anderson announced its proposal; as well as emails and other documents that are not only highly-incriminating standing alone, but also demonstrate conclusively that these calls related to defendants' coordinated, collective response to Anderson's and Source's announcement.  (*See* Anderson Curtis Opp. 20-22),

Curtis' participation in defendants' conspiracy is also evidenced by, among other things, the admission of its then-president, ██████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████ (Anderson Curtis Opp. 20.)

The evidence also demonstrates that DSI -- acting on behalf of all of its clients, including Rodale -- was a central participant in defendants' conspiracy, acting as a clearinghouse and conduit for its co-defendants' conspiratorial communications, and in many instances driving

defendants' collusive strategy for eliminating Anderson and Source from the marketplace.[28]  For

example, it was ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  DSI

also shared among competitors the results of each others' calls with retailers using joint scripts.

(¶¶ 77-78, 212.)  DSI also developed an alternative distribution plan that used historical data

from competitors Curtis and Kable, which was then shared among its publisher clients.  (¶¶ 88,

92-93.)  DSI also worked to ensure that Anderson did not "piece" defendants "apart," by keeping

defendants aligned in their collective strategy to resist Anderson's and Source's proposals and

eliminate them from the market.  (¶¶ 102-105, 113-15, 118, 125-26.)  And DSI also engaged in

an intense level of monitoring of defendants' negotiations and the status of their magazine

shipments, and shared that competitively-sensitive information with its clients.  (¶¶ 104-05, 113-

15, 125-26.)

Further, there can be no dispute that, as Rodale essentially concedes, by engaging in this

conduct, Curtis and DSI were acting on behalf of Rodale, among other of their clients:  ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████  (Rodale Br. 9.)[29]

---

[28]   Indeed, neither DSI nor its owner AMI challenge the sufficiency of the evidence of defendants' conspiracy, or their role in the conspiracy.  For that matter, similarly defendants Hachette, Time and TWR also do not contest the sufficiency of the evidence of defendants' conspiracy, or their role in the conspiracy.

[29]   Rodale also argues that because it purportedly instructed Curtis to advise Anderson that it would agree to Anderson's proposed per-copy distribution fee on a one-time basis, Rodale cannot be held responsible for its participation in defendants' conspiracy.  (Rodale Br. 10.)  This argument ignores the evidence showing that Rodale's

Therefore, whether examining Rodale's role in the conspiracy directly or through its agents Curtis and DSI, there is substantial evidence that Rodale was an active and knowing participant in the coordinated conduct and conspiracy to eliminate Anderson from the market. Because Rodale clearly has failed to meet its burden, its summary judgment motion should be denied.

## CONCLUSION

Based on the foregoing, Anderson respectfully requests that Rodale's motion be denied.

Dated: New York, New York
       March 9, 2015

                         Respectfully submitted,

                         KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

                         By: _____
                             Marc E. Kasowitz (mkasowitz@kasowitz.com)
                             Hector Torres (htorres@kasowitz.com)
                             Seth Davis (sdavis@kasowitz.com)
                             Seth A. Moskowitz (smoskowitz@kasowitz.com)
                             Gavin D. Schryver (gschryver@kasowitz.com)

                         1633 Broadway
                         New York, New York 10019
                         Tel.: (212) 506-1700
                         Fax: (212) 506-1800

                         *Attorneys for Plaintiff Anderson News, L.L.C.*

---

purported agreement was for a limited number of titles at a limited number of locations, and specifically did not include magazines distributed to Prologix East (a majority-owned subsidiary of Anderson) because Rodale was joining its co-conspirators in diverting those copies to TNG. (Pl. 56.1 Resp. ¶ 723.) In any event, even if Rodale did agree to ship a certain limited number of titles to Anderson, that does not mean that all of the evidence of its participation in defendants' conspiracy -- either directly or through the acts of its agents -- should be ignored.