UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDERSON NEWS, L.L.C. and LLOYD WHITAKER, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C.,

                    Plaintiffs,

          - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING CO., L.P., CURTIS CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI MEDIA U.S., INC., HEARST COMMUNICATIONS, INC., HUDSON NEWS DISTRIBUTORS LLC, KABLE DISTRIBUTION SERVICES, INC., RODALE, INC., TIME INC., and TIME/WARNER RETAIL SALES & MARKETING, INC.,

                    Defendants.

---

AMERICAN MEDIA, INC., HEARST COMMUNICATIONS, INC., and TIME INC.,

                    Counterclaim-Plaintiffs,

          - against -

ANDERSON NEWS, L.L.C. and CHARLES ANDERSON, JR.,

                    Counterclaim-Defendants.

---

09 Civ. 2227 (PAC)

Filed Under Seal

---

**MEMORANDUM OF LAW OF PLAINTIFF ANDERSON NEWS, L.L.C. IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS TIME INC., TIME/WARNER RETAIL SALES & MARKETING, INC., AND HEARST COMMUNICATIONS, INC.**

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700

*Attorneys for Plaintiff Anderson News, L.L.C.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ....................................................................... 4

    A.    Anderson's Position In The Single-Copy Magazine Distribution Channel ............... 4

    B.    Anderson Develops A Plan To Innovate The Distribution Channel ........................ 5

    C.    Anderson Negotiates A Compromise Agreement With Time ................................... 7

    D.    Time Reneges On The Agreement It Reached With Anderson ................................. 8

    E.    Anderson's 90-Year History As A Magazine Wholesaler
        Is Forced Into An Abrupt And Untimely End ........................................... 9

    F.    Anderson Sells Its Assets To TNG ........................................................ 9

    G.    Source Obtains A TRO ................................................................... 10

ARGUMENT ................................................................................ 11

I.      SUMMARY JUDGMENT STANDARD ..................................................... 11

II.     DEFENDANTS' UNLAWFUL CONDUCT
       CAUSED ANDERSON'S DESTRUCTION ................................................... 11

    A.    Causation Standard .................................................................... 12

    B.    Defendants -- Not Anderson -- Caused Anderson's Destruction ........................... 13

    C.    Charlie Anderson's Statements Were Part Of A Negotiation Strategy ..................... 16

    D.    Anderson Was Not An Intervening Cause ................................................ 17

III.    ANDERSON WAS THE VICTIM OF DEFENDANTS'
       UNLAWFUL CONDUCT .................................................................. 20

IV.    MATERIAL ISSUES OF FACT EXIST ON
       ANDERSON'S STATE LAW CLAIMS ..................................................... 24

CONCLUSION ............................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999)..................................................................23

*In re Airport Car Rental Antitrust Litig.*,
    474 F. Supp 1072 (N.D. Ca. 1979) ........................................................20

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*,
    446 F.2d 1131 (2d Cir. 1971)................................................................23

*Am. Tel. & Tel. Co. v. Delta Commc'ns Corp.*,
    590 F.2d 100 (5th Cir. 1979)................................................................23

*Amerisource Corp. v. RX USA Int'l, Inc.*,
    2007 WL 2816193 (E.D.N.Y. Sept. 26, 2007) ........................................25

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012).............................................................21, 22

*Argus, Inc. v. Eastman Kodak Co.*,
    612 F. Supp. 904 (S.D.N.Y. 1985) ........................................................16

*Argus, Inc. v. Eastman Kodak Co.*,
    801 F.2d 38 (2d Cir. 1986)...................................................................16

*Bohack Corp. v. Iowa Beef Processors, Inc.*,
    715 F.2d 703 (2d Cir. 1983).................................................................13

*Chan v. Donahoe*,
    2014 WL 6844943 (E.D.N.Y. Dec. 4, 2014) ..........................................20

*Dahl, Inc. v. Roy Cooper Co.*,
    448 F.2d 17 (9th Cir. 1971) ..................................................................23

*Discover Fin. Servs. v. Visa U.S.A., Inc.*,
    582 F. Supp. 2d 501 (S.D.N.Y. 2008)....................................................12

*Engwiller v. Pine Plains Cent. Sch. Dist.*,
    110 F. Supp. 2d 236 (S.D.N.Y. 2000)................................................13, 14

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
    391 U.S. 253 (1968)......................................................................2, 18, 23

*In re Flonase Antitrust Litig.*,
    798 F. Supp 2d 619 (E.D. Pa. 2011) ..............................................................15, 20

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    466 F.3d 961 (11th Cir. 2006) ...............................................................................14

*Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*,
    510 F.2d 1140 (2d Cir. 1975)..................................................................................15

*Italverde Trading, Inc. v. Four Bills of Lading*,
    485 F. Supp. 2d 187 (E.D.N.Y. 2007) ....................................................................24

*KGK Jewelry LLC v. Esdnetwork*,
    2013 U.S. Dist. LEXIS 3693 (S.D.N.Y. Jan. 8, 2013)..........................................24

*Liriano v. Hobart Corp.*,
    170 F.3d 264 (2d Cir. 1999) ..................................................................................12

*Litton Sys., Inc. v. AT&T Co.*,
    700 F.2d 785 (2d Cir. 1983).................................................................................12

*Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
    710 F.3d 71 (2d Cir. 2013)....................................................................................14

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    014 WL 4370333 (D. Mass. Sept. 4, 2014) ..........................................................15

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
    36 F.3d 565 (7th Cir. 1994) ..................................................................................12

*Peda v. New York Univ. Hosp. Ctr., Hosp. for Joint Diseases*,
    2014 WL 1013844 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.)....................................11

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012)....................................................................................12

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
    660 F.2d 1195 (7th Cir. 1981) ...............................................................................23

*Ramco Int'l, Inc. v. Travex Corp.*,
    531 F. Supp. 796 (S.D. Fla. 1982) ........................................................................23

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    2007 U.S. Dist. LEXIS 504 (S.D.N.Y. Jan. 8, 2007) (Crotty, J.) .........................11

*Reborn Enters., Inc. v. Fine Child, Inc.*,
    590 F. Supp. 1423 (S.D.N.Y. 1984).....................................................................23

*Rivas v. City of Passaic*,
   365 F.3d 181 (3d Cir. 2004)...................................................................................20

*Royster Drive-in Theatres v. Am. Broad.-Paramount Theatres, Inc.*,
   268 F.2d 246 (2d Cir. 1959)...................................................................................22

*St. Francis Hosp. v. Sebelius*,
   34 F. Supp. 3d 234, 244 (E.D.N.Y. July 23, 2014)...............................................14

*St. Pierre v. Dyer*,
   208 F.3d 394 (2d Cir. 2000)..............................................................................14, 15

*Tate v. Pac. Gas & Elec. Co.*,
   230 F. Supp. 2d 1086 (N.D. Cal. 2002) ................................................................23

*Trepel v. Dippold*,
   2006 WL 3054336 (S.D.N.Y. Oct. 27, 2006) .......................................................20

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
   454 F. Supp. 2d 62 (E.D.N.Y. 2006) ...............................................................13, 15

*Webster Rosewood Corp. v. Schine Chain Theatres, Inc.*,
   263 F.2d 533 (2d Cir. 1959)...................................................................................22

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
   425 F. Supp. 2d 484 (S.D.N.Y 2006)................................................................12, 13

*World Wrestling Fed'n Entm't, Inc. v. Bozell*,
   142 F. Supp. 2d 514 (S.D.N.Y. 2001)....................................................................25

