UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

ANDERSON NEWS, L.L.C., and LLOYD WHITAKER,　　:
as the Assignee under an Assignment for the Benefit of　　:
Creditors for Anderson Services, L.L.C.,　　　　　　　　　:　　　　　　　**09 CIV. 2227 (PAC)**

                                  :

                      Plaintiffs,　　:

                                    :

      -against-　　:

                                    :

AMERICAN MEDIA, INC., BAUER PUBLISHING　　　　　　:
CO., LP., CURTIS CIRCULATION COMPANY,　　　　　　　:
DISTRIBUTION SERVICES, INC., HACHETTE　　　　　　　:
FILIPACCHI MEDIA, U.S., INC., HEARST　　　　　　　　　:
COMMUNICATIONS, INC., HUDSON NEWS　　　　　　　　:
DISTRIBUTORS LLC, KABLE DISTRIBUTION　　　　　　　:
SERVICES, INC., RODALE, INC., TIME INC., and　　　　　:
TIME/WARNER RETAIL SALES & MARKETING,　　　　　　:
INC.,　　　　　　　　　　　　　　　　　　　　　　　　:

                                    :

                    Defendants.　　:

-------------------------------------------------------------------- x


**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION BY**
**DEFENDANT KABLE DISTRIBUTION SERVICES, INC.**
**FOR SUMMARY JUDGMENT**


MᶜELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Attorneys for Defendant
Kable Distribution Services, Inc.


*Office and Post Office Address, Telephone*
88 Pine Street, 24th Floor
New York, New York 10005
(212) 483-9490

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................................................ii

POINT I -   THE ALLEGED EXCHANGE OF INFORMATION
            WAS NOT UNLAWFUL. ...............................................................1

POINT II -  JOINT ACTION TO CHANGE WHOLESALERS
            WOULD HAVE BEEN LAWFUL ....................................................2

POINT III – THERE IS NO EVIDENCE OF AN AGREEMENT
            BY KABLE ...................................................................................4

POINT IV – ANDERSON CANNOT ESTABLISH CAUSATION .......................5

POINT V – THE CLAIM AGAINST KABLE MAKES NO
           ECONOMIC SENSE ......................................................................7

POINT VI – ANDERSON'S ADDITIONAL GENUINE ISSUES
            OF MATERIAL FACT, THE DECLARATION OF
            SETH DAVIS AND THE EXHIBITS REFERRED
            TO THEREIN SHOULD BE DISREGARDED ...............................9

Conclusion.... ..............................................................................................................10

i

## TABLE OF AUTHORITIES

Page(s)

CASES

AD/SAT v. Associated Press,
  181 F.3d 216 (2d Cir. 1999).................................................................................................4

Apex Oil Co. v. DiMauro,
  822 F.2d 246 (2d Cir. 1987)..........................................................................................2, 4, 8

Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,
  441 U.S. 1 (1979)...............................................................................................................3

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)............................................................................................................4

In re Baby Food Antitrust Litigation,
  166 F.3d 112 (3d Cir. 1999)...............................................................................................2

Interborough News Co. v. Curtis Publishing Co.,
  225 F.2d 289 (2d Cir. 1955)...............................................................................................3

Joseph E. Seagram v. Hawaiian Oke & Liquors,
  416 F.2d 71 (9th Cir. 1969) .............................................................................................3

Minepco, S.A. v. Conticommodity Servs., Inc.,
  673 F.Supp. 684 (S.D.N.Y. 1987) .....................................................................................4

Union Carbide Corp. v. Montell N.V., 179 F.R.D. 425 (S.D.N.Y. 1998) ........................................9

United States v. Huezo,
  546 F.3d 174 (2d Cir. 2008)...............................................................................................4

RULES

Local Civil Rule 56.1 .....................................................................................................................9

The actions of Defendant Kable Distribution Services, Inc. ("Kable") must be assessed in the proper context. The publishers did not suddenly decide en masse to put Anderson News, L.L.C. ("Anderson") out of business. It was Anderson's announcement of additional charges to the publishers combined with its announcement that it would not distribute for publishers which did not agree, within two weeks, to the charges which caused the publishers to act quickly and within the same short time period. It was not in the interests of the publishers to pay these charges when there were other wholesalers which were willing to distribute their magazines without the additional charges. Kable's decision to cease shipments to Anderson was made only after Anderson made clear that it would not distribute for non-consenting publishers.

