UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ANDERSON NEWS, L.L.C. and LLOYD          :
WHITAKER, as the Assignee under an
Assignment for the Benefit of Creditors for   :
Anderson Services, L.L.C.,

                                                              :

              Plaintiffs,

                                                              :        09 Civ. 2227 (PAC)

         -against-

                                                              :        OPINION & ORDER

AMERICAN MEDIA, INC., BAUER
PUBLISHING CO., L.P., CURTIS CIRCULATION:
COMPANY, DISTRIBUTION SERVICES, INC.,
HACHETTE FILIPACCHI MEDIA U.S., INC.,   :
HEARST COMMUNICATIONS, INC.,
HUDSON NEWS DISTRIBUTORS LLC, KABLE :
DISTRIBUTION SERVICES, INC.,
RODALE, INC., TIME INC., and TIME/WARNER:
RETAIL SALES & MARKETING, INC.,

                                                              :

              Defendants.
--------------------------------------------------------------X
AMERICAN MEDIA, INC., HEARST               :
COMMUNICATIONS, INC., and TIME INC.,

                                                              :

              Counterclaim-Plaintiffs,

                                                              :

         -against-

                                                              :

ANDERSON NEWS, L.L.C. and CHARLES
ANDERSON, JR.,                                       :

              Counterclaim-Defendants.        :
--------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

        If there were ever an antitrust case of the pot calling the kettle black, this is it.  In mid-

January 2009, Anderson News, which had been losing money for years, unilaterally decided to

raise its prices and shift its inventory costs to publishers and distributors in the single-copy

magazine market.  The publishers were given two weeks to fall in line with Anderson News'

new price and cost regime, "or else."[1]  If the publishers and distributors did not acquiesce to the price increase and to transferring inventory expenses by then, Anderson would not accept their single-copy magazines for distribution as of February 1, 2009.  Anderson also threatened to exit the business if publishers and distributors did not accept the price increase and inventory expense shift.

Not surprisingly, the target audience saw nothing in Anderson's proposal other than higher prices and greater costs.  They rejected the plan, and did so almost immediately.  Indeed, only 86 of 1,570 publishers accepted the proposal.  Other wholesalers did not raise their fees, nor did they seek to shift inventory expenses.  The publishers and distributors chose to do business with the wholesalers that offered lower prices and did not seek to increase inventory costs.

But Anderson was not finished with its plan, which it had been preparing for some months prior to the mid-January, 2009 announcement to the publishers and distributors.  It had talked to two large retailers concerning the plan, and had an agreement with these retailers that they would not shift their business to other wholesalers.  In other words, the publishers and distributors would have to deal with Anderson, if they wanted their magazines displayed at these large retailers.  Anderson also attempted to take advantage of its controlling position in ProLogix East[2] by refusing to open its warehouse and make deliveries for Anderson News' competitor, The News Group.  Anderson's threat to stop deliveries was enjoined by a federal court in the District of Delaware.  When Anderson received notice of the District Court's Order, it chose to go out of business.

---

[1] Anderson argues that its January statements were "invitations to negotiate" or a "proposal," not demands or ultimatums.  The outcome of this action does not depend on how past conduct is labelled, but rather, on the conduct and behavior itself.

[2] ProLogix East was a joint venture between Anderson Services and the logistics affiliate of Anderson's competitor The News Group.  ProLogix East provided magazine delivery services to retailers in the southeast United States.

After an extended period of discovery, Anderson has searched but not found any direct evidence of a conspiracy to drive Anderson out of business.  In fact, Defendants had a financial interest in Anderson's continued viability, because at the time it left the market, Anderson owed the Defendants substantial sums for magazines it had received on credit.

The Amended Complaint alleged a meeting between Anderson's competitors Hudson News and The News Group, as well as distributors Curtis Circulation, Time/Warner Retail, and Distribution Services, Inc.; that alleged meeting played a large role in the Second Circuit's decision on appeal from this Court's dismissal of the Complaint.  Discovery has now revealed that the assertion that such a meeting occurred is dubious at best.

Instead, Anderson shifts gears and points to a series of meetings and communications from which it infers that a conspiracy existed and caused Anderson's demise.  Anderson conceded at argument, however, that many of the conversations and meetings were entirely legal.  Certainly, meetings between publishers and their distributors were perfectly appropriate.  Moreover, any inference supporting a conspiracy must be weighed against an inference of independent action by each of the defendants.  This is particularly so when, even after extensive discovery, Anderson cannot say when the alleged conspiracy started.  It is clear that some publishers rejected Anderson's proposal—immediately upon hearing it from Anderson.  They knew the proposal was uneconomic, would increase their costs, and force them to pick up the wholesalers' inventory costs.  Rejection of the proposal before the alleged conspiracy commenced is very strong evidence of independent action.

Anderson's claim of injury from a concerted refusal to deal, which forced it out of the business, must be rejected.  It is clear its own ill-conceived and badly executed plan led to its downfall.  The antitrust laws do not compel any entity to accept a price increase, or assume the

burden of a significant cost.  This is especially so where there were other wholesalers available who offered lower prices and less expensive terms for handling inventory.

## Background

Plaintiffs Anderson News, L.L.C. and Anderson Services, L.L.C. filed a Complaint on March 10, 2009, against Defendants American Media, Inc. ("AMI"), Bauer Publishing Co., LP. ("Bauer"), Curtis Circulation Company ("Curtis"), Distribution Services, Inc. ("DSI"), Hachette Filipacchi Media, U.S., Inc. ("Hachette"), Hudson News Distributors LLC ("Hudson News"), Kable Distribution Services, Inc. ("Kable"), Rodale, Inc. ("Rodale"), The News Group, LP ("TNG"), Time Inc. ("Time"), and Time/Warner Retail Sales & Marketing, Inc. ("TWR").  The claims against TNG were voluntarily dismissed on March 12, 2009; the remaining Defendants moved to dismiss the Complaint on December 14, 2009.  On August 2, 2010, this Court granted the motions, and dismissed the Complaint with prejudice.  The Court denied Plaintiffs' motion for reconsideration, and for leave to file an amended complaint.  On appeal, the Second Circuit vacated the Court's dismissal, holding that Plaintiffs should have been permitted to file an amended complaint.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 194 (2d Cir. 2012).  Plaintiffs filed their Amended Complaint on September 7, 2012.[3]  The claims against Hudson News were voluntarily dismissed, pursuant to a settlement, on December 19, 2013.

### I. Single-Copy Magazine Industry

In the United States, magazines are sold in two ways: by subscription and through "single-copy" purchases.  Single-copy distribution includes sales from newsstands,

---

[3] In April 2009, Anderson Services executed an Assignment for the Benefit of Creditors that named Lloyd Whitaker as the Assignee.  Whitaker was certified as Assignee for the Benefit of Creditors in May 2009, and replaced Anderson Services as a named Plaintiff in the Amended Complaint.  Am. Compl. ¶ 23.

In addition, Hearst Communications, Inc. ("Hearst") was named as a Defendant in the Amended Complaint, as successor-in-interest to Hachette.  *Id.* ¶ 14.

supermarkets, and other retailers.  Time ¶¶ 1, 21.[4]  The single-copy magazine industry has four

levels: publishers, distributors, wholesalers, and retailers.  *Id.* ¶ 1.

Publishers create and produce magazines; they earn revenue through a combination of

subscription sales, single-copy sales, and advertising revenue.  *Id.* ¶ 3.  Publishers also determine

"cover prices" for their titles—the price at which the title will be sold to consumers.  *Id.* ¶ 9.

National distributors perform a variety of services for publishers, including marketing,

arranging for distribution and shipment of magazines to wholesalers, billing wholesalers, and

collecting payments.  *Id.* ¶ 5.  Some distributors also assume credit risks for wholesalers'

payments to publishers.  *See* Curtis ¶ 412.  Distributors generally do not purchase or sell

magazines, but instead earn revenue from fees or commissions paid by publishers.  Time ¶¶ 5-8.

Wholesalers purchase magazines from publishers at a discount to the cover price, and then

sell them to retailers at a smaller discount.  *Id.* ¶¶ 17-18.  Wholesalers (or the third-party

servicers they employ) deliver the magazines to retailers, stock them on retailers' shelves, and

retrieve magazines that remain unsold after their "off-sale" date.  *Id.* ¶ 19.  In 2009, the four

largest wholesalers in the United States were Anderson News, TNG, Hudson News, and Source

Interlink Distribution ("Source").  *Id.* ¶ 15.  TNG and Hudson News are no longer defendants

and Source was never a defendant.

Retailers sell magazines to consumers.  *Id.* ¶ 21.  Retailers include stores such as Wal-

Mart, Kroger grocery stores, and Barnes & Noble, as well as airport retailers and newsstands.  *Id.*

Retailers determine which magazines to purchase for sale in their stores.  *Id.* ¶ 22.  Moreover, to

reduce logistical costs, retailers generally permit distribution of magazines from only one

---

[4] References to Defendants' Rule 56.1 Statements in Support of their Motions for Summary Judgment appear as
"[Defendant] ¶ __."  Plaintiffs' responses to Defendants' Rule 56.1 Statements are cited as "Anderson Resp.
([Defendant]) ¶ __."  References to Plaintiffs' "Additional Genuine Issues of Material Fact" appear as "Anderson
Opp. ([Defendant]) ¶ __."

wholesaler at each retail outlet.  Anderson Opp. (Curtis) ¶ 18.

## II. Parties

### a.  Plaintiffs

In 2009, Plaintiff Anderson News was a magazine wholesaler.  Time ¶ 26.  Frank Stockard was its President, and Charles Anderson, Jr. was the Chief Executive Officer and largest shareholder of Anderson Media Corporation, the ultimate parent company of Anderson News.  *Id.* ¶¶ 28, 29, 30, 32.  Anderson News ceased operations on February 9, 2009, and in March 2009, certain of its creditors filed an involuntary bankruptcy petition.  *Id.* ¶ 138; Am. Compl. ¶ 88.

Prior to its bankruptcy, Anderson News contracted with Anderson Services, its distribution and logistics affiliate, to provide delivery, shelving, and pickup services at retail locations.  Time ¶ 27.  Anderson Services executed an Assignment for the Benefit of Creditors in 2009, and in May 2009 Plaintiff Lloyd Whitaker was certified as the assignee for the benefit of its creditors.  Def. (Whitaker) ¶¶ 247-48.

### b.  Defendants

Defendants are publishers and national distributors of single-copy magazines.

#### i.  Publisher Defendants

- *Time*: Time publishes titles which include *People*, *Time*, *Sports Illustrated*, and *InStyle* magazines.  In 2008, Time publications represented 16% of the national single-copy magazine market.  Anderson Opp. (Curtis) ¶ 5; Am. Compl. ¶ 11.

- *AMI*: AMI's titles include *National Enquirer* and *Star* magazines.  In 2008, its magazines made up 10% of the single-copy magazine market.  Anderson Opp. (Curtis) ¶ 5.