**Other Authorities**

13 Wright & Miller, *Federal Practice and Procedure* § 3531.5, at 457 (2d ed. 1984)................13

Plaintiff Anderson News, L.L.C. ("Anderson") respectfully submits this memorandum of law in opposition to the motion for summary judgment of defendants Time Inc. ("Time"), Time/Warner Retail Sales & Marketing, Inc. ("TWR"), and Hearst Communications, Inc., as successor to Hachette Filipacchi Media U.S., Inc. ("Hearst"), which the other defendants have incorporated by reference.[1]

## PRELIMINARY STATEMENT

Defendants erroneously contend in this "blame-the-victim" motion that their violation of the Sherman Act was not the proximate cause of Anderson's destruction because Anderson, they say, "voluntarily" ceased doing business.  Defendants can make this contention only by ignoring the overwhelming evidence showing that defendants, acting collectively, cut off Anderson's supply of magazines and thereby intentionally forced Anderson out of business, and by ignoring the controlling law in the Second Circuit concerning antitrust causation.  Defendants also argue, without any supporting authority, that they somehow can be absolved from liability for the enormous harm caused by their group boycott because Anderson's request for improved pricing terms supposedly constituted a demand for "supra-competitive terms."  This argument is equally meritless.

As discovery has now confirmed in spades, the cause of Anderson's demise was the clear and intended consequence of defendants' unlawful conspiracy:  as soon as Anderson disclosed its pricing proposal, defendants agreed to work collectively to resist the proposal and then

---

[1]   Submitted in further support of Anderson's opposition is the Declaration of Seth Davis, dated March 9, 2015 (the "Davis Declaration") and the declarations of Charles C. Anderson, Jr., John Campbell and Bo Castle, all dated March 9, 2015.  References to "Ex. __" refer to exhibits to the Davis Declaration.  References to "Pl. 56.1 Resp. ¶ __" refer to paragraphs of Anderson's response to Time/TWR/Hearst's Statement of Uncontested Facts.  References to "¶ __" refer to paragraphs of Anderson's Statement of Additional Genuine Issues of Material Fact.

To the extent relevant, Anderson hereby incorporates by reference its briefs in opposition to the motions for summary judgment filed by Time/TWR/Hearst's co-defendants.

In quotations, all emphasis supplied unless indicated.

immediately engaged in a coordinated effort to induce retailers to accept magazines from defendants' designated wholesalers.  Defendants shared information, including competitively-sensitive information, with each other to ensure their co-conspirators' commitment to the collective plan to resist Anderson's proposal -- and later the proposal of wholesaler, Source Interlink Distribution, Inc. ("Source").  Defendants' inter-competitor coordination culminated in defendants, in virtual lock step and within days of one another, cutting off both Anderson's and Source's magazine supply and forcing Anderson out of business.  Defendants' unprecedented, unlawful conduct was the direct, proximate and foreseeable cause of Anderson's destruction.

Defendants' "blame the victim" causation defense is thus fundamentally flawed, and defendants' efforts to assert it are meritless.

First, in contending that Anderson supposedly elected "voluntarily" to exit the magazine wholesaling business because of its past financial losses, defendants ignore the evidence showing that, among other things, Anderson invested approximately $200 million in its business and, after a period of aggressive cost-cutting and efficiency measures, had returned to profitability.

Second, under the law in the Second Circuit, a plaintiff's conduct breaks the causal chain and absolves defendants from liability only where, unlike here, the plaintiff's conduct is the sole cause of its damages.  Defendants do not -- and cannot -- support such a contention.  The reason is simple -- there is a mountain of contrary evidence demonstrating defendants' joint conduct to eliminate Anderson from the single-copy magazine industry.  But even assuming *arguendo* (and contrary to fact) that Anderson in some way contributed to its own destruction, the law is clear that any such conduct would be legally insufficient to absolve defendants from culpability for their collusive contribution to Anderson's destruction.

2

Third, defendants are mistaken in their contention that Anderson could have prevented its demise by accepting Time's January 27, 2009 30-day offer for a temporary 2% increase on Anderson's discount for all Time weeklies, by rescinding its pricing proposal, or by obtaining a temporary restraining order ("TRO") in response to the decision by defendants to cut off the supply of magazines to Anderson.  The evidence belies this argument:  in fact, Time's January 27 offer was superseded by an actual agreement between Anderson and Time and Curtis on January 31 for permanent, better terms, which in no way prevented defendants from proceeding to destroy Anderson.  Rescinding Anderson's pricing proposal also would not have derailed defendants' conspiracy, as demonstrated by defendants' coordinated conduct in cutting off the magazine supply to Source despite Source's rescission of its proposal.  The TRO argument likewise is meritless:  nothing in the law requires a victim of an antitrust violation to resort to seeking extraordinary relief in court to preserve its claim.  Further, the uncertainty of obtaining a TRO, much less the even greater uncertainty of subsequent litigation, renders this option entirely speculative.  In fact, defendants already had engaged in an aggressive, coordinated and successful campaign to induce retailers to abandon Anderson in favor of another wholesaler, The News Group, LP ("TNG") -- effectively rendering any temporary relief against defendants illusory.

Defendants also argue that, even if they engaged in an unlawful group boycott against Anderson, they can escape all antitrust liability because Anderson's proposed pricing terms supposedly were not "competitive."  No antitrust authority provides that a supplier has *carte blanche* to coordinate with its competitors to boycott and harm a purchaser which is seeking improved pricing terms.  Moreover, this legally baseless argument is premised on two demonstrably false facts -- that Anderson's proposal was not negotiable and that defendants

3

actually had competitive alternatives to Anderson.  The evidence is precisely to the contrary:  the Anderson proposal was negotiable -- as proven by the actual negotiations and agreements reached -- and defendants, acting unilaterally, did not have lower-cost alternatives to Anderson because they could not unilaterally force retailers to accept magazines from alternative wholesalers.

Defendants further argue that Anderson's state law claims for tortious interference fail because defendants did not breach their agreements with Anderson and because defendants did not take any wrongful action aimed at retailers.  This is contrary to Second Circuit law upholding tortious interference claims for conduct by a defendant that causes the plaintiff to breach its contract with a third party.  Here, the evidence proves that defendants' unlawful conduct caused Anderson to breach its agreements with more than 1,800 retailers throughout the country. Defendants also ignore the evidence showing that they did deliberately direct wrongful conduct at retailers for the express purpose of harming Anderson's critical relationship with those retailers -- evidence more than sufficient to satisfy the elements of Anderson's tortious interference with business relations claim.

In sum, and as shown further below, defendants' motion should be denied.

## STATEMENT OF FACTS

### A.    Anderson's Position In The Single-Copy Magazine Distribution Channel

Until its destruction in 2009, Anderson was one of the four largest wholesalers of single-copy magazines in the nation, employing thousands of people and distributing magazines to more than 1,800 different retailers in approximately 16,000 retail storefront locations.  (¶ 1.) With more than 90 years experience in the magazine wholesaling business, Anderson had an

experienced management team, a large revenue base, and a very strong relationship with major retailers.  (¶ 2.)