## POINT I

### THE ALLEGED EXCHANGE OF INFORMATION
### WAS NOT UNLAWFUL

Anderson argues (Opposition Memorandum, p. 18), that no publisher or distributor acting alone would have been able to force retailers to switch from their desired wholesalers. According to Anderson, only if a critical mass of publishers refused the additional charges and were cut-off by Anderson could those publishers have their magazines delivered to those retailers through other wholesalers. If that occurred, however, publishers and national distributors knew that they would also need to find alternative distribution – and they only had two weeks to arrange for such alternatives. Thus, under Anderson's theory, the options available to publishers and distributors might depend on how other industry participants responded to Anderson's announcement, and on how Anderson itself reacted to these responses. Under these circumstances, gathering of intelligence about what others in the industry were doing would have been entirely consistent with an effort to make informed unilateral decisions. The exchange

of information among competitors for that purpose would not have been unlawful and does not

support an inference of a conspiracy.  In re Baby Food Antitrust Litigation, 166 F.3d 112, 126

(3d Cir. 1999).  See Apex Oil Co. v. DiMauro, 822 F.2d 246, 257-58 (2d Cir. 1987).  Nor is

parallel conduct sufficient to establish a conspiracy, even if the defendants knew that the other

defendants were doing likewise. Id. At 253.  Summary judgment should therefore be granted.

**POINT II**

**JOINT ACTION TO CHANGE WHOLESALERS
WOULD HAVE BEEN LAWFUL**

Anderson is seeking a result that is contrary to the purpose of the antitrust laws.

According to Anderson, many retailers, including Wal-Mart, would refuse delivery from other

wholesalers so long as Anderson continued to supply magazines.  Anderson further asserts that

no publisher or distributor acting alone could persuade these retailers to accept deliveries from

other wholesalers.  Based on these assumptions, Anderson reasons that Kable must have worked

with other defendants to effect a change of wholesalers after Anderson announced its additional

charges.   Anderson's assumptions are not true, but even if they were, Anderson could not

recover, because coordination under those circumstances would be procompetitive and lawful.

On January 14, 2009, Anderson announced that, beginning February 1, it would charge

publishers a seven-cent per copy surcharge and shift to publishers its scan-based trading

inventory costs.  Anderson never claims that it subsequently offered Kable or any of Kable's

publisher clients any terms different from those it announced on January 14.  Anderson never

claims that it modified the February 1 deadline.  Thus, each of Kable's publisher clients had only

three options:  (1) pay the higher prices that Anderson demanded, regardless of the economic

consequences to their businesses; (2) refuse Anderson's demands without arranging for

2

alternative distribution, and lose approximately 25% of their sales; or (3) ship magazines through competing wholesalers that were willing to provide better terms than Anderson.  The first two options would have resulted in higher prices, reduced output, or both.  Kable's publisher clients chose the third option.

Anderson now claims that publishers must have coordinated in order to ship through Anderson's competitors.  Even assuming that were true, then Anderson still should not recover from Kable, because it would have been procompetitive for publishers to do so, and procompetitive for Kable to help its clients determine how they could get their magazines to consumers in the face of Anderson's refusal to deliver those magazines after February 1. Forcing Kable's publisher clients to choose one of the other two options would result in higher prices, lower output, or both, and would inhibit the objectives of antitrust law to promote consumer welfare. See Broadcast Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 19-20 (1979) (the antitrust laws:  condemn practices that "tend to restrict competition and decrease output" but not practices that "increase economic efficiency and render markets more, rather than less, competitive").   Thus, even where suppliers act jointly to effect a change from one distributor to another that provides better services to the suppliers, such action is not unlawful. Joseph E. Seagram v. Hawaiian Oke & Liquors, 416 F.2d 71, 880 (9th Cir. 1969).  Actions by a distributor to persuade other distributors to discontinue business with an underperforming wholesaler and use new wholesalers in its place were held to be lawful, even though the loss of that business resulted in the discontinuance of the original wholesaler's operations.  Interborough News Co. v. Curtis Publishing Co., 225 F.2d 289, 293 (2d Cir. 1955).  Summary judgment should therefore be granted for this reason as well.

## POINT III

### THERE IS NO EVIDENCE OF AN AGREEMENT
### BY KABLE

Even if there had been an unlawful agreement, there is no evidence that Kable was a party to any such agreement. Anderson has offered nothing except for communications between Kable and others. But after very extensive discovery, Anderson has not offered any evidence that any of these communications resulted in, evidenced or was in furtherance of an agreement by Kable and any other defendant.[1]

Anderson argues that "once a conspiracy is shown, only slight evidence is needed to link another defendant with it", citing Minepco, S.A. v. Conticommodity Servs., Inc., 673 F.Supp. 684, 688 (S.D.N.Y. 1987), which quotes from Apex Oil Co. v. DiMauro, 822 F.2d at 258. That argument is neither valid nor applicable. To begin with, it is doubtful that the "slight evidence" language is still good law. United States v. Huezo, 546 F.3d 174, 180 n. 2 (2d Cir. 2008). Anderson was required to provide evidence pertaining to each defendant to demonstrate that the defendant participated in the conspiracy. AD/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999). It has not even provided slight evidence that Kable was a participant.