- *Bauer*: Bauer publishes titles such as *In Touch* and *Life & Style*, and in 2008 represented 12% of the single-copy market.  *Id.*; Bauer ¶ 601.

- *Rodale*: Rodale publishes magazines, such as *Men's Health, Women's Health*, and *Bicycling*, which in 2008 made up 2% of the single-copy market.  Anderson Opp. (Curtis)

¶ 5; Rodale ¶ 702.

- *Hachette*: In 2008, Hachette published magazines including *Elle* and *Woman's Day*, which represented 2% of the single-copy market.  Anderson Opp. (Curtis) ¶ 5.

## ii.  Distributor Defendants

In 2009, each of the Distributor Defendants represented one or more Publisher Defendants, as well as other non-party publishers.[5]

- *TWR*: TWR represented Time.  Time ¶ 10.

- *Curtis*: Curtis represented Rodale, AMI, and Hachette.  *Id.* ¶ 11.

- *Kable*: Kable represented Bauer.  *Id.* ¶ 12.

- *DSI*: DSI represented AMI, Rodale, Hachette, and Bauer.  *Id.* ¶ 13.  DSI is a merchandising services company that in 2009 performed some of the services performed by the other distributors, but focused primarily on marketing.  *Id.*

## III. Scan-Based Trading

Under the traditional single-copy magazine model, wholesalers purchase magazines from publishers and sell them, in bulk, to retailers.  *Id.* ¶¶ 17-18.  Wholesalers, or their third-party servicers, deliver the magazines to retailers, who display the magazines until their off-sale dates. *Id.* ¶ 19.  Once the magazines' off-sale date passes, wholesalers collect the unsold magazines from each retailer, count them, and prepare a "return affidavit" listing the number unsold. Anderson Opp. (Curtis) ¶ 24.  Using the return affidavit, wholesalers refund retailers for each unsold magazine, so that retailers pay only for magazines that are not listed on the return affidavit.  Publishers, in turn, refund money to wholesalers for the unsold magazines.  *Id.* ¶ 20. As a result, wholesalers earn revenue only from magazines that are actually sold to consumers.

Publishers generally invest significant resources in creating content for their magazines;

---

[5] Although they are referred to as "distributors," these Defendants did not physically distribute magazines to retailers.  Time ¶ 6.  Rather, they worked on behalf of publishers to arrange for distribution of publishers' magazines, and provided the various other services set forth on p. 5, *supra*.

but the cost of actually printing each issue is relatively small.  *Id.* ¶ 22.  This encourages publishers to print more copies of each magazine than will likely sell, a practice referred to as "stuffing the channel."  *Id.* at ¶¶ 22-23.  Channel stuffing benefits publishers because the profit from each additional magazine sold outweighs its printing cost.  Yet it imposes burdens on wholesalers, who pay for the extra copies and expend additional resources retrieving unsold magazines from retailers, manually counting them, and preparing return affidavits, all without earning revenue from these unsold copies.  *Id.* at ¶ 24.

During the mid-to-late 2000s, retailers required their wholesalers to implement scan-based trading ("SBT") as an alternative to the traditional single-copy model.  SBT permits retailers to track magazines using bar codes that are electronically scanned during checkout.  *Id.* ¶ 35.  As with the traditional model, wholesalers purchase magazines from publishers at a percentage of the cover price.  But unlike the traditional model, wholesalers do not then sell the magazines to retailers.  Instead, retailers enter into consignment relationships with wholesalers, meaning that retailers purchase magazines from wholesalers only after the magazines have been scanned, and sold to consumers.  *Id.* ¶ 36.

One benefit of implementing SBT is that retailers can electronically track the number of magazines sold, so wholesalers no longer need to manually count unsold copies or prepare return affidavits.  *Id.* ¶ 38.  SBT also streamlines the process for dropping off and picking up magazines from retailers.  *Id.*

But the major detriment of SBT to wholesalers is that they bear the costs of buying magazines from the publishers, but are not compensated until the retailer records a sale.  Thus the wholesalers bear the cost of carrying magazines as inventory.[6]  The inventory costs of SBT

---

[6] There are other cost shifts associated with SBT as well.  The term "shrink" refers to the difference between the number of magazines actually sold and the number that are stolen or improperly scanned at the register.  *Id.* ¶ 37.

are significant.  In January 2009, Anderson News had "over $70 million invested in inventories from four major customers."  Time ¶ 77.  Anderson's January plan would relieve it of these costs and force the publishers and distributors to absorb them.  Bankruptcy enabled Anderson to avoid the inventory expenses it was attempting to shed.

## IV.  ProLogix East

In 2005, Anderson Services entered into a joint venture with News Group Distribution Services ("NGDS"), the logistics affiliate of TNG, to create two distribution services: ProLogix Distribution Services (East), LLC ("ProLogix East") and ProLogix Distribution Services (West), LLC ("ProLogix West").  *Id.* ¶ 36.  Anderson Services owned 64.5% of ProLogix East, and NGDS owned 35.5%.  NGDS owned 64.5% of ProLogix West, and Anderson Services owned 35.5%.  *Id.* ¶¶ 36-37.

ProLogix East and ProLogix West contracted with Anderson News and TNG to provide magazine delivery services to retailers.[7]  *Id.* ¶ 39.  ProLogix East serviced retailers in the southeastern United States, while ProLogix West serviced those in western states.  *Id.*  The geographical areas where Anderson News and TNG distributed magazines overlapped—more than 80% of the retail value of Anderson News' magazines went to retailers in zip codes that were also served by TNG.  *Id.* ¶ 44.  Indeed, ProLogix East and ProLogix West delivered Anderson News' and TNG's magazines using the same trucks, routes, and drivers.  *Id.* ¶ 42.

## V.  Anderson's Price Increase and Inventory Cost Shift Proposal

### a.  Preparation of the Anderson Proposal

Beginning in 2003, Anderson News made numerous attempts to increase the prices it

---

Under the traditional method, retailers bear the cost of shrink because wholesalers refund them only for the "unsold" magazines that wholesalers physically retrieve from stores.  The SBT method permits retailers to shift the costs of "shrink" to wholesalers, because retailers purchase from wholesalers only those magazines that are scanned as sold—which do not include stolen or improperly scanned magazines.  Time ¶ 59; Anderson Opp. (Curtis) ¶ 37.
[7] ProLogix East and West also provided various logistics services for other clients.  *Id.* ¶¶ 40-41.

charged publishers, or to shift certain costs onto publishers and distributors.  In 2003, Anderson News sought to impose a surcharge of seven cents per magazine distributed in metropolitan markets, and four cents per magazine in other markets.  *Id.* ¶ 62; *see id.*, Ex. 5 (C. Anderson Dep.) at 203.  No other magazine wholesaler instituted a similar surcharge, and no publishers agreed to Anderson's proposal.  *Id.*, Ex.5 at 204.  In 2004, Anderson again sought to impose a per-magazine surcharge, this time eight cents per magazine in metropolitan markets.  Again, no other wholesaler instituted a similar surcharge, and no publishers agreed to the proposal.  *Id.*, Ex. 5 at 206-07.  In 2005, Anderson sought to charge publishers a fuel surcharge for the delivery of single-copy magazines, based on the weight of the copies distributed and returned.  *Id.*, Ex. 5 at 211.  Faced with pushback from publishers, Anderson withdrew its proposed fuel surcharge.  *Id.*, Ex. 5 at 215-16.  Finally, in 2007, Anderson News announced that it would deduct from its payments to national distributors the cost of SBT inventory.  *Id.*, Ex. 5 at 217.  No other wholesaler proposed such a deduction, and publishers and distributors did not agree to this proposal either.  *Id.*, Ex. 5 at 217-18.  Anderson ultimately "backed down" from this proposal as well.  *Id.*, Ex. 5 at 219.

Having tried for years to raise delivery rates and shift inventory costs, without success, Anderson knew it needed a game changer, if it were to succeed.  Prior to announcing the January 2009 seven-cent surcharge and inventory cost shift proposal, therefore, Anderson formulated a new strategy: "going dark," to be implemented if publishers rejected the proposal—as they had in the past.  *Id.* ¶ 63.

The "going dark" strategy sought to capitalize on Anderson Services' joint venture with NGDS, ProLogix East.  Charles Anderson thought that, as a manager of Anderson Services, the majority owner of ProLogix East, he could temporarily suspend ProLogix East's operations

without prior notice or consultation with his co-owner.  Anderson Resp. (Time) ¶ 64.  Since

ProLogix East used the same trucks and drivers to deliver Anderson News' magazines as it did to

deliver TNG's, rendering ProLogix East non-operational would enable Anderson News to cut off

delivery of both Anderson News' and TNG's magazines to retailers throughout the Southeast.

Time ¶ 128.

Charles Anderson believed that the "going dark" strategy would force publishers to agree

to the Anderson price increase and cost shift proposal for two reasons.  First, neither Anderson

News' nor TNG's magazines would be delivered until ProLogix East reopened, so publishers

would be deprived of income from both wholesalers until they reached an agreement with

Anderson News.  Second, shutting down ProLogix East would prevent publishers from simply

shifting their business from Anderson News to TNG.  *Id.*  Disabling ProLogix East was critical;

otherwise TNG would have been an attractive option to publishers because TNG did not seek

either a price increase or an inventory cost shift.  Further, publishers could avoid distribution-

and logistics-related disruptions in service by switching from Anderson News to TNG, since

ProLogix East used the same trucks and routes for both TNG and Anderson News.   Shutting

down ProLogix East would thus punish the publishers by making it more difficult to establish

alternative methods of distribution.

As another phase of the "going dark" strategy, Charles Anderson prevailed on Wal-Mart

and Kroger to refuse to accept magazines from other wholesalers at their Anderson-serviced

locations during the "dark" period.  *Id.* ¶ 65.  Both Wal-Mart and Kroger agreed that, if

Anderson implemented the strategy, they would not accept magazines from other wholesalers for

at least fourteen days.  *Id.*  It is clear that Anderson was trying to isolate the publishers from

other wholesalers, while at the same time preserving Anderson's unique relationship with two of

the largest retailers.

### b.  Charles Anderson Announces the Proposal

On January 12 and 13, 2009, Charles Anderson and Frank Stockard of Anderson News held a series of meetings with a number of publishers, including executives from Time, AMI, and Bauer.  Charles Anderson stated that Anderson News planned to impose a seven-cent-per-copy surcharge for each magazine it distributed, as well as an inventory cost shift from the wholesalers to the publishers based on the SBT method.  *Id.* ¶ 68.  Charles Anderson said he needed both to be "viable"; if publishers refused, Anderson might have to leave the business.  *Id.* ¶¶ 69-70, 74.