Between 1995 and 2008, Anderson, along with other wholesalers, faced financial challenges due to the dramatic consolidation and change in economics of the magazine wholesaling business, as well as declining sales due to the increasing popularity of the Internet. (¶ 3.)  Underscoring its commitment to the business, Anderson invested approximately $200 million to expand substantially its geographical operations through consolidation of smaller local wholesalers and, through aggressive revenue-enhancing and cost-saving measures, had turned the corner and returned to profitability.  (¶ 4.)  Indeed, the actual results from the first quarter of Anderson's 2009 fiscal year reveal that Anderson, with approximately $750 million in 2008 revenue, had achieved positive earnings.  (*Id.*)   It was precisely because of these actual financial results that the Chief Financial Officer for Anderson testified that "we were very optimistic of the company at this time."  (*Id.*)

## B.    Anderson Develops A Plan To Innovate The Distribution Channel

During mid-2008, Anderson was exploring additional measures to improve the return on investment of its equity holders, while also promoting technological innovation of the distribution channel.  One of those measures became Anderson's proposal to publishers and national distributors for publishers (i) to pay a $.07 per-copy distribution fee for each magazine distributed by Anderson to retailers; and (ii) to bear their respective share of the cost of the $70 million of scan-based trading ("SBT") inventory on Anderson's books.  (¶ 5.)

During the week of January 12, 2009, Charles Anderson, Jr. ("Charlie Anderson"), the head of Anderson, met with major magazine publishers to discuss Anderson's proposal.  To incentivize prompt negotiations and avoid delays, and to provide a temporal framework for the

negotiations, he further stated that, effective February 1, 2009, Anderson would not distribute magazines of publishers who did not agree to Anderson's terms or to mutually acceptable compromised terms.  (¶ 6.)  On January 14, 2009, Charlie Anderson reiterated his proposal to the industry at large in a public conference call hosted by John Harrington, the publisher of *The New Single Copy*, a trade publication that covered the single-copy magazine industry.  (*Id.*)

Charlie Anderson believed that, after the public announcement, there ultimately would be negotiations with publishers and national distributors and, as the deadline approached, Anderson would reach agreements on mutually-acceptable terms with the publishers and national distributors.  (¶ 7.)  To obtain the best terms possible, and based on Anderson's prior efforts to obtain concessions from publishers, Charlie Anderson wanted to deliver a strong message, and to remain firm and insist on the terms to be proposed for as long as possible, which is known in negotiation theory as a "hard anchor."  (*Id.*; Ex. 262 (Subramanian Report) ¶¶ 18-26, 37-38, 63, 72, 82; Ex. 273 (Subramanian Reply) ¶¶ 9, 12.)[2]

Charlie Anderson also developed an emergency back-up plan -- known as the plan to "going dark" -- to assist in anticipated negotiations with publishers and national distributors.  (¶ 11.)[3]  This plan contemplated temporarily suspending distribution in all of the regions of the country where Anderson distributed magazines, including through a distribution joint-venture company called Prologix East ("Prologix"), if publishers and national distributors refused to

---

[2]   Before announcing the plan to publishers and national distributors, Charlie Anderson met separately with Anderson's two biggest customers, Walmart and Kroger.  (¶ 10.)  Because those retailers were interested in maintaining Anderson as their wholesaler, they informed Charlie Anderson that they would continue to accept magazines only from publishers that cooperated with Anderson on its pricing terms.  (*Id.*)  Charlie Anderson believed that such support from Walmart and Kroger -- even for a couple of weeks -- would encourage the publishers to negotiate with Anderson mutually-acceptable pricing terms.  (*Id.*)

[3]   Anderson's "going dark" plan was based, in part, on similar business negotiation tactics used in the cable industry where a cable company refuses to air a specific network -- a blackout period -- to further negotiations with that network.  (¶ 11.)

engage in any meaningful negotiations.  (¶ 11.)[4]  Charlie Anderson believed that this would

incentivize the publishers to reach a fair and reasonable agreement with Anderson.  (¶ 11.)[5]

### C.     Anderson Negotiates A Compromise Agreement With Time

On January 27, 2009, Richard Jacobsen of TWR sent a letter to Anderson proposing that

Time and TWR agree to a 30-day extension of the February 1 deadline and stating that, during

that period, Time would agree to a 2% increase on Anderson's discount for all Time weeklies.

(¶ 14.)  While Charlie Anderson viewed this as a positive development, he believed he could

obtain a permanent agreement with Time closer to the February 1 deadline, and therefore

rejected Time's counter proposal.  (*Id.*)  On Saturday, January 31, Charlie Anderson flew from

Knoxville, Tennessee to Jacobsen's New Jersey office for face-to-face negotiations.  During

those negotiations, Jacobsen did offer terms better than those in the January 27 letter -- namely, a

permanent increase in the discount on Time's most popular title, *People*, by 2.75%, and a 2%

discount increase on the balance of Time's weekly magazines.  (¶ 15.)  Charlie Anderson

accepted those terms and shook hands, confirming the deal.  (*Id.*)  Although not the compromise

he had anticipated, Charlie Anderson agreed to Time's terms at that meeting because he

understood -- as Jacobsen confirmed -- that any deal Anderson reached with Jacobsen at that

meeting also would apply to Curtis and its publisher clients.  (¶ 17.)[6]

Thus, by the time he left the January 31 meeting with Jacobsen, Charlie Anderson had

reached a negotiated agreement, on improved terms, that would allow Anderson to continue to

---

[4]  Prologix was a joint venture between Anderson and another wholesaler, TNG, of which Anderson owned 64.5%.
(¶ 12.)  Under this joint venture, Anderson and TNG used, among other things, the same facilities, trucks and
employees to distribute magazines to retailers in various regions of the country.  (*Id.*)

[5]  On or about January 19, 2009, Source announced its own $.07 per-copy distribution fee on magazine copies
distributed, but did not ask publishers to absorb the cost of SBT inventory on Source's books.  (¶ 13.)

[6]  Jacobsen claims that he re-offered the same terms that had been offered on January 27 -- only 2% on Time's
weeklies during a 30-day negotiating period but denies that any agreement was reached.  (¶ 16.)

receive magazines from Time and Curtis's publisher clients.  (¶ 18.)  This agreement, coupled with an agreement Anderson had reached with national distributor Comag Marketing Group, LLC ("Comag") two days earlier, which provided for Anderson to continue to receive magazines from Comag's publisher clients, meant that Anderson's negotiation strategy had been successful. (¶ 19.)  Anderson, which had recently returned to profitability, would be able to improve further the return on investment of its equity holders.  (¶¶ 4-5.)[7]

### D.    Time Reneges On The Agreement It Reached With Anderson

On Monday, February 2, 2009, Charlie Anderson received a call from Jacobsen informing him that -- despite the agreement they had reached two days earlier -- Ann Moore, the president of Time, had changed her mind.  Time would not honor the agreement Charlie Anderson and Jacobsen had reached on January 31, and Time would no longer be supplying Anderson with magazines.  (¶ 21.)

Stunned by this abrogation of the agreement, Charlie Anderson immediately called Moore.  During that call, Moore told Charlie Anderson that Anderson had been an "irritant," that Time had decided to "change the channel," that it was "too late" for Time to reconsider its decision, and that Time's decision was final.  (¶ 22.)[8]  By February 2, defendants stopped supplying Anderson with magazines.  (¶ 25.)[9]

---

[7]   Moreover, Anderson knew that any publisher or national distributor that had not yet reached an agreement with Anderson by January 31, would do so, or else face the prospect that their magazines would not be on display in the large number of retail locations serviced by Anderson.  (¶ 20.)

[8]   Charlie Anderson knew that Moore's decision was contingent upon retailers' agreeing to accept magazines from alternative wholesalers, which was far from certain, and that he still had his "going dark" plan as an option.  (¶ 22.)

[9]   Even though Source had rescinded its per-copy distribution fee proposal, defendants also cut off their supply of magazines to Source.  (¶ 27.)  As Jacobsen told Greg Mays, the CEO of Source's parent company, even though Source had rescinded its proposal, it was "too late" for Time to reconsider its decision to stop supplying Source. (¶ 28.)