By its motion for summary judgment, Kable informed the Court that after very extensive discovery, there was no evidence that there was any agreement between Kable and any other person or entity to drive Anderson out of business. Kable's moving Memorandum of Law, pp. 1-2. Because Anderson bears the burden of proof that Kable was a participant in such an agreement, that was sufficient to warrant summary judgment in favor of Kable. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In order to avoid summary judgment, Anderson was required to

---

[1] Most of Anderson's Opposition Memorandum is devoted to a discussion of alleged actions and communications by parties other than Kable.

make a showing sufficient to establish such an agreement.  Id.  Anderson has offered nothing but communications, without any evidence that any such communication constituted or was in furtherance of an agreement.  Summary judgment in favor of Kable should therefore be granted for this additional reason.

### POINT IV

### ANDERSON CANNOT ESTABLISH CAUSATION

In Kable's moving Memorandum of Law (p. 1), Kable pointed out that Anderson cannot establish causation, an essential element of an antitrust claim, because Anderson's notice of additional charges was addressed directly to the publishers, the overwhelming majority of which rejected the additional charges.[2]  These publishers, as well as almost all of the publishers represented by Defendants Curtis and Time/Warner, are not alleged to be participants in any conspiracy.[3]  Therefore, Anderson could not have obtained its additional charges even in the absence of the alleged conspiracy.

Anderson argues that Kable encouraged publishers to reject the charges.  Anderson's Opposition Memorandum of Law, p. 20.  Even if that were true, that would not establish causation.  The publishers acted in their own economic interests.  No matter what advice they may have received from Kable, which they had a right to expect, the publishers retained the

---

[2] Although Anderson insists that it was willing to negotiate its additional charges, it has not contested the fact that Kable had no power to make offers on behalf of its publisher clients and it has offered no evidence that it sought to negotiate with Kable's approximately 200 publisher clients.  Nor has Anderson even suggested how it would have been possible for it to negotiate and enter into agreements with the many hundreds of publishers for which it distributed magazines within a period of two weeks.

[3] Anderson has alleged that Curtis represented at least 400 publishers (Amended Complaint, ¶17) and that Time/Warner's publisher clients shipped 28% of all magazines sold in the United States.  Anderson's Response to Kable's Rule 56.1 Statement, ¶11.

authority to make their own decisions as to whether to pay Anderson's substantial additional charges.

In any event, many of the publishers made their decision to reject the charges because they were too costly, without any advice from Kable. Michael Duloc, Kable's President, spoke to many of the publishers and made no recommendations. Duloc moving Declaration, ¶7. This is corroborated by declarations of several publishers submitted with Mr. Duloc's Declaration. See Exs. 5-12 to Duloc Declaration. These declarations show that no one from Kable recommended to those publishers how to respond to Anderson's announcement. These publishers and most of Kable's other publisher clients rejected the charges because they were too expensive or unaffordable. Duloc Declaration, ¶6. Anderson acknowledges that if a publisher agreed to pay the additional charges to Anderson, it would also have had to pay them to the other wholesalers. Plaintiffs' Response to Defendant Kable's Rule 56.1 Statement, ¶51.

Anderson also argues (Anderson's Opposition Memorandum, p. 21) that Kable informed its publisher clients that if they wanted to use Anderson to distribute their magazines, Kable would no longer provide credit protection to those publishers for such distribution, which is an essential service that national distributors often provide to client publishers. Anderson concludes that through this action, Kable effectively made the decision for its publisher clients.

That is a specious argument. Kable's announcement that it would no longer assume the risk of non-payment by Anderson for magazines shipped to Anderson was not made until on or about February 2, 2009, which was after the deadline for accepting the additional charges had expired, after Anderson's President announced that Anderson would not pay its bill from Kable due on or about February 2, 2009, and after Anderson's effective termination of its distribution arrangements with the great majority of publishers. Duloc Declaration, ¶14.

6

Anderson is unable to explain away the facts that Kable continued shipments to Source after Source discontinued its surcharge and paid its bill from Kable (Duloc Declaration, ¶`18), and that Kable also continued shipments to MSolutions, a magazine wholesaler affiliated with Anderson which did not impose a surcharge or seek to transfer inventory costs to publishers (Plaintiffs' Response to Kable's Rule 56.1 Statement, ¶513).  These facts show conclusively that it was Anderson's imposition of additional charges and its refusal to distribute for non-consenting publishers which caused its loss of supply, and not some desire of Kable or its publisher clients to reduce the number of wholesalers.