On January 14, 2009, Charles Anderson participated in an interview with John Harrington, publisher of the industry newsletter *The New Single Copy*.  *Id.* ¶ 71.  The interview was conducted via a conference call, with over 300 industry participants dialing in.  *Id.* ¶¶ 71-72.  During the call, Charles Anderson stated that "over the last 10 years," Anderson News' profits had "eroded to nothing and into significant losses."  *Id.* ¶ 76.  He explained that "effective February 1," Anderson News was "adding a magazine distribution charge of 7 cents a copy to all copies distributed by the company."  *Id.* ¶ 77.  Charles Anderson also stated that Anderson News would "no longer participate in the investment" in SBT.  He explained that Anderson News had "over $70 million invested in inventories from four major customers," and that it "should be only fair for the manufacturer or publisher to bear this cost."  *Id.*  Harrington asked if seven cents per copy was a "negotiable figure"; Charles Anderson responded: "[W]e think it's fair. . . . [I]f we negotiated the rate then it would not be fair so the answer is that we really believe that the 7 cent number is the number."[8]  *Id.* ¶ 78.

---

[8] Anderson insists that Charles Anderson's announcement of the surcharge was an invitation to negotiate, rather than a unilateral demand, even going so far as to hire an expert to testify that Anderson intended the price increase and

Harrington also asked Charles Anderson, "[I]n the event of significant levels of non-cooperation, is it a possibility that Anderson News would leave the magazine distribution business?"; Charles Anderson responded, "The last thing we want to do is exit this business.  But we— why should we continue to lose money in a business that doesn't . . . give us any return?" *Id.* ¶ 80.   Charles Anderson reiterated that the deadline for publishers to agree to the Anderson prince increase and inventory cost shift was February 1, 2009, and stated that Anderson News would refuse to distribute magazines for publishers who did not agree to the price increase and cost shift by that date.  *Id.* ¶ 79.

Also on January 14, 2009, Anderson News sent a letter to publishers, which stated:

> Effective February 1, 2009, Anderson News, LLC will add a $0.07 per copy distribution fee in addition to any current terms and conditions received by your company.  The fee will be applied to all copies distributed February 1, 2009 and forward.  In addition, Anderson News, LLC will pass the inventory carrying cost on all SBT accounts back to the publisher.  Please agree to issue a credit for the $0.07 fee and a deduction for the inventory carrying cost to ensure future distribution.

*Id.* ¶ 83.  The letter directed publishers to "[p]lease execute the enclosed letter [assenting to Anderson's terms] . . . no later than Friday, January 23, 2009."  *Id.*

On January 19, 2009, Source, a competitor wholesaler to Anderson News, announced via letter that it was also seeking a similar price increase of seven cents per copy for magazine distribution, also effective February 1, 2009.  *Id.* ¶ 89.  Besides Source, no other wholesaler, who distributed magazines throughout the geographical area covered by Anderson News, announced a surcharge.  *Id.* ¶ 92.  Neither Source, nor any other wholesaler, announced a SBT inventory

---

inventory cost shift to be negotiable.  *See* Subramanian Report ¶ 105.  Not only is the proposed expert testimony impermissible under Fed. R. Evid. 702, *see* Order Granting in Part and Denying in Part Defendants' Motions to Exclude Expert Testimony, but it is also unnecessary, because the full transcript of Charles Anderson's telephone conference with John Harrington is available.  There is no doubt regarding what Charles Anderson said or how he explained the price increase, inventory cost shift, and the effective date.  In any case, it is ultimately irrelevant whether Charles Anderson's words are labelled as a "demand" or a "proposal"; what matters is Anderson's conduct following the announcement of the surcharge and cost shift.

cost shift, as did Anderson.  *Id.* ¶ 94; Anderson Resp. (Time) ¶ 89.

### c.  Defendants React to the Anderson Proposal

Following Charles Anderson's announcement, some Defendant Publishers responded directly to Anderson News.  Others discussed the proposal with their distributors, who communicated with Anderson News on their behalf; still others communicated with Anderson News both directly and through their distributors.  Finally, publishers and distributors talked and emailed with one another concerning the Anderson News surcharge and inventory cost proposal.

Plaintiff's counsel concedes that many communications between Defendants were not simply permissible, but necessary—it was critical for Publisher Defendants to communicate with their distributors regarding their responses to the Anderson proposal, and for Distributor Defendants to discuss the proposal with their publisher clients.  *See* Dkt. No. 445 (Oral Argument Transcript) at 37 ("National distributors can talk to their publishers for whom they work.  No problem there.").

### i.  Bauer and Kable

Hubert Boehle and Richard Parker, Bauer's CEO and Senior Vice President, immediately rejected the Anderson price increase and inventory cost shift during their initial meeting with Charles Anderson and Stockard on January 13, 2009.  Bauer ¶¶ 622-23.

On January 28, 2009, the CEO of Kable emailed Stockard that Kable's client Bauer could not afford the $0.07 fee.  Kable ¶ 508; *id.*, Ex. 13.  The email explained that "if there are other alternatives, [Kable is] willing to listen and share with [Kable's] clients, but if it is only the $0.07 fee," then Kable had "no other choice" but to cease distribution to Anderson News.  *Id.*  Bauer had an economic interest in keeping Anderson in business, as Anderson owed it $16.66 million.[9]

---

[9] Anderson disputes that it owed Bauer $16.66 million, but does not dispute that it owed Bauer money at the time it went bankrupt.  *See* Anderson Resp. (Bauer) ¶ 619.

Bauer ¶ 619.  Any hope of repayment was realistic only if Anderson stayed in business.

### ii.  Time and TWR

On January 21, 2009, Richard Jacobsen, CEO of TWR, met with Charles Anderson and Stockard to further discuss the Anderson price increase and inventory cost shift.  Time ¶ 105.  At the meeting, Jacobsen offered to increase Anderson News' discount on certain weekly publications by two percentage points, and reiterated "the need to reduce [TWR's] receivables exposure."  That is, Anderson had to pay Time/TWR to earn that discount.  The parties did not reach an agreement.  *Id.* at ¶ 106.

On January 25, Jacobsen proposed that Anderson News and TWR maintain the current status quo for a 30-day negotiating period; Anderson rejected that offer too.  *Id.* ¶ 108.  Two days later, on January 27, Jacobsen, on behalf of Time, sent Anderson News a letter proposing a 30-day negotiation period, in which the parties would attempt to reach an agreement regarding, *inter alia*, the per-copy magazine surcharge and the proposed inventory cost shift.  *Id.* ¶¶ 109-10.  The letter offered Anderson News an additional 2 percentage points of discount on certain Time magazines.  In return, TWR requested that Anderson News not impose the per-copy surcharge during the 30-day period, and that Anderson News not shift its inventory expenses, but rather pay its January 2009 invoice of $11,336,614.  *Id.* ¶ 110; *id.*, Ex. 88.  Anderson News rejected this offer as well.  *Id.* ¶ 115.  The next day, January 28, Jacobsen informed Anderson News via letter that TWR would no longer provide Anderson News with Time publications.  *Id*. ¶ 116.

At his deposition, Charles Anderson stated that he and Jacobsen had participated in yet another round of negotiations on January 31, 2009.  Anderson Opp. (Time) ¶ 15.  During those negotiations, Jacobsen is said to have improved the terms of his January 27, 2009 letter by offering Anderson a 2.75 percentage point increase in the discount on *People*, Time's most

popular publication, and a two percentage point discount increase on Time's other magazines. *Id.* Charles Anderson said he accepted those terms, and he and Jacobsen shook hands to confirm the deal. *Id.* On February 2, 2009, however, Charles Anderson spoke with Ann Moore, CEO of Time, who informed him that Time would no longer supply Anderson with magazines. *Id.* ¶¶ 21-22.

### iii.  AMI, Rodale, Hachette, and Curtis

Richard Alleger, Rodale's Senior Vice President of Retail, first learned of the Anderson surcharge and inventory cost shift from the January 14, 2009 conference call.[10]  Rodale ¶ 709. He immediately computed the costs that Rodale would incur by paying the seven-cent per magazine surcharge, and determined that Rodale could not afford it. *Id.* at ¶ 711.  That day, Alleger informed Rodale's distributor Curtis that Rodale would not pay. *Id.* at ¶ 712.

Charles Anderson testified that, on January 17, 2009, he spoke via telephone with Robert Castardi, Curtis' President, about the per copy surcharge.  Anderson Opp. (Rodale) ¶ 145. Castardi told Charles Anderson that he was "working together with" Jacobsen of TWR, and that "whatever [Jacobsen] decided, [Curtis] was going along with." *Id.*  Subsequently, on January 21, 2009, Castardi met with Charles Anderson on behalf of Curtis' publisher clients, who included Defendants Hachette, Rodale, and AMI.  Curtis ¶ 428.  The parties did not reach an agreement regarding the magazine surcharge; instead, Charles Anderson reiterated that February 1, 2009 was a firm deadline for publishers to agree to it. *Id.*  AMI sent a letter to Stockard that day rejecting the surcharge and inventory cost shift.  Anderson Opp. (Rodale) ¶ 97.

Following January 21, 2009, Castardi called Stockard on January 22 and 23, and asked to speak with Charles Anderson to discuss the surcharge and cost shift, but Charles Anderson never

---

[10] The evidence indicates that, although Alleger had heard rumors regarding Anderson's proposed surcharge and inventory cost shift by January 13, he did not formally learn of Anderson's terms until the January 14 call. Anderson Opp. (Rodale) ¶ 60.

returned Castardi's calls.  Curtis ¶ 430.  On January 26, Castardi emailed another Anderson

News executive, explaining that he had been "asking for discussions with [Charles Anderson] for

the past week; to no avail."  *Id.* ¶ 432.  The email noted that "the vast majority of our clients have

adamantly decline[d] you[r] offer without any influence from Curtis."  Castardi invited the

executive to "feel free to call" him, and to "[l]et [him] know if anything ha[d] changed."  *Id.*

Again, Anderson News did not respond.  *Id.*  Castardi called Stockard again on January 27 to

request that Stockard set up a call with Charles Anderson; Charles Anderson never returned that

call either.  *Id.* ¶ 433.  Finally, on January 29, Curtis announced that it would seek alternative

distribution methods for its publisher clients.[11]  *Id.* ¶ 440.

According to Charles Anderson, on January 31, during negotiations with Jacobsen,

Jacobsen asked Charles Anderson about the status of his negotiations with Curtis.  Charles

Anderson replied that Castardi had said that Castardi and Jacobsen were "working together."

Jacobsen folded his arms and nodded in the affirmative.  Anderson Opp. (Curtis) ¶ 158.

### d.  Anderson Implements "Going Dark" Plan

After February 1, Anderson advised its two largest retailers (Wal-Mart and Kroger) that it

was not receiving magazines from its publishers.  Both retailers affirmed their agreement to not

take magazines from wholesalers other than Anderson at their Anderson-serviced locations.