E.     **Anderson's 90-Year History As A Magazine Wholesaler
         Is Forced Into An Abrupt And Untimely End**

In a last-ditch effort to save his company, Charlie Anderson, on February 7, attempted to implement the "going dark" plan and temporarily suspended operations at Anderson's distribution facilities, including Prologix. (¶ 29.) The following day, however, TNG moved in Delaware federal court for a temporary restraining order, compelling Anderson to reopen Prologix so that TNG could use it to deliver defendants' magazines. (¶ 30.) On February 10, the court granted that motion and ordered Anderson to allow TNG to take control of Prologix's distribution facilities and begin distribution of defendants' magazines, including to retail accounts previously serviced by Anderson pursuant to the joint venture (the "TNG TRO"). (*Id.*)

Defendants' decision to cut off nearly 75% of Anderson's magazine supply forced the company out of business. (¶ 29.) As Bo Castle, president of Anderson Services, explained, at that point "there was no way economically to run the trucks and be able to pay our personnel." (*Id.*)

F.     **Anderson Sells Its Assets To TNG**

As a result of defendants' unlawful conduct, Charlie Anderson was left with no choice but to mitigate Anderson's damages by conducting a fire sale of the assets of his 90-year-old business. Anderson sought offers from two of its principal competitors, TNG and Hudson News Distributors, LLC ("Hudson"), for Anderson's assets on February 11, 2009 (¶ 32), and on February 18, 2009, Anderson completed a sale -- at fire sale prices -- to TNG of certain of its assets. (*Id.*)

During this time, Charlie Anderson had consulted with his father, Charles Anderson, Sr., who had worked in the single-copy magazine business for decades and, at one time, had been the head of Anderson. (¶ 33.) Charlie Anderson's father reminded him of the importance of seeking

9

to salvage jobs for the thousands of Anderson employees. (*Id.*) Through the asset sale, approximately 77% of those jobs were saved as the former Anderson employees were hired by TNG. (*Id.*)

### G.   Source Obtains A TRO

On February 12, Source obtained from this Court a TRO, requiring certain of the defendants in this action to resume supplying Source with magazines on the same terms that defendants had supplied magazines to Source before its proposal was announced (the "Source TRO"). (¶ 34.) The Court, however, denied Source's request for such relief against TNG and Hudson, which allowed TNG and Hudson to compete for Source's retail customers. (*Id.*)

For Anderson, seeking a TRO was not a viable option for a number of reasons. Among other things, Anderson was in a different position than Source. With a TRO, Source -- which was the only major wholesaler with infrastructure in the Southern California and Mid-Atlantic regions of the country -- was assured that the retailers it serviced would have no choice but to continue to use Source if they wanted to ensure a supply of magazines without disruption. (¶ 35.) Anderson's distribution footprint, by contrast, overlapped significantly with TNG, and the retailers in that footprint had, by that point, been the target of an intense and coordinated lobbying campaign by defendants against Anderson, attacking Anderson and encouraging retailers to switch from Anderson to TNG. (*Id.*) This meant that, even assuming Anderson would have been able to obtain a TRO, there now was an increased risk that retailers would have elected to receive magazines from TNG and such relief would have therefore been illusory. (*Id.*)[10]

---

[10]   Charlie Anderson also realized that if Anderson obtained a TRO, it would make it a less desirable target for acquisition by TNG or Hudson, which would not be interested in acquiring a company that might obtain a permanent restraining order requiring defendants to resume supplying Anderson on a permanent basis. (¶ 36.) This

**ARGUMENT**

## I.    SUMMARY JUDGMENT STANDARD

In their summary judgment motion, defendants bear the burden of establishing that "there is no genuine dispute as to any material fact," and must "produc[e] evidence on each material element of [their] claim or defense demonstrating that [they are] entitled to relief." *Peda v. New York Univ. Hosp. Ctr., Hosp. for Joint Diseases*, No. 12 CIV. 0586 (PAC), 2014 WL 1013844, at *7-8 (S.D.N.Y. Mar. 17, 2014) (Crotty, J.) (citations and quotation omitted).  Even then, summary judgment must be denied if Anderson, as the non-moving party, meets its "limited burden of production" by demonstrating the existence of a genuine dispute as to material facts. *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ. 1895 (PAC), 2007 U.S. Dist. LEXIS 504, at *20 (S.D.N.Y. Jan. 8, 2007) (citation and quotation omitted).  Moreover, the evidence must be construed "in the light most favorable to the non-moving party," and all factual inferences must be drawn in favor of Anderson, the non-moving party. *Peda*, 2014 WL 1013844, at *7 (citation and quotation omitted).

## II.   DEFENDANTS' UNLAWFUL CONDUCT CAUSED ANDERSON'S DESTRUCTION

In a classic "blame-the-victim" defense, defendants erroneously contend -- based on nothing more than speculation -- that Anderson's supposed "voluntary" decision to cease operations was an "intervening" cause severing the chain of causation and thus absolving defendants -- who, the evidence shows, collusively cut off Anderson's supply of magazines -- from any liability.  (Def. Br. 13, 15.)  Defendants predicate this argument on three demonstrably false assumptions concerning so-called options supposedly available to Anderson to avoid its

---

uncertainty also would jeopardize the ability of thousands of Anderson employees to obtain employment with TNG or Hudson.  (*Id.*)

11

demise.  (Def. Br. 3, 7, 14, 15.)  As shown below, this argument ignores the controlling Second

Circuit law and the overwhelming evidence uncovered during discovery showing that it was

defendants' unlawful conduct that forced Anderson out of business.[11]

### A.   Causation Standard

The Second Circuit recently summarized the standard for determining antitrust causation:

"'[I]t is enough that the illegality is shown to be a material cause of the [antitrust] injury; a

plaintiff need not exhaust all possible alternative sources of injury in fulfilling [its] burden of

proving compensable injury,'" and "an antitrust defendant's unlawful conduct need not be the

sole cause of the plaintiffs' alleged injuries; to prove a 'causal connection' between the

defendants' unlawful conduct and the plaintiff's injury, the plaintiff need only 'demonstrate that

[the defendant's] conduct was a substantial or materially contributing factor' in producing that

injury."[12]  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 66 (citations omitted).[13]  Moreover, a

plaintiff is required to show:

---

[11]  For a more complete discussion of defendants' collusive conduct and how defendants directly caused Anderson's destruction, *see* Anderson's Opposition to Curtis' Motion ("Curtis Opp.") and accompanying Additional Genuine Issues of Material Fact; Anderson's Opposition to Bauer's Motion and Additional Genuine Issues of Material Fact.

[12]  Moreover, where a plaintiff has adduced evidence of its injury and of defendants' antitrust violation, and the injury is of the type typically caused by the violation in question, courts hold that causation is presumed at the summary judgment stage and the burden shifts to defendants, who must rebut a strong inference of causation.  *See*, *e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66-67 (2d Cir. 2012) (summary judgment denied where defendants' argument does not "conclusively rebut" plaintiff's evidence); *Liriano v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir. 1999) (where defendant's conduct "is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued, that very causal tendency is evidence enough to establish a prima facie case of cause-in-fact.  The burden then shifts to the defendant to come forward with evidence that its negligence was not such a but-for cause") (emphasis in original).  Here, causation is thus presumed at this summary judgment stage because Anderson has adduced evidence of defendants' antitrust violation and the destruction of its business (*supra* at 12, n.11), which certainly is the type of injury typically caused by a group boycott.