The great majority of publishers, which are not alleged to be co-conspirators, made the decision in their own economic interests not to pay the additional charges.  Anderson therefore cannot establish causation.  Summary judgment should be granted for this reason in addition to the reasons discussed above.

### POINT V

### THE CLAIM AGAINST KABLE MAKES
### NO ECONOMIC SENSE

Mr. Duloc pointed out in his Declaration (¶15) that the claim against Kable made no economic sense because Anderson went out of business leaving an unpaid debt to Kable of approximately $10 million, which was reduced to approximately $6 million after applying credits, and because Anderson's departure from the business resulted in lost sales of magazines never distributed and continuing lost sales because the remaining wholesalers were not willing to service many of the stores which had been serviced by Anderson.  The implausibility of the claim that Kable conspired with others to drive Anderson out of business required Anderson to produce strong direct or strong circumstantial evidence in support of that claim, which Anderson

has failed to do, and reduced the range of permissible inferences that may be drawn from ambiguous evidence.  See Apex Oil Co. v. DiMauro, 822 F.2d at 253.

Anderson argues (Opposition Memorandum, p. 22), without any supporting evidence, that Kable either believed that Anderson would pay its debts or that Kable determined that the benefits of avoiding the surcharge outweighed the risks of non-payment by Anderson.[4] Anderson also argues that even assuming non-payment by Anderson, it remained in the interest of Kable to cut off Anderson's magazine supply because that was the desire of its major client, Bauer.

These are not facts.  They are merely arguments, and are totally unsupported.  Mr. Duloc expressed his concern about non-payment by Anderson in an e-mail exchange with an officer of Kable on January 14, 2009, in which the officer suggested that Kable advise the publishers that Kable did not support Anderson's charges and Mr. Duloc asked him to hold off on any advice, expressing concern about the $10 million owed by Anderson which Kable could lose if Anderson went out of business.  Duloc Declaration, ¶8 and Ex. 3.

The non-payment by Anderson nearly resulted in the termination of Kable's business. Duloc Declaration, ¶15.  The argument that Kable would risk going out of business to please a major client is just another specious argument.  The lack of economic sense of the claim against Kable is another of the several independent reasons for granting summary judgment to Kable.

---

[4] Avoidance of the surcharge is not a benefit properly attributable to Kable, as the surcharge was not imposed on Kable.

POINT VI

**ANDERSON'S ADDITIONAL GENUINE ISSUES
OF MATERIAL FACT, THE DECLARATION OF
SETH DAVIS AND THE EXHIBITS REFERRED
TO THEREIN SHOULD BE DISREGARDED**

Kable submitted a Rule 56.1 Statement in support of its motion containing 15 paragraphs. Anderson responded with an additional 286 paragraphs containing multiple assertions, rather than a "short and concise statement" as required by Local Civil Rule 56.1. The great majority of those paragraphs relate to parties other than Kable and have no relevance to Kable's motion. Moreover, many present arguments rather than facts. By its submission, Anderson seeks to obfuscate the facts supporting Kable's motion rather than to assist the Court. The multiple citations supporting each purported fact are primarily to the irrelevant exhibits to the Opposition Declaration of Seth Davis, one of Anderson's attorneys, and in some cases are to paragraphs in the Rule 56.1 Statements of other parties. It is therefore submitted that the 286 additional paragraphs in Plaintiffs' Response should be disregarded. See Union Carbide Corp. v. Montell N.V., 179 F.R.D. 425, 428 (S.D.N.Y. 1998).

The Davis Declaration purports to attach 656 exhibits. Anderson has sought to overwhelm the Court with large piles of papers, none of which shows an agreement between Kable and any other defendant. Many of the exhibits are hearsay articles from various media publications. The great majority relate to other defendants and have no relevance to Kable's motion, notwithstanding the fact that Anderson was required by an Order filed January 21, 2015 to respond separately to the summary judgment motion of each defendant so that the facts and arguments applicable to each defendant could be determined without confusion. Accordingly, it is submitted that the Davis Declaration and the exhibits referred to therein should be disregarded.

9

## Conclusion

For the foregoing reasons, it is again respectfully submitted that Kable's motion should be granted.

Dated:  April 17, 2015

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

By *I. Michael Bayda*

I. Michael Bayda
Jay A. Katz
Attorneys for Defendant
Kable Distribution Services, Inc.
Wall Street Plaza
88 Pine Street, 24th Floor
New York, NY  10005
(212) 483-9490
ibayda@mdmc-law.com
jkatz@mdmc-law.com

10