Time ¶ 123.  On Saturday, February 7, 2009, after Anderson's price increase proposal was

rejected by almost every publisher, including all Defendants, Anderson implemented the next

phase of its "going dark" plan.  Anderson News announced via press release that it had

"suspended normal business activities effective immediately."  *Id.* ¶ 125.  That day, Bo Castle,

---

[11] At oral argument, counsel for Defendants asserted that Hachette agreed to Anderson's seven-cent per magazine price increase.  Dkt. No. 445, at 57-59.  The evidence indicates, however, that at most, Hachette agreed to pay the price increase on a "short-term" basis.  *See* Fritzler Decl., Exs. 97, 98.  In fact, on January 30, 2009, Hachette sent Anderson News a letter stating that it would not accept either the seven-cent surcharge or the SBT inventory cost shift.  Davis Decl., Ex. 515.

President of Anderson Services, informed Anderson News and NGDS that ProLogix East would "stop production and deliveries immediately," and that its employees would "be notified not to report to work on Monday, February 9, 2009." *Id.* ¶ 126.  Charles Anderson was aware that, at the time he ordered ProLogix East to shut down, a supply of TNG's magazines was locked in ProLogix East's warehouses and there was no way for anyone from TNG or ProLogix East to access it.  *Id.* ¶ 127.

TNG and NGDS objected to the shutdown of ProLogix East.  *Id.* ¶130.  On Sunday, February 8, 2009, Glen Clark, President of TNG and a manager of ProLogix East, wrote to Charles Anderson and Castle, asserting that Clark had not been informed of the shutdown in advance, and that the decision was made "without a meeting of, or any discussions of, the full Management Committee of the Company."  *Id.* ¶ 131.  Clark sought a special meeting of ProLogix East's management committee, but Castle refused, stating: "We are not prepared to meet at this time."  *Id.* ¶¶ 131-32.

On Monday, February 9, 2009, Great Atlantic News, TNG's subsidiary, filed suit in the U.S. District Court for the District of Delaware, seeking a temporary restraining order ("TRO") requiring ProLogix East to continue distributing TNG's magazines to retailers.  *Id.* ¶ 133.  On February 9, the District Court granted the TRO, forcing ProLogix East to reopen and resume distributing TNG's magazines.[12]  *Id.* ¶ 134.  Charles Anderson testified that the TRO "forc[ing] us to open back up, in my opinion, . . . was game over," and that it "opened the floodgates up." *Id.* ¶ 135.  Following the Order, Anderson News "became quickly insolvent."  *Id*.

Immediately upon the issuance of the TRO on February 9, 2009, Charles Anderson decided to permanently close Anderson News.  At that time, Anderson News had not liquidated

---

[12] The Delaware Court issued the TRO orally on February 9, 2009, and the written Order was entered on February 10, 2009.  Oral Arg. Tr. at 62.

any assets or terminated any employees.  *Id.* ¶¶ 137-38.  That day, Charles Anderson called "key retailers" and explained that, "because of this temporary restraining order, we're going to have to liquidate the company or sell what we can as quickly as we can."  *Id.* ¶ 139.  Anderson News never retracted the price increase and inventory cost shift; it did not offer to distribute magazines on pre-January 12, 2009 terms; nor did Anderson News seek legal intervention requiring publishers to continue to supply it with magazines.

**DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

### I.   Legal Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the "burden of proof at trial would fall on the nonmoving party," however, it is "ordinarily . . . sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citation omitted).  If the movant does so, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact . . . in order to avoid summary judgment."  *Id.*  The nonmoving party may not "rest on allegations in the pleadings," but must "point to specific evidence in the record" to meet its burden.  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).

A factual dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering whether such a dispute exists, a court examines all evidence in the light most favorable to the nonmoving party.  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  The "mere existence of *some* alleged fact dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment." *Liberty Lobby*, 477 U.S. at 247-48.  Rather, there must "be no *genuine* issue of *material* fact."  *Id.*  Summary judgment is "particularly favored" in antitrust cases "because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002).

### a.  Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To prove an antitrust violation, a plaintiff must show: (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) an "unreasonable restraint of trade either *per se* or under the rule of reason."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).

### i.  Concerted Action

To prove a conspiracy, a plaintiff must "present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation omitted).  The Sherman Act, however, does not prohibit independent action; rather, the "[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."  *Id.* (citation omitted).

If the evidence of an unlawful agreement is "ambiguous," "antitrust law limits the range of permissible inferences" that may be drawn from defendants' conduct.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  Conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference

of antitrust conspiracy." *Id.* To survive a motion for summary judgment, a plaintiff "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Id.* (citation omitted).

The "range of inferences that may be drawn" from a plaintiff's evidence "depends on the plausibility of the plaintiff's theory." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012). If a plaintiff's "theory of recovery is implausible," then "strong direct or circumstantial evidence" is necessary to "satisfy *Matsushita*'s 'tends to exclude' standard." *Id.* (citation omitted). In contrast, if the conspiracy is "economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive," the standard is "more easily satisfied." *Id.* (citation omitted). Plaintiffs need not "disprove all nonconspiratorial explanations for the defendants' conduct"; instead, plaintiffs must present "sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (citation omitted).

### ii.   Unreasonable Restraint of Trade

Despite its broad language, Section 1 prohibits only "unreasonable" restraints on trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). "Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." *AD/SAT v. Associated Press*, 181 F.3d 216, 232 (2d Cir. 1999).

Some agreements are illegal *per se*, in that they "are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (citation omitted). Other agreements are outlawed under the rule of reason. In those cases, "plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market." *Geneva Pharms.*

*Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004) (citation omitted).

In determining whether conduct is unlawful *per se* or under the rule of reason, courts distinguish between "horizontal" agreements, which "involve coordination 'between competitors at the same level of a market structure,'" and "vertical" agreements, which "are created between parties 'at different levels of a market structure.'"  *United States v. Apple, Inc.*, 2015 WL 3953243, at *17 (2d Cir. June 30, 2015) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012)).  Horizontal agreements are, "with limited exceptions, *per se* unlawful." *Id.*  In particular, horizontal agreements to "allocate territories in order to minimize competition" are *per se* unlawful, even if there are no allegations of horizontal price-fixing. *Anderson News, L.L.C.*, 680 F.3d at 182-83 (citation omitted).  Similarly, "certain concerted refusals to deal or group boycotts" have long been held to be violations of Section 1 of the Sherman Act because they are "likely to restrict competition without any offsetting efficiency gains." *Id.*at 183 (citation omitted); *see Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).

Vertical agreements, on the other hand, are "subject to the rule of reason."  *Apple, Inc.*, 2015 WL 3953243, at *24.  In cases involving both horizontal and vertical agreements, all participants in the conspiracy may be liable "when the objective of the conspiracy [is] a *per se* unreasonable restraint of trade."  *Id.* at *25.

### b.  Clayton Act

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."  15 U.S.C. § 15.  To recover under Section 4, a plaintiff must "prove the existence of *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent that flows from that

which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citation omitted).  Accordingly, a plaintiff "can recover [for an antitrust injury] only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of competition[,] not competitors.") (citation omitted).

In addition, plaintiffs "must prove that [their] claimed injury was caused by the violation." *Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1019 (2d Cir. 1984).  A plaintiff "need not exhaust all possible alternative sources of injury in fulfilling its burden of proving compensable injury"; nor must plaintiffs demonstrate that "defendant's unlawful conduct [is] the *sole* cause of the plaintiffs' alleged injuries." *Publ'n Paper Antitrust Litig.*, 690 F.3d at 66 (citation omitted).  But a plaintiff must show that defendants' illegal conduct is "both a material and but-for cause" of the injury.  *Id.*

## ANALYSIS

### I.   Sherman Act

#### a.   Parallel Conduct

"[C]onspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, L.L.C.*, 680 F.3d at 183 (citation omitted).  One form of "admissible circumstantial evidence from which the fact finder may infer" a conspiracy is parallel business conduct. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (citation omitted).  "[E]vidence of [defendants'] parallel conduct alone," however, "cannot suffice to prove an antitrust conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.

1987).  Where defendants' parallel conduct forms the basis of a Section 1 claim, plaintiffs must "show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."  *Id.* at 253.

On January 12, 13, and 14, 2009, Anderson said it was losing millions of dollars and then announced its plan to impose a surcharge of seven cents per magazine, plus a shift of inventory costs of at least $70 million from Anderson to the publishers.  Anderson claimed that acceptance of the plan was critical to Anderson's continuing "viability."  Anderson gave the publishers and distributors until January 23, 2009, to accept this proposal.  If they did not accept, then Anderson would refuse to make deliveries of the publishers' magazines, as of February 1, 2009.  When it announced the plan, Anderson did not disclose its agreement with Walmart and Kroger that they would take magazines only from Anderson, and not from any other wholesaler.  Nor did Anderson mention the plan to prevent ProLogix East from making any deliveries.  In effect, Anderson was saying: "It's me or nobody."

Anderson can not state when the conspiracy started, but it is clear that there was no conspiracy at the time of the initial publications of the Anderson plan.  As of January 12, there was no conspiracy, and no one wanted to drive Anderson out of business.  Indeed it was in the publishers' and distributors' best interest to keep Anderson in business, if only so that Anderson would pay what it admittedly owed to the distributors and publishers.  According to Anderson, the conspiracy was formed "in a series of overlapping phases" subsequent to January 12.  Opp. Mtn. (Kable), at 5.

The Anderson proposal was designed for its own benefit, but it had no advantage or benefit whatsoever for the publishers and distributors.  There was no economic reason for them

to accept.  But in order to prevent the publishers and distributors from shifting their business to

alternate wholesalers, Anderson had devised its "going dark" plan to force the Defendants into

acceptance.  The publishers' and distributors' initial reactions are instructive.  They reacted in a

variety of ways, but were consistent in their determination that they were not acquiescing to the

Anderson proposal.

- Bauer immediately informed Anderson that it would not agree to the surcharge and cost shift during the parties' initial meeting on January 13.  Bauer ¶ 623.

- When Rodale learned of the surcharge and inventory cost shift on January 14, it contacted Curtis, its distributor, to reject Anderson's terms, but did not independently contact Anderson News regarding the proposal.[13]  Rodale ¶¶ 708-13.

- AMI rejected the surcharge on January 21, via letter to Anderson News.  Anderson Opp. (Rodale) ¶ 97.

- Curtis met with Anderson on January 21, but did not reach an agreement on behalf of its publisher clients.  Anderson did not move from its surcharge proposal, or from the February 1, 2009 date.  Thereafter, Castardi attempted to speak with Charles Anderson on multiple occasions, but Charles Anderson never returned his calls.  Curtis ¶¶ 430, 432.  Curtis announced on January 29 that it would seek alternative distribution for its publishers (Rodale, AMI, and Hachette).  *Id.* ¶ 440.

- On January 25 and 27, TWR sought to maintain the existing arrangement for a 30-day period to permit the parties to continue negotiations.  On January 31, according to Charles Anderson, TWR and Charles Anderson reached a handshake agreement, pursuant to which Time would not pay the surcharge, but would offer Anderson News an increased discount on Time's magazines.  Anderson Opp. (Time) ¶ 15.  On February 2, Time's CEO informed Anderson that Time would no longer ship magazines to Anderson.  *Id.* ¶ 22.