[13]  *See also Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 503-04 (S.D.N.Y. 2008) ("It is well established that in order to succeed, an antitrust plaintiff must adhere to common law principles of causation.  To prove causation, an antitrust plaintiff must demonstrate that the unlawful conduct at issue…substantially contributed to its injury, even though other factors may also have contributed significantly.") (citations and quotations omitted).

 Nothing in *Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785 (2d Cir. 1983), *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565 (7th Cir. 1994), or *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F. Supp 2d 484 (S.D.N.Y 2006), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) -- relied on by defendants (Def. Br. 9-10) -- is to the

> [N]ot that the violation was the sole and only cause of its injury,
> but only that the violation played a substantial part in causing its
> losses. . . . Proof which shows a reasonable probability that the
> [illegal conduct] had the effect of injury is sufficient.  Plaintiff
> need not show that the [illegal conduct] was a more substantial
> cause of injury than any other.

*Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 711 (2d Cir. 1983) (citation and

quotation omitted).  Likewise, it is well-established that both causation and standing -- which

courts address interchangeably[14] -- are "'not defeated merely because the plaintiff in some sense

contributed to his own injury.  [They are] defeated only if it is so completely due to the

plaintiff's own fault as to break the causal chain.'"  *Engwiller v. Pine Plains Cent. Sch. Dist.*,

110 F. Supp. 2d 236, 247 (S.D.N.Y. 2000) (quoting 13 Wright & Miller, *Federal Practice and

Procedure* § 3531.5, at 457 (2d ed. 1984)).

## B.    Defendants -- Not Anderson -- Caused Anderson's Destruction

Defendants do not dispute that their conduct was a "material" cause of Anderson's

destruction, nor do they dispute that their conduct was a "but for" cause of Anderson's

destruction.  Instead, defendants erroneously contend (Def. Br. 13, 15) that they supposedly are

absolved from all liability because Anderson, in reaction to defendants' violation of the Sherman

Act, allegedly "act[ed] as an intervening cause" of its own destruction.  Contrary to defendants'

argument, however, the evidence conclusively demonstrates that Anderson shut down its

business as a direct and foreseeable consequence of defendants' actions and that Anderson was

---

contrary.  Those decisions stand for the uncontroverted proposition that a plaintiff must show, with a "fair degree of certainty," that a defendant's conduct was a substantial or material cause of the plaintiff's injuries.  Here, that standard is easily satisfied because the overwhelming evidence shows beyond any reasonable doubt that defendants' conduct was not only the cause of Anderson's injuries, but also the intended goal of defendants' conspiracy.  (*Supra* at 12, n.11.)

[14]   Indeed, defendants rely (Def. Br. at 9, 13) on several standing cases in purported support of their causation argument.  *See, e.g.*, *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 70-73 (E.D.N.Y. 2006); *World Wrestling*, 425 F. Supp. 2d at 519-21.

not even a contributing factor -- much less an "intervening" factor -- in its own destruction.  (*See supra* at 12, n.11.)

Further, even assuming *arguendo* and contrary to the evidence, that Anderson contributed in some way to its own demise, Second Circuit law would not allow defendants to escape liability for their unlawful conduct.  As the Second Circuit has held, to break the chain of causation and absolve defendants of liability, the plaintiff's injury must be due solely to plaintiff's own conduct, and not that the plaintiff may have been a "contributing" factor:

> Not every infirmity in the causal chain deprives a plaintiff of standing.  Although standing has been denied because the injury seems solely attributable to the plaintiff, [s]tanding is not defeated merely because the plaintiff has in some sense contributed to his own injury.  Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain.  So long as the defendants have engaged in conduct that may have contributed to causing the injury, it would be better to recognize standing.

*St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (citations and quotations omitted).  *See also Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013), *as amended* (Mar. 21, 2013) ("An injury is self-inflicted so as to defeat the causation necessary to establish standing . . . only if . . . the injury is so completely due to the plaintiff's own fault as to break the causal chain.") (citation and quotation omitted).[15]

Defendants do not -- and cannot -- contend that Anderson's destruction was due "solely" or "completely" to Anderson's own actions.  To the contrary, there is overwhelming evidence

---

[15]   *See also Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 965 (11th Cir. 2006) ("[T]he mere fact that the [plaintiff]'s own decisions played a role in its [injury] does not obviate the causal connection between the defendants' conduct and the plaintiff's injury."); *St. Francis Hosp. v. Sebelius*, 34 F. Supp. 3d 234, 244 (E.D.N.Y. July 23, 2014); *Engwiller*, 110 F. Supp. 2d at 246-47.

showing that the forced shutdown of Anderson's business was the direct, foreseeable and intended consequence of defendants' collusive conduct.  (*Supra* at 12, n.11.)[16]

Moreover, because any alleged decision by Anderson to shut down was undoubtedly a foreseeable consequence of defendants' conspiracy, Anderson's conduct cannot possibly constitute an "intervening" factor that breaks the chain of causation.  *See In re Flonase Antitrust Litig.*, 798 F. Supp 2d 619, 628 (E.D. Pa. 2011) ("[C]ourts have consistently found the causation requirement satisfied and the chain of causation intact where that intervening conduct was the foreseeable consequence of the original antitrust violation."); *In re Nexium (Esomeprazole) Antitrust Litig.*, No. CIV.A. 12-MD-02409, 2014 WL 4370333, at *30 (D. Mass. Sept. 4, 2014) ("[S]ummary judgment on questions of causality is not appropriate where the plaintiff was injured by intervening conduct proximately caused by the defendant's antitrust action, or where such intervening conduct was a foreseeable consequence of the defendant's antitrust action."). Because the evidence shows conclusively that one of the principal objectives of the conspiracy was to force Anderson out of business, defendants cannot legitimately contend that such an outcome was not a foreseeable consequence of their conduct.

---

[16]  Defendants misleadingly rely on two cases, *Union Cosmetic*, 454 F. Supp. 2d at 70-73 and *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140 (2d Cir. 1975), in purported support of the proposition that Anderson's conduct constitutes an "intervening" cause that allegedly absolves defendants from liability. (Def. Br. 13, 15.)  Neither case provides any such support.  In *Hudson Valley*, the court expressly predicated its holding on the fact that the plaintiff had "voluntarily terminated its insulation contracting business" before the alleged refusal to deal occurred, and there was no evidence to support collusion. 510 F.2d at 1142-43.  In *Union Cosmetic,* the court explicitly qualified its holding by citing to the Second Circuit's decision in *St. Pierre* (discussed above), and explained that "[n]ot every infirmity in the causal chain deprives a plaintiff of standing . . . standing is defeated only if it concluded that the injury is so completely due to plaintiff's own fault as to break the causal chain." 454 F. Supp. 2d at 71 (citation and quotation omitted).  Ultimately, the court ruled that the causal chain had been broken because plaintiff had rejected multiple offers from defendants over the years for product distribution before any alleged boycott.  Defendants here do not -- and cannot -- show that Anderson rejected multiple offers by defendants.  The exact opposite is the case -- Anderson accepted the terms proposed by Jacobsen at the January 31, 2009 meeting.  (¶ 15.)

15

### C.     Charlie Anderson's Statements Were Part Of A Negotiation Strategy

Contrary to the dismal picture defendants attempt to paint (Def. Br. 2, 4, 10), Anderson, after a number of difficult years, had returned to profitability in 2009 and was a viable business with a positive future.  (¶ 4.)  In 2008, as shown above (*supra* at 5), Anderson's annual revenues were approximately $750 million and, by the first quarter of 2009, Anderson had turned the corner, had achieved positive earnings, and had begun to implement various initiatives to increase further the company's profitability.  (¶¶ 4-5.)[17]  *See also* Anderson's Opposition to AMI and DSI's Motion at 11-12.