These differing reactions do not support an inference of "parallel business conduct"; if

anything, Defendants' initial reactions to Anderson's proposal are inconsistent with "a conscious

commitment to a common scheme."  *Monsanto Co.*, 465 U.S. at 764 (citation omitted); *see*

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009).  Each of

---

[13] Anderson asserts that "Rodale personnel had direct contact with high level Anderson personnel" during this time, but does not elaborate on who these individuals are, or what the "contact" entailed.  Anderson Resp. (Rodale) ¶ 713.

the Defendants acted in their own economic interest.  There is no doubt, however, that

Defendants' ultimate conclusions were the same, in that each Defendant eventually rejected

Anderson's proposal to increase prices and shift inventory costs.  Instead they moved their

business to alternative wholesalers who continued to offer less onerous terms (*i.e.* more

favorable to the publishers and distributors).  *See Anderson News, L.L.C.*, 680 F.3d at 191

("[T]he '*key* parallel conduct allegation' was that all of the publisher and distributor defendants

ceased doing business with Anderson." (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 732

F. Supp. 2d 389, 398 (S.D.N.Y. 2010))).  Because Defendants' ultimate reactions were to refuse

to accept Anderson's price increase proposal and inventory cost shift and to move their business

to wholesalers who offered lower prices and costs, the Court turns to whether Plaintiffs have

provided evidence that Defendants' conduct was consistent with a conspiracy to drive Anderson

out of business, or whether Defendants' proof is consistent with establishing independent action

on behalf of each Defendant.  *See Apex Oil Co.*, 822 F.2d at 253.

### b.  Plus Factors

"Plus factors" indicative of an illegal agreement include "a common motive to conspire,

evidence that shows that the parallel acts were against the apparent individual economic self-

interest of the alleged conspirators, and evidence of a high level of interfirm communications."

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)

(citation omitted).  These plus factors are "neither exhaustive nor exclusive, but rather illustrative

of the type of circumstances which, when combined with parallel behavior," may permit the

inference of "the existence of an agreement."  *Id.* at 136 n.6.

But the presence of plus factors certainly does not compel or "necessarily lead to an

inference of conspiracy."  *Apex Oil Co.*, 822 F.2d at 254.  In some cases, plus factors "lead to an

equally plausible inference of mere interdependent behavior, *i.e.*, actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Id.*

Plaintiffs seek to introduce expert testimony that certain plus factors are in fact "super-plus" factors; that is, factors that "by themselves allow a strong inference of collusion." *See* Expert Report of Dr. Leslie Marx ("Marx Report"), ¶ 67.  Plaintiff's expert, Dr. Marx, asserts that three "super-plus" factors are present in this case. *Id.* ¶ 68.  Plaintiffs offer no evidence, however, that the term "'super-plus' factors" has been generally accepted by the scientific or academic communities, or that Dr. Marx's methodology is reliable.  Accordingly, Plaintiffs' use of, and reliance upon, the term "super-plus factors" is rejected. *See* Order Granting in Part and Denying in Part Defendants' Motions to Exclude Expert Testimony.

### i.  Common Motive to Conspire

Motive to conspire may be inferred where the parallel "action taken [by defendants] had the effect of creating a likelihood of increased profits." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968).  An anticompetitive motive may also be inferred where there is evidence that "defendants were primarily motivated by a desire to damage plaintiff or put it out of business." *Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71, 78 (9th Cir. 1969).  Courts may not, however, "infer a conspiracy where the defendants have no 'rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations.'" *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (quoting *AD/SAT*, 181 F.3d at 233).

Plaintiffs have not presented evidence supporting the inference that Defendants had a common motive to force Anderson News out of business.  Anderson concedes that there was no

conspiracy to drive Anderson out of business prior to its January, 2009 proposal.  The proposal offered nothing for the publishers and distributors, other than higher per-magazine charges and higher inventory costs.  Other wholesalers offered better terms.  Nonetheless, Plaintiffs conjures up two "motives" for Defendants to engage in the conspiracy; however, in each instance, Defendants' conduct was "as consistent with permissible competition as with illegal conspiracy." *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 588.

First, Plaintiffs contend that if Anderson News successfully imposed its plan on distributors and publishers, they realized that other wholesalers would quickly follow suit. Plaintiffs point to an internal email written by Hubert Boehle, Bauer's CEO, which states that "if [the seven-cent surcharge] were to be introduced, . . . it goes without saying that all wholesalers would demand the same fee."  Davis Decl., Ex. 330.  Similarly, James Roberts of Kable emailed his colleague that "we are encouraging our publishers not to [agree to the Anderson proposal] since they would have to do it with every other wholesaler."  *Id.*, Ex. 423.

Stripped to its essentials, Anderson argues that Defendants were concerned that agreeing to Anderson's proposal would encourage other wholesalers to implement similar surcharges and inventory cost shifts, so Defendants had a motive to conspire against Anderson News.  This is a slender reed to support such a weighty conclusion.  No Defendant was seeking to "increase[] [its] profits"; rather, it is apparent that the publishers and distributors were trying to avoid a price increase for each magazine and a shift of inventory costs that Anderson was trying to impose on them.  *See First Nat'l Bank of Ariz.*, 391 U.S. at 287.  A far more plausible explanation for Defendants' conduct is that each Defendant was independently unwilling to accept the Anderson proposal, because acceptance would result in a substantial increase in costs.  That other wholesalers might demand similar surcharges, if Anderson's proposal were successful, merely

provided an additional reason for each Defendant to reject it.  *See Ross*, 35 F. Supp. 3d at 443.

Next, Anderson posits that Defendants sought to reduce the number of wholesalers in the single-copy market, because the remaining wholesalers could then extract pricing concessions from retailers, rather than from publishers.  (Keep in mind that this argument is made by the entity which agreed with two of the nation's largest retailers to support Anderson in its going dark plan.  *See* p. 11, *supra*.)  Plaintiffs continue that, because retailers use only one wholesaler per geographical area, the exit of a single wholesaler from that area results in less competition between the remaining wholesalers.  Those wholesalers therefore exert more power over retailers, and can seek concessions from retailers that wholesalers would otherwise obtain from publishers and distributors.  *See Anderson News, L.L.C.*, 680 F.3d at 194 ("With only two national wholesalers, each with its own allocated territory, many retailers would have no other supplier choice; wholesalers could increase their profits by raising prices to the retailers, and not seek, as Anderson and Source had, to increase charges to the publishers.").

Plaintiffs' argument is based on the expert report of Dr. Marx, which in theory relies largely on communications by Defendants and retailers.  For example, in an email dated January 30, 2009, a Hachette executive wrote that one benefit of Anderson News and Source exiting the market would be that "[f]ewer wholesalers reduce[] retailers['] options to play one wholesaler against another."  Anderson Opp. (Curtis) ¶ 227.  Richard Parker of Bauer wrote in an internal email regarding Anderson News and Source, "Hopefully they are both gone!"[14]  Marx Report ¶ 130.  Dr. Marx also refers to testimony from retailers referencing concerns that a reduction in the number of wholesalers would increase prices to retailers, and decrease services.

This line of argument puts speculation on top of conjecture and then projects a bad

---

[14] Similarly, Jim Gillis, Chief Operating Officer of Source's parent company, testified that, during separate conversations with Jacobsen of TWR and Castardi of Curtis, each stated that they sought to create a "two-wholesaler" system.  Anderson Opp. (Curtis) ¶ 98.

motive onto the Defendants.  It also overlooks evidence that reducing the number of wholesalers was not in Defendants' interests.  Indeed, evidence strongly suggests that Defendants wanted more, rather than fewer, wholesalers in the single-copy market, because more wholesalers meant more competition for both retailers' and publishers' business—resulting in more favorable terms for Defendants.  *See* Curtis Mtn. at 7-8; Expert Report of Dr. Janusz Ordover ¶ 10.  For example, the undisputed evidence demonstrates that, prior to Anderson's announcement of the proposal, Curtis had taken affirmative steps to help keep Anderson News in business.  *See* Curtis ¶ 441; Bauer ¶ 632 (internal Bauer email stating that the "rosiest scenario" would be for Anderson to remain in business but retract the magazine price increase).  This is inconsistent with Defendants' alleged desire to force Plaintiffs out of the business.

Driving Anderson News out of business is not plausible because it was not in the Defendants' financial interest.  In January 2009, Anderson News owed significant sums to Defendants.  For example, Defendants contend that, at the time Anderson News exited the market, it owed Curtis $35 million, Bauer $16.66 million, and Kable $6 million.  Curtis ¶ 442; Bauer ¶ 619; Kable ¶ 510.  The total amount Anderson owed to Defendants was set at over $100 million in the bankruptcy proceeding.[15]  Time ¶ 148.  Forcing Anderson News out of business would deprive Defendants of being paid.  It was in Defendants' best interest to keep Anderson viable and in business so it could repay its trade debts.  Conspiring to force Anderson News out of business would virtually guarantee that Defendants would not recoup these amounts.

### ii.  Acts Against Individual Economic Self-Interest

Evidence that defendants' parallel acts were "against [their] apparent individual economic self-interest" may also "tend to exclude the possibility of independent parallel

---

[15] Anderson News disputes these amounts, but does not deny that it owed Defendants money at the time it exited the market.  *See, e.g.*, Anderson Resp. (Curtis) ¶ 442.

behavior." *Apex Oil Co.*, 822 F.2d at 254 (citation omitted).  Parallel acts are less indicative of collusion, however, where defendants' actions are "economically reasonable."  *See Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 2007 WL 39301, at *10 (S.D.N.Y. Jan. 8, 2007); *cf. In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) (observing that "[w]e can . . . without suspecting illegal collusion, expect competing firms to keep close track of each other's . . . market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it," and holding that "[t]acit collusion, also known as conscious parallelism," does not violate Section 1 of the Sherman Act).  A defendant's "decision to terminate a service that [is] both costing . . . money and not bringing in additional revenue, and to install an alternative, cost-free service" is economically reasonable, and therefore "does not give rise to an inference of an unlawful conspiracy."  *See AD/SAT*, 181 F.3d at 237-38; *First Nat'l Bank of Ariz.*, 391 U.S. at 279 ("Obviously it would not have been evidence of conspiracy if [defendant] refused to deal with [plaintiff] because the price at which he proposed to sell oil was in excess of that at which oil could be obtained from others.").