Defendants misleadingly take wholly out of context certain statements by Charlie Anderson during negotiations in their attempt to provide some support for their baseless argument that the destruction of Anderson was not a natural and foreseeable consequence of defendants' unlawful actions but the result of some voluntary act by Charlie Anderson.  The first is a statement made by Charlie Anderson to John Harrington to the effect that, if publishers and national distributors did not agree to the terms that Anderson announced, Anderson would shut down its operations.  (Def. Br. 11.)  The second consists of a statement by Charlie Anderson during the conference call:  "The last thing we want to do is exit the business.  But we -- why should we continue to lose money in a business that doesn't have -- you know, give us any return."  (Def. Br. 11.)  Defendants ignore the context of those statements:  business negotiations between Anderson and powerful publishers over pricing terms.  Moreover, nothing in these

---

[17]   The facts in *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38 (2d Cir. 1986), relied on by defendants (Def. Br. 9-10, 15), are not even remotely close to the facts here.  There, the plaintiffs failed to adduce any evidence in support of their claims and relied on conclusory and inconsistent statements by their officers.  *Id.* at 42-46.  The trial court thus held that there was "no factual support -- no specific probative evidence -- for the alleged causal links" between the defendants' antitrust violation and the injuries asserted.  *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 919 (S.D.N.Y. 1985).  In stark contrast, here, Anderson has adduced a wealth of "specific probative evidence" directly tying defendants' illegal conduct to Anderson's injury.  (*Supra* at 12, n.11.)

statements negates the actual, contemporaneous financial data, which show that the company had turned the corner and returned to profitability.

Further, in framing Anderson's proposal, Charlie Anderson employed a standard negotiation tactic -- he presented his proposed terms in a forceful manner to incentivize the publishers to accede to the request or, at the very least, present a reasonable counter-offer.  No business executive would initiate such negotiations by stating to the counter-party:  Here are my company's proposed pricing terms:  while we would like you to accede to these terms, there is really no compelling need to do so.  (¶ 8.)[18]  Moreover, the evidence, including contemporaneous Anderson documents and testimony of all Anderson's management (¶ 9), demonstrates without any doubt that Anderson had no intention to exit the business.  (*Id.*)[19]

### D.      Anderson Was Not An Intervening Cause

Despite the evidence conclusively showing that defendants caused Anderson's destruction, defendants argue that Anderson was an "intervening" factor in its own destruction

---

[18]   Defendants also purport to rely on a draft presentation prepared by someone at Anderson to be presented to Walmart, which stated that "we lost support from our stockholders -- we have no history of paying dividends -- our business plan does not justify a capital contribution." (Def. Br. 10-11.)  Defendants not only ignore that this presentation was never given, but just like Anderson's negotiation strategy with respect to its announcement in mid-January, Anderson was attempting to obtain concessions from Walmart in anticipated negotiations.  (¶ 8.)

Defendants also falsely argue that the Anderson family was "unwilling to continue investing" in the business.  (Def. Br. 10.)  The evidence is to the contrary -- there is indisputable evidence that the Anderson family made significant capital contributions to Anderson in 2007 and 2008.  (Pl. 56.1 Resp. ¶¶ 52-53.)

Defendants also purport to rely on (Def. Br. 4) a single January 15, 2009 e-mail from Jay Maier to Joel Anderson, which contained Maier's quick, "back-of-the-envelope" estimate of Brookvale Holding's cumulative losses ($236 million) over the previous ten years.  First, the losses in that e-mail do not represent losses only of Anderson News and Anderson Services -- but also include losses to affiliated non-parties Brookvale Holding, LLC,  Twin Rivers, LLC and MSolutions, LLC.  (Pl. 56.1 Resp. ¶ 46.)  Second, Maier's "hurried calculation" includes the operating losses that flowed from the operations of certain Anderson assets sold to a competitor in 2006 and were no longer part of Anderson or Anderson Services.  (*Id.*)  The estimate of losses also excludes the $54 million gain on the 2006 sale of those assets.  (*Id.*)

[19]   Further evidencing that Anderson had no intention of leaving the business, and contrary to defendants' intimations otherwise (Def. Br. 13), are Anderson's payments in late December 2008 of approximately $20 million to TWR and Anderson's payments in December 2008 and January 2009 -- including a payment made after Anderson's announcement -- of approximately $16 million to Curtis and approximately $11 million to Kable, substantial payments no company would make if it intended to shut down operations.  (¶ 9.)

17

because it supposedly had three so-called "options" that would have enabled Anderson to continue to operate as a wholesaler.  (Def. Br. 3, 7, 14, 15.)  This speculative argument is meritless and ignores the evidence and the controlling causation standard in the Second Circuit.

First, defendants' argument that Anderson could have accepted Time's January 27, 2009 offer (Def. Br. 15), ignores the key evidence concerning Anderson's negotiations with Time.  At a January 31 meeting between Charlie Anderson and Jacobsen, an agreement was reached for permanent and more favorable terms than the temporary offer made on January 27.  (¶ 15.)  Thus, Anderson's rejection of the January 27 temporary terms is entirely meaningless because a deal was reached just four days later.

Second, defendants contend that, at any time on or before February 12, 2009, Anderson could have rescinded its proposal.  (Def. Br. 3, 7.)  The argument is contradicted by defendants' own conduct.  Despite Source's rescission of its per-copy distribution fee proposal, defendants, consistent with their collective plan, did not reverse their decision to cut off Source's supply of magazines.  (¶ 27.)[20]  Moreover, Time's president Moore already had told Charlie Anderson on February 2 that, even if Anderson had rescinded its proposed terms, Time had decided that it was "chang[ing] the channel," it was "too late" for Time to change its decision, and that Time would no longer supply Anderson with magazines.  (¶ 22.)  Defendant Bauer likewise took the identical position that, by the last week of January, it was too late for Anderson to rescind its proposal because Bauer already had decided that it would no longer ship magazines to Anderson.  (¶ 23.)

█████████████████████████████████████████████████████████████

---

[20]   While defendants are intentionally vague as to when Source rescinded its proposal, they concede that it was rescinded as to "certain publishers" as of February 1 and that, in seeking a TRO on February 9, Source rescinded its proposal across the board.  (Def. Br. 14.)  Further, with respect to Time specifically, Source rescinded its per-copy distribution fee proposal no later than January 31.  (¶ 28.)

████████████████████████████████████████████████████████

███████████████████████████[21]

Defendants' argument also ignores the overwhelming evidence that a principal objective of defendants' conspiracy was not only to resist Anderson's proposal, but to eliminate Anderson from the marketplace to increase wholesaler concentration.  (*See supra* at 12, n.11.)  Thus, this latter objective demonstrates independently that the so-called "rescission option" is completely illusory and unsupported by any evidence.

Third, defendants erroneously contend that Anderson could have avoided its destruction by seeking a TRO, like Source had done.  (Def. Br. 14.)[22]  Defendants' argument is contrary to the evidence and based on pure speculation.  The presumption that such relief would have saved Anderson's business is unfounded.  Source was able to continue distributing magazines not simply because it obtained the Source TRO, but because it quickly reached settlements with each of the defendant publishers and national distributors.  (¶ 34.)  Defendants are merely assuming that Anderson would have reached similar settlements with defendants.  Moreover, the Source TRO was limited in duration -- it lasted only 12 days (*id.*) -- and had Anderson obtained such relief, absent a settlement, it would have had to demonstrate its right to a preliminary and then permanent injunction, the success of which was highly uncertain.