Plaintiffs assert that Defendants' refusal to accept Anderson's magazine price increase and shift of inventory expenses was counter to Defendants' economic self-interest.  Counsel could cite no case in which the antitrust laws were successfully invoked by an entity attempting to raise prices and shift inventory costs to its trading partners.[16]  Dkt. 445, at 101.  Plaintiffs persist in their novel (but unsupported) theory that it was in Defendants' self-interest to agree to

---

[16] One week after oral argument, Plaintiffs were still unable to discover any case support for their proposition.  Dkt. 447, at 3.  The Second Circuit analysis of the allegations of the amended pleading do not control.  The Second Circuit emphasized that "the mere fact that an offer of goods or services at a given price may be nonnegotiable does not mean that the offerees, in responding to it, cannot violate the antitrust laws."  *Anderson News, L.L.C.*, 680 F.3d 162 at 192.  No court has ever held, however, that the antitrust laws require businesses to accept a higher price than that which is offered by competitors.

Anderson's price increase proposal, if only to avoid disruption in the distribution of magazines.[17] Acceptance of the proposal would reward publishers, Anderson speculates: Defendants would gain increased display space at retailers' stores, since Anderson would have ceased distributing magazines from publishers who had not agreed to the surcharge.  In support, Plaintiffs point to an internal DSI email regarding non-party Comag—who had continued to ship magazines to Anderson News—stating that Comag "continue[s] to receive distribution and . . . now receive dramatically better display because they are in our pockets!!!"  Anderson Opp. (Bauer) ¶ 204.

Plaintiffs' argument is illogical.  If each Defendant acquiesced to the magazine surcharge and inventory cost shift, then no Defendants' distribution would be disrupted, and all of their magazines would be displayed in retail stores.  Defendants therefore would have paid more to Anderson and accepted harmful monetary charges, but would have received no benefit in the form of increased retail space.  Furthermore, Plaintiffs offer no evidence that Defendants viewed a temporary disruption in distribution to be more costly than the cumulative costs of accepting the Anderson proposal.

Absent collusion, plaintiffs claim, Defendants could not shift their business to an alternative wholesaler who was not seeking a surcharge, because retailers determined which wholesalers would distribute to their stores, and many retailers preferred to work with Anderson News.  Again, it must be kept in mind that it was Anderson itself which arranged for two of the nation's largest retailers to refuse to do business with wholesalers other than Anderson. According to Anderson, a Defendant, acting unilaterally, would be unable to convince retailers to switch wholesalers from Anderson News to an alternative wholesaler.  In 2008, for example,

---

[17] Plaintiffs seek to bolster their unpersuasive theory using Dr. Marx's expert testimony that it was in each Defendant's independent economic self-interest to continue to supply Anderson News with magazines.  *See* Marx Report, ¶¶ 305, 318.  Dr. Marx, however, provides no analysis to support this conclusion, other than repeating the contents of certain of Defendants' email communications.  Such testimony is inadmissible under Fed. R. Evid. 702. *See* Order Granting in Part and Denying in Part Defendants' Motion to Exclude Expert Testimony.

Curtis had attempted to unilaterally change its Texas wholesaler from Anderson News to TNG. Anderson Opp. (Curtis) ¶ 260.  Wal-Mart refused to accept the change, however, and Curtis was forced to continue using Anderson News as its Texas wholesaler.  *Id.* ¶¶ 261-62.

The evidence suggests that Defendants understood that the more publishers and distributors who shifted from Anderson News to an alternative wholesaler, the more pressure they could place on retailers to accept that wholesaler.  For example, Alleger of Rodale wrote to Michael Porche of DSI that Comag had reached a deal with Anderson "and will continue to SHIP!"  Alleger opined that "[Michael] Sullivan [of Comag] is dangerous."  Anderson Opp. (Curtis) ¶ 153; *see id.* ¶ 103 (Castardi of Curtis stated during meeting with DSI that "[o]bviously, disagreement among publishers and national distributors with regard to alternative distribution will make it difficult to execute the alt[ernative] distribution plan."); Anderson Opp. (Kable) ¶ 208 (internal Bauer email stated that it was "important" that Wal-Mart know that "not only Time but Bauer, AMI[,] all Curtis and Kable" would not ship magazines to Anderson News).

Even if any individual Defendant would be unable to unilaterally switch wholesalers, it was still consistent with each Defendant's independent self-interest to attempt to do so. Anderson News' wholesaler competitors TNG and Hudson News did not impose a per-magazine surcharge, nor did they attempt to shift inventory costs.  Defendants' choices were therefore to: (1) acquiesce to the Anderson proposal which would have increased substantially their cost of doing business, or (2) seek to shift their business to another wholesaler, and not bear the additional cost and expense of giving in to Anderson's pricing demands.  Defendants' choice to do the latter is consistent with their economic self-interest.  *See Interborough News Co. v. Curtis Publ'g Co.*, 225 F.2d 289, 293 (2d Cir. 1955) (holding that distributor "had a legal right to break away from a wholesaler whose service it considered unsatisfactory and to set up and encourage

by subsidy new competing wholesalers," and that there was "no reason . . . why [distributor] should not use every reasonable effort to influence and persuade other national distributors to patronize the new competing wholesalers," so long as "[e]ach defendant independently negotiated its agreements with its respective wholesalers" and "[e]ach new wholesaler was in spirited competition with plaintiff and each other").

Defendants could also, without colluding, work to shift their business to an alternate wholesaler, in the hope that other Defendants would do the same. Even if Defendants "ke[pt] close track of each other's" attempts to switch wholesalers, and "[found] it in their self-interest to imitate that behavior," this would not violate the law. *See Text Messaging Antitrust Litig.*, 782 F.3d at 879. Indeed, it was Anderson News' own action—imposing a plan which was good for it, but unacceptable to everyone else—that provided a common economic stimulus for Defendants' attempts to switch wholesalers.[18] Plaintiffs have offered no evidence that it was *counter* to any individual Defendant's self-interest to shift its business to an alternate wholesaler.

### iii.  Interfirm Communications

Interfirm communications may be evidence of an illegal agreement, particularly where those communications "represent[] a departure from the ordinary pattern" of communications between defendants. *See United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 655 n.14 (S.D.N.Y. 2013). Interfirm communications are especially probative where there is evidence that defendants exchanged confidential information, *see In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 369 (S.D.N.Y. 2011), or sought to conceal their communications. *See In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009). Yet a "mere showing of close relations or frequent meetings between the

---

[18] Plaintiffs concede that there is no evidence that, prior to the announcement of the Anderson price increase and inventory cost shift, Defendants conspired against Anderson News. The alleged conspiracy started post-January 12, 2009, and ended when Anderson shut its doors on February 9, 2009.

alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981) (citation omitted).

Plaintiffs set forth a number of telephone calls, emails, and meetings between Defendants that occurred between Anderson's announcement of its proposal and the date it exited the business. None of these communications, however—viewed separately or as a whole—provide "sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not."[19] *Publ'n Paper Antitrust Litig.*, 690 F.3d at 63 (citation omitted).

As an initial matter, many communications that occurred between Defendants were not only permissible, but were necessary for Defendants to respond to Anderson's proposal and to conduct their day-to-day business. Anderson was of course aware that Defendant Publishers had relationships with Defendant Distributors, and that certain Defendant Distributors represented multiple Defendant Publishers. Plaintiffs concede that conversations between "[n]ational distributors" and "their publishers for whom they work" are perfectly acceptable. Dkt. No. 445, at 37.

### 1. Meetings and Telephone Calls

Plaintiffs point to a number of meetings and telephone calls between Defendants that were direct competitors. For example, on January 14, 2009, following Charles Anderson's telephone conference announcing the seven-cent increase and inventory cost shift, David Pecker of AMI spoke via telephone to Ann Moore of Time, and to Cathie Black of Hearst, and discussed Anderson's terms. Anderson Opp. (Curtis) ¶ 62. Pecker also held a meeting with Richard Parker of Bauer at AMI's offices; the Anderson price proposal was discussed. *Id.* ¶ 63. That

---

[19] The meetings, telephone calls, and emails cited in this Order are not exhaustive of those that appear in the parties' papers. The Court has, however, considered all communications set forth in Plaintiffs' motions and Rule 56.1 Statements.

day, telephone calls were also placed from Curtis to two of its competitors—Richard Jacobsen of

TWR and Michael Duloc of Kable.  *Id.* ¶ 62.  On January 15 and 16, 2009, calls were placed

from Bauer's office to competitors Time and Rodale, and from Curtis to competitors TWR and

Kable.  Jacobsen also spoke multiple times to Robert Castardi of Curtis.  *Id.* ¶ 68.  Competitors

Duloc (Kable) and Castardi (Curtis) met for dinner on January 17, along with William

Michalopoulous of Hachette.  *Id.* ¶ 69.  Between January 20 and January 30, Curtis and Kable

each placed a number of calls to their distributor competitors; Bauer and Rodale each placed

multiple calls to their publisher competitors.  *Id.* ¶¶ 128-35.  On January 29, competitors Duloc

and Jacobsen met at Jacobsen's office, and the two also spoke via telephone the following

morning.  *Id.* ¶¶ 122-23.  Competitors Parker and Pecker spoke via telephone that day as well.[20]

*Id.* ¶ 122.

> At their depositions, when asked about these calls and meetings, the participants each
categorically denied ever proposing or reaching any agreement concerning how to respond to
Anderson.  Their testimony is that, at most, the terms of the Anderson proposal were discussed;
conversations between competitors regarding Anderson's terms do not, however, violate the law.
Indeed, Anderson invited all competitors to participate in the January 14, 2009 industry call.

> Moreover, in their Amended Complaint, Plaintiffs alleged that on January 29, executives
from Hudson, TNG, Curtis, DSI, and TWR met at Hudson's offices, and "discussed and planned

---

[20]   Plaintiffs have also provided evidence that the "frequent telephone calls among the . . . Defendants during the period of their negotiations with [Anderson News] represented a departure from the ordinary pattern of calls among them."  *See Apple, Inc.*, 2015 WL 3953243, at *6 (citation omitted).  In particular, Plaintiffs assert that in the month prior to the announcement of the Anderson price increase and inventory cost shift, "defendants exchanged with other defendants who were their competitors, or with defendant publishers or national distributors with whom they did not have a publisher-distributor relationship," 39 telephone calls and/or text messages, with a total duration of 82.4 minutes.  In contrast, from January 12, 2009 through February 12, 2009, there were "120 calls between direct competitor defendant publishers or national distributors, and 36 calls between defendant national distributors and non-client defendant publishers," with a total duration of 801.1 minutes.  Anderson Opp. (Curtis) ¶¶ 283-84.  Surely it was not a surprise to Anderson that its proposal, made on January 14 during an industry-wide telephone conference/interview, would stir up industry dialog.

their collusive activity." Am. Compl. ¶ 63.  That allegation was repeatedly cited in the Second

Circuit's opinion, but discovery has now confirmed that the claim that this key meeting occurred

is dubious at best.  Instead of direct evidence of collusion, as the alleged meeting was previously

heralded, we are called upon to draw inferences of the alleged illegal agreement, based on

numerous telephone conversations and in-person meetings.