Further, as demonstrated above (*supra* at 10), the effectiveness of a TRO would not have been the same for Anderson as it was for Source because Anderson's distribution footprint overlapped significantly with TNG, and retailers in that footprint had, by that point, been lobbied

---

[21] ████████████████████████████████████████████████████████

[22]   Defendants argue that, because Anderson knew that Source was contemplating seeking a TRO no later than February 5, 2009, Anderson should have set in motion the same strategy.  (Def. Br. 14.)  This ignores the fact that, as of February 5, Anderson still had at its disposal options other than a TRO, including its "going dark" strategy, and believed that it had retailer support.  (¶¶ 10-11, 29.)

aggressively by defendants to switch from Anderson to TNG.  (¶ 35.)  In fact, the evidence

shows that defendants already had engaged in an aggressive, coordinated and successful

campaign to induce retailers to abandon Anderson in favor of TNG, thereby effectively rendering

any temporary relief against defendants illusory.  (*Id.*)[23]

Even assuming *arguendo* that defendants' causation argument had any factual support

(which it clearly does not), it is well-established that the issue of causation requires a fact-

intensive inquiry that cannot be resolved on summary judgment.  *See, e.g.*, *Trepel v. Dippold*,

No. 04 Civ. 8310 (DLC), 2006 WL 3054336, at *8 (S.D.N.Y. Oct. 27, 2006) (denying summary

judgment on causation because it is "a fact-intensive issue").[24]

In short, in view of the mountain of evidence showing that the elimination of Anderson

was the direct, foreseeable and intended consequence of defendants' unlawful conduct, there is

simply no basis for any determination, as a matter of law, that Anderson's demise was caused by

any of the Anderson conduct identified by defendants.

## III.  ANDERSON WAS THE VICTIM OF DEFENDANTS' UNLAWFUL CONDUCT

Defendants' argument that Anderson is somehow precluded from bringing a boycott

claim because it cannot show that it attempted to do business with defendants on the same terms

---

[23]   Further, any application for a TRO would have adversely affected Anderson's efforts at mitigation of damages
and jeopardize the ability of thousands of Anderson employees to secure employment with the acquiring entity.  (¶ 36.)

[24]   *See also Chan v. Donahoe*, No. 13-CV-2599, 2014 WL 6844943, at *25 (E.D.N.Y. Dec. 4, 2014) (reversing ALJ
finding regarding causation and noting that it is "a heavily fact-based inquiry that is not suited to disposition at the
summary judgment stage"); *In re Airport Car Rental Antitrust Litig.*, 474 F. Supp 1072, 1100 (N.D. Ca. 1979)
("Causation is a question of fact.  For that reason, the courts have hesitated in granting summary judgment against
plaintiffs on the causation issue, particularly in antitrust cases.") (citations omitted); *In re Flonase*, 798 F. Supp 2d at
627 ("[T]he presence of the requisite causation is normally a question of fact for a jury . . . .") (quoting *Rivas v. City
of Passaic*, 365 F.3d 181 (3d Cir. 2004)).

as its competitors (Def. Br. 16-17) -- is sophistry, relies on false factual assumptions and has no basis or support in the case law.[25]

As a threshold matter, defendants' argument is predicated on the assumptions that Anderson's proposal constituted "supra-competitive terms," and that defendants had alternative, lower-cost options. (Def. Br. 16.) Both assumptions are false. Anderson's proposal was merely its opening position in negotiations -- not, as defendants now argue, a take-it-or-leave-it ultimatum. (¶¶ 5-8, 14-18.)[26] Indeed, Anderson negotiated and reached a deal with non-party Comag and defendant Time (*see supra* at 7-8), both of which defendants do not dispute were on competitive terms. (¶¶ 15-19.)[27] Moreover, the evidence shows that, absent collusion, defendants did not have lower-cost alternatives to Anderson because they could not unilaterally force retailers to switch from their desired wholesalers. In fact, an agreement to shift their collective business away from Anderson and Source to TNG was a central goal of defendants' conspiracy.[28]

In any event, no cases support defendants' sweeping contention (Def. Br. 16-19) that any time a party seeks improved pricing terms from its customers, those customers essentially have *carte blanche* to engage in collusive conduct. (Def. Br. 16-19.) Indeed, the Second Circuit decision in this case is precisely to the contrary. The court expressly held that defendants were

---

[25]  Although defendants divide this argument into two sections -- that Anderson did not attempt to deal with defendants on competitive terms and defendants did not refuse to deal with Anderson on competitive terms -- that is merely the proverbial two sides of the same tarnished coin. Anderson thus addresses both arguments concurrently.

[26]  As the Second Circuit found, "[t]he fact[] that there were various proposed alternatives to the Surcharge -- and that Anderson agreed to some of them" refutes defendants' argument that the surcharge proposal was "a take-it-or-leave-it demand by Anderson . . . ." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 192 (2d Cir. 2012).

[27]  Even accepting Jacobsen's version of that January 31 meeting, the offer from Time was an additional 2% discount off Time's weekly magazines, ███████████████████████████████████████ (¶ 16.)

[28]  *See* Curtis Opp. 4-11.

21

not immunized from liability merely because Anderson's proposed terms might have been higher

than its competitors:

> [T]he mere fact that an offer of goods or services at a given price
> may be nonnegotiable does not mean that the offerees, in
> responding to it, cannot violate the antitrust laws.  Thus, the
> *Twombly* Court referred not simply to "responses" to given stimuli,
> but rather to "independent responses to common stimuli, or ...
> interdependence unaided by an advance understanding among the
> parties."  The presentation of a common economic offer may well
> lend itself to innocuous, independent, parallel responses; but it
> does not provide antitrust immunity to respondents who get
> together and agree that they will boycott the offeror.

*Anderson News*, 680 F.3d at 192 (citation omitted).

None of defendants' cases supports the proposition that defendants can escape antitrust

liability if they engage in collusive conduct in response to proposed supra-competitive price

terms.  The first two cases upon which defendants rely (Def. Br. 16-17, 19), *Webster Rosewood*

*Corp. v. Schine Chain Theatres, Inc.*, 263 F.2d 533 (2d Cir. 1959) and *Royster Drive-in Theatres*

*v. Am. Broad.-Paramount Theatres, Inc.*, 268 F.2d 246 (2d Cir. 1959), are factually inapposite.

In both, plaintiff movie theater operators sued their competitor theaters and movie distributors,

alleging that the defendants monopolized the local markets for "first-run" films and prevented

plaintiffs from receiving those films.  *Webster*, 263 F.2d at 534; *Royster*, 268 F.2d at 247.  The

holdings in those cases were premised on the fact that the plaintiffs had never requested that

defendant distributors provide them with these first-run films and, as a result, the "refusal" to

provide these films could not serve as the basis for an antitrust violation.  Unlike the *Webster* and

*Royster* plaintiffs, Anderson had competed in the single-copy magazine industry for decades and

had, during that time, requested and received magazines from defendants.  Further, despite

defendants' contention, nowhere in either opinion do the courts hold that relief "requires a

plaintiff to show that it attempted to do business with defendants on the same terms as the plaintiff's competitors."[29]  (Def. Br. 16.)[30]

The other authorities cited by defendants (Def. Br. 20-22), are also unavailing.  In several of their cases, the courts grant summary judgment because, unlike here, the defendants had never refused to deal with the plaintiffs.  *See, e.g.*, *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1206 (7th Cir. 1981); *Reborn Enters., Inc. v. Fine Child, Inc.*, 590 F. Supp. 1423, 1443 (S.D.N.Y. 1984), *aff'd*, 754 F.2d 1072 (2d Cir. 1985); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 237 (2d Cir. 1999).[31]  Here, the evidence shows that defendants -- through their coordinated actions to boycott Anderson -- refused to deal with Anderson.[32]

---

[29]   The remaining cases cited by defendants (Def. Br. 16-19), are equally inapposite because they merely hold that a single defendant's refusal to deal is not sufficient evidence of a conspiracy.  *See, e.g.*, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 279-81 (1968); *Am. Tel. & Tel. Co. v. Delta Commc'ns Corp.*, 590 F.2d 100, 101 (5th Cir. 1979); *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1086, 1097 (N.D. Cal. 2002); *Ramco Int'l, Inc. v. Travex Corp.*, 531 F. Supp. 796, 800 (S.D. Fla. 1982).  Here, Anderson has adduced overwhelming evidence that shows defendants conspired to reject Anderson's proposal and force Anderson out of business.  (*Supra* at 12, n.11.)