Anderson concedes that there was no conspiracy prior to its mid-January, 2009

announcement.  Anderson's argument is now that Defendants' conspiracy "unfolded in a series

of overlapping phases."  *See, e.g.*, Opp. Mtn. (Kable), at 11.  This is entirely inconsistent with

Plaintiffs' burden to present circumstances that "reveal a . . . *meeting of minds* in an unlawful

arrangement."  *See Monsanto Co*., 465 U.S. at 764 (citation omitted) (emphasis added).

### 2.  Email Communications

Plaintiffs also point to email communications between competitor Defendants.  It will be

remembered that on January 12 and 13 Charles Anderson met with Time, AMI, and Bauer to

propose the price increase and inventory cost shift.  On January 13, 2009, Porsche of DSI

emailed Pecker of AMI that he had spoken "to Rick Parker [of Bauer] last night" and that "[l]ike

us [Parker] also believes we should start simultaneously using our collective resources and

influence to direct business towards [TNG]."[21]  Anderson Opp. (Curtis) ¶ 57.  Michael Roscoe, a

consultant to AMI and DSI, responded that the "best strategy" would be to "get Bauer and as

many other big players as possible on board to moving business away from Anderson" and to

"finaliz[e] a fail safe program to replace them entirely if they go down or walk away from the

business."  *Id.* ¶ 58.  Pecker agreed.  *Id.*  After the call-in conference with John Harrington on

January 14, 2009, Parker emailed his superior at Bauer on January 15: "[Time CEO] Ann

Moore[,] . . . [Hearst President] Cathy Black[,] as a matter of fact no one will ag[r]ee.  Pecker

---

[21] DSI acted as a distributor for both AMI and Bauer.  Time ¶ 13.

with us." *Id.* ¶ 65.  Porche also emailed Pecker (AMI), stating that Roscoe "is asking [Castardi of Curtis] to call Wal-Mart," because "[w]e agree the more companies that get on the record saying they do not intend to pay the 7¢ fee the better." *Id.* ¶ 77.

On January 20, Phillippe Guelton, COO of Hachette, sent an internal email instructing Thomas Masterson to "monitor closely how the industry is reacting" to Anderson's proposal.  *Id.* ¶ 105.  Guelton also told Masterson that Alaine LeMarchand, CEO of Hachette, had been in contact with Bauer, and that Bauer was "holding tight for now."  *Id.*  Masterson replied that "we are in constant touch with Curtis, DSI, and other publishers."  *Id.*  On January 27, 2009, Porche asked Parker (Bauer) "what [he was] hearing regarding *People* [m]agazine."  *Id.* ¶ 113.  That day, Parker emailed Time's logistics company seeking "any information on . . . any Time publishing being held up."  *Id.* ¶ 111.  Porche (DSI) emailed Pecker (AMI) that "Parker has notified me that both Anderson and Source were cut off by him and Kable.  I just asked him for that info in writing."  *Id.* ¶ 114.  Porche sent the same information separately to Curtis.  *Id.*

On January 28, 2009, Jacobsen sent an internal email stating that TWR's competitor Curtis was "shutting off ANCO," and that Bauer was "holding product back from Source and ANCO but [had] not come ou[t] publicly about [its] plans."  *Id.* ¶ 120.  Alleger of Rodale emailed a DSI executive two days later, asking "Our man in Bauerland still solid?"; the executive responded, "He's solid alright."  *Id.* ¶ 126.  The next day, Duloc (Kable) sent an internal email stating, "[S]poke to [Jacobsen] earlier and not shipping . . . Would think we will announce shut off . . . [Anderson News] tomorrow."  *Id.* ¶ 174.  On February 1, a DSI executive sent an internal email explaining that "Bauer is hanging around waiting to see what we do," and "Time Warner is sending 100% of their print to new locations." [22] *Id.* ¶ 180.

---

[22] Plaintiffs also contend that Defendants sought to conceal their communications.  *See, e.g.*, *id.* ¶ 266 (internal Kable email following email exchange with Kable publisher client regarding Anderson price increase and inventory

Defendants' emails do not indicate that a coordinated agreement existed.  Instead, the communications demonstrate a *lack* of coordination among Defendants.  Far from providing circumstantial evidence of a "conscious commitment to a common scheme," *see Monsanto Co.*, 465 U.S. at 764 (citation omitted), Defendants' emails indicate that they did *not* know what their competitors were doing.  In particular, the communications detail Defendants' numerous attempts to determine how other Defendants were reacting to the Anderson proposal—communications that would be unnecessary if Defendants had reached a "common . . . understanding."  *Id.*; *see, e.g.*, Anderson Opp. (Curtis) ¶ 111 (Bauer seeking "any information on . . . any Time publishing being held up"); ¶ 114 (Porche informing AMI that "Parker [of Bauer] has notified me that both Anderson and Source were cut off by him and Kable," and stating "I just asked him for that info in writing").  It is to be expected that, in the absence of an agreement between Defendants, they would seek to "keep close track of each other's . . . market behavior" with respect to Anderson's proposal, and even "to imitate that behavior."  *See Text Messaging Antitrust Litig.*, 782 F.3d at 879.  The content of Defendants' emails show little more than industry participants endeavoring to gather information regarding how their competitors were reacting to the Anderson proposal.  It was Anderson News itself that set the deadline for acceptance of its proposal to increase prices and shift inventory costs in excess of $70 million to the publishers.  As the deadline approached, and Anderson did not change it, there was increasing uncertainty—not conformity in action.

### 3.   Communications with Wholesalers

Finally, Plaintiffs point to communications between Defendants and Anderson News or its wholesale competitors, which, Plaintiffs claim, support the inference of a conspiracy.  For

---

cost shift, stating, "You need to call these guys when they email you."); ¶ 267 (email from Porti of Curtis responding to request from client regarding Anderson proposal, stating, "No E-mails . . . I am in all day . . . call when you get a moment").

example, on January 17, during a call with Anderson, Castardi told Charles Anderson that he was "working together with [Jacobsen]," and that "whatever [Jacobsen] decided, [Curtis] was going along with." Anderson Opp. (Curtis) ¶ 145. On January 19, Castardi called retailers Wal-Mart and Kroger to discuss Anderson's efforts to lock other wholesalers out of Kroger and Wal-Mart. According to David Rustad, a buyer at Kroger, Castardi told him that "none of the[] publishers were going to support the 7-cent surcharge." *Id.* ¶ 79. Rustad also spoke to Jacobsen, who informed Rustad that he had spoken with "all [of] the publishers in the industry," and that "nobody was going to support the fee." *Id.* ¶ 82.

Jim Gillis, COO of Source's parent company, testified that Jacobsen told him that Jacobsen was "going to make it a two-magazine wholesaler system, and [Source] was not going to be one of them. *Id.* ¶ 98. Jacobsen told Gillis that, to do so, "All I need is Bob Castardi, and I got Bob Castardi." *Id.* Gillis also testified that Castardi had said, "[i]f Jacobsen says right, I go right. If he says left, I go left. We're in lockstep. We're doing this together. This is going to be a two-wholesaler system, and you ain't going to be one of them." *Id.* During a conversation with Charles Anderson, Castardi told Charles Anderson that he was "working" with Jacobsen, and that Anderson should "let . . . Source go out first." *Id.* ¶ 144.

As with the email communications, none of these conversations indicate the existence of an illegal agreement between Defendants. At most, the conversations suggest that Defendants sought to determine how their competitors would behave, and even, perhaps, to imitate it. This does not violate the law. Accordingly, Plaintiffs' "mere showing of close relations or frequent meetings" between Defendants do not "sustain [their] burden absent evidence which would permit the inference that these close ties led to an illegal agreement." *H.L. Moore Drug Exch.*, 662 F.2d at 941 (citation omitted).

40

Plaintiffs have failed to present evidence that "tends to exclude the possibility that [Defendants] acted independently."  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 588 (citation omitted).  Rather, Plaintiffs have set forth evidence that Defendants, when presented with a common economic stimulus which Plaintiffs themselves instigated, acted in a manner that was consistent with each Defendant's own, separate economic self-interest.  That Defendants' conduct was parallel is not dispositive.

Plaintiffs' theory, that Defendants acted contrary to their self-interest when they rejected the Anderson price increase and inventory costs, and shifted their business to alternative wholesalers who were not imposing a surcharge or imposing inventory costs, is a concoction which is not plausible.  Indeed it is ridiculous.  After six years of litigation, Anderson still cannot explain why it was in Defendants' interest to pay more per magazine, and assume substantial inventory costs.  It is clear why no explanation is possible; it was simply not in Defendants' interest to do so.  This is especially so because other wholesalers were offering lower prices and were offering to bear inventory costs.  Plaintiffs have not offered "strong direct or circumstantial evidence" that would "satisfy *Matsushita*'s 'tends to exclude' standard."  *See Publ'n Paper Antitrust Litig.*, 690 F.3d at 63.  Defendants' communications with one another following the announcement of Anderson's proposal do not provide this "strong . . . circumstantial evidence," because Plaintiffs have presented no evidence that the communications led to a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *See Monsanto Co.*, 465 U.S. at 764 (citation omitted).  Plaintiffs have thus failed to demonstrate a genuine issue of material fact regarding whether Defendants participated in a "concerted action" in violation of Section 1 of the Sherman Act.

## II.  Clayton Act

### a.  Antitrust Injury

Even assuming that Plaintiffs had demonstrated a genuine issue of material fact regarding the existence of a conspiracy between Defendants, and further assuming that such a conspiracy constituted an illegal agreement, Plaintiffs have failed to raise an issue of material fact regarding whether they have suffered an antitrust injury.  *See Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1019 (2d Cir. 1984).

It is undisputed that, with the exception of Source, Plaintiff's wholesaler competitors did not seek a price increase or to shift inventory costs, or that the prices and costs that Anderson News sought to impose were above that which other wholesalers were charging.  Plaintiffs fail to explain how Defendants' refusal to acquiesce to their above-market prices constitutes an antitrust injury.  Indeed, a company's inability "to raise [its] prices" due to competition is not an antitrust injury.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990).  Plaintiffs cannot demonstrate that Defendants' actions were "competition-reducing," because Anderson News was not attempting to "compete" with other wholesalers.  *See id.* at 344.  Instead, Anderson News sought to unilaterally increase its rates above market price.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of competition[,] not competitors.") (citation omitted).

### b.  Causation

Moreover, Plaintiffs fail to raise a genuine issue of material fact regarding whether Defendants' conduct caused Plaintiffs' alleged antitrust injury.  The undisputed facts show that

Anderson News' collapse was entirely due to its own actions, and nobody else's.  *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 44 (2d Cir. 1986).

Prior to announcing the surcharge in January 2009, Anderson News had been losing money for years.  In each fiscal year from 2004 through 2008, Anderson News reported income from continuing operations ranging from negative $18.9 million to negative $30.9 million.  Time ¶ 48.  During those years, Anderson News' earnings before interest, taxes, depreciation, and amortization, ranged from negative $12.5 million to negative $23 million.  *Id.* ¶ 49.  In fact, between 2004 and 2008, Anderson News reported positive net income only in 2006—and that positive income was solely due to the sale of certain operations to its competitor Source.  *Id.* ¶ 50.