[30]   Contrary to defendants' argument, *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17 (9th Cir. 1971), another "first-run" case, does not stand for the proposition that the victim of a boycott cannot assert an antitrust claim because it demanded "above-market pricing."  (Def. Br. 17-18.)  In that case, the court affirmed summary judgment because it found that the record was "wholly lacking in any evidence of conspiracy . . . and in any facts from which an inference of conspiracy can rationally be drawn[.]"  *Id.* at 19.

[31]   Defendants argue that *AD/SAT* also supports the proposition that, if a defendant (at any time) negotiates with a plaintiff, that in and of itself precludes a boycott claim.  (Def. Br. 20-22.)  Aside from defendants' tacit concession that the Anderson proposal was negotiable, the case is inapposite.  The *AD/SAT* court held that the fact the defendant continued negotiations with the plaintiff until the action was filed was merely additional evidence supporting defendants' argument that their conduct was legitimate business activity and not an unlawful conspiracy.  181 F.3d at 237.  Here, by contrast, Anderson has adduced a wealth of evidence that defendants engaged in an unlawful conspiracy.  (*Supra* at 12, n.11.)

[32]   *Am. Mfrs. Mut. Ins. Co. v. Am. Broad. Paramount Theatres, Inc.*, 446 F.2d 1131 (2d Cir. 1971), also relied on by defendants, is inapplicable because it involved no group boycott claim but instead a tying claim.  Moreover, the three propositions that defendants purport to rely on from that decision actually provide further support for rejection of defendants' argument:  The first point is that "anticompetitive conduct implies actual exertion of economic muscle, not a mere statement of bargaining terms" -- here, the evidence demonstrates that defendants exerted their collective economic muscle, because no single defendant, acting unilaterally, had sufficient market power to induce retailers to switch wholesalers.  (Ex. 259 (Marx Report) ¶¶ 315-20, Figures 1, 2, pp. 13-14; Ex. 269 (Marx Reply) ¶¶ 119-20.)  The second point is that Anderson's "failed bartering ploy is not the concern of antitrust laws" -- here, Anderson's proposal was doomed to failure, not because it was a "failed bargaining ploy" but because of defendants' unlawful antitrust conspiracy.  (*See supra* at 12, n.11.)  The third point is that Anderson's proposal "constituted an unsuccessful attempt to buttress its sagging market position" -- here, the indisputable evidence shows that, at the time of its destruction, Anderson was one of the largest single-copy magazine wholesalers in the nation, with strong

## IV. MATERIAL ISSUES OF FACT EXIST ON ANDERSON'S STATE LAW CLAIMS

Defendants argue that Anderson's tortious interference with contractual relations claim fails because Anderson cannot prove that its retail customers breached their contracts with Anderson. (Def. Br. 23-24.) This argument, however, ignores the case law in this Circuit expressly holding that this claim can also be predicated on a plaintiff's breach of its contract with a third-party where, as here (¶ 31), the defendants' actions prevented the contract from being performed. *See, e.g.*, *KGK Jewelry LLC v. Esdnetwork*, No. 11 Civ. 9236, 2013 U.S. Dist. LEXIS 3693, at *12-14 (S.D.N.Y. Jan. 8, 2013) ("The Court cannot conceive of any principled reason why the tort should be cabined as Defendants propose; nor is it aware of any binding authority directly holding that a breach by plaintiff will not suffice.").[33]

In each of those cases, the courts found that the defendant prevented the plaintiff from performing its contracts with third-parties, and held that to be sufficient to constitute tortious interference with contractual relations, even in the absence of a breach by the third-party. *See id*. Similarly here, the evidence establishes, at a minimum, the existence of a genuine issue of material fact regarding whether defendants' conspiracy caused Anderson to breach its retailer contracts or otherwise rendered performance of those contracts impossible. (¶31.)[34]

Defendants also argue that Anderson's claim for tortious interference with business relations should be dismissed because Anderson allegedly has failed to adduce evidence that defendants "took any wrongful actions directed at retailers that caused those retailers to end their business relationships with Anderson News." (Def. Br. 24.) That contention is belied by the

---

relationships with major retailers, and had returned to profitability -- the precise opposite of a "sagging market position." (¶¶ 1-2, 4-5.)

[33] *See also Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 203 (E.D.N.Y. 2007) ("[A] defendant who causes a plaintiff to breach a contract is liable for tortious interference with the contract . . . .").

[34] Defendants' cases for this proposition (Def. Br. 23-24) are all unavailing for the simple reason that each turns on whether there was a breach at all, not the identity of the breaching party.

evidence, which establishes that, in furtherance of their conspiracy, defendants jointly made disparaging statements to the retailers regarding Anderson's financial status and its viability in the market, which caused retailers to end their business relationships with Anderson.  (¶¶ 26, 35.)[35]  Here, defendants cut off Anderson's magazine supply expressly to induce retailers to sever their relationships with Anderson and switch to defendants' designated wholesalers. (¶¶ 22-23, 25, 31, 35.)

Defendants finally argue that New York does not recognize an independent claim for civil conspiracy.  (Def. Br. 25.)  Because Anderson has established that, at a minimum, there are genuine issues of material fact regarding its antitrust and state law claims, its civil conspiracy claim also should withstand summary judgment.  *See World Wrestling Fed'n Entm't*, 142 F. Supp. 2d at 532 ("[I]f an underlying, actionable tort is established, . . . plaintiff may plead the existence of a conspiracy . . . to demonstrate that each defendants' conduct was part of a common scheme.") (citation and quotation omitted).

## CONCLUSION

Based on the foregoing, Anderson respectfully requests that the Court deny defendants' motion for summary judgment.

---

[35]   *See, e.g.*, *Amerisource Corp. v. RX USA Int'l, Inc.*, No. 02 CV 2514 DLI CLP, 2007 WL 2816193, at *5-6 (E.D.N.Y. Sept. 26, 2007) (denying summary judgment where defendant "informed third-party wholesalers that [plaintiff] was a bad credit risk in order to interfere with [plaintiff]'s prospective business relations with the wholesalers"); *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001) (denying a motion to dismiss based on statements to third parties).

Dated: New York, New York
       March 9, 2015

Respectfully submitted,

KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP

By: _____
     Marc E. Kasowitz (mkasowitz@kasowitz.com)
     Hector Torres (htorres@kasowitz.com)
     Seth Davis (sdavis@kasowitz.com)
     Seth A. Moskowitz (smoskowitz@kasowitz.com)
     Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Plaintiff Anderson News, L.L.C.*

26