When Charles Anderson made his January 2009 proposal for a price increase and inventory cost shift, he explicitly stated that "over the last 10 years . . . profits [had] eroded to nothing and into significant losses."  *Id.* ¶ 76.  If publishers did not agree to the Anderson proposal, Anderson News would likely exit the business.  During his January 12 meeting with Ann Moore of Time, Charles Anderson told her that Anderson News needed to implement the price increase, and shift inventory expenses, "to be viable."  *Id.* ¶ 69.  While planning the telephone conference to announce and explain the proposal, Charles Anderson told John Harrington, who conducted the conference, that "if [Anderson News] didn't get an agreement . . . they would cease operations, they would close the doors."  *Id.* ¶ 74.  During the conference, Charles Anderson stated that "this business is not profitable and has not been for a very long time."  *Id.* ¶ 76.  Harrington also asked Charles Anderson, "[I]n the event of significant levels of non-cooperation, is it a possibility that Anderson News would leave the magazine distribution business?"; Charles Anderson responded, "The last thing we want to do is exit this business.  But

we— why should we continue to lose money in a business that doesn't . . . give us any return?"
*Id.* ¶ 80.

Charles Anderson also made clear that Anderson News would not distribute magazines
for publishers who did not agree to the surcharge and inventory cost shift proposal.  *Id.* ¶ 79.
(Harrington: "And if [publishers] haven't signed [the] form [assenting to Anderson's terms] as of
February 1, you will refuse to distribute them?" C. Anderson: "Yes, that's correct.").

Once Anderson determined that publishers were not responding or submitting to the
February 1, 2009 deadline, Charles Anderson implemented his "going dark" strategy—forcing
ProLogix East to suspend operations, thus preventing ProLogix East from delivering magazines
for Anderson News *or* TNG.  *Id.* ¶¶ 63, 124.  Instead of trying to increase prices and shift
inventory costs, TNG retained its existing terms and prices.  TNG sought and obtained a TRO
forcing ProLogix East to reopen and permitting ProLogix to deliver TNG magazines.  When
Charles Anderson was unable to make good on his threat to stop deliveries for publishers who
refused the price increase, the "floodgates" opened.  *See id.* ¶ 135; ¶ 139 (C. Anderson testified
that he informed "key retailers" that "because of this temporary restraining order, we're going to
have to liquidate the company or sell what we can as quickly as we can").  That day, Charles
Anderson decided to permanently close Anderson News, even though he had not, at that time,
liquidated any assets or terminated any employees.  *Id.* ¶¶ 137-38.

Even assuming that Defendants had conspired to reject Anderson News' proposal, it
was Anderson News' own conduct and decisions that forced Anderson News out of business, not
Defendants.  Anderson News sought to counteract years of business losses by unilaterally raising
its prices; Anderson News made clear that it would not distribute magazines for publishers who
would not agree to the price increase; and Anderson News attempted to ensure that TNG could

not distribute magazines during Anderson News' "dark" phase.  *See Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006) ("[H]ere, the injury of which the plaintiffs complain appears to be largely the result of their own business decisions.").

When Charles Anderson realized that his "going dark" strategy failed, he chose to shut down Anderson News, rather than explore alternatives.  *See Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co. Inc.*, 510 F.2d 1140, 1142 (2d Cir. 1975) (where plaintiff had "voluntarily terminated" its business, there was "no causal connection between the alleged antitrust violations and th[e] business decision").  For example, Anderson News did not retract the price increase and seek to distribute magazines pursuant to pre-January 12, 2009 arrangements with publishers, nor did it seek court intervention to help enable it to remain in business.[23]  Instead, Anderson made the decision to exit the business.

Plaintiffs have therefore failed to raise a genuine issue of material fact regarding whether Defendants' conduct was "both a material and but-for cause" of Plaintiffs' injury.  *Publ'n Paper Antitrust Litig.*, 690 F.3d at 66.

## III.    State Law Claims

Plaintiffs assert claims for tortious interference and civil conspiracy, pursuant to New York state law.

### a.   Tortious Interference with Contract

The elements of tortious interference with contract "are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without

---

[23] In contrast, Anderson News' competitor Source filed—and was granted—a TRO requiring publishers to continue to supply it with magazines on pre-surcharge terms.  *See* Counterclaims, *infra*.

justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citation omitted).  Plaintiffs assert that, "even in the absence of a breach by [a] third party," a defendant tortiously interferes with contract where "the defendant prevent[s] the plaintiff from performing its contracts with third parties."  Opp. Mtn. (Time), at 24.  To the extent that Plaintiffs breached their contracts with retailers, the evidence indicates that it was Anderson's actions, not Defendants' actions, that caused Anderson to breach these contracts.  Defendants' motion for summary judgment on the tortious interference with contract claim is therefore GRANTED.

### b.  Civil Conspiracy

Summary judgment for Defendants is also GRANTED with respect to Plaintiffs' civil conspiracy claim.  New York "does not recognize an independent tort of conspiracy," *Kirch*, 449 F.3d at 401, and Plaintiffs have no provided evidence of "an otherwise actionable tort." *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).

## COUNTERCLAIMS

In February 2014, Defendants AMI, Hearst, and Time ("Counterclaim Plaintiffs") filed counterclaims against Anderson News and Charles Anderson ("Counterclaim Defendants").  The counterclaims alleged that Anderson News and its competitor Source had engaged in an illegal price-fixing conspiracy that caused Counterclaim Plaintiffs to lose profits and incur costs associated with making alternative distribution arrangements.

Anderson announced the Anderson price increase and inventory cost shift on January 12, 13, and 14, during meetings with publishers and the telephone conference with John Harrington of *The New Single Copy*.  Time ¶¶ 68, 71.  On January 19, 2009, Source sent a letter to publishers explaining that Source would also impose a seven-cent surcharge on each magazine it

distributed.  *Id.* ¶ 89.  Like Anderson News, Source set February 1, 2009 as the effective date for the surcharge.  Unlike Anderson News, however, Source did not seek to shift the costs of SBT inventory to publishers.  Counterclaim ¶ 25.

When publishers, including Defendants, rejected both the Anderson proposal and the Source price increase, Charles Anderson implemented his "going dark" strategy.  Counterclaim Opp. ¶ 71.  On February 7, 2009, Bo Castle, President of Anderson Services, informed Anderson News and NGDS that ProLogix East would "stop production and deliveries immediately," and that its employees would "be notified not to report to work on Monday, February 9, 2009."[24] Time ¶ 126.

In contrast, Source contacted publishers to inform them it did not want any interruption in the distribution of publishers' magazines to retailers.  *Id.* ¶¶ 98, 100.  During the first week of February, Source rescinded its surcharge, but some publishers and distributors still refused to supply it with magazines.  *Id.* ¶¶ 97, 101.  On February 9, 2009, Source filed a lawsuit in the Southern District of New York seeking a TRO requiring AMI, Bauer, Curtis, DSI, Hachette, Hudson News, Kable, Time, TWR, and TNG to continue supplying it with magazines.  *Id.* ¶ 102. This Court granted the TRO on February 12, 2009, and ordered the TRO Defendants to continue to supply magazines to Source "on the same terms and conditions under which the defendants respectively supplied such magazines to Source as of January 2009."  *Id.* ¶ 103.  Following entry of the TRO, the TRO Defendants reached settlements with Source, pursuant to which they continued to distribute magazines through Source.  *Id.* ¶ 104.

Counterclaim Plaintiffs assert that Anderson News and Source conspired to fix prices by agreeing to implement a seven-cent surcharge on each magazine they distributed, and by

---

[24] On February 9, the Delaware District Court granted a TRO forcing ProLogix East to reopen and resume distributing TNG's magazines.  Time ¶ 134.

convincing retailers not to accept magazines from publishers who did not pay the surcharge. Counterclaim Plaintiffs claim that they suffered lost profits from sales that they would have made, but for Anderson's "going dark" strategy, which prevented both Anderson News and TNG from delivering magazines to retailers.  In addition, Counterclaim Plaintiffs claim that Anderson News improperly withheld payment on due and past-due notices in order to negatively impact Counterclaim Plaintiffs' cash flows and encourage them to accept the Anderson price increase and inventory cost shift.  Finally, Counterclaim Plaintiffs argue that they incurred costs associated with making alternative arrangements to replace Anderson News and Source.

### I.   Legal Standard

To recover damages under Section 4 of the Clayton Act, a private plaintiff must demonstrate antitrust standing.  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75-76 (2d Cir. 2013).  To do so, a plaintiff must show that it suffered an injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes . . . defendants' acts unlawful."  *Id.* at 76 (citation omitted).  The injury suffered by the plaintiff therefore must "correspond[] to the rationale for finding a violation of the antitrust laws in the first place."  *Atl. Richfield Co.*, 495 U.S. at 342.

### II.   Analysis

Even assuming that Counterclaim Defendants conspired to fix prices, Counterclaim Plaintiffs have not suffered damages "of the type the antitrust laws were intended to prevent." *See Gatt Commc'ns, Inc.*, 711 F.3d at 76 (citation omitted).  Counterclaim Plaintiffs do not claim that they paid inflated prices for Anderson News or Source magazines.  Instead, they claim three types of damages: lost profits from sales that they would have made, but for Anderson's "going dark" strategy; improperly withheld payments on Anderson News' due and past-due notices; and

costs associated with making alternative arrangements to replace Anderson News and Source.

These injuries do not "flow[] from that which makes" Counterclaim Defendants' acts unlawful, because Counterclaim Plaintiffs would have suffered each of these injuries even in the absence of a conspiracy. *Id.* Counterclaim Plaintiffs have provided no evidence that their responses to the Anderson price increase and inventory cost shift or the Source price increase would have been different, had the alleged conspiracy not existed. Nor have they provided evidence that the implementation of Anderson's "going dark" strategy was dependent on the alleged conspiracy. Rather, the evidence indicates that, even if Anderson News and Source had independently and unilaterally imposed the seven-cent surcharges, Counterclaim Plaintiffs would still have rejected them. As a result, Anderson would have implemented its "going dark" strategy, and would have withheld payment for its due and past-due notices; and Counterclaim Plaintiffs would have sustained costs in finding alternative wholesalers to replace Anderson News and Source. Counterclaim Plaintiffs may indeed have suffered damages from Anderson News' and Source's conduct, but those damages were not due to Counterclaim Defendants' participation in the alleged conspiracy. Accordingly, the motion for summary judgment on the Counterclaims is GRANTED.

## CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are

GRANTED.  Counterclaim Defendants' motion for summary judgment on the counterclaims is

also GRANTED.


Dated: New York, New York          SO ORDERED
       August 20, 2015

                                   _____
                                   PAUL A. CROTTY
                                   United States District Judge